# Exhibit
# G

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION
- - - -

R. CATHY REARDON,                          )
On behalf of herself and          )
all similarly situated            )
individuals,                      )
                                  )
                  Plaintiffs,   )
                                  )
        -vs-        )  No. 2:08cv1730GLL.
                                  )
CLOSETMAID CORPORATION and    )
EMERSON ELECTRIC CO.,          )
                                  )
                  Defendants.   )

- - - -

DEPOSITION OF: CATHERINE B. BEAL
- - - -

DATE:   August 27, 2009
        Thursday, 9:00 a.m.

LOCATION:  OGLETREE DEAKINS NASH
           SMOAK & STEWART, P.C.
           Suite 400
           Four Gateway Center
           444 Liberty Avenue
           Pittsburgh, PA  15222

TAKEN BY:  Plaintiffs

REPORTED BY:  Nina Warren Biehler
              Notary Public
              Reference No. NB14437

Page 2

1    DEPOSITION OF CATHERINE B. BEAL,
     a witness, called by the Plaintiffs for examination,
2    in accordance with the Federal Rules of Civil
     Procedure, taken by and before Nina Warren Biehler, a
3    Court Reporter and Notary Public in and for the
     Commonwealth of Pennsylvania, at the offices of
4    Ogletree Deakins Nash Smoak & Steward, P.C., Suite
     400, Four Gateway Center, 444 Liberty Avenue,
5    Pittsburgh, Pennsylvania, on Thursday, August 27,
     2009, commencing at 9:09 a.m.
6
7            - - - -

8    APPEARANCES
9
     FOR THE PLAINTIFFS
10   James M. Pietz, Esq.
     PIETZ LAW OFFICE, LLC
11   Suite 700
     Mitchell Building
12   304 Ross Street
     Pittsburgh, PA  15219
13   P 412-288-4333
     F 412-288-4314
14   jpietz@pietzlaw.com
         and
15   Christopher Colt North
     THE CONSUMER & EMPLOYEE
16   RIGHTS LAW FIRM, P.C.
     751-A Thimble Shoals Blvd.
17   Newport News, VA  23606
18
     FOR THE DEFENDANTS
19   Maria Greco Danaher, Esq.
     Thomas A. Smock, Esq.
20   OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.
     Suite 400
21   Four Gateway Center
     444 Liberty Avenue
22   Pittsburgh, PA  15222
     P 412-394-3333
23   F 412-232-1799
     maria.danaher@ogletreedeakins.com
24   thomas.smock@ogletreedeakins.com
25

Page 3

1    APPEARANCES: (CONTINUED)
2    FOR THE DEFENDANTS: (CONTINUED)
         and
3    Jeffrey R. Carius
     EMERSON
4    Suite 220
     3300 Arapahoe Avenue
5    Boulder, CO  80303
     P 303-440-0297
6
7            * I N D E X *
8    Examination by Mr. Pietz - - - - - - - - - - - -   4
9    Certificate of Court Reporter - - - - - - - - - 133
     Errata Sheet - - - - - - - - - - - - - - - - - - 134
10   Notice of Non-Waiver of Signature - - - - - - -  135
11
12
13
14
15          * INDEX OF EXHIBITS *
16   Deposition Exhibit 1 - - - - - - - - - - - - -     9
     Deposition Exhibit 2 - - - - - - - - - - - - -    13
17   Deposition Exhibit 3 - - - - - - - - - - - - -    17
     Deposition Exhibit 4 - - - - - - - - - - - - -    20
18   Deposition Exhibit 5 - - - - - - - - - - - - -    24
     Deposition Exhibit 6 - - - - - - - - - - - - -    39
19   Deposition Exhibit 7 - - - - - - - - - - - - -    51
     Deposition Exhibit 8 - - - - - - - - - - - - -    84
20   Deposition Exhibit 9 - - - - - - - - - - - - -    96
     Deposition Exhibit 10 - - - - - - - - - - - -    113
21   Deposition Exhibit 11 - - - - - - - - - - - -    116
     Deposition Exhibit 12 - - - - - - - - - - - -    118
22   Deposition Exhibit 13 - - - - - - - - - - - -    118
     Deposition Exhibit 14 - - - - - - - - - - - -    118
23   Deposition Exhibit 15 - - - - - - - - - - - -    122
24
25

Page 4

1              CATHERINE B. BEAL,
2            having been duly sworn,
3        was examined and testified as follows:
4                  - - - -
5                EXAMINATION
6                  - - - -
7    BY MR. PIETZ:
8    Q.  Ma'am, my name is Jim Pietz, I'm one of the
9        plaintiffs' counsel in this case, Reardon
10       versus ClosetMaid.
11   A.  Um-hum.
12   Q.  I'm here with my co-counsel Chris North.
13       Could you state your full name for
14       the record?
15   A.  Catherine B. Beal.
16   Q.  And what's your current job title?
17   A.  Vice-president of human resources.
18   Q.  For whom?
19   A.  ClosetMaid.
20   Q.  Okay.  And do you work for Emerson Electric
21       Company?
22   A.  Yes.
23   Q.  In what connection?
24   A.  It's our parent company.
25   Q.  And when you say you work for them, what duties

Page 5

1    and responsibilities do you have to Emerson
2    Electric?
3  A. None, we are autonomous in nature; but it is
4    our parent company.
5  Q. Do you receive a paycheck from Emerson
6    Electric?
7  A. We receive a paycheck through the payroll
8    system, that is Oracle, and it is a ClosetMaid,
9    slash, Emerson paycheck.
10 Q. Okay. Then is that operated by Emerson?
11 A. Not exactly. Actually, ClosetMaid does all the
12    payroll locally in Ocala and then it is
13    submitted electronically to Emerson Business
14    Systems, which is the company that actually
15    handles the paychecks.
16 Q. Do you have an Emerson email address?
17 A. Yes.
18 Q. Okay. And why do you have an Emerson email
19    address?
20 A. A year or two, a couple of years ago, for a
21    branding purpose, Emerson changed all of our
22    e-mails to Emerson.com.
23 Q. And do you have a business card?
24 A. Yes.
25 Q. And what does that business card indicate that

Page 6

1    your employer is or who you work for?
2  A. ClosetMaid.
3  Q. Okay.
4  A. And then Emerson is on all of our documents.
5       MR. NORTH: Excuse me, one second,
6    I'm sorry.
7       When she keeps referring to Emerson,
8    are we talking about Emerson Electric? I think
9    that we need to make that clear, as opposed to
10    Storage Solutions or some other Emerson that
11    might be out there. I don't mind you -- we
12    don't mind you referring to Emerson, as long as
13    we understand it's Emerson Electric, the parent
14    company.
15       MS. DANAHER: So let's wait for Jim
16    to ask you the question.
17 BY MR. PIETZ:
18 Q. Do you understand that when I use the term
19    Emerson I'm referring to Emerson Electric,
20    okay? If -- when you answer a question and
21    you're referring to something else please let
22    me know, because we understand there's other
23    terminology here, for example, Emerson Storage
24    Solutions, that we've seen.
25 A. That is correct, it's Emerson Electric.

Page 7

1       MS. DANAHER: And if I could just add
2    for the record, I understand that there are a
3    lot of lawyers in the room, but if we could
4    focus on one lawyer to question one witness,
5    and if we have interruptions we can just do
6    them as asides off the record and then have the
7    questions come from one --
8       MR. NORTH: I wasn't asking her a
9    question, I was just trying --
10      MS. DANAHER: I understand.
11      MR. NORTH: -- to be helpful. I
12    heard her say Emerson three times and, you
13    know, I'm not sure the record would reflect
14    what she's referring to.
15      MS. DANAHER: And I appreciate that,
16    but I'm just putting on the record I'd prefer
17    to have the questions come from Jim.
18      Thank you.
19 BY MR. PIETZ:
20 Q. Are you familiar with the allegations that have
21    been made in this lawsuit?
22 A. Can you clarify, please? Which allegations?
23 Q. Well, the -- have you seen the complaint in
24    this case?
25 A. Yes.

Page 8

1  Q. Okay. And what's your understanding of the
2    claims that have been made in there?
3  A. On Cathy Reardon?
4  Q. Just what's your understanding of, in a
5    nutshell, of what the claims being made in the
6    case are?
7  A. That Cathy Reardon was not hired based on her
8    background.
9  Q. Do you have an understanding as to the -- is
10    there any claim made about the procedures being
11    used by ClosetMaid?
12 A. There's a question about the procedures that's
13    being used.
14 Q. And what's your understanding of those claims?
15 A. That we used inappropriate form or something of
16    that nature.
17 Q. You understand that today you're testifying
18    here as a corporate representative for
19    ClosetMaid; is that right?
20 A. Yes.
21 Q. And you understand that since you are
22    testifying as the corporate representative
23    you're not -- you're not testifying in your
24    individual capacity, but any testimony you give
25    will bind ClosetMaid; do you understand that?

Page 9

1  A.  Yes.
2  Q.  Have you had occasion to give a deposition
3     before?
4  A.  Yes.
5  Q.  Okay.  In what connection was that?
6  A.  A criminal case.  And workers' comp cases.
7  Q.  Okay.  So you have some understanding of some
8     of the general rules here, you know, when I ask
9     a question if you don't understand what I'm
10     asking, please let me know and I'll be happy to
11     rephrase it.
12  A.  Okay.
13  Q.  Also, you understand that the court reporter
14     here is taking down my question and your
15     answer, so let me finish my question before you
16     start your answer, you understand that?
17  A.  Okay.
18         MR. PIETZ:  Okay, let's mark this as
19     Exhibit No. 1, which is the notice.
20         - - - -
21     (Exhibit No. 1 marked for identification.)
22         - - - -
23  BY MR. PIETZ:
24  Q.  Showing you what we've marked as Exhibit No. 1,
25     you recognize -- do you recognize this

Page 10

1     document?
2  A.  Yes.
3  Q.  Have you had occasion to review it prior to
4     your deposition here today?
5  A.  Yes.
6  Q.  And do you see it lists a number of topics
7     here?
8  A.  Yes.
9  Q.  Are you papered today to testify with respect
10     to each of these subjects?
11  A.  To the best of my ability, yes.
12  Q.  Did you do anything in preparation for coming
13     here today to testify on these topics?
14  A.  Some, yes.
15  Q.  What did you -- can you just tell me generally
16     what you did?
17  A.  We reviewed some documents that were submitted
18     to you.
19  Q.  Okay.  And those are documents that were
20     submitted that we requested as part of the
21     discovery in this case?
22  A.  That is correct, they were submitted to our
23     attorney.
24  Q.  Can you tell me what the nature of the business
25     is at ClosetMaid?

Page 11

1  A.  We make storage products, closets, shelving,
2     pantry shelving, some wood products, shower
3     caddies, miscellaneous storage.
4  Q.  And where is ClosetMaid located?
5  A.  ClosetMaid's headquarters?
6  Q.  Yes.
7  A.  Ocala, Florida.
8  Q.  And are there other areas where they do
9     business or have offices?
10  A.  They do have offices in Grantsville, Maryland.
11  Q.  Okay.
12  A.  Chino, California.  We have distribution
13     centers in Tacoma, Washington and Belle Vernon,
14     Pennsylvania.
15  Q.  Anywhere else?
16  A.  That's all, as far as the U.S. is concerned.
17  Q.  How many employees does ClosetMaid have?
18  A.  A little over a thousand, I don't have the
19     exact number.
20  Q.  And that's in all these locations you just
21     described?
22  A.  Yes.
23  Q.  Okay.  And what type of employees, generally?
24  A.  More general labor, some professional, a few
25     sales.

Page 12

1  Q.  Any other types of employees?
2  A.  Warehouse workers.
3  Q.  Now, with respect to these employees, can you
4     explain to me how the human resources function
5     operates with respect to -- with respect to
6     them?
7  A.  Can you be more specific?  I mean, that's
8     pretty broad.
9  Q.  Okay.  Is there a human resources department
10     that handles the employment of these employees?
11  A.  Yes.
12  Q.  And what, generally, do they do, that
13     department?
14  A.  The employment?
15  Q.  Right.
16  A.  They receive requisitions, employment
17     requisitions, which is an internal document
18     approving the hire of that position.  Once they
19     have the approval of hiring the position they
20     sit down with the hiring manager and determine
21     what they're looking for in a particular
22     position.
23         Then we develop a recruiting plan on
24     how we're going to recruit, is it going to be
25     internal, is it going to be external.  And then

Page 13

1   we determine, you know, what needs to be done
2   at that point in time.  Then we accept the
3   resumes, applications, it depends, you know, of
4   the position.
5       MR. PIETZ:  Okay.  Well, we'll get to
6   that in a second.  Let's get back to the issue
7   of -- some charts were produced in connection
8   with this litigation, let's take a look at
9   those.
10          - - - -
11  (Exhibit No. 2 marked for identification.)
12          - - - -
13      MR. PIETZ:  This would be Exhibit 2.
14  BY MR. PIETZ:
15  Q.  Okay, looking at Exhibit 2, there's a series of
16      documents here, but can you generally describe
17      what these are?
18  A.  They're internal ClosetMaid organizational
19      charts.
20  Q.  Okay.  Okay, let's look at the first -- the
21      first one on top, President's Office
22      Organizational Chart.  What is this?
23  A.  This is the direct reports to the president of
24      ClosetMaid.
25  Q.  Okay.  And the president here is Robert J.

Page 14

1   Clements, he's the president of ClosetMaid?
2   A.  Of ClosetMaid.
3   Q.  Okay, is he an officer of Emerson, as well, to
4       your knowledge?
5   A.  No.  To my knowledge, no, he's just the
6       president of ClosetMaid.
7   Q.  Okay.  Who does he report to?
8   A.  He reports to Russ Kerstetter.
9   Q.  Who's Russ Kerstetter?
10  A.  He is a business unit leader.
11  Q.  For whom?
12  A.  He works for Emerson.
13  Q.  And that's his title, business unit leader?
14  A.  I don't know.
15  Q.  Is there someone named Patrick Sly that
16      oversees ClosetMaid?
17  A.  He is the group leader.  Again, I don't know
18      his specific title, senior executive, that Russ
19      reports to Pat Sly.
20  Q.  Okay.  And what -- do you know what Mr. Sly
21      oversees as part of his job?  He works for
22      Emerson, right?
23  A.  He works for Emerson.
24  Q.  What does he do for Emerson, to your knowledge?
25  A.  He is a group leader over some subsidiaries, I

Page 15

1   don't know specifically.
2   Q.  Does he have responsibilities for this entity
3       known as Emerson Storage Solutions?
4   A.  I'm not positive.
5   Q.  What is Emerson Storage Solutions?
6   A.  It's a branding.
7   Q.  What does that mean, branding?
8   A.  Just like Emerson is a name, ClosetMaid is a
9       name, it was a group of our division that
10      actually was going to be known as Emerson
11      Storage Solutions.
12  Q.  The way you're answering it sounds like it's
13      the past tense.
14  A.  There was a lawsuit where we had to dismantle
15      using that term, because there's another
16      company out there that used something, and the
17      agreement was we no longer use Emerson Storage
18      Solutions.
19  Q.  I see.  And Emerson Storage Solutions, though,
20      it connoted a group of companies underneath or
21      subsidiaries of Emerson Electric; is that
22      right?
23  A.  I'm not really familiar with who it included,
24      but I know that ClosetMaid was using Emerson
25      Storage Solutions for a short period of time.

Page 16

1   Q.  Actually using that name, instead of
2       ClosetMaid?
3   A.  No, we never dismantled ClosetMaid.
4       ClosetMaid's the brand.
5   Q.  Okay.
6   A.  But in trying to describe more about what we
7       do, I believe marketing, I'm not positive, came
8       up with Emerson Storage Solutions --
9   Q.  I see.
10  A.  -- but it did not fly.
11  Q.  How long have you been with ClosetMaid?
12  A.  Thirteen years.
13  Q.  So tell me about how you -- what was your first
14      position at ClosetMaid?
15  A.  An HR manager.
16  Q.  HR manager.  And then when was that that you
17      began, what year?
18  A.  September of '96.
19  Q.  And at that time was ClosetMaid part of Emerson
20      Electric or a subsidiary?
21  A.  Yes.
22  Q.  When was, to your knowledge, ClosetMaid
23      acquired by Emerson Electric?
24  A.  I don't remember the specific dates.  We were
25      part of a joint venture at one point with

Page 17

1    Vermont American when I first started, that was
2    owned by ClosetMaid -- or owned by Emerson.
3  Q.  All right, well, tell me, then, more about your
4    positions within ClosetMaid.
5  A.  I was the HR manager. At a later date, and I
6    don't remember exactly when, I was promoted to
7    director of human resources. And, eventually,
8    vice-president of human resources.
9         MR. PIETZ: Let's mark this as
10   Exhibit 3.
11         - - - -
12   (Exhibit No. 3 marked for identification.)
13         - - - -
14         MR. PIETZ: I show you what we marked
15   as Exhibit 3.
16         MR. SMOCK: Could we go off the
17   record for a minute, Jim?
18         - - - -
19   (There was a discussion off the record.)
20         - - - -
21  BY MR. PIETZ:
22  Q.  I'm showing you what we've marked as Exhibit 3,
23    and this is a -- just to let you know,
24    something we found on the Internet from a
25    website called Jigsaw.com. Are you familiar

Page 18

1    with that website?
2  A.  No.
3  Q.  Have you seen this before?
4  A.  No.
5  Q.  Do you see that it lists your name there?
6  A.  Yes.
7  Q.  And it lists you as vice-president of human
8    resources?
9  A.  Yes.
10 Q.  For -- and your business card indicates Emerson
11   Electric Company on that website.
12 A.  Okay.
13 Q.  Is that your email address?
14 A.  Yes.
15 Q.  And that's Emerson -- that address there, what
16   is that address that's listed?
17 A.  That's where my office is.
18 Q.  And that phone number there, is that your phone
19   number?
20 A.  Yes. That is the main telephone number.
21 Q.  For whom?
22 A.  ClosetMaid.
23 Q.  352 that's an area code --
24 A.  Yes.
25 Q.  -- for Ocala?

Page 19

1         Okay, let's look at the next page
2    here, which is Bates stamped No. 238. This
3    indicates it's the Human Resources
4    Organizational Chart. Can you tell me what
5    this document is?
6  A.  It was -- as of May '09 this was the human
7    resources department.
8  Q.  For?
9  A.  ClosetMaid.
10 Q.  And you're the head of the human resources
11   department of ClosetMaid?
12 A.  That is correct.
13 Q.  How long have you been here?
14 A.  I think -- I don't know exactly, I think 2001.
15 Q.  Now, it lists another person here, Pat Dameron,
16   and it lists her as Director of Human Resources
17   Corporate. What is her duties and
18   responsibilities?
19 A.  She reports directly to me.
20 Q.  Okay.
21 A.  And assists me in working with these other
22   facilities that ClosetMaid is responsible for.
23 Q.  And those are the facilities around the country
24   that you described in the United States?
25 A.  Yes.

Page 20

1  Q.  And there's a Jennifer Boring listed as human
2    resources manager for Ocala.
3  A.  That's correct.
4  Q.  And what's her responsibility?
5  A.  She is responsible for Ocala, slash, CMNA.
6  Q.  What's CMNA?
7  A.  ClosetMaid North America.
8  Q.  Now, do all these -- the persons we just
9    identified, do they also have Emerson email
10   addresses?
11 A.  Yes.
12        MR. PIETZ: Let's mark this as
13   Exhibit 4.
14        - - - -
15   (Exhibit No. 4 marked for identification.)
16        - - - -
17 BY MR. PIETZ:
18 Q.  Exhibit 4, just to let you know, is something,
19   again, we downloaded from a website,
20   Monster.com. It appears to be a listing for a
21   human resources manager.
22        Are you familiar with that
23   advertisement?
24 A.  I know we recruited for that position. It is
25   not my job to post an ad.

5  (Pages 17 to 20)

Page 21

1  Q.  Okay.  Would that have been Pat Dameron's
2      responsibility?
3  A.  Yes.
4  Q.  And that is Pat Dameron's email address that is
5      listed there?
6  A.  That is correct.
7  Q.  And that's an Emerson email address; is that
8      correct?
9  A.  That is correct.
10 Q.  And the next chart at 239, Bates No. 239,
11     again, that's another organizational chart,
12     apparently for -- it says, Ocala/CMNA?
13 A.  That's correct.
14 Q.  Can you tell me what that is?
15 A.  That is the same chart that we discussed
16     earlier, Jennifer Boring is the human resource
17     manager for ClosetMaid Ocala and ClosetMaid
18     North America.
19 Q.  Okay.  In connection with the documents that
20     were put together and produced in this
21     litigation, did Jennifer Boring have some
22     responsibility?
23 A.  Yes.
24 Q.  And what was that?
25 A.  She put most of the documents together.

Page 22

1  Q.  Did there come a point in time in that process
2      where you learned that additional documents had
3      to be produced?  Or supplemental documents had
4      to be produced?
5  A.  During the transition or the time period Maria
6      would occasionally --
7          MS. DANAHER:  Hold on just a second.
8      I would prefer that you don't mention anything
9      that we specifically talked about.  But if you
10     can answer this question by giving him general
11     information, which was the yes or no question,
12     then you can do that.
13         THE WITNESS:  Yes.
14 BY MR. PIETZ:
15 Q.  Okay, I'm not asking for anything, you know,
16     your attorney told you, I just want to know
17     what did you understand has happened with
18     respect to this production of documents.  Why
19     was there a need to produce more documents, to
20     your understanding?
21 A.  You had requested them.
22 Q.  Okay.  Did Jennifer Boring, when she was doing
23     -- producing the documents here, did she only
24     produce documents that were limited to the
25     Ocala location and --

Page 23

1  A.  That is all that she is responsible for.
2  Q.  I see.  And so when that initial production was
3      made it was limited only to Ocala?
4  A.  Yes.  And ClosetMaid North America.
5  Q.  What's the difference between -- or what's
6      ClosetMaid North America?
7  A.  ClosetMaid North America is our sales positions
8      throughout the country.
9  Q.  Okay.
10 A.  And the drivers.
11 Q.  I see.  But it doesn't include those other
12     locations that you had described earlier,
13     Chino, Grantsville --
14 A.  No.
15 Q.  -- Belle Vernon?
16 A.  No.
17 Q.  Okay, let's go now to 240.  And can you tell me
18     what that document is?
19 A.  It's an organizational chart for Chino,
20     California.
21 Q.  And then 241?
22 A.  It is an organizational chart for our Canada
23     facility, which is no longer in existence.
24 Q.  Okay.  And then, finally, 242, that would be
25     the chart for Grantsville --

Page 24

1  A.  That's correct.
2  Q.  -- Maryland.  Okay.
3          MR. PIETZ:  Let's mark this as
4      Exhibit 5.
5              - - - -
6      (Exhibit No. 5 marked for identification.)
7              - - - -
8  BY MR. PIETZ:
9  Q.  I'm showing you what we've marked as Exhibit 5,
10     and I'll represent to you that these are some
11     screen shots that we printed from the Emerson
12     website, Emerson.com.
13         Are you familiar with the Emerson
14     website?
15 A.  I know it's in existence.
16 Q.  Have you had occasion to go on it and review
17     it?
18 A.  I don't go on it.
19 Q.  You don't go on it at all?
20 A.  No.
21 Q.  Okay.  Okay, do you see that first page on
22     Exhibit 5?  In there it uses the term, Emerson
23     Storage Solutions.  Is that what your
24     understanding -- does this describe -- and I'm
25     sorry, strike that question.

Page 25

1    Does this explain what Emerson
2 Storage Solutions was?
3    MS. DANAHER: I'm going to object
4 just to the extent that she said that she
5 doesn't go on this website, and because this is
6 multiple pages I'm concerned that she may be
7 answering a question that she's not fully
8 informed about. So to that extent I object.
9    You can answer if you can.
10 BY MR. PIETZ:
11 Q.  I'm just asking about the first page. Looking
12    at the first page, does this describe what was
13    your understanding of what Emerson Storage
14    Solutions is?
15    MS. DANAHER: Let me just add one
16 more objection. Because we've already defined
17 Emerson as Emerson Electric, and I understand
18 what you're doing here, but I'm just concerned
19 that we're stretching beyond the scope of this
20 30(B)(6). She's here with respect to
21 ClosetMaid and ClosetMaid's relationship to
22 Emerson Electric, as Mr. North has pointed out,
23 and so I'm concerned that we're stretching
24 beyond the scope of the 30(B)(6). I'm not
25 telling her not to answer, but I am putting an

Page 26

1 objection on the record, because I think it
2 goes a little afield of what we're here to do.
3    MR. PIETZ: Well, this does mention
4 ClosetMaid.
5    MS. DANAHER: I'm fine, Jim, I didn't
6 tell her not to answer. I just want to make
7 sure that my objection is on the record.
8    THE WITNESS: I'm not familiar with
9 all the detail.
10 BY MR. PIETZ:
11 Q.  Okay, going on to the second page. And this is
12    a document that appears to list the executive
13    leadership for Emerson.
14    Are you familiar with these persons
15    and their role at Emerson?
16 A.  Some of them.
17 Q.  And this lists Patrick Sly. Second to the last
18    person there.
19 A.  That is correct.
20 Q.  And he's listed as the executive
21    vice-president, Emerson Storage Solutions &
22    Professional Tools.
23 A.  Okay.
24 Q.  Is that -- we talked about him earlier. Is
25    that, to your understanding, what his title is?

Page 27

1    MS. DANAHER: Asked and answered,
2 objection.
3    MR. PIETZ: I thought she had
4 answered that she wasn't sure what his title
5 was?
6    MS. DANAHER: That's right, she said
7 she didn't know, and I'm --
8 BY MR. PIETZ:
9 Q.  Well, does this refresh your recollection as to
10    what his title is?
11 A.  I can't guarantee it. As I stated earlier, I
12    thought it was executive vice-president, so
13    that's similar.
14 Q.  Okay, let's go back to what you started talking
15    about earlier.
16    Can you -- in your role as the head
17    of human resources, you're familiar with the
18    policies and procedures for interviewing and
19    recruiting clients?
20 A.  Yes.
21 Q.  Okay. Can you just tell me, generally, how
22    that process works with respect to ClosetMaid?
23 A.  As far as recruiting?
24 Q.  Recruiting and interviewing, finding and
25    recruiting employees. Just generally, I'm not

Page 28

1 asking for --
2 A.  For all the details?
3 Q.  Right.
4 A.  We receive a requisition that it's approved to
5    hire. And then we meet with the hiring
6    manager. We determine what they're looking
7    for, versus the job description. And then once
8    that has been decided we develop a recruiting
9    plan as to if we're going to run an ad, if it's
10    internal, and we post it accordingly.
11 Q.  Okay. And then the next step is what, in that
12    process, once it's posted and you have a
13    potential recruit?
14 A.  They would interview the individuals, usually
15    by phone, initially, if they are external. If
16    not, if it's internal, we would interview them
17    locally, determine if they are what we call
18    good standing, which means they have a good
19    record, in general. If it's internal at that
20    point, if they are eligible, the hiring manager
21    may interview the individual. We -- if they
22    are selected for the job we give them an offer
23    letter.
24 Q.  Okay, you've used the term external and
25    internal, what does that mean?

Page 29

1  A.  Internal would be someone that may be promoted
2      or transferred into this job that's already
3      working within ClosetMaid.
4  Q.  Okay. Would that -- what about with respect to
5      Emerson Electric or any of its subsidiaries?
6  A.  No.
7  Q.  Is that considered internal?
8  A.  No.
9  Q.  And external is someone?
10 A.  That does not work for ClosetMaid.
11 Q.  And you used the phrase, determine that they
12     are in good standing?
13 A.  That's an internal terminology.
14 Q.  And what does that mean?
15 A.  Basically they don't have a lot of write-ups,
16     disciplinaries.
17 Q.  So that term applies to a person from inside
18     ClosetMaid --
19 A.  That is correct.
20 Q.  Okay, based upon their employment file?
21 A.  Correct.
22 Q.  Okay. Now, is there a point in this process
23     where, as a matter of practice and procedure,
24     that ClosetMaid seeks to obtain a consumer
25     report or background check on an employee or a

Page 30

1      prospective employee?
2  A.  Yes.
3  Q.  Okay. Can you tell me what that process is or
4      how that works?
5  A.  Once the individual has been interviewed on the
6      phone or locally and they're determined to be a
7      potential candidate, they're qualified,
8      first-line basis, they're qualified for the
9      position, then at that point in time we would
10     give them documents to perform a background
11     check.
12 Q.  Okay. And with respect to the documents, what
13     are you -- what documents are you referring to?
14 A.  The release for the background.
15 Q.  And what else?
16 A.  The FCRA information.
17 Q.  Okay. And are these form documents?
18 A.  Yes.
19 Q.  Okay. And when did you first become aware that
20     these form documents were used for purposes of
21     consumer reports and FCRA?
22 A.  Early -- I don't remember. I mean, several
23     years ago.
24 Q.  Well, you started in '97 in human resources.
25     Did you have -- become aware of them at that

Page 31

1      point, when you began working?
2  A.  I believe it was after that.
3  Q.  Okay.
4  A.  2000, 2001, I don't know. And maybe 2000.
5      Yeah, I don't know. I can't remember
6      specifically.
7  Q.  Okay. Do you remember the occasion you had to
8      become aware of that?
9  A.  I don't remember.
10 Q.  Well, as head of the human resources at
11     ClosetMaid do you have any duties and
12     responsibilities with respect to these forms?
13 A.  Yes.
14 Q.  And what's that?
15 A.  I mean, we have to abide by the law and we go
16     to seminars. We use services.
17 Q.  When you say, services, what do you mean?
18 A.  Bureau of Labor Reporting, BLR; Aer Employer
19     associations. Various things that keep us
20     abreast of what's going on in laws and
21     regulations.
22 Q.  And whose responsibility is it to do that, with
23     respect to these forms?
24 A.  Basically, me.
25 Q.  And in that connection did you do anything in

Page 32

1      your tenure at ClosetMaid to go back and
2      examine the forms to determine whether or not
3      they were in compliance with the law?
4  A.  Yes.
5  Q.  And tell me what you did.
6  A.  We researched various forms on the websites,
7      the legal websites.
8  Q.  The forms that you -- that were -- that were
9      used, that you described, these documents, can
10     you tell me where they came from?
11 A.  No, it was too long ago.
12 Q.  Were you involved in their creation?
13 A.  I worked with my management to create them,
14     yes.
15 Q.  And who did you work with to create them?
16 A.  I don't remember.
17 Q.  When was that?
18 A.  Again, I don't remember the time frame. So
19     whoever the HR manager was at the time.
20 Q.  Was that someone that you reported to or --
21 A.  No, they reported to me.
22 Q.  Okay. To your knowledge, the documents that
23     we're referring to, how long have they been in
24     use at ClosetMaid?
25 A.  The specific, I'm not sure. For several years.

8 (Pages 29 to 32)

Page 33

1  Q.  And the documents that you're referring to, are
2      they standard documents that are used in all
3      the areas of the company that you described,
4      you know, Grantsville, Chino, Belle Vernon, et
5      cetera?
6          MS. DANAHER:  I'm just going to
7      object because the question is awfully broad in
8      terms of time frame.  She's been there for a
9      number of years.
10         But if you can answer that, go ahead.
11         THE WITNESS:  In general, yes.
12  BY MR. PIETZ:
13  Q.  Have they changed over time with respect to
14      form?
15  A.  There are certain forms in California that are
16      different than Ocala.
17  Q.  Okay.
18  A.  They may have changed a little over time, I
19      cannot confirm.  We are constantly looking at
20      updating various documents.
21  Q.  With respect to the forms, did you -- did you
22      obtain legal advice with respect to the
23      legality of these forms?
24  A.  I don't recall at the time.
25  Q.  Is there in-house counsel at ClosetMaid?

Page 34

1  A.  No.
2  Q.  Who handles the -- that function of whether or
3      not forms that are being used by ClosetMaid
4      comply with the law?
5  A.  Basically, me.
6  Q.  Okay.  Is there an in-house counsel function
7      that would govern ClosetMaid?
8  A.  No.
9  Q.  Does -- is there an in-house counsel function
10     at Emerson that oversees ClosetMaid?
11  A.  Oversees?
12  Q.  Yes.
13  A.  No.
14  Q.  Do you -- is there an outside counsel that you
15      have access to --
16  A.  No.
17  Q.  -- to determine?
18         So with respect to the forms that are
19      being used, who has -- what is the approval
20      process for use of those forms?  Can you
21      describe that for me?
22  A.  As I stated earlier, we research through
23      various avenues to determine what forms we need
24      to use.  We go to government websites, we go to
25      legal websites and I confer with the HR manager

Page 35

1      and we come up with a form.
2  Q.  Have you ever submitted those forms to anyone
3      at Emerson for their review?
4  A.  I don't remember.
5  Q.  Did you contact anyone at Emerson for
6      consultation with respect to the appropriate
7      type of form?
8  A.  I can't remember specifically.
9  Q.  Did you contact anyone at Emerson or any of its
10     other subsidiaries about the forms that they
11     use?
12  A.  I don't deal with the other subsidiaries.
13  Q.  My question was, did you ever contact them in
14     that regard?
15  A.  I don't know.  I don't contact the other
16     subsidiaries.
17  Q.  But my question is specifically with respect to
18     these forms.
19  A.  No.
20  Q.  So you were never curious as to what these
21     other companies do?
22  A.  No.
23  Q.  In connection with this notice of deposition,
24     did you go and examine the forms that they use,
25     with respect to this deposition?

Page 36

1  A.  Who is, they?
2  Q.  These other -- Emerson and their other
3      subsidiaries.
4  A.  No.  I have no responsibility to them, nor do
5      they have responsibility to me.
6  Q.  Do you have -- can you look at our Exhibit 1?
7      Can you look at No. 8 on Exhibit 1?
8  A.  Okay.
9  Q.  In preparing for your deposition today what did
10     you do in connection with No. 8?
11  A.  Nothing.
12  Q.  You did nothing?
13  A.  I did nothing.  They are not -- as I stated
14     earlier, we do not -- I don't contact other
15     subsidiaries.  I am responsible for ClosetMaid.
16  Q.  But this asks that you know and do that.
17         MS. DANAHER:  I object, because I
18     think that's an interpretation.  It just says
19     -- she's testifying with respect to her
20     knowledge as to the extent to which the
21     applications for employment used by ClosetMaid
22     are used by other subsidiaries.  She's coming
23     with her own knowledge and she's letting you
24     know that.
25         And, Jim, I'm sorry, if you don't

9  (Pages 33 to 36)

Page 37

1    like the answer, I'm sorry, but we can't put
2    knowledge into her head.
3        MR. PIETZ: Well, it's her duty to
4    determine what ClosetMaid's knowledge is, not
5    her own. And to that extent this is asking for
6    ClosetMaid's knowledge.
7        MS. DANAHER: Exactly right. And she
8    has ClosetMaid's knowledge and she just told
9    you, as VP of HR, if she doesn't coordinate and
10   make sure that they all use the same form,
11   that's just a fact.
12   BY MR. PIETZ:
13   Q. And now looking at No. 17. That says a --
14       asking you for the policies, practices and
15       procedures that are required or recommended by
16       Emerson for ClosetMaid to follow to obtain
17       written consent from prospective or current
18       employees to obtain a consumer report and to
19       send pre-adverse action notices.
20           What did you do in connection with
21       preparing to answer this area of inquiry?
22   A. Like I said, I am responsible for ClosetMaid.
23       Emerson does not give us absolutes as to what
24       we have to do or don't have to do. Emerson's
25       direction to us is to follow the law, to which

Page 38

1    we have done.
2    Q. Have you ever had occasion to contact anyone at
3        -- in-house counsel for Emerson, about any
4        matter?
5    A. Yes.
6    Q. And what was that in connection with?
7        MS. DANAHER: And, again, the same
8    objection, you don't need to go into detail,
9    but you can answer his question generally.
10       THE WITNESS: I use them for guidance
11   or advice. I can't --
12   BY MR. PIETZ:
13   Q. On an ongoing basis?
14   A. Off and on.
15   Q. And you do that because there's no in-house
16       counsel function at ClosetMaid?
17   A. That is correct.
18   Q. Now, the policies and practices used for --
19       that we're talking about for obtaining consumer
20       reports about prospective or current employees,
21       is that the same for any type of employee, you
22       know, whether they're professional or truck
23       driver, hourly, salaried, is it the same?
24   A. No.
25   Q. And what -- how is it different?

Page 39

1    A. We -- as an example, we do not request specific
2        information on credit for anyone that it
3        doesn't apply. If they're not going to have
4        company credit cards or be in a significant
5        managerial role we don't get into their credit.
6    Q. Okay.
7    A. So it depends on the job.
8    Q. Any other differences?
9    A. Truck drivers, there's more specific
10       information we have to get.
11   Q. But is it fair to say that on all types of
12       prospective employees there's some form of
13       consumer report that's typically ordered?
14   A. Yes.
15   Q. And what about with respect to a current
16       employee, is that different in any way?
17   A. We do not do another report if they're already
18       current, they've already been hired.
19   Q. And that -- you just rely on their employee
20       file.
21   A. That is correct.
22           - - - -
23       (Exhibit No. 6 marked for identification.)
24           - - - -
25   BY MR. PIETZ:

Page 40

1    Q. Showing you what we've marked as Exhibit 6, can
2        you identify this document?
3    A. This is a standard operating procedure that we
4        used in 2006.
5    Q. For what?
6    A. For recruiting.
7    Q. And in only 2006?
8    A. It may have been tweaked since then. I know
9        that it was created as dated, in 2006, this
10       particular document.
11   Q. Okay, so this is dated, am I correct, April
12       25th, 2006?
13   A. That is correct.
14   Q. And it supersedes a prior procedure that was
15       dated May of 2004?
16   A. That is correct.
17   Q. And is this -- this indicates it's for salaried
18       recruiting procedure. What does that mean?
19   A. That means that it would be salaried positions.
20       It would not be a warehouse worker.
21   Q. Okay, so this only applies to salaried?
22   A. That's correct.
23   Q. It doesn't apply to hourly?
24   A. That's correct.
25   Q. Is there a procedure that applies to hourly?

10 (Pages 37 to 40)

Page 41

1  A.  I'm not positive if it's documented like this.
2      I can't answer that.
3  Q.  Are consumer reports or background checks done
4      with respect to hourly employees?
5  A.  Not credit.
6  Q.  But otherwise?
7  A.  Yes.
8  Q.  And the forms that you were talking about
9      earlier, are those same forms used for --
10 A.  Yes.
11 Q.  -- those employees?  Okay.
12         All right, let's look at this.  Now,
13     in Section 3.0 there's some definitions there.
14     Can you help me with the TBNT, do you see that?
15 A.  Yes.
16 Q.  Can you explain what that is?
17 A.  It's a letter to the applicant that basically
18     states, thank you for applying, but no thank
19     you, you're not selected for the position;
20     thanks but no thanks.  This is just an internal
21     document, SOP, that we use for recruiting.
22 Q.  But is that a document that's sent --
23 A.  Yes.
24 Q.  -- to a potential recruit?
25 A.  That is correct.

Page 42

1  Q.  Informing them that the company is not
2      interested.
3  A.  That is correct.
4  Q.  Okay.  And there's a -- it says, JobLine, can
5      you tell me what that is?
6  A.  That was an internal job line where you could
7      call and find out about the positions that we
8      had available.
9  Q.  Okay.  And that's for internal?
10 A.  For ClosetMaid, in general.
11 Q.  But that applies to employees of ClosetMaid?
12 A.  That is correct.
13 Q.  And, Intranet, what is that?
14 A.  That is where we post jobs on ClosetMaid's
15     website.
16 Q.  Well, the term, Intranet, what does that mean?
17 A.  That's internal, intra.  It's the ClosetMaid
18     website.
19 Q.  And is that just to ClosetMaid or does that
20     include Emerson --
21 A.  No.
22 Q.  -- and its subsidiaries?
23 A.  It's strictly ClosetMaid.
24 Q.  Okay, let's go over to 5.3.  This is entitled,
25     Creating a Position Folder/File.  Can you

Page 43

1      explain what this is referring to?
2  A.  Again, these are processes that I set up for my
3      recruiters.
4  Q.  Okay.
5  A.  And they're just to create a file with a
6      potential job.
7  Q.  Okay.
8  A.  That's exactly what it is, it's a folder.
9  Q.  And that would include all the information
10     related to the recruiting of that -- for that
11     position?
12 A.  That is correct.
13 Q.  All applicants and other information gained
14     with respect to those applicants?
15         MS. DANAHER:  Object to form.  I
16     think it doesn't accurately reflect what she
17     just answered.  It misstates her testimony.
18     But go ahead.
19         And I'll tell you specifically, I
20     think she said, position, and then you said,
21     applicants.  So I'm concerned that you've
22     broadened out the definition.
23         But Cathy can handle that.
24 BY MR. PIETZ:
25 Q.  Do you understand the question?

Page 44

1  A.  Can you be more clear?
2  Q.  Can you repeat the question?
3          - - - -
4      (The record was read back by the Reporter.)
5          - - - -
6         THE WITNESS:  It is a folder that
7      includes resumes and applications for the
8      position.
9  BY MR. PIETZ:
10 Q.  Okay.  And it would include the
11     thanks-but-no-thanks letter, as well?
12 A.  I don't know.
13 Q.  Okay.  Well, it says here, However, they are
14     required to maintain a thanks but no thanks
15     file of resumes in the front filing area for
16     each position.
17         Why is that done?
18 A.  Once they have been eliminated from being a
19     potential candidate --
20 Q.  Yeah.
21 A.  -- then we send them a thanks-but-no-thanks
22     letter and we file it away for record
23     retention.
24 Q.  Okay.  Going back to this -- talking about this
25     document in general, you indicated it was

11 (Pages 41 to 44)

Page 45

1    created in 2006?
2  A.  Apparently it was updated in 2006.
3  Q.  Okay. Can you tell me what you -- and in 2006,
4    were you head of human resources?
5  A.  Yes.
6  Q.  Okay. Can you tell me what you -- the steps
7    you went through to update this document?
8  A.  As I stated before, I work very closely with my
9    HR managers and we have very specific processes
10   in place in trying to continue to abide by the
11   law, just like we do.
12       And so at the time Mary Price was my
13   manager and we documented the steps that we go
14   through in recruiting. And once she -- since
15   she was closer to it, once she created this
16   document on the steps then she would work with
17   me, submit it to me, we would review it and
18   then we would train the recruiters at the time.
19 Q.  And you said her name was Mary Brice?
20 A.  Price.
21 Q.  Price, okay. Is she still with the company?
22 A.  No.
23 Q.  Do you know where she is now?
24 A.  Yes.
25 Q.  And where is that?

Page 46

1  A.  Ocala Recycling.
2  Q.  So she was generally responsible for coming up
3    with this subject with your review and approval
4    and whatever revisions you had; is that fair to
5    say?
6  A.  Yes.
7  Q.  Once you reached -- once you had what you
8    believed was final who did you submit it to to
9    get approval?
10 A.  This process?
11 Q.  This document.
12 A.  No one. No one.
13 Q.  You didn't submit it to any legal department?
14 A.  No.
15 Q.  Any outside lawyer?
16 A.  No.
17 Q.  No one at Emerson?
18 A.  No.
19 Q.  What did Mary Price do to come up with some of
20   the forms that were being used in connection
21   with this procedure for consumer -- for
22   obtaining consumer reports?
23 A.  I would only be guessing, so I don't think
24   that's a fair answer.
25 Q.  Did you contact her at all in connection with

Page 47

1    preparation for today's deposition?
2  A.  No.
3  Q.  Going on to Section 5.2. I note that there's,
4    in 5.2, what it refers to as some attachments,
5    5.2.2, 5.2.3, but they're not attached to this
6    document. Is there a reason for that?
7  A.  5.2.1 are job descriptions, and that would be
8    for every job that we have.
9  Q.  I guess what I'm asking is, in italics it says,
10   See Attachment 5.2.2, but they're not attached.
11 A.  Okay.
12 Q.  Was that -- is there a reason for that?
13 A.  Well, as I indicated, when we sit down with the
14   hiring manager I may have a piece of paper that
15   actually says, this is what I'm looking for for
16   this position.
17 Q.  Um-hum.
18 A.  So that is a recruitment plan. They then have
19   to determine where I need to post the job.
20 Q.  I understand?
21 A.  Such as Monster.com.
22 Q.  I see. Okay. I'm just trying to understand
23   why --
24 A.  Because they're individual documents.
25 Q.  It's an individual document.

Page 48

1  A.  It's an individual document or recruitment
2    plan.
3  Q.  Okay. And then going on to Page 166, Bates No.
4    166, it says here, All advertisements must
5    include: Closetmaid, comma, A Division of
6    Emerson.
7       Now, why did you make that
8    requirement as part of this procedure?
9  A.  We are a division of Emerson. We are a
10   subsidiary of Emerson.
11 Q.  Did you have any direction that you were
12   required to put that in, from Emerson?
13 A.  The marketing department, the brand department,
14   and I don't remember when specifically, but
15   determined that Emerson would be on all
16   documents.
17 Q.  And that is the marketing department for whom?
18 A.  Our marketing department working with Emerson's
19   marketing department.
20 Q.  And do you know the reason for that?
21 A.  Branding.
22 Q.  I don't understand what that means, branding.
23   Why -- what is that -- I don't work in
24   advertising, maybe you could help me.
25 A.  Brand recognition.

12 (Pages 45 to 48)

1  Q.  Okay.
2  A.  So that's what they're trying to do is to
3      develop the name of Emerson.
4          MR. PIETZ: Yes.
5          Okay, let's take a quick break here.
6          - - - -
7      (There was a recess in the proceedings.)
8          - - - -
9  BY MR. PIETZ:
10 Q.  Let's just take a step back here. I was asking
11     you -- we were talking about the internal
12     employees. Now, I'm not sure if it's clear,
13     are there periodic consumer reports done on
14     internal employees?
15 A.  I don't think so. I don't know.
16 Q.  Okay.
17 A.  I don't think. It's not our standard process.
18 Q.  But then if an employee, an internal employee,
19     is applying for a different job is a check then
20     done at that point, or no?
21 A.  No.
22 Q.  Okay. And I just want to go back and make
23     clear, too, when -- as I understand your
24     testimony, consumer reports and background
25     checks are run on all prospective employees,

1      you know, once they reach a certain -- once
2      they're deemed qualified is a check run on
3      everyone?
4  A.  Not everyone. You know, once they have been
5      selected to hire.
6  Q.  Um-hum.
7  A.  Yes. Then at that point we do run backgrounds,
8      call references.
9  Q.  Okay. And that's salaried, hourly, it doesn't
10     matter?
11 A.  That's correct.
12 Q.  Okay. I just wanted to be clear on that.
13         Okay, then, let's go to the -- on the
14     -- I think this is Section 5.6 of this
15     procedure. I think you talked in general about
16     what happens when it's deemed a candidate is
17     determined to be qualified and then at that
18     point you begin to run a check.
19         Okay, now, does 5.6, does that set
20     out the procedure that's to be followed in that
21     situation?
22 A.  That's correct.
23 Q.  So the first step in that process, then, is to
24     get an application; is that right?
25 A.  That is correct.

1  Q.  And once they're determined qualified you have
2      them fill out an application?
3  A.  There are -- yes. If we received a resume and
4      did not receive an application then at some
5      point in time we have to have an application
6      completed.
7  Q.  Okay. And that's -- in connection with
8      creating this did you come up with an
9      application form?
10 A.  We have applications, yes.
11 Q.  Okay. And that's -- is that what's attached as
12     -- referred to as 5.6.3?
13 A.  This is one version of the applications we
14     used, yes.
15         MR. PIETZ: All right, let's mark
16     this as No. 7.
17         - - - -
18     (Exhibit No. 7 marked for identification.)
19         - - - -
20     (There was a discussion off the record.)
21         - - - -
22 BY MR. PIETZ:
23 Q.  Okay, you said the attachment 5.6.3 is one of
24     the application forms you use. What -- now,
25     what about Exhibit 1, what is Exhibit 1?

1  A.  That is the application we're using.
2  Q.  That's the application you're currently using?
3  A.  Yes.
4  Q.  And how long have you been using this
5      application?
6  A.  A couple of years.
7  Q.  Do you know when you started using that
8      application?
9  A.  In '07.
10         MS. DANAHER: Excuse me just one
11     moment.
12         - - - -
13     (There was a discussion off the record between
14         counsel and the witness.)
15         - - - -
16 BY MR. PIETZ:
17 Q.  And so this exhibit, which is Exhibit 7, has
18     been used since some time in '07?
19 A.  That is correct.
20 Q.  And does this Exhibit 7, though, also contain
21     some other forms apart from just the
22     application; isn't that right?
23 A.  On 440, that is a separate document that is
24     given at a later time to employees that we are
25     going to run a background on.

Page 53

1  Q.  Okay.  And when you say, a later time, how --
2  A.  Not at the time of completing the application.
3  Q.  At what point is this done?
4  A.  After we have reviewed and determined that we
5      are interested.
6  Q.  Okay.  And did you create this form?
7  A.  No.
8  Q.  Who created this form?
9  A.  I don't know.  Mary Price was involved in
10     researching.  I don't know where it came from.
11 Q.  And do you know who she consulted with?
12 A.  I don't know.
13 Q.  Do you have some form of manual, FCRA manual,
14     that's used as a reference?
15 A.  Manual?  No.
16 Q.  Did she consult with legal counsel in creating
17     this?
18 A.  I'm going to say no.  I don't know.
19 Q.  Did she consult with anyone from a consumer
20     reporting agency?
21 A.  I don't know.
22 Q.  Did you, you know, in approving this form, did
23     you talk to any legal counsel?
24 A.  Not that I'm aware of, no.
25 Q.  Did you consult with anyone with a legal

Page 54

1      background?
2  A.  I don't know.
3  Q.  Did you consult any manuals on the FCRA?
4  A.  Me personally?
5  Q.  Yes.
6  A.  No.
7  Q.  Okay, what did you do to make sure that this
8      form was compliant with the FCRA?
9  A.  The responsibility of the individual that
10     helped in this process, researched it, created
11     it, that was her responsibility.
12 Q.  And that was Mary Price?
13 A.  I assume, I do not know.
14 Q.  Okay, going back to 5.6 on this policies form,
15     do you see where it says, Consumer
16     Notification, See Attachment 5.6.4?  Can you
17     tell me what that is?
18 A.  It's the document that was created to inform
19     the applicant of the Fair Credit Reporting Act.
20 Q.  Okay.  And get their consent to pull up a
21     report?
22 A.  Yes.
23 Q.  Okay.  And who created this document?
24 A.  I don't know.
25 Q.  Did Mary Price create this?

Page 55

1  A.  I don't know.
2  Q.  When was the first time you saw this document?
3  A.  I've seen it off and on for a couple or a few
4      years.
5  Q.  Is this document being currently used?
6  A.  Currently?
7  Q.  Yes.
8  A.  Not as of today.
9  Q.  It's not being used today?
10 A.  Not today.
11 Q.  When was it -- when did it stop being used?
12 A.  I don't know.
13 Q.  What document is now being used to obtain
14     consent?
15 A.  The 5.6.5, Page 179.
16 Q.  And when was this document -- when did you
17     begin using this document?
18 A.  I don't know.
19 Q.  Who created this document?
20 A.  I don't know.
21 Q.  Do you have -- do you recall when this started
22     being used, this 5.6.5?
23 A.  I don't, but I do want to clarify that this is
24     a different form from the current application
25     that we're using.

Page 56

1  Q.  Okay.
2  A.  This is an old document and, in looking at it,
3      it has changed a little.
4  Q.  And why was it changed?
5  A.  We are constantly condensing and improving
6      forms.
7  Q.  And that's with regard to 5.6.4, right?
8  A.  I'm sorry, I didn't understand your question.
9  Q.  The -- I'm sorry -- your answer to the last
10     question was with respect to which document?
11 A.  My last question was -- or the last answer was
12     in response to the Authorization to Obtain a
13     Consumer Credit Report and Release of
14     Information for Employment Purposes.
15 Q.  Okay.
16 A.  The one that we are now using --
17 Q.  Um-hum.
18 A.  -- is stated, Combined Disclosure Notice and
19     Authorization to Obtain a Consumer Credit
20     Report.
21 Q.  Okay.  And this 5.6.5 --
22 A.  Yes.
23 Q.  -- how long has that been used?
24         MR. NORTH:  The old one or the new
25     one?

14  (Pages 53 to 56)

Page 57

BY MR. PIETZ:
1   Q.   The one that's attached, how long was that one
2        used? The one that's attached --
3   A.   I understand.
4   Q.   -- as 5.6.5.
5   A.   A few years.
6   Q.   Okay. That would have been a few years from
7        the date of this policy manual?
8   A.   That is -- at the time that this document was
9        created that was the form we were using.
10  Q.   Okay. And the document that you referred to
11       here, on Exhibit 7, Page 440, when did that
12       begin to be used?
13  A.   I believe this year.
14  Q.   This year. When this year?
15  A.   I can't tell you the exact date.
16  Q.   And was that done as a result of this lawsuit?
17  A.   It was an updated form that we reviewed, yes.
18  Q.   So you reviewed the allegations in this lawsuit
19       and then based upon that you made the change to
20       this document?
21  A.   That is correct.
22  Q.   And what did you determine was wrong with the
23       form that you had previously been using?
24  A.   I'm not saying it was wrong.

Page 58

1   Q.   Then why did you make the change?
2   A.   Because of the lawsuit.
3   Q.   Okay. And what -- what did you -- what
4        specifically about the form was it that made
5        you change it?
6   A.   Well, you're questioning the paragraph of
7        releasing ClosetMaid.
8   Q.   And that was changed?
9   A.   And that was taken out of this document.
10  Q.   Anything else?
11  A.   There's a couple of differences.
12  Q.   And what else?
13  A.   In the first paragraph.
14  Q.   Okay, we're looking at the new authorization
15       form you said was created this year.
16  A.   Yes. That's correct.
17  Q.   Okay, the first paragraph was changed?
18  A.   There is an additional paragraph.
19  Q.   And what paragraph is that? Which additional
20       one?
21  A.   It's on Exhibit I.
22  Q.   Okay, Page 440?
23  A.   That's correct.
24  Q.   Okay, and what paragraph is new?
25  A.   The new one?

Page 59

1   Q.   Yes.
2   A.   I understand that, as a condition of my
3        employment with ClosetMaid, or as a condition
4        of my continued employment.
5   Q.   Now, in connection with the changes made this
6        year, were other documents changed? In
7        connection with this process that we're talking
8        about.
9   A.   I think the application is the same.
10  Q.   And what about -- looking at Exhibit 6, Page
11       178, the Fair Credit Reporting Act
12       Authorization Form, is that form currently
13       being used?
14  A.   No.
15  Q.   When was that discontinued?
16  A.   I can't remember.
17  Q.   Why was that discontinued?
18  A.   Just simplification.
19  Q.   Well, did -- did the document on the next page
20       supersede that?
21  A.   No.
22  Q.   Okay. So when this manual was originally set
23       up both forms were in use?
24  A.   That's correct.
25  Q.   Okay. That's both forms, 178 and 179?

Page 60

1   A.   That is correct.
2   Q.   Okay, then, let's go back to this Pre-Screen
3        Processing at 5.6 of Exhibit 6. Okay, it
4        references something called a CPP; do you see
5        that?
6   A.   Yes.
7   Q.   Can you explain to me what that is?
8   A.   We don't use it any longer.
9   Q.   What was that form?
10  A.   It was a Wonderlic.
11  Q.   A Wonderlic is some kind of test?
12  A.   It's a company personality profile.
13  Q.   And going down, it mentions a pre-employment
14       information form. What was -- can you tell me
15       what that was?
16  A.   This is a self identification form for
17       affirmative action and EEO purposes.
18  Q.   Okay. So then going on with this document, the
19       next step in the process is 5.7, Reference
20       Processing/Start Candidate Hiring Process. Can
21       you tell me what that process is, generally?
22  A.   Can you repeat the question?
23  Q.   I'm just asking, in general, can you just give
24       me a general description of this process in
25       5.7? I mean, just backing up, this is once the

15 (Pages 57 to 60)

Page 61

1       forms that we've described have been --
2   A.  Submitted.
3   Q.  -- submitted, that this is the next step in the
4       process; is that right?
5   A.  Yes.
6   Q.  Okay, can you describe that process to me?
7   A.  At that point in time we start referring,
8       making phone calls, getting references,
9       confirming that they're still a candidate.
10  Q.  Okay. Once you get through that process and
11      you determine they're qualified you want to go
12      to the next step.
13  A.  Okay.
14  Q.  Tell me what that next step is.
15  A.  At that point we then use a third-party
16      background company, whether it be LexisNexis or
17      Accurate Background company to obtain
18      information.
19  Q.  Okay, did you already at that -- would you
20      already have had existing agreements --
21  A.  Yes.
22  Q.  -- with those companies?
23          Okay, now, tell me how --
24              - - - -
25      (There was an interruption in the proceedings.)

Page 62

1               - - - -
2           THE WITNESS: Can you repeat the
3       question, please?
4               - - - -
5       (The record was read back by the Reporter.)
6               - - - -
7           THE WITNESS: Yes.
8   BY MR. PIETZ:
9   Q.  Okay, now, just generally, tell me how that
10      process worked, getting the reports from these
11      various companies.
12  A.  It was different for Accurate Background and
13      LexisNexis.
14  Q.  Okay, tell me who the companies were.
15  A.  Accurate Background.
16  Q.  Okay.
17  A.  And LexisNexis.
18  Q.  Okay. There were just two?
19  A.  There were two at the time.
20  Q.  Did that later change?
21  A.  Recently we've changed to American Background.
22  Q.  Okay. Is that in addition to the other two?
23  A.  Our primary will be American Background.
24  Q.  Okay, tell me the procedure, how it worked.
25  A.  LexisNexis was a computer database that we

Page 63

1       would go on and input data. And I don't know
2       exactly what it is, because I don't do it.
3   Q.  Um-hum.
4   A.  Once we have the approval from the applicant or
5       candidate that we proceed, and then we receive
6       information on their background.
7   Q.  Okay. And what happens to that information
8       once it's received?
9   A.  It is kept internally in the human resources
10      department, it is not shared with anyone. We
11      review it. The candidate -- the recruiter
12      reviews the document and determines if there
13      are any issues.
14  Q.  And what does that mean, any issues?
15  A.  For example, if we were hiring a salesperson
16      and we were going to give them a company credit
17      card, their credit must be good enough to get a
18      credit card. So that is a bona fide reason as
19      to why that specific job required credit cards.
20  Q.  Um-hum. Okay, what other things were looked
21      for?
22  A.  If it was a truck driver, we may look at their
23      driving record.
24  Q.  Okay, let's back up. Okay, so there were
25      things you looked for which would disqualify a

Page 64

1       potential employee; is that right?
2   A.  That's correct.
3   Q.  So tell me, how did -- were the standards --
4       what standard was created for determining what
5       was disqualifying information?
6   A.  Criminal would be violent of nature, because of
7       violence in the workplace.
8           Credit, again, as I stated, you know,
9       if they have a lot of charge-offs, of that
10      nature, and they would not be considered --
11      American Express wouldn't accept their -- you
12      know, then they may be disqualified.
13  Q.  Okay. What else?
14  A.  We also do a Social Security verification.
15  Q.  Okay. And what's the purpose of that?
16  A.  To confirm that what they've told us is
17      accurate.
18  Q.  Okay. The standards that you're describing,
19      are they anywhere written down?
20  A.  In detail, no.
21  Q.  In general?
22  A.  I don't know. I don't think so.
23  Q.  Well, who would -- who would make this
24      determination?
25  A.  We've done internal training with the

16 (Pages 61 to 64)

Page 65

1    representatives, the HR reps, and they know
2    specifically what is, in general code,
3    acceptable and not. If they ran into a
4    situation that is questionable in their eyes at
5    that point they would take it to the HR
6    manager.
7  Q.  Okay. Are there written training materials
8    with respect to this subject?
9  A.  I am not positive if the training documents
10    give specifics. I don't know.
11       MR. PIETZ: I think that's some
12    documents we'd request if they are available.
13  BY MR. PIETZ:
14  Q.  Now, who would make the determination that a
15    candidate was disqualified based on a consumer
16    report?
17  A.  Probably the HR manager.
18  Q.  And when you say, the HR manager, that is --
19    who is that in this process?
20  A.  It's been different people at different times.
21  Q.  Okay. What's their job responsibilities?
22  A.  The HR manager?
23  Q.  Yeah.
24  A.  To manage recruiting, hiring, employee relation
25    issues.

Page 66

1  Q.  Okay.
2  A.  Wage increases.
3  Q.  And at what point would they make this
4    determination that the candidate was
5    disqualified?
6  A.  Towards the end of the recruiting process.
7  Q.  And what -- can you explain that?
8       Well, let's back up a second.
9       So the report comes back from the
10    credit reporting agency and there's information
11    on there that fits within the criteria you've
12    described. When is the determination that this
13    candidate disqualified based upon that
14    information, when is that made?
15  A.  As I stated, at the end of the recruiting
16    process. Once we've gotten to this point it's
17    pretty far down the process of getting ready to
18    potentially hire someone.
19  Q.  Okay. So once you get the report are we at the
20    end of the process?
21  A.  There's other things that take place, like drug
22    testing. You know, we don't do that till
23    after.
24  Q.  Okay, let's -- once the information comes back
25    from the credit reporting agency and it fits

Page 67

1    within the criteria for disqualification is
2    that the end of the process?
3  A.  As I just indicated to you, no. Once we have
4    determined that this is a candidate for hire
5    that we are interested in, at that point in
6    time we get ready to hire them, then there's
7    processes, like drug testing, that is after the
8    fact.
9  Q.  But I'm asking if you get the report back,
10    okay, and it has information that's
11    disqualifying --
12  A.  Okay.
13  Q.  -- is that the end of the process, is nothing
14    more done?
15  A.  Of course not. At that point we notify them
16    with a letter that indicates that there's been
17    potential questions of what came back in the
18    background and we send them the report.
19  Q.  Okay.
20  A.  And once that is done then the process is that
21    at least five days, but it's usually longer, at
22    that point we would send them a final letter
23    that determines whether or not we're going to
24    move forward.
25  Q.  I'm sorry, okay, so let's back up. What do you

Page 68

1    mean, at least five days, what are you
2    referring to?
3  A.  We send them a letter --
4  Q.  Okay.
5  A.  -- telling them that something came up in their
6    background --
7  Q.  Okay.
8  A.  -- that we are questioning.
9       We wait five days, or more, in most
10    cases it's more, and then at that point we send
11    them a second letter of notification.
12  Q.  Okay.
13  A.  And the letter would state that we have decided
14    that we may not proceed in the hiring process.
15  Q.  Okay. The so-called five-day letter, where did
16    you get the five days? Where is that from?
17  A.  I don't remember exactly, but I believe that
18    there's something in the statute or seminars
19    that we've gone to that you should wait at
20    least five days.
21  Q.  Five days from when?
22  A.  Technically, from the time that we notify them.
23  Q.  From -- well, what does that mean, the day --
24    when is the date that you notify them?
25  A.  We send them a letter.

17 (Pages 65 to 68)

Page 69

1   Q.   Okay, is it the date of the letter?
2   A.   The date of the letter.
3   Q.   So you wait five days from the date of the
4        letter --
5   A.   At least five days.
6   Q.   Okay.  And to your understanding, what's the
7        purpose of that, of having five days?
8   A.   It gives them time to understand what has been
9        given to them.
10  Q.   Okay.  And where did you -- you said you got
11       this from seminars and whatnot?
12  A.   I don't remember where it came from, I'll be
13       honest with you.  But I know that it's not
14       something that just was pulled out of the air.
15  Q.   Okay.  And those were seminars dealing with the
16       FCRA?
17  A.   Like I said, I don't know if it was a seminar,
18       I don't know where it came from.
19  Q.   Okay.  Do you remember being in a seminar and
20       they explained why there was five days?
21  A.   No.
22  Q.   Okay.  To your understanding, is it the purpose
23       of having that time period is to give the
24       potential employee a chance to address the
25       information with the company?

Page 70

1   A.   That is the understanding.
2   Q.   Okay.  So explain to me how the five-day rule
3        that you came up with, how does that give the
4        employee an opportunity to address that
5        information with the company?
6   A.   They were given notification and during the
7        period of time, once they received the letter,
8        then at that point in time they usually would
9        call or talk to the recruiter and respond
10       accordingly.
11  Q.   Okay.  But did you put in the letter that you
12       would wait five days from the date of the
13       letter?
14  A.   I don't recall what it says.
15  Q.   Let's look at -- what we're talking about,
16       isn't that -- if you go back to Page 168, at
17       the bottom.  Is that the letter you're talking
18       about, the attachment?  It is referring to an
19       Attachment 5.7.3.
20  A.   No, that is the second letter.
21  Q.   Okay, let's -- okay, well, let's look at this
22       paragraph on 168.  It says, If the
23       disqualification of the candidate is the result
24       of information received from a third party,
25       i.e., Accurate Background Check, the Human

Page 71

1        Resources Representative must personally send a
2        TBNT in accordance with the FCRA Act, see
3        Attachment 5.7.3.
4              Okay?  Is that the letter you were
5        talking about?
6   A.   This is the initial letter that is given.
7   Q.   And that's -- that's the letter on page Bates
8        No. 183?
9   A.   It's 184.
10             Page 183 is the final letter that is
11       given to the candidate, that is correct.
12  Q.   Okay.  So the first letter that's given is the
13       letter at 184; is that right?
14  A.   I'm sorry?
15  Q.   At Bates No. 184 is the letter that's initially
16       given?
17  A.   That is correct.
18  Q.   Okay.  And is that the TBNT in accordance with
19       the FCRA, as referred to at 168?
20  A.   No.  Page 183 is the TBNT.
21             MS. DANAHER:  Excuse me just for a
22       second.
23             MR. PIETZ:  I'm a little concerned
24       that you're talking with the deponent here, I
25       don't understand --

Page 72

1              MS. DANAHER:  But I can talk to her
2        because there's no question pending.  Then if
3        you want to ask her a question afterwards
4        that's fine, too.  But I certainly have the
5        right to talk to her between questions.
6              MR. PIETZ:  I disagree.  I mean, I
7        think that's inappropriate.
8              MS. DANAHER:  Then I will say it out
9        loud.
10             I just want to make sure that you
11       read through 183 and 184 before you answer any
12       more questions, because the questions have been
13       confusing enough that I'm afraid that now
14       you're confused.  Okay?
15  BY MR. PIETZ:
16  Q.   Okay, I'm trying to understand the paragraph
17       168.  It's simply referring to Attachment
18       5.7.3, okay?  As I understand what you're
19       saying, the TBNT letter is 183, Bates No. 183?
20  A.   Let me read them, please.
21  Q.   Okay.
22             - - - -
23       (The witness reviewed the Exhibits.)
24             - - - -
25             MS. DANAHER:  I think one of the

18  (Pages 69 to 72)

1     confusions is that one is marked -- typed in
2     5.7.3 and on Page 184 it has 5.7.3 up on the
3     top. And I apologize for that, I don't know if
4     that's the confusion.
5         MR. PIETZ: I was going to ask about
6     that.
7         MS. DANAHER: Okay. So when you
8     refer to 5.7.3 there's actually two documents
9     with that number and I think that's what's
10    confusing.
11        MR. PIETZ: Well, I think we've
12    established that.
13        THE WITNESS: That's correct.
14        MS. DANAHER: Right.
15          - - - -
16    (The record was read back by the Reporter.)
17          - - - -
18    BY MR. PIETZ:
19    Q.  Do you understand my question?
20    A.  You want to know if this is the
21    thanks-but-no-thanks letter.
22    Q.  Right.
23    A.  The final letter.
24    Q.  That's 183.
25        Okay, look, back at -- on Page 168

1     there's a reference to a TBNT in accordance
2     with the FCRA. I'm simply asking which --
3     there's two letters attached at 5.7.3. Which
4     one -- what are we referring to here back on
5     Page 168?
6    A.  This on Page 183 --
7    Q.  Yes.
8    A.  -- is referring to the paragraph on 168.
9    Q.  Okay, then, going over to 184, what -- this
10    also says 5.7.3; isn't that correct? Do you
11    know whose handwriting that is?
12    A.  I don't.
13    Q.  Okay. And this is the letter that you were
14    describing earlier that was used with respect
15    to giving -- sending out the initial copy of
16    the consumer report; is that right?
17    A.  That is correct.
18    Q.  And this says, the company will wait five days
19    from the date of this letter before it makes a
20    decision on your application. Okay.
21        Why -- in coming up with this form --
22    this is a form letter, right?
23    A.  Yes.
24    Q.  And this was used as -- how long has this been
25    in use?

1    A.  I don't know. It's dated 2003, so at least
2    that time.
3    Q.  Okay. Is it still being used today?
4    A.  This one or something similar.
5    Q.  Okay. Now, in coming up with this letter, what
6    did you determine as the basis for why using
7    five business days from the date of the letter
8    was sufficient time for allowing the
9    prospective employee an opportunity to address
10    what's in the report?
11    A.  As I stated earlier, it came from something.
12    I'm not going to sit here and tell you where,
13    because I don't know.
14    Q.  Right.
15    A.  But it was my understanding it was part of the
16    statute or it came from a legal seminar we
17    attended or something off the Web, I can't tell
18    you where it came from. But the five days was
19    determined at that point in time.
20    Q.  Well, just from a practical point of view, did
21    you consider that five days from the date of
22    the letter was sufficient amount of time for
23    an employee to get a copy in the mail and to
24    address any issues with the company?
25    A.  We tried to abide by the law completely. We

1     followed rules and if at some point in time we
2     were given that five days, whether it be in the
3     statute or whether it be in a seminar, was the
4     number of days, then that's where it was
5     determined.
6    Q.  I understand that. But did you indicate that
7    the purpose of having five days was to give the
8    prospective employee a sufficient amount of
9    time to address information in the report?
10    Isn't that your understanding?
11    A.  That's the purpose.
12    Q.  So can you tell me why you believed that five
13    -- using five days from the date of the letter
14    was sufficient, from a practical point of view,
15    to give a sufficient amount of time for the
16    candidate to address issues in the report?
17    A.  You're questioning something where a decision
18    that was made in the past. And at the
19    particular time, like I said, we didn't come up
20    with five days just anywhere, whether it's
21    practical or not, you can try to put words in
22    my mouth and say that it's not practical, but
23    at the time, everything that we knew was the
24    standard was five days.
25    Q.  Okay. The letters, how did you -- how would

Page 77

1     they have been sent, what form of mail?
2  A.  Probably regular mail.
3  Q.  Regular mail.  And what's your understanding is
4     the amount of time -- well, let's back up.  Did
5     you consider the amount of time a mailing that
6     went by regular mail would take to get to the
7     prospective candidate?
8  A.  No.
9  Q.  You didn't consider that?
10  A.  No.
11  Q.  Did you ever consider using certified mail?
12  A.  We do.
13  Q.  You do?
14  A.  I don't know if we did or we do, but there's
15     times when we use certified mail, yes.
16  Q.  Okay, what's the practice that's typically used
17     for sending this so-called five-day letter?
18  A.  I don't know.
19  Q.  Did you -- did the company, in using this
20     letter, receive complaints that people didn't
21     have a sufficient amount of time to address
22     information in the consumer report?
23  A.  No.
24  Q.  What was the -- tell me about the procedures
25     that are in place for allowing prospective

Page 78

1     employees to address information in the report,
2     once they get this letter.
3  A.  They'll contact -- usually they'll contact the
4     recruiter.  We also gave them information that
5     they can contact the third party to -- if there
6     is a question of validity of the report.
7  Q.  Okay, but I'm asking, what did the company do
8     with respect to giving the person an
9     opportunity to dispute this information
10     directly with ClosetMaid?
11  A.  As I indicated, they have -- at this point in
12     time they have had multiple communications with
13     the HR rep, the person that's doing the
14     recruiting --
15  Q.  No, no, my question is, right at the point of
16     the five-day mailing, okay, when a person gets
17     the mailing and wants -- and comes back to the
18     company, what was the procedure in place for
19     addressing a prospective employee's dispute
20     about that information?
21  A.  Depending on the situation.
22  Q.  I'm asking, was there a procedure in place to
23     handle that situation?
24     MS. DANAHER:  Do you mean from the
25     company's perspective?  I think she's looking

Page 79

1     at it from the company's perspective.
2  BY MR. PIETZ:
3  Q.  No, I'm asking from ClosetMaid.  What
4     procedures did they create in order to allow a
5     prospective employee to address a dispute
6     directly to the company?
7  A.  As I indicated, at that point in time they're
8     in conversation with the recruiter.
9  Q.  Okay.
10  A.  And if the recruiter -- if there's something
11     that comes up that's disputed and it's
12     pertinent, such as a credit report, you know,
13     there have been times that they question their
14     credit report, then we give them an opportunity
15     to clear their credit report.  And so at that
16     point there's the conversation with the
17     recruiter.
18  Q.  Okay.  And I guess -- so what you're saying,
19     and then my question was, what procedures were
20     established in order to address that situation?
21     Are you saying there were no procedures, it was
22     just an informal give-and-take between the
23     recruiter and the applicant?
24  A.  There's nothing in writing.
25  Q.  All right.  Was there any training that was

Page 80

1     provided to train HR personnel on how to handle
2     a dispute directly from a prospective employee?
3  A.  They work with the HR manager.
4  Q.  And what do you mean by that?
5  A.  I mean that the HR manager works with them,
6     on-the-job training, if you will, on how you
7     handle different situations.
8  Q.  Were there events that occurred where a person
9     -- prospective employee identified -- or
10     brought a dispute to the company saying some
11     information was wrong and that the company then
12     overlooked that information?
13  A.  That's a broad question.  I don't deal with
14     this on a day-to-day basis, so I can't answer
15     that.
16  Q.  Well, what I'm asking is, are you aware of that
17     situation occurring?
18  A.  I'm not aware of it.
19  Q.  Were there guidelines ever provided to HR
20     personnel as to when they could overlook
21     so-called disqualifying information?
22  A.  Written guidelines, no.
23  Q.  Were there any guidelines with respect to --
24     or, for example, if there was information about
25     a crime on a consumer report, was there a

Page 81

1   distinction between whether or not it was a
2   charge of a crime or a conviction?
3   A.   Yeah.
4   Q.   And what was that?
5   A.   I mean, you know, they have to be convicted of
6       the crime. And if there was a question, like I
7       stated, the recruiter works with the applicant
8       -- I mean, there's been examples where someone
9       has come back and gave us more information
10      where they were not charged with this crime.
11      And we've ended up hiring them.
12  Q.   Okay, now, let's go, then, to, I guess, the
13      next step in the process. We have just been
14      talking -- we talked about the five-day letter.
15      What would be the next step in the process
16      after the mailing of the five-day letter and
17      thereafter?
18  A.   The next step, if we heard nothing, they would
19      probably be sent the second letter that we've
20      determined that we are not going to hire you.
21  Q.   Okay. And is there an example of that letter
22      here?
23  A.   The 5.7.3 on 183 is an example of a similar
24      letter or letter that was sent to someone for
25      the fact that we have now decided that we're

Page 82

1       not going to hire you.
2   Q.   And is that -- that form being used today, to
3       your knowledge?
4   A.   There's different versions of this letter.
5       This is not an absolute.
6   Q.   Okay, we're at Exhibit 8.
7           I'm not sure -- let me back up and
8       ask you one question on the -- going back to
9       Exhibit 6, the five-day letter that we were
10      talking about, has that -- I'm not sure if I
11      asked this, is that letter still being used
12      today?
13  A.   Are you specifically asking about this specific
14      letter?
15  Q.   I'm saying, yes, the language, The company will
16      wait five business days from the date of this
17      letter before it makes a decision, is that --
18      is that language being used today?
19  A.   This is not -- this is an example of a letter,
20      it's not the exact letter that's being used
21      today. So I'm going to say, no, this letter,
22      as it's written, is probably not the letter
23      that we're using, but, you know, as I stated
24      before, you keep going back to this five days,
25      that is our procedure, but in more cases than

Page 83

1       not it's a lot more than five days.
2   Q.   Well, my question is, is this letter still
3       being used today?
4   A.   Something very similar, yes.
5   Q.   Are you, to this date, still telling employees
6       that they have five days from the date of this
7       letter to --
8   A.   I don't know.
9           MS. DANAHER: I'd object to form
10      only, because that's not what the letter says.
11          MR. NORTH: It's five business days.
12  BY MR. PIETZ:
13  Q.   Let me make it clear. Are you still using this
14      language today?
15  A.   I don't know.
16  Q.   And let me say the language, The company will
17      wait five business days from the date of this
18      letter before it makes a decision.
19  A.   I don't know.
20  Q.   Well, who would know the answer to that
21      question?
22  A.   The HR managers.
23  Q.   But as a result of this lawsuit you haven't
24      made the change to that language?
25  A.   (Witness shook head.)

Page 84

1   Q.   I'm sorry, you have to answer verbally.
2   A.   No.
3   Q.   The court reporter can't pick up a nod.
4   A.   I understand.
5           MR. PIETZ: Okay, let's go on, then,
6       to Exhibit 8.
7           - - - -
8       (Exhibit No. 8 marked for identification.)
9           - - - -
10  BY MR. PIETZ:
11  Q.   And let me just represent that I've
12      incorporated here this Exhibit C from
13      ClosetMaid's responses to document requests
14      and that these are what I believe to be a
15      series of service agreements with various
16      credit reporting agencies.
17          MS. DANAHER: Can we go off the
18      record just for a second?
19          - - - -
20      (There was a discussion off the record.)
21          - - - -
22          MR. PIETZ: We'll add this to
23      Exhibit 8. So I don't know -- if we have a
24      stapler we can just staple it.
25          MS. DANAHER: Yeah.

21 (Pages 81 to 84)

Page 85

1           - - - -
2     (There was a recess in the proceedings.)
3           - - - -
4  BY MR. PIETZ:
5  Q.  Have you had a chance to look through Exhibit
6     8?
7           - - - -
8     (The witness reviewed the Exhibit.)
9           - - - -
10          MR. SMOCK: Jim, can you tell us how
11   many pages that exhibit is?
12          MR. PIETZ: It's from page Bates No.
13   188 to 206, and then there's the additional
14   copy.
15          MS. DANAHER: I have 207.
16          MR. SMOCK: What's the last page
17   before the new page?
18          MR. PIETZ: She says she has 207.
19          MS. DANAHER: Do you have 207?
20          THE WITNESS: Yes.
21          MR. PIETZ: Okay, 207.
22          MR. NORTH: Mine doesn't have Bates
23   numbers and the pages jump around.
24  BY MR. PIETZ:
25  Q.  Showing you what we've marked as Exhibit 8,

Page 86

1     which I think was the whole Exhibit C, if I
2     remember correctly, that was produced by your
3     office, and we've included 207. Can you tell
4     me what these series of documents are?
5  A.  They're agreements with the credit agencies to
6     run backgrounds.
7  Q.  Okay. And there's, do I understand here, three
8     separate agreements?
9  A.  Securant is LexisNexis.
10 Q.  Okay. Securant became LexisNexis?
11 A.  Yes.
12 Q.  Okay, so I'm trying to understand, was there
13    just -- in order to do credit reports and
14    background checks did you just use one agency
15    or did you have a series of them at one time?
16 A.  We have had two until recently and we have now
17    signed a contract with American Background.
18 Q.  But the two you had until recently were -- you
19    had them simultaneous?
20 A.  Yes.
21 Q.  Okay, what's the reason for that, why did you
22    have to have two different ones?
23 A.  Accurate Background service is a local service
24    that's in Ocala. And Securant is a database
25    service, now LexisNexis. Accurate Background,

Page 87

1     the cost was more and it took longer to get the
2     reporting than LexisNexis.
3  Q.  Um-hum.
4  A.  So we used LexisNexis more than Accurate.
5  Q.  Okay. I see.
6           And then the last page of this
7     exhibit is something that was just produced to
8     me yesterday. And can you tell me what this
9     is?
10 A.  American Background service --
11 Q.  Yeah.
12 A.  -- is a new service that we started using, I
13    believe, in August, maybe July.
14 Q.  August of this year?
15 A.  This year.
16 Q.  Okay. And that is a background package and
17    a la carte pricing for ClosetMaid, dash,
18    Emerson; is that correct?
19 A.  That's correct.
20 Q.  So that's an agreement between American
21    Background and Emerson -- ClosetMaid and
22    Emerson?
23 A.  It is -- Emerson has used their autonomy of
24    scale to get better pricing and then each
25    individual subsidiary decides whether or not

Page 88

1     they want to participate in that pricing. And
2     so this is a contract with ClosetMaid and
3     American Background.
4  Q.  Okay. And is there a copy of the contract? Is
5     this the contract?
6  A.  I think this is it.
7  Q.  Okay. Now, in looking at -- first of all,
8     let's look at -- going back to the last page,
9     is that Emerson, is that the reference to
10    Emerson Electric?
11 A.  Yes.
12 Q.  When these agreements were entered did you --
13    who was responsible for negotiating these
14    agreements?
15 A.  Securant and LexisNexis was done by Mary Price,
16    Securant, at the time. And she was the HR
17    manager.
18 Q.  Okay.
19 A.  Since Mary left Jennifer Boring also is
20    involved in that.
21 Q.  Okay. The Securant agreement that starts on
22    188, is that -- is that 188 to 191, is that the
23    agreement?
24 A.  This is the contract that I see.
25 Q.  And I'm just trying to understand, that was a

Page 89

1    contract that appears to be entered August 31st
2    of '04?
3  A.  Okay.
4  Q.  Is that right?  Okay.
5        And then the next document that
6    begins at 192, that is another -- that's a
7    contract with LexisNexis, as I understand?  Can
8    you tell me that entire agreement, you know,
9    the page range for that agreement.
10 A.  I can't tell you, no.
11 Q.  Okay, but then at Page 196, does that show
12   Jennifer Boring's signature?
13 A.  Yes.
14 Q.  Dated August 26, 2005?
15 A.  Yes.
16 Q.  So that's the agreement with LexisNexis?
17 A.  Yes.
18 Q.  Did you have occasion to review this agreement?
19 A.  No.
20 Q.  Jennifer Boring was responsible for negotiating
21   this?
22 A.  Yes.
23 Q.  And to your knowledge did she review this
24   thoroughly?
25 A.  I have no way of knowing.

Page 90

1  Q.  Do you see, going on to 197, there is an
2    Appendix A?
3  A.  Yes.
4  Q.  Do you remember ever reviewing this information
5    in connection with this agreement?
6  A.  No.
7  Q.  Do you know if Jennifer Boring reviewed it?
8  A.  I don't know.
9  Q.  Did this -- would the information that's here,
10   would this be information that you would
11   utilize in coming up with your policies and
12   practices for obtaining consumer reports?
13       MS. DANAHER:  That's what he's asking
14   you, just this page.
15       THE WITNESS:  I mean, it's not in
16   order.
17       MS. DANAHER:  Wait, you're asking
18   specifically about Page 197, right?
19       MR. PIETZ:  Yes.
20       MS. DANAHER:  Okay, so take your time
21   and read that.
22       MR. PIETZ:  I see what you mean, it
23   may be out of order, but I think that's the way
24   it was produced to me.
25       MS. DANAHER:  I apologize if that's

Page 91

1    confusing.
2        MR. PIETZ:  Okay, I see it.
3        MR. NORTH:  Yes, I put this back
4    together the right way, I think, if that will
5    help you.
6        MS. DANAHER:  Can we go off the
7    record for a minute?
8        - - - -
9    (There was a discussion off the record.)
10       - - - -
11       MR. PIETZ:  The documents between 192
12   and 206 appear to me to be part of the same
13   contract, based upon the page numbers where it
14   says Page -- well, now it gets more confusing.
15       MS. DANAHER:  Off one more minute.
16       - - - -
17   (There was a discussion off the record.)
18       - - - -
19   (There was a recess in the proceedings.)
20       - - - -
21   BY MR. PIETZ:
22 Q.  We left off with this exhibit that you
23   rearranged --
24 A.  Yes, that's correct.
25 Q.  -- I guess, would be fair to say.

Page 92

1        So can you just maybe, on the record,
2    describe what you did?
3  A.  I used the page numbers at the bottom, Page 1
4    of 14, 2 of 14, 3 of 14, put them in
5    simultaneous order.
6  Q.  Okay.
7  A.  14 of 14.
8  Q.  Okay.  And the first agreement is which one?
9  A.  Securant.
10 Q.  And that -- okay, how many pages is that?
11 A.  Fourteen.
12 Q.  Okay.  All right.  And that's the one that was
13   signed by?
14 A.  Mary Price.
15 Q.  Mary Price?  Okay.
16       And then what's the second agreement
17   in that exhibit?
18 A.  LexisNexis.
19 Q.  Okay.  And how many pages is that?
20 A.  Five.
21 Q.  Okay.  And that was the agreement signed by
22   Jennifer Boring?
23 A.  Yes.
24 Q.  And that's dated?
25 A.  8-26-2005.

Page 93

1  Q.  Okay. And then the next document is --
2  A.  It's Accurate Background check.
3  Q.  Okay. And is that -- that's another company
4      that --
5  A.  It's an addendum, yes.
6  Q.  And what's it an addendum to?
7  A.  Pricing. And it was to Mary Price from Lola
8      Gonzalez.
9  Q.  Okay. And then the final page of that is the
10     document with respect to American Background
11     that we talked about already.
12 A.  That is correct.
13 Q.  That was just produced.
14 A.  And that was signed in April of '09.
15 Q.  Okay. All right.
16     MS. DANAHER: This will be one
17     collective Exhibit 8 then, as we described it.
18     MR. PIETZ: Yes, one Exhibit 8.
19 BY MR. PIETZ:
20 Q.  Were these -- going back to this series of
21     documents that are represented in Exhibit 8,
22     were these documents that were used as a basis
23     to comply with the FCRA?
24 A.  These are contracts that allowed us to access
25     an individual's background.

Page 94

1  Q.  All right. But isn't it also true that there
2      were certain appendix that were attached that
3      described requirements under the Fair Credit
4      Reporting Act?
5  A.  There are appendix attached.
6  Q.  Were these appendices used as a basis for
7      ClosetMaid's endeavor to comply with the Fair
8      Credit Reporting Act?
9  A.  We have a standard operating procedure that was
10     in place, I believe, at the time that these
11     were signed.
12 Q.  Okay. At any point in time did you compare
13     those procedures with the requirements that are
14     outlined in these appendices?
15 A.  I did not.
16 Q.  Did anyone at the company?
17 A.  I don't know.
18 Q.  Did you ask anyone to do it?
19 A.  No.
20 Q.  Did anyone in -- did you provide these
21     agreements to any of the lawyers to review?
22 A.  Not that I'm aware of.
23 Q.  Let's look at, it would be Page 5 of 14. Do
24     you see that Appendix A?
25 A.  I do.

Page 95

1  Q.  Okay. Do you see No. 1? Can you read that?
2      Let me read it to you.
3      It says, prior to procuring a
4  consumer report, a clear and conspicuous
5  disclosure, consisting solely of the
6  disclosure, that a consumer report might be
7  obtained for employment purposes must be made
8  to the applicant.
9      What did that language -- what does
10 that language, consisting solely of the
11 disclosure, mean to you?
12 A.  That they need to be notified of their rights.
13 Q.  I understand that.
14 A.  And that they would sign off on us getting
15     their background.
16 Q.  But the language that says, consisting solely
17     of the disclosure, what does that mean?
18 A.  I don't understand what it reads, I'm just
19     thinking.
20 Q.  Well, if a disclosure included a release of all
21     claims against ClosetMaid and its affiliates
22     and its representatives would that be a
23     disclosure consisting only of the disclosure?
24     MS. DANAHER: Object to the extent
25     that it calls for a legal conclusion.

Page 96

1      MR. PIETZ: No, I'm not asking for a
2  legal conclusion.
3      MS. DANAHER: I understand, I just
4  need to put that on the record.
5      THE WITNESS: Again, it's my opinion,
6  so I don't know. I mean, you could -- it's
7  interpretation of what this document states.
8      MR. PIETZ: This is 9.
9      ----
10 (Exhibit No. 9 marked for identification.)
11     ----
12     MR. NORTH: Marie, did she have a
13 hand in preparing this? I assume she did or
14 we're wasting our time.
15 BY MR. PIETZ:
16 Q.  Okay, this is -- this is Exhibit 9, but this
17     was a document that was produced with the
18     supplemental disclosures that we recently got
19     that was identified as Exhibit G.
20     Can you tell me what this document
21     is?
22 A.  It is a document that was submitted to our
23     attorney giving you information of how many
24     applications that we took from 12-1-06 until
25     June 30th of '09.

Page 97

1    And under, Candidates, that is the
2 number of resumes or applications the were
3 selected --
4 Q. Okay, we'll go through it.
5    Let me just -- let's back up a second
6 and me ask you, first of all, what was the
7 reason that this was developed, to your
8 understanding?
9 A. It was asked for on the number of applications.
10 Q. Okay, but -- okay, explain to me, then, why you
11 created this form.
12 A. We created the form to try to give our attorney
13 the information that was requested on how many
14 applications that we took during this period of
15 time.
16    MS. DANAHER: And if you'll allow me
17 to clarify, it wasn't a confidential
18 communication, it was in response to your
19 discovery requests that you and I discussed.
20    MR. PIETZ: Right.
21    MR. NORTH: Please drop in any time.
22    MS. DANAHER: I just wanted to let
23 you know.
24    MR. NORTH: Yes, I appreciate that.
25 BY MR. PIETZ:

Page 98

1 Q. All right, you referenced a time frame of
2 12-1-06 to some time in '09. How did that time
3 frame -- why was that time frame created?
4 A. Because the Cathy Reardon case was from
5 12-1-06, so we froze all files at that point in
6 time.
7 Q. Okay. I see. And are you saying that
8 documentation with respect to the years prior
9 doesn't exist?
10 A. No, it does not.
11 Q. Is there any kind of documents that can be used
12 to identify that, any kind of electronic or
13 other type of information --
14 A. Applicants?
15 Q. Yes.
16 A. No.
17 Q. Okay. And what is your document retention
18 policy?
19 A. Two years.
20 Q. Two years. Can you be more descriptive?
21 A. We keep applications two years.
22 Q. Okay.
23 A. So on 12-1-08 or 12 of '08, the following month
24 we would destroy all of December. So it's a
25 running --

Page 99

1 Q. Right. At any point in the process is
2 applicant information input into a computer?
3 A. We have applicant flow logs.
4 Q. What is that?
5 A. It is a list of candidates.
6 Q. Okay. And when you say, list, what's on the
7 list?
8 A. Basic information on the job that they're
9 applying for.
10 Q. Okay.
11 A. Their name.
12 Q. Okay. Address?
13 A. The date they applied. I don't think the
14 address is on there. The date they applied and
15 the disposition.
16 Q. Okay. And that -- how is that stored
17 electronically?
18 A. I don't know if it purges after two years or
19 not, I honestly don't know.
20 Q. Okay. But there is some mechanism where
21 applicant information is put in through some
22 form of a database?
23 A. In some locations, yes. Others were just
24 handwritten on a log.
25 Q. Okay. And what happens to the logs?

Page 100

1 A. After two years they're destroyed.
2 Q. The document retention policy, is that a
3 uniform policy throughout all the locations?
4 A. Yes. Yes. And the applicant flow log is part
5 of our affirmative action plan and it is
6 destroyed after two years.
7 Q. Okay, but it's put into a computer somehow?
8 A. Like I stated, it could be handwritten or it's
9 put in a computer.
10 Q. Okay, but you -- yeah, you indicated there was
11 some form of computer entry where it goes to a
12 database.
13 A. In some locations.
14 Q. Okay, in some locations.
15 A. Right.
16 Q. Do you know which locations those are?
17 A. I'm not positive.
18 Q. Okay. Let's look at this -- this form. Who
19 created this?
20 A. It was a combination between Jennifer Boring
21 and Pat Dameron because of their responsibility
22 of locations.
23 Q. Okay. And what did they do to create this?
24 A. They used data, the applicant flow logs, data
25 from Oracle and our affirmative action plan.

Page 101

1   Q.   What do you mean Oracle?
2   A.   Oracle is the system I discussed earlier that
3        was the payroll software system.
4   Q.   How would that contain information -- would
5        that contain information about applicants?
6   A.   It may.
7   Q.   Okay. Now, tell me what -- let's go through
8        this, and there's different columns here. Can
9        you tell me why you came up with these
10       different columns?
11  A.   In the far right you have two columns that say,
12       Candidates and Applicants. A candidate is --
13  Q.   Okay, we're going to go from the right to left?
14  A.   Yes, we are.
15  Q.   Okay.
16  A.   I don't know why. I'm sorry, I don't know why.
17       The right, a candidate is anyone that
18       applied for a position that was open. And an
19       applicant is anyone that expressed interest in
20       that position and possesses the qualifications
21       for that job.
22  Q.   Okay, let me see if I understand. A candidate
23       would be someone that may not be qualified,
24       but, nevertheless, applied?
25  A.   Yes.

Page 102

1   Q.   Whereas an applicant is someone that's
2        qualified and applied?
3   A.   That's correct.
4   Q.   So they both would be considered -- they both
5        applied for this?
6   A.   It's one minus the other --
7            MS. DANAHER: To the extent that
8        applied hasn't been defined, do you mean
9        writing out an application? Maybe that needs
10       to be clarified.
11           MR. PIETZ: Yeah, let's approach it
12       that way.
13  BY MR. PIETZ:
14  Q.   Let's start with the applicants, did they
15       complete the forms that we've been talking
16       about, the consent form and go through that
17       procedure?
18  A.   Not necessarily.
19  Q.   And why not necessarily?
20  A.   I can give you an example to where you can
21       understand.
22  Q.   Okay.
23  A.   Someone applies for an accounting manager
24       position. And they've never been in accounting
25       in their life. So they're not going to be

Page 103

1        considered an applicant, because they need
2        experience to be in that position.
3   Q.   I understand.
4   A.   But they applied through a resume. But their
5        basic resume shows that they are, maybe,
6        qualified, based on their resume.
7   Q.   Okay.
8   A.   So that's why I said not necessarily. At this
9        point it could be a resume, but they are a
10       potential applicant for the position that's
11       available.
12  Q.   Okay. But you would have a copy of a form that
13       they signed and filled out; isn't that right?
14  A.   I would have a resume at that point in time.
15  Q.   Okay.
16  A.   Or an application, depending on how they
17       applied.
18  Q.   I understand. But whether or not they signed
19       the FCRA forms -- can I call them the FCRA
20       forms now? That could be determined simply by
21       going to their file and looking to see if they
22       signed a form.
23  A.   That's correct.
24  Q.   Okay. Okay, so they may or may not have gotten
25       to the point where an FCRA form was filled out?

Page 104

1   A.   That is correct.
2            MR. NORTH: Candidate or applicant?
3            MR. PIETZ: Applicant. We're talking
4        about applicants, on the left.
5            MR. NORTH: Which is smaller than
6        candidates.
7            THE WITNESS: Right.
8            MS. DANAHER: Can we agree that no
9        candidates filled out an application form, so
10       we can cross that off?
11           MR. PIETZ: Okay, that was going to
12       be my next question.
13           MS. DANAHER: I'm sorry.
14           MR. PIETZ: Okay.
15  BY MR. PIETZ:
16  Q.   So moving right to left, the candidates,
17       though, okay, as counsel indicated, they were
18       people who may have sent in a resume, but never
19       got to the point of filling out any form?
20  A.   No, that's not correct. I'm sorry.
21           MS. DANAHER: It's not your fault.
22           THE WITNESS: A candidate is anyone
23       that applies for a position. If they were in
24       Ocala they may have came in and completed an
25       application, they didn't have a resume.

Page 105

1   BY MR. PIETZ:
2   Q.  Okay.
3   A.  So it could be either resume or application.
4   Q.  Okay. But what about the FCRA forms?
5   A.  They aren't completed yet.
6   Q.  So none of the people in the candidate column
7       would have filled out an FCRA form?
8           MR. NORTH: Well, later they might
9       have, right?
10          THE WITNESS: Later. Later.
11          MR. PIETZ: Okay.
12          THE WITNESS: But at the time of
13      submitting their resume or application that is
14      not the process.
15          MR. NORTH: You explained that
16      earlier, that once you make the cut there's a
17      subuniverse of people who sign the forms,
18      right?
19          THE WITNESS: Right.
20  BY MR. PIETZ:
21  Q.  The bottom line, I guess, is, though, with
22      respect to the candidates, we could determine,
23      from going to their file and seeing what forms
24      are there, to determine whether or not they --
25      there's a form?

Page 106

1   A.  Correct.
2   Q.  Isn't that right?
3   A.  That's correct.
4   Q.  All right.
5           Okay, now, going to the next column,
6       it says, Number of Credit Checks Run.
7   A.  Okay, now we're going to go to the beginning.
8   Q.  Okay.
9   A.  So we have our applicant. I'm trying to
10      confuse you, okay?
11          MS. DANAHER: You're doing a good
12      job.
13          THE WITNESS: Okay, the first column
14      is the people that were actually hired.
15          MR. PIETZ: Okay.
16          THE WITNESS: Okay?
17          MR. NORTH: You're over in the left
18      now?
19          THE WITNESS: In the left.
20          The next column, that is headed, FCRA
21      Forms Completed and Background Checks Run, But
22      was Not Hired. So that is the group of people
23      where they actually completed the form, but for
24      some reason or another they were not hired.
25          MR. PIETZ: Okay.

Page 107

1           THE WITNESS: That could be their
2       references came out really, really bad. It
3       doesn't have to be something that was on that
4       third-party report. It could be that when I
5       called them back they didn't return my call.
6       It could be they didn't show up. It could be
7       drug testing. So I don't have the specifics as
8       to why, but that's the number where we ran the
9       background.
10  BY MR. PIETZ:
11  Q.  Okay, so -- just so I understand, though, the
12      column, Employees Hired, and then the next
13      column --
14  A.  Um-hum.
15  Q.  -- those are exclusive groups; isn't that
16      right?
17  A.  Those are all together.
18  Q.  No, no, what I'm saying is no one in the second
19      column is a member of the first column?
20  A.  That is correct. That is correct.
21  Q.  If we went to the group in the second column --
22  A.  Um-hum.
23  Q.  -- FCRA forms completed --
24  A.  Um-hum.
25  Q.  -- would we be able to determine, by looking at

Page 108

1       their files, as to why they were not hired?
2   A.  I think so.
3   Q.  And why do you think so?
4   A.  Because that's the process, that we would keep
5       their applications intact with what forms were
6       used at that time.
7   Q.  Okay. But how -- what would, in the file,
8       indicate the reason for not being hired? Is
9       there some form that would explain that?
10  A.  There would be an internal code that would tell
11      us it's for references or whatever.
12  Q.  Okay. And it would -- there's a code for --
13      that would apply to a background check or a
14      consumer report?
15  A.  Or credit.
16  Q.  Okay. Now, let's go to the next column,
17      Filling out the FCRA, No Background Check.
18      What is this column?
19  A.  Basically that means that an applicant was more
20      or less qualified for the position. And so if
21      you recall the procedure, we may have
22      interviewed them on the phone or whatever, we
23      decided to proceed to the interview if we were
24      going forward. So we had them complete the
25      FCRA form, but somewhere before we actually

27 (Pages 105 to 108)

Page 109

1    sent it in to get the background they were
2    eliminated from the potential hire.
3  Q.  Okay.
4  A.  So there were that many people that completed
5    the form --
6  Q.  Okay.
7  A.  -- but we did not complete the process and do
8    the background.
9  Q.  Okay. So then my next question, like the
10    previous one, this column, it is exclusive of
11    the first two, meaning no one would be a member
12    -- who is a member of this third column,
13    Filling out FCRA Form, would be a member of
14    either of the first two?
15  A.  That is correct. That is correct.
16        MR. NORTH: Could I say one thing on
17    the record?
18        I bet this was hard and we really
19    appreciate you doing it.
20        THE WITNESS: It was.
21        MR. NORTH: Because I've done a lot
22    of these cases and sometimes it takes two years
23    just to get an employer to do this. So I
24    really appreciate it. It's really going to
25    help us if we ever can resolve the case. And I

Page 110

1    know you had help, because you couldn't
2    possibly do it without help, but thank you. We
3    appreciate it. It's required, but that doesn't
4    mean it doesn't take years to get it sometimes.
5        MR. PIETZ: And the short amount of
6    time it was done.
7        THE WITNESS: Very short.
8  BY MR. PIETZ:
9  Q.  Okay, then, the next column is, Credit Checks
10    Run.
11  A.  Um-hum.
12  Q.  Can you --
13  A.  Specifically, they're -- as I indicated
14    earlier, there are only certain positions that
15    we run a credit on, such as somebody that needs
16    a credit card, somebody that is of high
17    management and they have a fiduciary
18    responsibility to ClosetMaid. And so we ran 36
19    credit checks.
20  Q.  Now, this credit checks column, though, would
21    -- they would be a member of the first two?
22  A.  Could be.
23  Q.  Or one of the two?
24  A.  Yes.
25  Q.  Okay. So what you're saying, I guess, then, if

Page 111

1    we went and looked at Cathy Reardon's file --
2  A.  Um-hum.
3  Q.  -- we would be able to determine from that file
4    why she was not hired?
5  A.  Yes.
6  Q.  Do you know why she was not hired?
7  A.  Credit.
8  Q.  Credit. And that's reflected in her file --
9  A.  Yes.
10  Q.  -- by a code?
11  A.  I have the background. I have the credit
12    report. And it was charged off by American
13    Express, and we could go on and on.
14        MR. PIETZ: Now, what I wanted to do,
15    I don't know if there's a way to short circuit
16    it, but I have these exemplars and I wanted to
17    sort of identify and figure out what part of
18    ClosetMaid they represented.
19        MS. DANAHER: Cathy can probably tell
20    you, if you want to stay off the record for a
21    second, she can flip through and tell you which
22    one came from which location.
23        To make it simple, everything I sent
24    to you yesterday came from Chino.
25        MR. PIETZ: I understand.

Page 112

1        MR. NORTH: Can we agree, though,
2    that everything you sent us is authentic, so we
3    don't have to go through and authenticate a
4    bunch of stuff? I mean, we got it from you,
5    but if you don't agree --
6        MS. DANAHER: Can you stipulate to
7    their authenticity?
8        THE WITNESS: Okay.
9        MS. DANAHER: To say that they're a
10    part of the business records, that someone --
11        THE WITNESS: Okay.
12        MS. DANAHER: -- either you or
13    someone in your control went through --
14        THE WITNESS: Okay.
15        MS. DANAHER: -- and pulled that out
16    and gave it to you and you gave it to me?
17        THE WITNESS: Okay.
18        MR. PIETZ: I think we're going to
19    say it, it's just --
20        MR. NORTH: It was our concern. His
21    concern I think, is where, I don't think --
22        MR. PIETZ: Well, one of the things
23    I, you know, wanted to -- again, also, is that,
24    you know, these are from different parts of
25    ClosetMaid, okay? So I wanted her to identify

Page 113

1    --
2         MS. DANAHER: Yes, from the different
3    locations, you mean.
4         MR. PIETZ: Maybe we can just go
5    through each one.
6         MS. DANAHER: Yeah, and we may be
7    able to do them in groups.
8         Jim, if you want to give us a second
9    and hand us what you're looking at she can flip
10   through, then you can just ask one question,
11   you know, where do these --
12        MR. NORTH: Off the record.
13        - - - -
14   (There was a discussion off the record.)
15        - - - -
16   (Exhibit No. 10 marked for identification.)
17        - - - -
18   BY MR. PIETZ:
19   Q.  Okay, looking at Exhibit 10 -- let me ask you
20       first, just generally, as part of the discovery
21       in this case we had an agreement with counsel
22       that ClosetMaid would produce some exemplar
23       files from its different locations.  Tell me
24       what you did in response to that agreement.
25   A.  It was my understanding that you wanted

Page 114

1    applications.  So we went back and tried to
2    give you examples of applications from each
3    location.
4    Q.  Okay.
5    A.  And that's why they are what they are.
6    Q.  And to do that, though, you went to sort of --
7        how did you select an exemplar file?
8    A.  We asked the individual locations to send us
9        applications -- again, this was a very big task
10       -- an application as an example from periodic
11       times throughout the process, so that you could
12       get a representative sample of what took place.
13       Because as I indicated earlier, we have changed
14       things along the way.
15   Q.  So that in each respective location whoever was
16       responsible for getting the documents would
17       have to go to a particular file, and what were
18       they instructed to pull out of the file?
19   A.  The applications during that period of time.
20   Q.  Okay.  And anything else, apart from the
21       applications?
22   A.  I don't think so.
23   Q.  And what about the FCRA forms?
24   A.  I don't think so.
25   Q.  They didn't get all the FCRA forms?

Page 115

1    A.  I don't know.  I don't know.  I didn't do it.
2    Q.  Who was responsible for this task?
3    A.  Pat and Jennifer.
4    Q.  Pat Dameron and Jennifer Boring?
5    A.  That is correct.
6    Q.  Okay, let's look at what we've marked as
7        Exhibit 10.
8        Okay, Exhibit 10 is one of these
9        exemplar files from which location?
10   A.  It's one or the other, and I think it's
11       Grantsville.  It could be Belle Vernon, because
12       of the Pennsylvania address.
13   Q.  Okay.
14        MS. DANAHER: If you're going to use
15       these as exhibits, Jim, I would simply ask that
16       before we make them part of the deposition
17       transcript that we be permitted to black out
18       the personal information, because you and I
19       have that confidentiality agreement, and there
20       are Social Security numbers and things --
21        MR. PIETZ: Oh, yeah, I -- I would
22       say -- I thought the confidentiality agreement
23       would cover these.  We can stipulate on the
24       record that if they're ever filed in court
25       that, you know, we would redact any personal

Page 116

1    identifying information.  In fact, I think it's
2    a local rule here.
3         MS. DANAHER: Yes.
4         MR. PIETZ: So I really do agree to
5    that, there's no reason we have to have that on
6    here.
7         MS. DANAHER: Okay.
8         MR. PIETZ: I don't know that for
9    purposes of making it a part of the deposition
10   right now we have to go through and redact
11   everything.
12        MS. DANAHER: Because the depositions
13   aren't filed there would be at least that
14   protection.  And if you and I can agree that if
15   the deposition is ever going to be disseminated
16   or attached to anything we'll redact the
17   information.
18        MR. PIETZ: Yes.  That's correct.
19        THE WITNESS: I think that's
20   Grantsville, Maryland.
21        - - - -
22   (Exhibit No. 11 marked for identification.)
23        - - - -
24        THE WITNESS: This is Grantsville,
25   Maryland.

Page 117

1   BY MR. PIETZ:
2   Q.   And this is Exhibit 11.
3   A.   Yes.
4   Q.   Let me ask you, though, specifically about
5       Exhibit 11, on the last page, is that one of
6       the FCRA forms that we've been discussing
7       earlier that was used?
8   A.   Yes.
9   Q.   You see there where it references Emerson
10      Electric at the beginning, I hereby authorize
11      ClosetMaid, slash, Emerson Electric?
12  A.   Yes.
13  Q.   Do you know why Emerson Electric was included
14      there?
15  A.   Like I said, it's a branding and at some point
16      in time, and I don't recall when, we were told
17      to start putting Emerson on everything that we
18      did, for brand purposes.  So we took the
19      liberty to put ClosetMaid slash Emerson
20      Electric.
21  Q.   Okay.  Was -- was this -- were these forms
22      given to the marketing department for review?
23  A.   No.  These are employment documents, so they
24      don't review those.
25              - - - -

Page 118

1       (Exhibit No. 12 marked for identification.)
2               - - - -
3   BY MR. PIETZ:
4   Q.   Okay, this is the next one.
5   A.   This is Grantsville, Maryland.
6   Q.   That's the exemplar forms from Grantsville?
7   A.   Yes.  Correct.
8               - - - -
9       (Exhibit No. 13 marked for identification.)
10              - - - -
11          THE WITNESS:  This is Ocala, Florida.
12  BY MR. PIETZ:
13  Q.   And that's exhibit?
14  A.   13.
15  Q.   13 is from Ocala.
16              - - - -
17      (Exhibit No. 14 marked for identification.)
18              - - - -
19  BY MR. PIETZ:
20  Q.   Exhibit 14.
21  A.   This is from Chino, California.
22  Q.   That's Exhibit 14?
23  A.   Yes.
24  Q.   Now, is it -- was it determined in this --
25          MR. SMOCK:  Are you jumping around

Page 119

1       some from the order that we provided them?
2           MR. PIETZ:  Yes, I'm not going to go
3       through them all.
4           MR. SMOCK:  Yes, I'm just asking.
5           MR. PIETZ:  We don't want to be here
6       till tomorrow.
7   BY MR. PIETZ:
8   Q.   Exhibit 14 was from Chino, you said?
9   A.   Yes.
10  Q.   Was there something about Chino that's distinct
11      from the other locations that you can tell me?
12  A.   There's California verbiage.
13  Q.   In what sense?
14  A.   They have to check the box at the bottom of the
15      release.  And there's very specific boxes that
16      must be checked or completed.  And that's the
17      California.
18  Q.   And whose responsibility was it to determine
19      compliance with California rules?
20  A.   Pat Dameron oversees that.
21  Q.   Um-hum.
22  A.   And we did have -- we've had two applications
23      -- I mean two managers at that location that
24      took applications.  One of them is no longer
25      there, the other one is.  So it is their

Page 120

1       responsibility to make sure that they're in
2       compliance with what has been set up by
3       ClosetMaid.
4   Q.   Okay.  And looking at this California
5       authorization or release --
6   A.   Um-hum.
7   Q.   -- the form that's used here, do you see it
8       also there at the last paragraph, before the
9       handwriting, it again references Emerson
10      Electric; do you see that?
11  A.   Yes.
12  Q.   And is that the same -- is Emerson Electric
13      there for the same reason?
14  A.   The same reason.
15  Q.   Okay.  What's Do+Able Products?
16  A.   Do+Able is the name of the company that we
17      purchased, I think it was around early '05,
18      late '04, I think it's early '05.  And that was
19      their name when we purchased them.
20  Q.   Yes, it's located in Chino?
21  A.   Chino, California.
22  Q.   Under this release form, do you see at the
23      bottom it says, Attached, please find your
24      rights under the California Consumer Reporting
25      Agencies Act?

Page 121

1  A.  Yes.
2  Q.  Do you see that form here?
3  A.  I don't know what it looks like, so I couldn't
4      tell you.
5          MR. NORTH:  Do you know, Marie, or do
6      you want to comment?
7          MS. DANAHER:  All I know, is that we
8      gave you what we got from California.  So if
9      there's something else we need to look for you
10     tell us.
11         MR. NORTH:  But this says for first
12     -- yeah, the FCRA.  But there's -- you know,
13     California's got some different rules, so we're
14     talking about whether it --
15         MR. PIETZ:  Well, I guess what we
16     were looking for, as far as exemplar files, was
17     not only the application, but the FCRA forms.
18     So I'm a little concerned that we don't have a
19     complete set of documents that we were looking
20     for.  I mean, I see that -- we know that we
21     have one of the FCRA forms, but are there
22     others?
23         And, once again, it gets back to the
24     other issue, too, we wanted to see some
25     exemplars of people who had adverse action

Page 122

1      taken.
2          MS. DANAHER:  Let me just say for the
3      record, that I think there may have just been
4      some miscommunication, and that would be on
5      this end, with respect to the term exemplar
6      files -- I mean, applicant files and
7      applications.  So if we need to talk about that
8      after the deposition and if further
9      supplementation is necessary we'll certainly
10     take care of that.
11         MR. PIETZ:  Okay.
12         Okay, let's mark this as the next
13     exhibit.
14              - - - -
15     (Exhibit No. 15 marked for identification.)
16              - - - -
17         THE WITNESS:  This is ClosetMaid
18     North America.
19  BY MR. PIETZ:
20  Q.  But looking at this more specifically, is this
21      -- this was a document that was produced as
22      differently, as Exhibit D for the responses.
23  A.  Okay.
24  Q.  Which I believe was to be Ms. Reardon's file.
25  A.  Okay.

Page 123

1  Q.  Do you know whether this set of documents was
2      her complete file?
3  A.  I'm not a hundred percent positive, but it
4      appears to be.
5  Q.  Okay.  I was a little concerned because I
6      thought that the documents that we had that
7      Ms. Reardon indicated had been sent to
8      ClosetMaid were a larger universe of documents,
9      so I just was concerned that this wasn't the
10     complete set.
11         MS. DANAHER:  We'll see what
12     Ms. Reardon has to say.
13         MR. NORTH:  You've got her complete
14     file from us.  So -- have you compared them,
15     Jim?
16  BY MR. PIETZ:
17  Q.  Looking at this -- this is documents from
18      Ms. Reardon's file, isn't that right, the
19      plaintiff in this action?
20  A.  Yes.
21  Q.  Now, again, I'm giving these to you as they
22      were produced to me, and I have a sense that
23      they may be a little out of order, but, anyway,
24      let's go through this.  The first page is the
25      cover of the application; is that right?

Page 124

1  A.  Yes.
2  Q.  All right.  The second page is -- this is one
3      of the FCRA forms; is that right?
4  A.  That is correct.  And that is not part of the
5      application, it is a separate document.
6  Q.  Okay.  But it would be presented to the
7      applicant --
8  A.  At some point during the process.
9  Q.  With the application?
10  A.  No.  We changed that over a period of time, I'm
11     not sure of the date, to be honest with you.
12  Q.  While you're looking at this document, which is
13     209, let me ask you about -- what I was looking
14     for was, there's this authorization form and
15     then attached to the complaint, as one of the
16     exhibits, is this form that Ms. Reardon signed.
17  A.  Okay.
18         MR. PIETZ:  Maybe we should mark this
19     as an exhibit, I don't -- well, I'll just refer
20     to it, it's exhibit -- is it in here?  I can't
21     find it.
22         MS. DANAHER:  Go back further.  There
23     it is.
24  BY MR. PIETZ:
25  Q.  Okay, that would be 227, which is also

31 (Pages 121 to 124)

Page 125

1   entitled, Fair Credit Authorization Form.
2   A.   Okay.
3   Q.   Can you explain to me why Ms. Reardon was
4        required to sign two different fair credit
5        authorization forms?
6   A.   As I indicated earlier, at some point during
7        our recruiting process we eliminated this form.
8   Q.   Which form are you --
9   A.   The Fair Credit Reporting Act short form, Page
10       227.
11  Q.   Um-hum.
12  A.   We were trying to be extremely clear in the
13       Fair Credit Reporting Act and that is why,
14       apparently, at that particular time we were
15       using it.
16  Q.   So you went from the form at 227 to -- and the
17       form at 209 was replacing --
18  A.   No, it was not replacing, we gave them both.
19  Q.   Oh, you gave them both?
20  A.   At one time.
21  Q.   Okay.  And do you know when that was
22       instituted, that procedure?
23  A.   I'm sorry, I don't.
24  Q.   Now, the one at 227, was that eliminated at
25       some point?

Page 126

1   A.   I don't think we use it at this time.
2   Q.   You don't use it at this time.
3            And do you know when it was
4        eliminated?
5   A.   I don't.
6   Q.   Let me ask you about the short form at 227.  It
7        says, I understand that -- the last paragraph
8        says, I understand that, pursuant to the
9        federal Fair Credit Reporting Act, if any
10       adverse action is to be taken based upon this
11       consumer report, a copy of the report and a
12       copy of the consumer's rights will be provided
13       to me if requested.
14           Do you understand that to be
15       accurate?
16  A.   Yeah, we give it to them automatically.
17  Q.   Is it required to be given automatically, under
18       the Act?
19  A.   Our process is if there's any type of adverse
20       actions that they automatically get a copy of
21       the report, with the letter.
22  Q.   I understand that.  What's your understanding
23       of the requirements under the FCRA?
24  A.   That they receive it at the time that there's
25       any kind of potential adverse --

Page 127

1   Q.   Right.
2   A.   The initial letter that we discussed earlier?
3   Q.   Right.
4   A.   At that point in time.
5   Q.   Right.
6   A.   If you go back to that it says, enclosed is a
7        copy of your report.
8   Q.   I understand that.  Is it your understanding of
9        the act that the potential employer has a duty
10       to provide that automatically?
11           MS. DANAHER:  Asked and answered.
12       You asked her that and she answered that.
13           MR. NORTH:  It was answered yes,
14       right?
15           THE WITNESS:  Yes.
16  BY MR. PIETZ:
17  Q.   So if that's your understanding, why would you
18       put in this form that they had to --
19  A.   I don't know.
20  Q.   -- request it?
21  A.   I don't know.
22  Q.   Okay, now, going on with Ms. Reardon's file, go
23       to Page 216.
24  A.   Okay.
25  Q.   Okay, now, with respect to Ms. Reardon's

Page 128

1        application for employment, this is the
2        so-called five-day letter --
3   A.   That is correct.
4   Q.   -- that you were talking about earlier?
5   A.   The initial letter.
6   Q.   The company had found some information on her
7        consumer report that may be disqualifying, so
8        they sent her this letter; is that right?
9   A.   That states, Enclosed you will find a copy of
10       the report we obtained.
11  Q.   Right.  And the report was attached to this
12       letter.
13  A.   That is correct.
14  Q.   And in the letter the company told her that
15       same language we talked about earlier, the
16       company will wait five days from the date of
17       this letter before it makes a decision.
18  A.   That's correct.
19           MR. NORTH:  Five business days.
20           MR. PIETZ:  Five business days, I'm
21       sorry.
22  BY MR. PIETZ:
23  Q.   Then going on to Page 217.  Do you see that
24       letter?
25  A.   Yes.

Page 129

1 Q.  And can -- what form letter is this with
2     respect to the company's process?
3 A.  This would be the letter that we would give
4     them telling them that we had decided not to
5     proceed with the hiring.
6 Q.  Okay.  And this letter is dated December 22nd,
7     2006.
8 A.  That is correct.
9 Q.  And the previous letter we looked at, the
10    five-day letter, is December 18th.  Do you know
11    why the company sent it before the five days
12    expired?
13 A.  It is five days exactly.  But I do think
14    because it was Christmas and we were trying to
15    get her an answer before Christmas, that it was
16    sent out on that Friday.
17        There were other examples, like I
18    stated, more than five days.  Just trying to be
19    fair to the individual.
20 Q.  Did you go back to determine if it was five
21    business days between December 18th, 2006 and
22    December 22nd, 2006?
23 A.  Did I personally?
24 Q.  Yes.
25 A.  No.

Page 130

1 Q.  Was Ms. Reardon given an opportunity to dispute
2     information in her file?
3 A.  I know what the process is.  I never spoke to
4     Ms. Reardon, so I do not know.
5 Q.  I know, but did you speak to anyone at the
6     company as to whether or not they, you know,
7     allowed Ms. Reardon to present a dispute, show
8     that the information was not accurate?
9 A.  Not until this claim came up --
10 Q.  Okay.
11 A.  -- I was not involved at all.
12 Q.  Did you, as part of this process of preparing
13    for the deposition, go back and find out
14    whether she was given an opportunity to present
15    her dispute to the company?
16 A.  I don't know.
17 Q.  Do you know whether the company considered her
18    dispute?
19 A.  I don't know.
20 Q.  Do you know whether there are any documents
21    evidencing the consideration of that dispute?
22 A.  I never saw anything in reference to her
23    credit, a dispute on her credit.
24 Q.  Um-hum.  Was she informed, in this time frame,
25    that that was the reason?

Page 131

1 A.  I don't know.
2 Q.  Was she given an opportunity to present issues
3     dealing with her credit?
4 A.  I don't know.
5 Q.  Would that be reflected in her file in any way?
6 A.  I don't know.
7         - - - -
8     (There was a recess in the proceedings.)
9         - - - -
10      MR. PIETZ:  Ms. Beal, I have nothing
11    further for you right now.
12      We're going to have to, as they say,
13    keep this deposition open for a number of
14    different reasons, we have more documents that
15    may be coming; we're in the class certification
16    stage of this case, so we'll have to keep your
17    deposition open, meaning we may have to, at
18    some point, bring you back to follow up.
19      THE WITNESS:  Okay.
20      MR. PIETZ:  But for now I have
21    nothing further at this point.
22      MR. NORTH:  Now it's my turn.  Just
23    kidding.
24      MS. DANAHER:  And I don't have any
25    questions at this point in time.

Page 132

1      And even though we're leaving the
2    deposition open, we'd like the transcript and
3    we'd like to read and sign.
4         - - - -
5    (The proceedings were recessed at 1:15 p.m.)
6         - - - -

Page 133

```
 1   COMMONWEALTH OF PENNSYLVANIA )   CERTIFICATE
 2   COUNTY OF ALLEGHENY        )  SS:
 3        I, Nina Warren Biehler, a Court Reporter and
 4   Notary Public in and for the Commonwealth of
 5   Pennsylvania, do hereby certify that the witness,
 6   CATHERINE B. BEAL, was by me first duly sworn to
 7   testify to the truth; that the foregoing deposition
 8   was taken at the time and place stated herein; and
 9   that the said deposition was recorded
10   stenographically by me and then reduced to printing
11   under my direction, and constitutes a true record of
12   the testimony given by said witness.
13        I further certify that the inspection, reading
14   and signing of said deposition were NOT waived by
15   counsel for the respective parties and by the
16   witness.
17        I further certify that I am not a relative or
18   employee of any of the parties, or a relative or
19   employee of either counsel, and that I am in no way
20   interested directly or indirectly in this action.
21        IN WITNESS WHEREOF, I have hereunto set my hand
22   and affixed my seal of office this 11th day of
23   September, 2009.
24        _____
25              Notary Public
```

Page 135

```
 1            COURT REPORTERS
           436 Boulevard of the Allies
 2           Pittsburgh, PA 15219
 3
     September 11, 2009
 4
     TO: Maria Greco Danaher, Esq.
 5       OGLETREE DEAKINS NASH
         SMOAK & STEWART, P.C.
 6       Suite 400
         Four Gateway Center
 7       444 Liberty Avenue
         Pittsburgh, PA 15222
 8       P 412-394-3333
 9
10       RE:  DEPOSITION OF CATHERINE B. BEAL
11        NOTICE OF NON-WAIVER OF SIGNATURE
12       Please have the deponent read her deposition
     transcript. All corrections are to be noted on the
     preceding Errata Sheet.
13
         Upon completion of the above, the Deponent must
14   affix her signature on the Errata Sheet, and it is to
     then be notarized.
15
         Please forward the signed original of the
16   Errata Sheet to James M. Pietz, Esq. for attachment
     to the original transcript, which is in his
17   possession. Send a copy of same to all counsel, and
     also a copy to me.
18
         Please return the completed Errata Sheet within
19   thirty (30) days of receipt hereof.
20
21
     Nina Warren Biehler
22   Court Reporter
23
24
25
```

Page 134

```
 1   COMMONWEALTH OF PENNSYLVANIA  )    E R R A T A
     COUNTY OF ALLEGHENY           )    S H E E T
 2
        I, CATHERINE B. BEAL, have read the foregoing pages
 3   of my deposition given on August 27, 2009, and wish
     to make the following, if any, amendments, additions,
 4   deletions or corrections:
 5   Page/Line  Should Read        Reason for Change
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
     In all other respects, the transcript is true and
20   correct.
21        _____
              CATHERINE B. BEAL
22
     Subscribed and sworn to before me this
23   _____ day of _____, 20_____.
24   _____
              Notary Public
25   Reference No. NB14437
```

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | | |
|---|---|---|
| R. CATHY REARDON<br>On behalf of herself and all<br>similarly situated individuals, | ) ) ) ) | |
| Plaintiffs, | ) | NO. 2:08cv1730GLL |
| v. | ) | |
| CLOSETMAID CORPORATION<br>and EMERSON ELECTRIC CO. | ) ) | Hon. Judge Gary Lancaster |
| Defendants. | ) ) | |

TO:    Emerson Electric Co.

c/o    Maria Greco Danaher
       Ogletree Deakins
       Four Gateway Center
       Suite 400 Pittsburgh, Pa. 15222-1237

### AMENDED NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that pursuant to Rules 26 and 30(b)(6) of the Federal Rules of

Civil Procedure, Plaintiffs, by their counsel, and by agreement have re-scheduled the deposition

of Emerson Electric Co. to be taken at the offices of Ogletree Deakins, Four Gateway Center,

Suite 400 Pittsburgh, Pa. 15222-1237, on August 27 at 2:00 p.m. unless otherwise agreed by all

counsel and the deponent.

The deposition will be recorded by stenographic means and may also be videotaped. The

deposition will continue from day to day until completed. You are invited to attend and

participate. The words, terms and phrases used herein shall have the same meaning as they have

in common and ordinary usage, unless otherwise indicated. Specific "Definitions and



Instructions" applicable to this request are set forth in Plaintiffs First Request For Production of Documents or First Set Of Interrogatories.

Emerson is requested to designate on or before July 18 , 2009  in writing, one or more of its officers, directors, managing agents or others  knowledgeable to testify on its behalf with respect to each of the following categories  described below.  Pursuant to Fed.R.Civ.P. 30(b)(6), Emerson is to set forth, for each person designated, the matters on which the person will testimony.  The requested testimony is with respect to:

    1.    The number of and identity of all persons who either applied for employment with Emerson or who were existing employees of Defendant and from whom Defendant obtained written consent to obtain a consumer report using substantially the same application for employment and consent forms as used with Ms. Reardon.

    2.    The number of and identity of all persons and as to whom Defendant Emerson then procured a consumer report.

    3.    The number of  persons or employees Emerson terminated or denied employment since December 20, 2003 because of, in part, information in a consumer report which you obtained concerning them and the policies, practices and procedures followed in taking this action.

    4.    The extent to which the application and consent forms used by ClosetMaid with respect to Ms. Reardon is used by Emerson and its related and subsidiary companies.

    5.    The policies, practices and procedures used by Emerson to obtain written consent to obtain a consumer report about employees and to send Pre-Adverse Action Notices.

6.      The organizational structure and oversight authority of Emerson's Human Relations department or function and the companies that report to it and that it oversees during the applicable time period.

7.      The policies, practices and procedures used by Emerson Storage Solutions and/or the companies that comprise Emerson Storage Solutions, a division of Emerson, to obtain written consent to obtain a consumer report about employees and to send Pre-Adverse Action Notices.

8.      The extent to which the policies, practices and procedures used by Emerson Storage Solutions and/or the companies that comprise Emerson Storage Solutions, a division of Emerson, to obtain written consent to obtain a consumer report about employees and to send Pre-Adverse Action Notices are the same as those used by ClosetMaid.

9.      The extent to which the policies, practices and procedures used by Emerson to obtain written consent to obtain a consumer report about employees and to send Pre-Adverse Action Notices are the same as those used by Emerson Storage Solutions and ClosetMaid.

10.     The source for and the creation of the policies, practices and procedures used by Emerson, Emerson Storage Solutions and ClosetMaid to obtain written consent to obtain a consumer report about employees and to send Pre-Adverse Action Notices.

11.     The source for creation and determination to use the application for employment and consent to obtain a consumer report forms used by ClosetMaid.

12.     The extent to which the application for employment and consent to obtain a consumer report forms used by ClosetMaid are used by Emerson, Emerson Storage Solutions and other subsidiary or related companies of Emerson.

13.     Emerson's procedure for hiring or screening employees it proposes to hire or retain as employees, including the application process, the interview process, all background

checks that are completed, the communication to the applicant of the hiring decision, and all paperwork or documentation that changes hands between Defendant and the applicant from the beginning of the process until the applicant is either hired or rejected for employment during the applicable time period.

14.     The source and creation of the Salaried Recruiting Procedure manual that was produced with Defendants' Fed.R.Civ.P. 26 disclosures.

15.     The extent to which the Salaried Recruiting Procedure manual that was produced with Defendants' Fed.R.Civ.P. 26 disclosures is followed by Emerson and other subsidiaries or related companies.

16.     The method or procedure Emerson uses to verify that an applicant who is rejected because of information on the applicant's consumer report receives a copy of the consumer report and a description in writing of the FCRA rights of the consumer as required by FCRA § 1681b(b)(3)(A)(I).

17.     The identification and authenticity of documents sent to or received from other subsidiaries or affiliated entities of discussing or referring to policies, practices and/or procedures related to consumer reports about employees.

18.     The identification and authenticity of documents related or referring to the employee hiring practices, policies and procedures that Emerson requires, recommends or disseminates to ClosetMaid.

19.     The identification and authenticity of documents referring or related to the policies, practices and procedures used to obtain written consent to obtain a consumer report about employees.

20.     Whether and to what extent training is provided by the Human Resources

department of Emerson for ClosetMaid's Human Resources function, including but not limited to employment applications and obtaining consumer reports.

21.     The policies, practices and procedures that are required or recommended by Emerson for ClosetMaid to follow to obtain written consent from prospective or current employees to obtain a consumer report and to send Pre-Adverse Action Notices.

22.     Emerson's policies, practices and procedures related to the sharing of consumer reports obtained from a consumer reporting agency with or among affiliates or subsidiaries of ClosetMaid for employment purposes.

23.     Whether Emerson or any affiliate or subsidiary of Emerson has ever shared a copy of a consumer report that was obtained from a consumer reporting agency with another affiliate or subsidiary of Emerson.

24.     The consumer reporting agencies, including but not limited to LexisNexis, Securint, Express Screening, from whom Emerson obtained consumer reports for employment purposes during the applicable time period, including the contracts between Emerson and any such consumer reporting agency and the policies, practices and procedures used to obtain consumer reports.

25.     The facts related to the application of R.Cathy Reardon for employment with ClosetMaid that is at issue in this matter.

26.     The organizational structure of the human resources department or function of ClosetMaid and its reporting relationships including its reporting relationship to Emerson or related companies.

27.     The organizational structure of the human resources department or function of Emerson and its reporting relationships including its reporting relationship with Emerson or

related companies.

28.     The organizational structure of the human resources department or function of Emerson Storage Solutions and its reporting relationships including its reporting relationship with Emerson or related companies.

29.     The services that Emerson provides for ClosetMaid and Emerson Storage Solutions, such as management, accounting, purchasing, legal or administrative services as well as training with respect to Human Resource practice and procedures.

30.     The legal relationship between Emerson and ClosetMaid or Emerson, Emerson Storage Solutions  and other subsidiaries or affiliated companies.

31.     The corporate financial statements produced for Emerson and ClosetMaid for the last 5 years.

32.     The procedures and practices of Emerson Storage Solutions, ClosetMaid, Metro, Flo-Healthcare and Lionville related to consumer reports about employees during the applicable time period.

33.     The offices/locations that Emerson and ClosetMaid share

34.     The role that Emerson has in the selection and assignment of ClosetMaid Corporation's officers and executive personnel.

35.     The staff that Emerson, Emerson Storage Solutions and ClosetMaid share

36.     The amount of shares and  percentage of the stock of ClosetMaid Corporation is owned by Emerson.

37.     The role that Emerson has in the selection and assignment of ClosetMaid Corporation's officers and executive personnel during the applicable time period.

38.     The Annual Report of Emerson for each of the last 5 years

39.     The identification and authenticity of documents referring to relating to practices and/or procedures of the Employee Relations department or function of Defendant as overseen by the Vice President of Employee Relations of Defendant related to consumer reports about employees during the applicable time period.

40.     The identification and authenticity of documents sent to or received from the Employee Relations department of Defendant or by Defendant to other subsidiaries or affiliated entities of Defendant discussing or referring to policies, practices and/or procedures related to consumer reports about employees during the applicable time period.

41.     Contracts between Emerson or any of its affiliates or subsidiaries and LNRM, or any other consumer reporting agency used for employment purposes during the applicable time period.

42.     The services that Emerson provides for its affiliates, divisions, subdivisions and subsidiaries such as management, accounting, purchasing or administrative services during the applicable time period.

43.     Any hiring, vetting, interviewing, or other recruitment or application processing which is shared between Emerson, its affiliates, divisions, subdivision, and subsidiaries, including but not limited to ClosetMaid, where this is shared geographically and to what extent this has occurred during the applicable time period.

44.     The organizational structure of Emerson and its affiliates, divisions, subdivisions and subsidiaries and the officers and Board of Directors of each such entity during the applicable time period.

45.     Any topic reasonably related to the above topics

By: Dated: August 17, 2009          Respectfully Submitted:

By:

James M. Pietz
Pa/I.D. No. 55406
Pietz Law Office LLC
Mitchell Building
304 Ross Street, Suite 700
412-288-4333
jpietz@jpietzlaw.com

Leonard A. Bennett, Esq.
Consumer Litigation Associates
12515 Warwick Boulevard
Newport News, Va. 23606
(757) 930-3660
lenbennett@clalegal.com

Christopher North, Esq.
751-A Thimble Shoals Blvd.
Newport News, Va 23606
(757) 873-1010
*Counsel for the Representative And ClassPlaintiffs*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA
### PITTSBURGH DIVISION

R. CATHY REARDON                    )
On behalf of herself and all        )
similarly situated individuals,     )
                                    )
         Plaintiffs,         )          NO. 2:08cv1730GLL
                                    )
v.                                  )
CLOSETMAID CORPORATION              )          Hon. Judge Gary Lancaster
and EMERSON ELECTRIC CO.            )
                                    )
         Defendants.         )

TO:    ClosetMaid Corporation.

c/o    Maria Greco Danaher
       Ogletree Deakins
       Four Gateway Center
       Suite 400 Pittsburgh, Pa. 15222-1237

### AMENDED NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that pursuant to Rules 26 and 30(b)(6) of the Federal Rules of

Civil Procedure, Plaintiffs, by their counsel and by agreement have re-scheduled the deposition

of ClosetMaid Corp. to be taken at the offices of Ogletree Deakins, Four Gateway Center, Suite

400 Pittsburgh, Pa. 15222-1237, on August 27 at 9:00 a.m. unless otherwise agreed by all

counsel and the deponent.

The deposition will be recorded by stenographic means and may also be videotaped. The

deposition will continue from day to day until completed. You are invited to attend and

participate. The words, terms and phrases used herein shall have the same meaning as they have

in common and ordinary usage, unless otherwise indicated. Specific "Definitions and

1



Exhibit
Witness ClosetMaid
Date 8/27/09 Rptr. NB
AKF

Instructions" applicable to this request are set forth in Plaintiffs First Request For Production of Documents or First Set Of Interrogatories.

ClosetMaid is requested to designate on or before August 23, 2009  in writing, one or more of its officers, directors, managing agents or others  knowledgeable to testify on its behalf with respect to each of the following categories  described below.  Pursuant to Fed.R.Civ.P. 30(b)(6), ClosetMaid is to set forth, for each person designated, the matters on which the person will testimony.  The requested testimony is with respect to:

1. The number of and identity of all persons who either applied for employment with ClosetMaid or who were existing employees of Defendant and from whom Defendant obtained written consent to obtain a consumer report using substantially the same application for employment and consent forms as used with Ms. Reardon.

2. The number of and identity all persons and as to whom Defendant then procured a consumer report.

3. The number of  persons or employees you terminated or denied employment since December 20, 2003 because of, in part, information in a consumer report which you obtained concerning them and the policies, practices and procedures followed in taking this action.

4. The extent to which the application and consent forms used by ClosetMaid with respect to Ms. Reardon is used by Emerson and its related and subsidiary companies.

5. The policies, practices and procedures used by ClosetMaid to obtain written consent to obtain a consumer report about employees and to send Pre-Adverse Action Notices.

2

6.      The source for and the creation of the policies, practices and procedures used by ClosetMaid to obtain written consent to obtain a consumer report about employees and to send Pre-Adverse Action Notices.

7.      The source for creation and determination to use the application for employment and consent to obtain a consumer report forms used by ClosetMaid.

8.      The extent to which the application for employment and consent to obtain a consumer report forms used by ClosetMaid are used by other subsidiary or related companies.

9.      ClosetMaid' s procedure for hiring or screening employees it proposes to hire or retain as employees, including the application process, the interview process, all background checks that are completed, the communication to the applicant of the hiring decision, and all paperwork or documentation that changes hands between Defendant and the applicant from the beginning of the process until the applicant is either hired or rejected for employment during the applicable time period.

10.     The source and creation of the Salaried Recruiting Procedure manual that was produced with Defendants' Fed.R.Civ.P. 26 disclosures.

11.     The method or procedure ClosetMaid uses to verify that an applicant who is rejected because of information on the applicant's consumer report receives a copy of the consumer report and a description in writing of the FCRA rights of the consumer as required by FCRA § 1681b(b)(3)(A)(I).

12.     The identification and authenticity of documents sent to or received from other subsidiaries or affiliated entities of discussing or referring to policies, practices and/or procedures related to consumer reports about employees.

3

13.    The identification and authenticity of documents related or referring to the employee hiring practices, policies and procedures that Emerson requires, recommends or disseminates to ClosetMaid.

14.    The identification and authenticity of documents referring or related to the policies, practices and procedures used to obtain written consent to obtain a consumer report about employees.

15.    ClosetMaid's hiring or placement procedures during the applicable time period concerning individuals who applied to be placed with ClosetMaid, including those who were rejected because of the contents of their consumer report.

16.    The training that is provided by the Human Resources department of Emerson for ClosetMaid's Human Resources function, including but not limited to employment applications and obtaining consumer reports.

17.    The policies, practices and procedures that are required or recommended by Emerson for ClosetMaid to follow to obtain written consent from prospective or current employees to obtain a consumer report and to send Pre-Adverse Action Notices.

18.    ClosetMaid's policies, practices and procedures related to the sharing of consumer reports obtained from a consumer reporting agency with or among affiliates or subsidiaries of ClosetMaid for employment purposes.

19.    Whether and to what extent ClosetMaid or any affiliate or subsidiary of ClosetMaid has ever shared a copy of a consumer report that was obtained from a consumer reporting agency with another affiliate or subsidiary of ClosetMaid.

4

| ■CLOSETMAID | Salaried Recruiting Procedure |
|---|---|
| HUMAN RESOURCES | Category: Selection Process |
| Date: 04/25/2006 | Procedure No. |
| No. of Pages: 8 | Supercedes Procedure Dated: 05/25/2004 |

**1.0   PURPOSE**

To establish a method by which salaried positions are filled by candidates that have been sourced, screened, interviewed and hired in a timely manner.

**2.0   SCOPE**

Human Resources Department

**3.0   DEFINITIONS**

Red Folders: Contain all information for current "active applicants".
TBNT : Thanks But No Thanks
ABC:  Accurate Background Reporting Service
Lexis Nexis :  Online Background Check Service
CPP:     Comprehensive Personality Profile
DMV:   Department of Motor Vehicles
Open Req Report: Listing of all Open, Filled and Transferred Requisitions
www.closetmaid.com : ClosetMaid website
One Stop :  State Employment Agency
JobLine:  Internal Job posting recording
Intranet:  Internal HR Communication System
"Good standing" :  criteria used to establish if an internal applicant is eligible for a
         opportunity or transfer.
"The usual" :  packet of information from microfiche which includes application,
         reviews and disciplinary notices.

**4.0   RESPONSIBILITY**

The Human Resources Department and its representatives establish the hiring and processing criteria for hiring.  External agents may be responsible for recruitment and pre-screening responsibilities.

**5.0   PROCEDURE**

*5.1   Personnel Requisition (See Attachment 5.1.1)*

The personnel requisition should be received as soon as the Hiring Manager, Human Resources Manager, VP of HR and President complete proper signature approval.  The Hiring Manager is responsible for signature routing.





164

| ■CLOSETMAID | Salaried Recruiting Procedure | Date 05/25/2004 |

Upon receipt of the personnel requisition, the Human Resources Representative is responsible for entering the open position in the Open Req Report *(See Attachment 5.1.2 )*

**5.2     *Meeting with the Hiring Manager***
Even if the Human Resources Representative knows the Hiring Manager and is recruiting for a repeat position, he/she must schedule a face-to-face verbal interview with the Hiring Manager.  The Human Resources Representative should pull the current Job Description *(See Attachment 5.2.1)* and bring a copy to the meeting with the Hiring Manager.

During the interview, the Human Resources Representative is required to:
- Formulate position needs and requirements
- Confirm Salary Range
- Confirm current Job Description.  If changes are required, please refer to the Job Description Procedure.
- Develop a Recruitment Plan *(See Attachment 5.2.2)*
- Determine Job Specific questions to incorporate into the standard interview questions *(See Attachment 5.2.3)*

**5.3     *Creating a Position Folder/File***
Each Human Resources Representative is responsible for developing their organizational approach to recruiting.  However, they are required to maintain a TBNT file of resumes in the front filing area for each position as well as Resumes Pending file in their office in order for other staff members to easily locate information should it become necessary.  The Human Resources Representative is responsible for creating a Red File Folder for any viable candidates in order for other HR staff members to easily locate any information.

**5.4     *Recruiting Options***
Every position must be posted on the Job Line *(Please see Job Line Procedure for further clarification),* the Intranet,  www.closetmaid.com and One Stop immediately.

After the position has been posted, the Human Resources Representatives are responsible for working with the Employee Relations Manager to place appropriate advertisements as indicated on the Recruitment Plan or to contact Employment Agencies if it has been approved by the VP of HR.

165

| ■CLOSETMAID | Salaried Recruiting Procedure | Date 05/25/2004 |

All advertisements must include:

- **Closet**Maid, A Division of Emerson
- Fax Number
- E-Mail address
- ClosetMaid Web Site Address
- EOE Statement

### 5.5   *Review of Applicants/Resumes*

Open and date each resume received. Determine qualification level and appropriate match of each applicant to the position. Place potential resumes in Resumes Pending file. Route and unqualified candidates to the switchboard operator with the appropriate TBNT code in order for TBNT notice to be sent. These will be returned to the Human Resources Representative. Place in front TBNT files.

Make Pre-Qualifying calls to obtain missing information or further evaluate qualifications such as ability to relocate, gaps in history and salary requirements. This information will allow the Human Resources to discuss the candidate with the Hiring Manager.

### 5.5.a.  *Internal Requests*

Internal applicants may apply. When this occurs, the associate will submit an opportunity request to the Human Resources Department. The opportunity is forwarded to the Executive Assistant for processing, where "good standing" eligibility is determined. The opportunity request is then forwarded to the appropriate Human Resources Representative.

The Human Resources Representative is responsible for reviewing the qualifications of the position against the qualification of the internal candidate. If it is found that the internal candidate is not qualified, the Human Resources Representative is responsible for sending a letter to the associate explaining this *(See Attachment 5.5.a.1 )*.

If it is found that the internal candidate is qualified for the position, it is the responsibility of the Human Resources Representative to request "the usual" from Microfiche using the MARS system. Once it is received, the Human Resources Representative should photocopy the Opportunity Request and the papers received from microfiche and forward them to the Hiring Manager. Place originals in a newly created Red Folder File.

The Hiring Manager is responsible for conducting an interview with an internal candidate. It is the responsibility of the Human Resources Representative to coordinate the interview.

| ■CLOSETMAID | Salaried Recruiting Procedure | Date 05/25/2004 |

If the Hiring Manager is not interested in the internal candidate after the interview, the Human Resources Representative is responsible for sending an internal TBNT letter *(See Attachment 5.5.a.2)*. The opportunity request and a copy of the letter should be sent to microfiche.

If the Hiring Manager is interested in the internal candidate, proceed with a potential internal transfer *(Please see Internal Transfer Procedure for further clarification)*.

**5.6   *Pre-Screen Processing***

Schedule and conduct pre-screen personal or phone interviews. Some Hiring Managers may request to review resumes before pre-screen interviews are conducted to identify their preferred candidates, others may request that the Human Resources Representative makes this determination.

Human Resources Representatives are responsible for assuring that Job Specific questions are incorporated into the standard interview questions. Job specific questions can be generated from the recruitment plan meeting with the Hiring Manager from step 5.2.

If the candidate appears qualified, photocopy resume and interview notes. Forward photocopies to the Hiring Manager for review.  Place originals in a newly created Red Folder File.  Attach pre-orientation checklist sheet *(See Attachment 5.6.1 )* to the Red Folder. Fax or Mail the following to eligible candidate with a Fax Coversheet *(See Attachment 5.6.2)* explaining the individual forms and a request for References:

- Application  *(See Attachment 5.6.3)*
- Consumer Notification *(See Attachment 5.6.4)*
- Release form *(See Attachment 5.6.5)*
- CPP *(See Attachment 5.6.6)* or other personality profile evaluation
- Pre-Employment Information Form *(See Attachment 5.6.7)*

References should include a total of three (3) references:
- two (2) Supervisory references,
- a peer reference or a subordinate reference if applicable.

If candidate is not qualified, attach interview notes to resume and send TNBT letter *(See Attachment 5.6.8)* after 4 business days. File in front TBNT file.

**5.7   *Reference Processing/Start Candidate Hiring Process***

| ■CLOSETMAID | Salaried Recruiting Procedure | Date 05/25/2004 |

This only begins after applicants are interviewed, and determined qualified for the position.

Once all the appropriate information has been returned to the Human Resources Representative, he/she should process the CPP or other personality profile test first. *(See CPP Procedure for further clarification)*. Read over results *(See Attachment 5.7.1)* and highlight areas of strength and areas of weakness.

Check references based on results. Human Resources Representatives have the responsibility to assure all weaknesses are thoroughly explored in the reference check process. All references need to be completed in full, printed and placed into the Red Folder.

Verify past employment. Dates, position title and re-hire eligibility must be verified by previous employers. Be sure to record the name of the individual who verifies the information.

Verify education. Verify with school's registrar's office. Social security number will be needed. Be sure to record the name of the individual who verifies the information.

Utilize ABC or Lexis Nexis for all other background verifications. To use ABC, utilize the ABC Form found in the Human Resources Recruiter files on the Desktops *(See Attachment 5.7.2)*. Fax ABC Form and Release Form to the phone number printed on the Fax ABC Form. Be sure to mark on the form the required checks to be obtained (if not sure if credit is required, please refer to the Background Check Matrix ). For Lexis Nexis, simply utilize the online access.

Results will be placed online through the Accurate Background Check or Lexis Nexis website. The Human Resources Representative should print these results. Place results in the Red Folder.

If any of the Reference Processing results in the disqualification* of a candidate, notify the Hiring Manager immediately. Remove the candidate from the Red Folder status and send a TBNT letter. File in the front TBNT files.

*If the disqualification of the candidate is the result of information received from a third party (i.e. Accurate Background Check), the Human Resources Representative must personally send a TBNT in accordance with the (FCRA) Fair Credit Reporting Act *(See Attachment 5.7.3)*.

| ▦CLOSETMAID˙ | Salaried Recruiting Procedure | Date 05/25/2004 |
|---|---|---|

**5.8    *Hiring Manager Interview***

Hiring Manager conducts either on site interview (if applicable) or telephone interview asking additional questions which more deeply into the overall qualifications of the candidate. The Hiring Manager completes the Interview Rating Sheet *(See Attachment 5.8.1)* and returns to the Human Resources Representative.

**5.8.a *On-Site Interview (if applicable)***

Coordinate on-site interview date with Hiring Manager and candidate. Use ClosetMaid's online travel services to make travel and car reservations if needed. Check with VP of HR for approval on credit card processing. See Human Resources Assistant to make hotel reservations if needed.

Contact ClosetMaid employees responsible for interviewing candidate to coordinate the interview schedule. Obtain assistance from Hiring Manager if necessary. Prepare interview agenda *(See Attachment 5.8.a.1)*. Human Resources Representatives should always be listed first in order to greet the candidate and escort the candidate to the first interviewer. If the candidate may potentially relocate to the Ocala area, the Human Resources Representative should schedule a 30-minute meeting with the candidate during the day to answer any questions and forward an area information packet to them (*available from the Marion County Chamber of Commerce*).

Forward a copy of the itinerary and resume to interviewers. Delete salary information from interview notes.

Send the candidate via mail, fax or e-mail:

- Travel itinerary *(See Attachment 5.8.a.2)*
- Directions to plant and hotel (if applicable) *(See Previous Attachment 5.8.a.2)*
- Interview agenda *(See Previous Attachment 5.8.a.1)*

Notify Guard/Security (6173) and HR desk of candidate's name and arrival time.

**5.9    *Offer Process***

If the Hiring Manager determines that the candidate should be offered a job, the offer process begins.

The Human Resources Representative must notify the Hiring Manger of their responsibilities with a potential new hire. Forward to them a copy of the Hiring Manager Checklist *(See Attachment 5.9.1)*and a Sample Orientation Schedule *(See Attachment 5.9.2)* , which are found in the Document Control Database. Explain that the sample orientation schedule

169

| ■CLOSETMAID | Salaried Recruiting Procedure | Date 05/25/2004 |

must be submitted to the Human Resources Representative prior to the new employee's start date and the Hiring Checklist must be submitted to the Human Resources Representative at the conclusion of the associate's first week.

It is the responsibility of the Human Resources Representative to forward all necessary documentation to the Employee Relations Manager and/or VP of HR for approval.  The documentation should include:

- ❑ Application
- ❑ Resume
- ❑ HR Representative Interview Notes
- ❑ Hiring Manager Interview Notes (if applicable)
- ❑ Interview Rating sheets (if applicable)
- ❑ References
- ❑ Background Results
- ❑ Credit Results (if applicable)
- ❑ CPP Form and results
- ❑ Offer Documentation (see Attachment 5.9.3)
- ❑ Offer Letter
- ❑ Internal Equity report (if applicable)
- ❑ Training Plan
- ❑ Requisition
- ❑ Any additional relevant paperwork

The VP of HR will make any changes to the offer letter and obtain verbal approval from the President to present the offer.  DO NOT make an offer to a candidate without first obtaining the President's approval.

### 5.10   *Offer Presentation*

The Human Resources Representative should call the candidate with the verbal offer only.  The Human Resources Representative should then mail/fax the offer ASAP and should request a response within 3 days of receipt.  Once a singed letter is obtained from the candidate, photocopy the signed letter and forward to VP of HR.

### 5.11   *Closing Process*

- Coordinate Drug Screen and Pre-Employment Health Screen.
- Coordinate start date with Hiring Manager.
- Update pre-orientation list.
- Update open requisition report (cut and paste).
- Send out and outstanding TBNT letters.
- Remove position from Jobline
- Remove position from www.closetmaid.com
- Remove position from any other recruiting sources.
- Add Outlook Calendar reminder to remove resumes for the position from the front TBNT files and destroy via records retention guidelines.

| ■CLOSETMAID | Salaried Recruiting Procedure | Date 05/25/2004 |

- Forward revised copy of job description, Hiring Manager Checklist and Sample Orientation plan to the Employee Relations Manager for review and filing.

**6.0    DOCUMENTATION and RECORD KEEPING**
The Human Resources Representative is responsible for all documentation and record keeping.

| **ⅢCLOSETMAID** | Salaried Recruiting Procedure | *ATTACHMENT 5.6.1* |
|---|---|---|

**EMERSON.**
*rage* Solutions

### Pre-Orientation Checklist - Salaried                    **ⅢCLOSETMAID**

NAME: _____        Dept: _____

## BEFORE OFFER

- ❑ Application
- ❑ Resume
- ❑ Release Form
- ❑ Pre-Employment Form
- ❑ Previous Employed / Applied?
- ❑ Interview Notes
- ❑ TABE Test (if applicable)
- ❑ CPP Form
- ❑ CPP Results
- ❑ Hiring Manager Approval
- ❑ Degree Verified
- ❑ References (3)
- ❑ Background Checks
  - o Social Security # Check
  - o Accurate Background Check
  - o Credit (if applicable)
  - o MVR (if applicable)
- ❑ Requisition Enclosed
- ❑ Offer Documentation
- ❑ Offer Letter
- ❑ Job Description edited

## AFTER OFFER

- ❑ Signed copy of letter to Cathy Beal
- ❑ Schedule Health Screen
- ❑ WOTC Form
- ❑ Orientation Information
- ❑ Email sent to Hiring Manager on Training plan and Hiring Checklist

## FIRST DAY

- ❑ Copy of ID's
- ❑ Drug Screen
- ❑ Relocation Check (if applicable)
- ❑ Sign-on Check (if applicable)

REV 05/25/2004
JPB

| ◼CLOSETMAID | Salaried Recruiting Procedure | *ATTACHMENT 5.6.2* |
|---|---|---|



# EMERSON.
Storage Solutions



# Facsimile

650 S.W. 27th Avenue
P.O. Box 4400
Ocala, FL 34478-4400

T (352) 401-6126
F (352) 401-6130

---

To:                                         No. of Pages *(including cover sheet:)* 5

Company:

Fax Number:

Date:          **26-May-2004**

From:          **Jennifer Boring**

Phone:         **(352) 401-6126**

Comments:

**Thank you,**

**Jennifer Boring**
**Employee Relations Manager**

173

CLOSETMAID | Salaried Recruiting Procedure | ATTACHMENT 5.6.3

# ■CLOSETMAID®

**A Division of Emerson**

## APPLICATION FOR EMPLOYMENT

Appl # _____
Org # _____

Mailing Address: PO Box 4400,   Ocala, FL 34478
Location:  650 SW 27th Avenue,  Ocala, FL 34474
Jobline Number: 800-338-6071
Main Number:  800-227-8319

INTERVIEWED BY:

Position Applied For: _____

| FULL NAME (LAST, FIRST, MIDDLE) | | | | FULL TIME ☐   PART TIME ☐ | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|
| STREET ADDRESS | | | | SHIFT: 1ST ☐  2ND ☐  3RD ☐ / 12 hour days ☐  nights ☐ | HOME TELEPHONE NUMBER |
| CITY | STATE | COUNTY | ZIP CODE | OVERTIME/WEEKENDS ☐ | WORK/BEEPER/MOBILE/OTHER |

**Important Notice:** This application is to be completed in detail, in ink, with your own printing/handwriting.  If you need assistance in completing this application, please contact a Human Resources Representative.  Please ensure that this application is accurate and completed in full.  Inaccurate, false and/or incomplete or omitted information will result in rejection of application or termination if discovered subsequent to your employment with ClosetMaid.  ClosetMaid is an Equal Opportunity Employer and will not discriminate against any employee or applicant for employment in any manner prohibited by law.

| YES ☐  NO ☐ | ARE YOU LEGALLY AUTHORIZED TO WORK IN THE UNITED STATES? |
|---|---|
| YES ☐  NO ☐ | HAVE YOU EVER APPLIED FOR WORK AT CLOSETMAID/CLAIRSON INTERNATIONAL? |
| YES ☐  NO ☐ | ARE YOU 18 YEARS OF AGE OR OLDER? |
| YES ☐  NO ☐ | DO YOU HAVE ANY ACQUAINTANCES/RELATIVES EMPLOYED BY CLOSETMAID/CLAIRSON INTERNATIONAL?  IF "YES," PLEASE STATE NAME AND RELATIONSHIP: |
| *YES ☐  NO ☐ | HAVE YOU EVER BEEN CONVICTED (OR PLEAD NO CONTEST) TO A FELONY OR BEEN CONVICTED OF A MISDEMEANOR RESULTING IN IMPRISONMENT?  IF "YES," PLEASE EXPLAIN: |

*NOTE: ANSWERING "YES" TO THIS QUESTION WILL NOT NECESSARILY DISQUALIFY YOU FROM THE POSITION DESIRED.  EACH ACTION AND EXPLANATION WILL BE WEIGHED AND CONSIDERED IN RELATIONSHIP TO THE POSITION FOR WHICH YOU ARE APPLYING.

| SCHOOL | NAME AND LOCATION | | | | | GRADUATED | |
|---|---|---|---|---|---|---|---|
| HIGH SCHOOL | | 1 | 2 | 3 | 4 | YES ☐ | NO ☐ |
| BUSINESS/ TECHNICAL TRADE | | 1 | 2 | 3 | 4 | YES ☐ | NO ☐ |
| COLLEGE | | 1 | 2 | 3 | 4 | YES ☐ | NO ☐ |
| GRADUATE | | 1 | 2 | 3 | 4 | YES ☐ | NO ☐ |

HOW WERE YOU REFERRED?  ☐ NEWSPAPER  ☐ AGENCY  ☐ FRIEND/RELATIVE (NAME[S]) _____
☐ OTHER (specify) _____

EMERSON
Business Solutions

174

**EMPLOYMENT HISTORY** (PLEASE LIST LAST 4 EMPLOYERS BEGINNING WITH PRESENT OR MOST RECENT EMPLOYER)

| NAME OF EMPLOYER | | | | TELEPHONE | | |
|---|---|---|---|---|---|---|
| ADDRESS - STREET | | | CITY | STATE/ZIP | | IMMEDIATE SUPERVISOR |
| EMPLOYMENT DATES (MO & YR)  FROM | TO | TITLE OF POSITION | | | SALARY START | SALARY END |
| REASON FOR DESIRING CHANGE OR LEAVING | | | | | | |
| DESCRIPTION OF DUTIES | | | | | | |
| | | | | | | |

| NAME OF EMPLOYER | | | | TELEPHONE | | |
|---|---|---|---|---|---|---|
| ADDRESS - STREET | | | CITY | STATE/ZIP | | IMMEDIATE SUPERVISOR |
| EMPLOYMENT DATES (MO & YR)  FROM | TO | TITLE OF POSITION | | | SALARY START | SALARY END |
| REASON FOR DESIRING CHANGE OR LEAVING | | | | | | |
| DESCRIPTION OF DUTIES | | | | | | |
| | | | | | | |

| NAME OF EMPLOYER | | | | TELEPHONE | | |
|---|---|---|---|---|---|---|
| ADDRESS - STREET | | | CITY | STATE/ZIP | | IMMEDIATE SUPERVISOR |
| EMPLOYMENT DATES (MO & YR)  FROM | TO | TITLE OF POSITION | | | SALARY START | SALARY END |
| REASON FOR DESIRING CHANGE OR LEAVING | | | | | | |
| DESCRIPTION OF DUTIES | | | | | | |
| | | | | | | |

| NAME OF EMPLOYER | | | | TELEPHONE | | |
|---|---|---|---|---|---|---|
| ADDRESS - STREET | | | CITY | STATE/ZIP | | IMMEDIATE SUPERVISOR |
| EMPLOYMENT DATES (MO & YR)  FROM | TO | TITLE OF POSITION | | | SALARY START | SALARY END |
| REASON FOR DESIRING CHANGE OR LEAVING | | | | | | |
| DESCRIPTION OF DUTIES | | | | | | |
| | | | | | | |

175

**Additional Information**

Please list any Languages spoken other than English:

_____
_____
_____

Please list any Special Honors or Certifications received:

_____
_____
_____

Please list any Professional Organizations of which you are a member:

_____
_____
_____

Please list any specialized skills, courses or training that you have had:

_____
_____
_____

176

**REFERENCES** – Please list supervisors, co-workers and people who are familiar with your work or school achievements.  NOTE: Do NOT list relatives.

| | 1. | 2. | 3. |
|---|---|---|---|
| Name | | | |
| Position | | | |
| Company/ School | | | |
| Address | | | |
| Telephone No. | | | |

Please read carefully: Regardless of whether or not I become employed by ClosetMaid I recognize that this application is not and should not be considered as a contract.  Employment may be terminated with or without cause, and without notice, at any time, at my option or ClosetMaid's.  I further understand that no ClosetMaid employee or representative has the authority to enter into a contract regarding duration of terms and conditions of employment other than an officer or official of ClosetMaid and then only by means of a signed written document.  I understand that misrepresentations of any material fact by me in this application can result in denial of employment or, upon subsequent discovery, immediate termination of employment.  I recognize that any offer of employment is conditional upon satisfactory results of a post offer health screening and background verification, which includes drug screening.  I understand that any offer of employment is also contingent upon my ability to provide the documentation required by the Immigration Reform and Control Act of 1986 to substantiate that I am legally authorized to work in the United States.  I authorize ClosetMaid to contact any or all of my former employers or any of the references I have supplied, for the purpose of verifying the information I have provided, and/or for the purpose of obtaining any information, whether favorable or unfavorable, about me or my employment with any former employer, except as noted below:  (If none, write "none") _____          SIGNATURE: _____                    DATE: _____

| ▓CLOSETMAID | Salaried Recruiting Procedure | *ATTACHMENT 5.6.4* |
|---|---|---|

# ▓CLOSETMAID®

# FAIR CREDIT REPORTING ACT AUTHORIZATION FORM

### NOTICE OF INTENT TO OBTAIN A CONSUMER CREDIT REPORT

I understand that, as a condition of my consideration for employment with ClosetMaid, or as a condition of my continued employment with ClosetMaid may obtain a consumer report that includes, but is not limited to, my credit history or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information bearing on my credit standing or credit capacity.

I understand that, pursuant to the federal Fair Credit Reporting Act, if any adverse action is to be taken based upon this consumer report, a copy of the report and a summary of the consumer's rights will be provided to me if requested.

_____     _____
Signature of Applicant                                                            Date

_____
Printed Name of Applicant

| **CLOSET**MAID | Salaried Recruiting Procedure | *ATTACHMENT 5.6.5* |
|---|---|---|

# **CLOSET**MAID®

### AUTHORIZATION TO OBTAIN A CONSUMER CREDIT REPORT AND RELEASE OF INFORMATION FOR EMPLOYMENT PURPOSES

Pursuant to the Fair Credit Reporting Act, I hereby authorize ClosetMaid and its designated agents and representatives to conduct a comprehensive review of my background through a consumer report and/or investigative consumer report to be generated for employment, promotion, reassignment or retention as an employee. I understand the scope of the consumer report/investigative consumer report and may include, but is not limited to the following areas:

Verification of Social Security Number, current and previous residences, employment history including all personnel files, education, character references, credit history and reports, criminal history records from any criminal justice agency in any or all federal, state, or county jurisdictions, birth records, motor vehicle records to include traffic citations and registration and any other public records.

I, _____, authorize the complete release of these records or data pertaining to me which an individual, company, firm, corporation, or public agency may have. I understand that I must provide my date of birth to adequately complete said screening, and acknowledge that my date of birth with not affect any hiring decisions. I hereby authorize and request any present or former employer, school, police department, financial institution or other personal knowledge about me, to furnish bearer with any and all information in their possession regarding me in connection with an application or employment. I am authorizing that a photocopy of this authorization be accepted with the same authority as the original.

I hereby release ClosetMaid ,and its agents, officials, representative, or assigned agencies, including officers, employees, or related personnel both individually and collectively, from any and all liability for damages of whatever kind, which may at any time, result to me, my heirs, family, or associates because of compliance with this authorization and request to release. You may contact me as indicated below. I understand that a copy of this authorization may be given at anytime, provided I do so in writing.

I understand that, in pursuant to the Fair Credit Reporting Act, if any adverse action is to be taken based upon the consumer report, a copy of the report and a summary of the consumer's rights will be provided to me if requested.

### PLEASE PRINT CLEARLY!

Name (print): _____
           *First*      *Middle*         *Last*         *(Maiden)*

Print all Former Names Used: *(1)* _____ *(2)* _____

Social Security Number: _____-___-_____  Sex: *M / F*  Race: _____

Date of Birth: _____  Phone Number: _____  HS Graduation Year: ___

Current Street Address:
_____
   *Street*          *City*    *State*   *Zip*

Driver's License Number: _____  State of Issue: _____

May We Contact Your Employers? ____  May We Contact Your Supervisors? _____

Comments:
_____
_____

➤ Print Previous Three Addresses (City and State):

  *(1)* City: _____ State: _____ From: _____ To: _____

  *(2)* City: _____ State: _____ From: _____ To: _____

  *(3)* City: _____ State: _____ From: _____ To: _____

*By signing below, you are certifying that the above information is true and correct:*

Signature: _____  Date: _____

179

# CLOSETMAID™

650 SW 27th Avenue
P.O. Box 4400
Ocala, FL 34478-4400

APPL# _____

## PRE-EMPLOYMENT INFORMATION FORM

### (Answer All Questions – Please Print)

Qualified applicants are considered for employment, and employees are treated during employment, without regard to race, color, religion, sex, national origin, age, marital status, veteran status or disability.

To help us comply with Federal/State equal opportunity recordkeeping, reporting and other legal requirements, please answer questions below. Completion of this form is on a **voluntary basis** and has no bearing on whether of not you are hired by this company.

The Pre-Employment Form will be kept in a **Confidential File** separate from the Application for Employment.

Date: _____        SS# _____

Name (Print) _____
  **Last**                              **First**                                **Middle**

Sex        ☐Male (M)        ☐Female (F)

Race       ☐White (1)    ☐Black (2)    ☐Hispanic (3)    ☐Asian/Pacific Islander(4)    ☐American Indian/Alaskan Native (5)

Are you a Veteran?                        ☐Yes        ☐No

Are you a Vietnam Era Veteran?            ☐Yes        ☐No

Are you a Gulf War Veteran?               ☐Yes        ☐No

Have you as a Veteran served on active duty during a war or in a campaign

or expedition for which a campaign badge has been authorized?        ☐Yes        ☐No

Position Applied For _____

How were you referred?    ☐Newspaper    ☐Agency    ☐Friend/Relative (Name) _____    ☐ Other _____





EMERSON
Storage Solutions

| **CLOSETMAID** | Salaried Recruiting Procedure | *ATTACHMENT 5.6.8* |
|---|---|---|

March 11, 2004

Mr. Richard Snyder
8582 East Sweetwater Drive
Inverness, FL 34450

Dear Rich:

Thank you for your time and the interest you have shown in considering a position here at ClosetMaid. We were fortunate to have reviewed several qualified applications. After extensive review and careful consideration of your qualifications for the position, we have elected to proceed with candidates who are a closer match for the position.

Your regard for our company is greatly appreciated. Please accept our best wishes for your continued career success.

Sincerely,

Jennifer Boring
Employee Relations Manager

| ■CLOSETMAID | Salaried Recruiting Procedure | *ATTACHMENT 5.7.2* |
|---|---|---|



**EMERSON.**
Storage Solutions



# Facsimile

650 S.W. 27th Avenue
P.O. Box 4400
Ocala, FL 34478-4400

T (352) 401-6000
F (352) 401-6130

| To: | **Lola/Michelle** | No. of Pages *(including cover sheet)* | **3** |
|---|---|---|---|

| Company: | **Accurate Background Check** |
|---|---|

Fax Number:   **(352) 854-8917**

Date:   **26-May-2004**

From:   **Melissa Martell**

Phone:   **(352) 401-6109**

| Criminal☐ | W/C☐ | Credit*☐ | MVR☐ |
|---|---|---|---|

| **NAME** | **D.O.B.** | **SOCIAL SECURITY** |
|---|---|---|

\* Credit Required for All financial, procurement, Human Resources, Sales and Management positions

| ▓CLOSETMAID | Salaried Recruiting Procedure | *ATTACHMENT 5.7.3* |

July 30, 2002

Ms. Anna Jones
123 Main Street
Ocala, FL 34478

Dear Ms. Jones:

We regret to inform you that we have found it necessary to reject your application for employment.

This action was influenced by information in a consumer report made, at our request, by ABC at 3511 SW 25th Street Ocala, FL 34474.  You may also contact ABC via their toll free number 877-611-2277.

ABC did not make this decision and can not provide the reason for it.

You may obtain a free copy of the report within 60 days, and you have the right to dispute the accuracy of the information with ABC.

Sincerely,

Sonya Y. Young
HR Representative

5.73

July 24, 2003

Ms. Anna Jones
123 Main Street
Anywhere, FL  12345

Dear Ms. Jones:

Enclosed you will find a copy of a report we have obtained from Accurate Background
Check at 3511 SW 25th Street Ocala, FL 34474.

The Company may decide not to offer you the position you applied for based on whole
or in part upon the information in this report.  Enclosed is a summary of your rights
under the Fair Credit Reporting Act.

The Company will wait five business days from the date of this letter before it makes a
decision on your application.

Sincerely,

Jennifer Boring
Human Resources Representative

## A Summary of Your Rights
## Under the Fair Credit Reporting Act

The federal Fair Credit Reporting Act (FCRA) is designed to promote accuracy, fairness, and privacy of information in the files of every "consumer reporting agency" (CRA). Most CRAs are credit bureaus that gather and sell information about you -- such as if you pay your bills on time or have filed bankruptcy -- to creditors, employers, landlords, and other businesses. You can find the complete text of the FCRA, 15 U.S.C. 1681-1681u, at the Federal Trade Commission's web site (*http://www.ftc.gov*). The FCRA gives you specific rights, as outlined below. You may have additional rights under state law. You may contact a state or local consumer protection agency or a state attorney general to learn those rights.

- **You must be told if information in your file has been used against you.** Anyone who uses information from a CRA to take action against you -- such as denying an application for credit, insurance, or employment -- must tell you, and give you the name, address, and phone number of the CRA that provided the consumer report.

- **You can find out what is in your file.** At your request, a CRA must give you the information in your file, and a list of everyone who has requested it recently. There is no charge for the report if a person has taken action against you because of information supplied by the CRA, if you request the report within 60 days of receiving notice of the action. You also are entitled to one free report every twelve months upon request if you certify that (1) you are unemployed and plan to seek employment within 60 days, (2) you are on welfare, or (3) your report is inaccurate due to fraud. Otherwise, a CRA may charge you up to eight dollars.

- **You can dispute inaccurate information with the CRA.** If you tell a CRA that your file contains inaccurate information, the CRA must investigate the items (usually within 30 days) by presenting to its information source all relevant evidence you submit, unless your dispute is frivolous. The source must review your evidence and report its findings to the CRA. (The source also must advise national CRAs -- to which it has provided the data -- of any error.) The CRA must give you a written report of the investigation, and a copy of your report if the investigation results in any change. If the CRA's investigation does not resolve the dispute, you may add a brief statement to your file. The CRA must normally include a summary of your statement in future reports. If an item is deleted or a dispute statement is filed, you may ask that anyone who has recently received your report be notified of the change.

- **Inaccurate information must be corrected or deleted.** A CRA must remove or correct inaccurate or unverified information from its files, usually within 30 days after you dispute it. **However, the CRA is not required to remove accurate data from your file unless it is outdated (as described below) or cannot be verified.** If your dispute results in any change to your report, the CRA cannot reinsert into your file a disputed item unless the information source verifies its accuracy and completeness. In addition, the CRA must give you a written notice telling you it has reinserted the item. The notice must include the name, address and phone number of the information source.

- **You can dispute inaccurate items with the source of the information.** If you tell anyone -- such as a creditor who reports to a CRA -- that you dispute an item, they may not then report the information to a CRA without including a notice of your dispute. In addition, once you've notified the source of the error in writing, it may not continue to report the information if it is, in fact, an error.

- **Outdated information may not be reported.** In most cases, a CRA may not report negative information that is more than seven years old; ten years for bankruptcies.

- **Access to your file is limited.** A CRA may provide information about you only to people with a need recognized by the FCRA -- usually to consider an application with a creditor, insurer, employer, landlord, or other business.

- **Your consent is required for reports that are provided to employers, or reports that contain medical information.** A CRA may not give out information about you to your employer, or prospective employer, without your written consent. A CRA may not report medical information about you to creditors, insurers, or employers without your permission.

- **You may choose to exclude your name from CRA lists for unsolicited credit and insurance offers.** Creditors and insurers may use file information as the basis for sending you unsolicited offers of credit or insurance. Such offers must include a toll-free phone number for you to call if you want your name and address removed from future lists. If you call, you must be kept off the lists for two years. If you request, complete, and return the CRA form provided for this purpose, you must be taken off the lists indefinitely.

- **You may seek damages from violators.** If a CRA, a user or (in some cases) a provider of CRA data, violates the FCRA, you may sue them in state or federal court.

The FCRA gives several different federal agencies authority to enforce the FCRA:

| FOR QUESTIONS OR CONCERNS REGARDING: | PLEASE CONTACT: |
|---|---|
| CRAs, creditors and others not listed below | Federal Trade Commission Consumer Response Center - FCRA Washington, DC 20580 1-877-382-4367 (Toll-Free) |
| National banks, federal branches/agencies of foreign banks (word "National" or initials "N.A." appear in or after bank's name) | Office of the Comptroller of the Currency Compliance Management, Mail Stop 6-6 Washington, DC 20219 800-613-6743 |
| Federal Reserve System member banks (except national banks, and federal branches/agencies of foreign banks) | Federal Reserve Board Division of Consumer & Community Affairs Washington, DC 20551 202-452-3693 |

| | |
|---|---|
| Savings associations and federally chartered savings banks (word "Federal" or initials "F.S.B." appear in federal institution's name) | Office of Thrift Supervision<br>Consumer Programs<br>Washington, DC 20552<br>800-842-6929 |
| Federal credit unions (words "Federal Credit Union" appear in institution's name) | National Credit Union Administration<br>1775 Duke Street<br>Alexandria, VA 22314<br>703-518-6360 |
| State-chartered banks that are not members of the Federal Reserve System | Federal Deposit Insurance Corporation<br>Division of Compliance & Consumer Affairs<br>Washington, DC 20429<br>800-934-FDIC |
| Air, surface, or rail common carriers regulated by former Civil Aeronautics Board or Interstate Commerce Commission | Department of Transportation<br>Office of Financial Management<br>Washington, DC 20590<br>202-366-1306 |
| Activities subject to the Packers and Stockyards Act, 1921 | Department of Agriculture<br>Office of Deputy Administrator - GIPSA<br>Washington, DC 20250<br>202-720-7051 |

187

# *Exhibit I*



Exhibit    7
Witness *Closetmaid*
Date 8/27/09 Rptr. *NB*
*AKF*

# ■CLOSETMAID

## APPLICATION FOR EMPLOYMENT



**NAME** _____

**DATE** _____

**POSITION** _____

Application limited to opening applied for. ClosetMaid® is an Equal Opportunity Employer.
Applicants will be considered for job openings without any regard to race, sex, religion, sexual
orientation, national origin, creed, age, disability and military service/veteran status.

EMERSON

 
EMERSON.

# APPLICATION FOR EMPLOYMENT

Date _____ Position applied for: _____

How did you hear about this opening:_____

Referred by: _____ Date available for work: _____

**INSTRUCTIONS:** Please read carefully. Every item on this form must be answered to the best of your ability and knowledge. Please print and use a pen. Your qualifications will be carefully reviewed, and you will be given thorough consideration for the vacancy/position applied for. Upon employment, this application will become part of your permanent record with us. Keep this in mind as you complete it. *Special Note: You are not required to supply any information that is prohibited by Federal, State or Local law. We are an Equal Opportunity Employer.*

**PERSONAL:**

Name _____ Social Security # _____
       First           M.I.           Last

Street _____ Box _____

City _____ County _____ State _____ Zip _____

Telephone No. ( ) _____ Other Telephone No. ( ) _____

Email Address _____

- Are you 18 years of age or older? ☐Yes ☐ No
- Are you legally entitled to work in the United States? ☐Yes ☐ No
  (You will be required to provide proof of identity and eligibility to work in the U.S. if hired)
- Have you ever been convicted of or pleaded guilty or Nolo Contendre (no contest or an Alford plea) to any felony? ☐Yes ☐ No (The fact you have been convicted of a crime will not automatically disqualify you from further consideration for employment.) If "yes" please describe in detail: _____
  _____

**EDUCATION:**

High School (Name and Address) _____
Did you graduate? ____ If no, last grade completed _____ G.E.D obtained? _____Grade Average _____
College (Name and address) _____
College (Name and address) _____
Did you graduate? _____ If no, number of hours completed _____ Grade Point Average _____
Degree_____ Major _____ Minor _____
If attending, date of graduation _____
Other education _____
Certifications _____

Page 2

434

# ██CLOSETMAID®

EMERSON

Awards, Honors, Leadership Roles _____
_____
_____

Foreign Languages: _____  _____   _____

**MILITARY:** ☐ Not applicable

List service in U.S. Military: From _____ to _____ Branch _____

Rank at discharge _____ Military experience that may be applicable: _____

## GENERAL EMPLOYMENT INFORMATION:

1. List here all of the equipment with which you have experience and training. (Examples: computer,
   lathe, milling machine, etc.)   _____   _____
   _____   _____

2. Were you previously employed by us? _____ If yes, when? _____ to _____

3. Type of employment sought:  ☐ Regular full-time   ☐ Regular part-time
   ☐ Temporary   ☐ Seasonal

4. Which of these times are you available:   Days:  ☐ Yes  ☐ No   Nights: ☐ Yes  ☐ No
   Weekends:  ☐ Yes  ☐ No  Seasonal: ☐ Yes  ☐ No
   Number of hours available per week? _____  ☐ No preference

5. Present salary: _____  ☐ Hour  ☐ Week  ☐ Year
   Salary expected: _____  ☐ Hour  ☐ Week  ☐ Year

6. List here names of relatives currently in our employ: _____
   _____

## ACTIVITIES:

Please list any information which you feel may be helpful in considering your application. (Examples:
significant work accomplishments, special training, specific interests, etc.) _____
_____
Affiliations with professional, civic organizations which you consider relevant to your ability to perform the
job for which you are applying: _____
_____

Page 3

435

 

**EMPLOYMENT HISTORY:**

List below all present and past employment beginning with your most recent employer. Please attach a separate sheet of paper if you have additional prior employers.

1. Employer _____ Job Title _____

   Address _____

   Supervisor _____ Last salary _____ ☐ Per hour ☐ Per week ☐ Year

   Phone # (    ) _____ Dates employed _____ to _____

   Reason for leaving ☐ Quit ☐ Discharge ☐ Retired ☐ Layoff ☐ Other _____

2. Employer _____ Job Title _____

   Address _____

   Supervisor _____ Last salary _____ ☐ Per hour ☐ Per week ☐ Year

   Phone # (    ) _____ Dates employed _____ to _____

   Reason for leaving ☐ Quit ☐ Discharge ☐ Retired ☐ Layoff ☐ Other _____

3. Employer _____ Job Title _____

   Address _____

   Supervisor _____ Last salary _____ ☐ Per hour ☐ Per week ☐ Year

   Phone # (    ) _____ Dates employed _____ to _____

   Reason for leaving ☐ Quit ☐ Discharge ☐ Retired ☐ Layoff ☐ Other _____

4. Employer _____ Job Title _____

   Address _____

   Supervisor _____ Last salary _____ ☐ Per hour ☐ Per week ☐ Year

   Phone # (    ) _____ Dates employed _____ to _____

   Reason for leaving ☐ Quit ☐ Discharge ☐ Retired ☐ Layoff ☐ Other _____

Page 4

436

# ▓CLOSETMAID®


EMERSON

Do you have any current contractual obligations relating to a prior employer or client, such as a confidentially and/or non-compete agreement? ☐ Yes ☐ No  If so, please list the agreements, dates and employers/clients involved: _____

_____

_____

**REFERENCES:**

Please list below three business references who can attest to your skills, knowledge and experience, that will contribute to your success in the position for which you are applying.

1. Name _____ Job Title _____

   Address _____

   Phone # (    ) _____ Alternate phone # (    ) _____

   E-mail address _____

2. Name _____ Job Title _____

   Address _____

   Phone # (    ) _____ Alternate phone # (    ) _____

   E-mail address _____

3. Name _____ Job Title _____

   Address _____

   Phone # (    ) _____ Alternate phone # (    ) _____

   E-mail address _____

Page 5

437

## APPLICATION LIMITED TO OPENING APPLIED FOR
## DISCLOSURE TO EMPLOYMENT APPLICATION
## PLEASE READ CAREFULLY BEFORE SIGNING

I hereby affirm that my answers to the foregoing questions are true and correct. I authorize ClosetMaid to conduct whatever investigation it deems necessary to confirm the answers submitted on this application. If the investigation concludes that I provided any untrue information, this will serve as sufficient grounds to immediately terminate the application process, or immediately terminate my employment regardless of when the discovery occurs

I understand and agree that my employment is "at will" for no definite period and may, regardless of the period of payment and wages or salary, be terminated at any time for any reason without any previous notice. I further understand that no ClosetMaid official has made any promises to the contrary or guaranteed me employment for any specified period of time, or has the authority to make such promise/guarantee, and that no employee handbook or policy may be construed to the contrary or interpreted as a contract or guarantee of employment.

I also authorize any of my former employers to furnish this company with their record of my services, my reason for leaving their employ, and any other information they may have concerning me. I hereby release any of my former employers from all liability for any damages in furnishing said record.

I agree that if I am employed by this Company, a full transcript of my records as an employee, including reason for termination, may be given to a prospective future employer on its request, and do hereby release this Company from any and all liability or damages whatsoever in furnishing such information.

I agree to abide by the rules and policies of this Company. I further understand that all applicants are subject to post-offer medical examination, and drug screening, as a condition of employment. Examinations are to be made by a representative designated by the Company.

Upon separation of employment, I authorize the Company to withhold from my final paycheck, vacation and expense checks any and all monies owed to the Company by me at the time of my termination allowable by state/federal laws.

The use of this application form does not indicate that there are any positions available, and in no way obligates the Company.

I agree that any claim or lawsuit relating to this application, my service or employment with ClosetMaid or its affiliates, whether relating to contracts or federal or state statutory claims, must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit unless filed under a federal or state statute with a shorter statute of limitations. I specifically waive any federal and state statutes of limitations to the contrary.

Signature _____ Date _____

**■■CLOSETMAID®**

<div align="right">

≋
EMERSON

</div>

# APPLICANT NOTICE:

In accordance with our drug free workforce policy, ClosetMaid® will require a drug
test of all applicants prior to the first day of employment.

*Any offer of employment is considered conditional based upon the
successful completion of the drug screen process.*

---

### Our hiring policy is simple:

**This company hires lawful workers
only – U.S. citizens or nationals and non-
citizens with valid work authorization –
without discrimination.**

Federal immigration law requires all employers
to verify both the identity and employment
eligibility of all persons hired to work in the
United States.

In its efforts to meet the law's requirements,
this company is participating in the Basic Pilot
program established by the Department of
Homeland Security and the Social Security
Administration (SSA) to aid employers in
verifying the employment eligibility of all newly
hired employees. Our participation in the pilot
program does not exempt us from the
obligation to complete a Form I-9 for
everyone we hire.

**For additional information on the
verification program, contact:**
Department of Homeland Security
USCIS/SAVE Program
111 Massachusetts Avenue, 2nd Floor
Washington, DC 20001
Phone (888) 464-4218

### Nuestra póliza de empleo es simple:

**Sin disriminación, esta compañia emplea
solamente trabajadores legales –
ciudadanos o nacionales de los Estados
Unidos y extranjeros con autorización de
trabajo.**

La Ley Federal de Inmigración y Nacionalidad
require que todas las empresas verifiquen la
identidad y elegibilidad de las
personas que buscan  empleo en los Estados
Unidos.

En su esfuerzo de cumplir los requisitos de la
Ley, esta compañia participa en un programa
Piloto Básico de verificación de empleo,
establecido por El Departmento de Seguirdad
Nacional (DHS) en conjunto con la Adminis-
tración de Seguro Social en esta forma los
empleadores, verificaran la elegibilidad de
todos los nuevos aplicantes. Nuestra
participación en este programa piloto, hace
que no exista ningun tipo de excepción en la
Ley, tenemos la obligación de completar el
formulario I-9 para toda persona que nostros
empleamos.

**Para mayor información de este programa
de verificaión, puede usted comunicarse:**
Department of Homeland Security
U.S. Citizenship and Immigration Services
Systematic Alien Verification for Entitlements
(SAVE )Program
Washington, DC 20529
Phone (888) 464-4218

Page 7

439



## COMBINED DISCLOSURE NOTICE AND AUTHORIZATION
## TO OBTAIN A CONSUMER CREDIT REPORT

I understand that, as a condition of my employment with ClosetMaid, or as a condition of my continued employment, ClosetMaid may obtain a consumer report that includes, but is not limited to, my credit history or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information bearing on my credit standing or credit capability.

Pursuant to the Fair Credit Reporting Act, I hereby authorize ClosetMaid and its designated agents and representatives to conduct a comprehensive review of my background through a consumer report and/or investigative consumer report to be generated for employment, promotion, reassignment or retention as an employee. I understand the scope of the consumer report/investigative consumer report and may include, but is not limited to the following areas:

Verification of Social Security Number, current and previous residences, employment history including all personnel files, education, character references, credit history and reports, criminal history records from any criminal justice agency in any or all federal, state, or county jurisdictions, birth records, motor vehicle records to include traffic citations and registration and any other public records.

I, _____, authorize the complete release of these records or data pertaining to me which an individual, company, firm, corporation, or public agency may have. I understand that I must provide my date of birth to adequately complete said screening, and acknowledge that my date of birth will not affect any hiring or employment decisions. I am authorizing that a photocopy of this authorization be accepted with the same authority as the original.

I understand that, pursuant to the Fair Credit Reporting Act, if any adverse action is to be taken based upon the consumer report and/or investigative consumer report, a copy of the report and a summary of the consumer's rights will be provided to me prior to any final action being taken by ClosetMaid.

### PLEASE PRINT CLEARLY!

Name (print): _____
       *First*      *Middle*        *Last*       *(Maiden)*

Print all Former Names Used: *(1)* _____ *(2)* _____

Social Security Number: _____-_____-_____

Phone Number: _____

Current Street Address:
_____
    *Street*            *City*    *State*   *Zip*

*By signing below, you are certifying that the above information is true and correct and you are authorizing ClosetMaid to secure a consumer report and/or an investigative consumer report:*

Signature: _____ Date: _____

For California applicants only, if you would like to receive a copy of the report if one is obtained, please check here _____. For Minnesota or Oklahoma applicants only, if you would like to receive a copy of the report, if one is obtained, please check here _____.

Rev 0709JRC

440

# s e c u r **i** n t™

**P.O. Box 812289, Boca Raton, Florida 33481**

## APPLICATION AND SERVICE AGREEMENT

This application package includes: 1) an Application and Service Agreement ("Agreement"); 2) a copy of Securint's Access Security Requirements, 3) a Notice to Users of Consumer Reports; and 4) a Summary of Consumer Rights. To submit an application:

1. Print, fill out, initial pages 1-4, and sign the Agreement. You may also complete the form online, print it out, and sign it.
2. Include copies of documentation verifying your business and professional license. Examples of necessary documentation include:
   - Business Licenses
   - Professional Licenses
   - Corporate Charter or similar Certificate of Organization for Partnership/LLC (Certified Copy).
3. Fax pages 1-4 of the Agreement and supporting documentation to Seisint Decision Services, Inc. d/b/a Securint ("Securint") at **(561) 981-0799.** If you have any questions, please call 877-863-3282 for Sales or 866-242-1444 for Customer Support.

The information submitted on this Agreement will be used to determine eligibility for accessing the information, products and services provided by Securint. Securint reserves the right to reject this Agreement without reason or for any reason whatsoever, without recourse against Securint or any of its employees, officers, directors, agents, affiliates, or other designees. Additionally, the applicant hereby authorizes Securint to independently verify the information provided herein.

**PART 1:** (This section must be filled out entirely.)

**SECTION A: COMPANY INFORMATION**

Company Name _Closet Maid_
Physical Address _650 SW 27 Ave_
City _Ocala_  State _FL_  Zip _34474_
Telephone ( _352_ )  _401-6000_   Company Web Address _www. Closetmaid.com_

**SECTION B: COMPANY PRINCIPAL(S)**

Principal(s) of Company:

Last Name _Price_  First Name _Mary_  Title _HR Mgr._  SSN
Last Name  First Name  Title  SSN
Last Name  First Name  Title  SSN

**SECTION C: ACCOUNT CONTACT INFORMATION**
Last Name _Price_  First Name _Mary_  Title _HR Mgr_
Telephone ( _352_ )  _401-6137_   Extension  Fax ( _352_ ) _401-6130_
Email Address _Mary.price@closetmaid mail.com_

**PART 2:** (If you choose to be billed on a credit card, fill out this portion and then proceed to Part 4.)

We accept MasterCard, Visa, and American Express. For security and authentication purposes, we require the account holder to provide the address to which the credit card company mails the monthly statement.

Cardholder Name
Card Number  Expiration (MM/YY)
Credit Card Statement Address
City  State  Zip
Card Type: ☐ MasterCard ☐ Visa ☐ American Express

By choosing to have my credit card billed directly by Securint, I hereby authorize Securint to bill my credit card for the charges incurred for use of the Securint Service. Additionally, I hereby agree that if the credit card company refuses to pay Securint for such charges incurred for use of the Securint Service, I shall be personally responsible for the payment of such charges.

*CM* **EXHIBIT**
_C_

Exhibit  _8_
Witness _Closetmaid_
Date _8/27/09_ Rptr. _NB_
**AKF**

188

**PART 3:** (If you choose to be billed directly, fill out this portion.)

By submitting this direct billing application, I certify that I am authorized to apply for credit on behalf of the company named in this Application. I further certify that the information I provide relating to this credit application is true and complete. I hereby grant permission to Securint to obtain consumer reports from consumer reporting agencies in considering this application..

**BILLING CONTACT**
Last Name __Price__ First Name __Mary__ Title __HK Mgr__
Telephone (352) 401-6137 Extension _____ Fax (352) 401-6130
Email Address _____
Billing Address __650 SW 27 Ave__
City __Ocala__ State __FL__ Zip __34474__
Dun & Bradstreet Number __05-825-7569__

**BANKING INFORMATION**
Financial Institution _____ Contact Name _____ Title _____
Address _____
City _____ State _____ Zip _____
Contact Telephone Number (_____) _____ Extension _____
Type of Account: ❑ Checking ❑ Savings Account Number _____

**BUSINESS CREDIT REFERENCES**
Name of Creditor __See attached letter__
Contact Telephone Number (_____) _____ Account Number _____
Name of Creditor _____
Contact Telephone Number (_____) _____ Account Number _____

**PART 4:** (This section must be filled out entirely.)

**SECTION A: TYPE OF BUSINESS**

❑ Sole Proprietor ☑ Corporation ❑ Partnership/LLC State of _____
Federal Tax ID _____ Professional License Number __See attached__
Date Issued/Expiration Date _____ Town/City Issued _____
County Issued _____ State _____

**SECTION B: INDUSTRY CLASS** (Check the item that best describes the type of business in which you are engaged—**SELECT ONE.**)

❑ Background Screening ❑ Healthcare ❑ Legal ❑ Utility/Telecommunications
❑ Banking ❑ Insurance ☑ Manufacturing/Transportation ❑ Volunteer Organization
❑ Collections ❑ Landlord/Management ❑ Retail ❑ Other(Specify) _____
❑ Government ❑ Law Enforcement ❑ University

**PART 5: TERMS AND CONDITIONS OF USE**

**SECTION A: FCRA PERMISSIBLE PURPOSES (CHECK ALL THAT APPLY - AT LEAST ONE MUST BE CHECKED.)**

Some of the information provided by Securint pursuant to this Agreement constitutes a Consumer Report as such term is defined by the Fair Credit Reporting Act ("FCRA") (15 U.S.C. § 1681 et seq.). In accordance with the FCRA, I certify such information shall only be used for the following permissible purposes:

❑ For a credit transaction involving the extension of credit to, or the review or collection of an account of, the consumer.
☑ For employment purposes, including initial employment, promotion, reassignment or retention as an employee, for security clearance purposes, for acceptance or retention in a volunteer, intern, or apprentice capacity, or otherwise in connection with an employment decision involving the consumer.
❑ For a legitimate business need in connection with a business transaction initiated by the consumer.
❑ For a legitimate business need to review an account to determine whether the consumer continues to meet the terms of the account.

*Page 2 of 14*
*Revised 6-17-2004*
__MLP__ [Initial]

206

## SECTION B: TERMS AND CONDITIONS

**1. SCOPE OF SERVICES:** Subject to the terms and conditions set forth below, Securint agrees to provide Customer with access to two (2) distinct product offerings in a single unified application: (i) applicant verification services (the "Accurint® Services"); and (ii) consumer reporting services (the "Securint Services"). For more information about Accurint please go to www.accurint.com.

**2. RESTRICTED LICENSES:** To gain access to the Accurint Services and the Securint Services, Accurint and Securint hereby grant to the Customer the following restricted licenses to be used by Customer solely from internet protocol addresses located within the United States and its territories.

(i) ACCURINT LICENSE: Customer is hereby granted a restricted license to use the Accurint Services to verify an individual's identity prior to ordering a consumer report using the Securint Services. Customer shall not use the information provided hereunder for any purpose that would violate the privacy obligation policy and any other terms and provisions of the Gramm-Leach-Bliley Act (15 U.S.C. § 6801 et seq.), the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.), the Drivers Privacy Protection Act (18 U.S.C. § 2721 et seq.), or any similar state or local statute, rule, or regulation. Customer shall abide by such legislation and rules and regulations as may be enacted or adopted after the date hereof. Customer shall not resell or broker the Accurint Services or its associated applications. Customer agrees that if it is determined or if it is reasonably suspected that the Customer is reselling or brokering information provided hereunder, or otherwise violating any of the laws or regulations described in these terms and conditions, that Customer's license to use the Accurint Services may be immediately terminated.

(ii) SECURINT LICENSE: Subject to the requirements of the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.), and the Appendices attached hereto and incorporated herein, Securint hereby grants to Customer a restricted license to generate and utilize consumer reports. The Customer hereby expressly agrees (a) that except for the permissible purpose specifically stated in Part 5 Section A above Customer will not attempt to generate, use or otherwise disclose consumer reports obtained from Securint in any manner; and (b) that appropriate measures will be undertaken to protect against misuse of the information contained in any consumer report obtained from the Securint Services. Customer certifies that it will abide by all applicable provisions of the FCRA and such other applicable legislation and rules and regulations as may be enacted or adopted from time to time after the date hereof, including but not limited to, keeping all consumer reports and any constituent parts thereof, whether oral or written, strictly confidential, and except as required by law, to reveal no information from such consumer reports to any person except the consumer reported on or a person whose duty requires participation in the decision for the transaction for which the consumer report was ordered. Customer shall not resell or broker the Securint Services or its associated applications. Customer agrees that if Securint determines or reasonably suspects that Customer is reselling or brokering information provided hereunder, or otherwise violating any of the laws or regulations described in these terms and conditions, that Customer's license to use the Securint Services may be immediately terminated.

**3. PERFORMANCE:** Accurint and Securint shall each use reasonable efforts to deliver the respective services requested by the Customer, and to compile information gathered from third party sources used in each service; provided, however, that the Customer accepts all information "AS IS." Customer acknowledges and agrees that the information obtained from the Accurint Services and Securint Services is secured from and processed by fallible sources (human and otherwise) and that neither Accurint nor Securint can be either an insurer or a guarantor of the accuracy of the information reported.

**4. INTELLECTUAL PROPERTY:** Customer agrees that Customer shall not reproduce, retransmit, republish, reverse-engineer, or otherwise transfer for any commercial purposes the Accurint Services or Securint Services, programs or computer applications. Customer acknowledges that Accurint and Securint (and/or applicable third-party data providers) shall retain all right, title, and interest in and to the data and information provided by the Accurint and Securint Services under applicable contractual, copyright, and related laws, and Customer shall use such materials consistent with the licenses to the Accurint and Securint Services granted above.

**5. CHARGES:** For each response to a request for information, Customer agrees to pay to Securint for use of the Accurint and Securint Services the applicable charge then prevailing for the information requested. Customer shall pay to Securint fees in accordance with the prices as updated from time to time through online announcements, customer bulletins, and published price schedules. Securint is not responsible for ensuring Customer's receipt of such updates, changes, additions, or deletions to any of its policies that may occur from time to time, and it is the Customer's responsibility to check the Securint website and/or publications for such notifications. All current and future Securint pricing documents are deemed incorporated herein by reference.

**6. PAYMENT OF FEES:** Customer shall be responsible for payment for all services obtained through Customer's access identification code, whether or not such code is used by Customer or a third party, whether with or without Customer's consent, provided access to Customer's access identification code is not the result of use by a person formerly or presently employed by Securint or who obtains the code by or through a break-in or unauthorized access of Securint's offices, premises, records or documents, or computer system. Customer agrees that at all times it shall keep all passwords for use of the services confidential and shall provide such passwords only to individuals that have a need to know. Customer shall pay Securint for all charges incurred for the use of the services on a monthly basis, and Customer agrees to be electronically invoiced for those charges. At Customer's request, paper invoices can be mailed via the United States Postal Service at a cost of Ten Dollars ($10) per month, which will be included in Customer's monthly invoice as an additional itemized charge. All payments are due within 20 days of the date of an invoice for the services. Customer understands that it will be notified via electronic mail regarding all unpaid balances due. Customer shall pay interest at the rate of eighteen percent (18%) per annum from the date due on any charges not paid by the payment due date. All remittances shall be sent to Securint, Post Office Box 538380, Atlanta, Georgia, 30353-8380. Securint reserves the right to terminate this Application and Agreement (the "Agreement") and the right of Customer to use any information provided hereunder with prior notice to Customer upon any non-payment of fees by the date due.

**7. TERM OF AGREEMENT:** This Agreement is for services rendered and shall be in full force and effect during such periods of time during which Securint is providing services for Customer. Customer agrees that if it is found to be in violation of any specifications of this Agreement, Securint has the right to terminate Customer's access to the services. Provisions hereof related to release of claims, indemnification, use of information and data, payment for the services, and disclaimer of warranties shall survive any termination of this Agreement.

189

**8. GOVERNING LAW:** The Terms and Conditions of Customer's use of the services shall be governed by and construed in accordance with the laws of the State of Florida, without effect to conflict of law principles. Additionally, any action brought pursuant to Customer's use of the services or pursuant to the terms and conditions of this Agreement shall be brought within the jurisdiction of the courts of Palm Beach County, Florida.

**9. ASSIGNMENT:** Neither this Agreement, nor any portion hereof, may be assigned by Customer, in whole or in part, without the prior written consent of Securint.

**10. WARRANTIES/LIMITATION OF LIABILITY:** Neither Securint nor any third-party data provider (for purposes of indemnification, warranties, and limitations on liability, Securint and its data providers are hereby collectively referred to as "Securint") shall be liable to Customer (or to any person claiming through Customer to whom Customer may have provided the services-related data) for any loss or injury arising out of or caused in whole or in part by Securint's acts or omissions in procuring, compiling, collecting, interpreting, reporting, communicating, or delivering the services. If, notwithstanding the foregoing, liability can be imposed on Securint, then Customer agrees that Securint's aggregate liability for any and all losses or injuries arising out of any act or omission of Securint in connection with anything to be done or furnished under this Agreement, regardless of the cause of the loss or injury, and regardless of the nature of the legal or equitable right claimed to have been violated, shall never exceed $100.00; provided, however, that such limitation of liability shall not apply to Securint's indemnification obligation detailed in Paragraph 11 hereof; and Customer covenants and promises that it will not sue Securint for an amount greater than such sum even if Securint and/or third parties were advised of the possibility of such damages and that it will not seek punitive damages in any suit against Securint. Securint does not make and hereby specifically disclaims any warranty, express or implied, with respect to the services provided hereunder; provided, however, that Securint does hereby warrant that Securint has and will continue to comply with the FCRA regarding the making of Consumer Reports, the investigation of information contained therein, and the disclosure of such information. Securint does not guarantee or warrant the correctness, completeness, merchantability, or fitness for a particular purpose of the services or the components thereof or information provided hereunder. In no event shall Securint be liable for any indirect, incidental, or consequential damages, however arising, incurred by Customer from receipt or use of information delivered hereunder or the unavailability thereof.

**11. INDEMNIFICATION:** Customer hereby agrees to protect, indemnify, defend, and hold harmless Securint from and against any and all costs, claims, demands, damages, losses, and liabilities (including attorneys' fees and costs) arising from or in any way related to use or publication by Customer, or the employees or agents of Customer, of any information in violation of the terms of this Agreement or any applicable laws or regulations. Securint hereby agrees to protect, indemnify, defend, and hold harmless Customer from and against any and all costs, claims, demands, damages, losses, and liabilities (including attorneys' fees and costs) arising from or in any way related to a breach by Securint of its obligations under Paragraph 10.

**12. AUDIT:** Customer understands and agrees that in order to ensure compliance with the Fair Credit Reporting Act, Gramm-Leach-Bliley Act, Drivers Privacy Protection Act, and other applicable regulations, Securint shall conduct periodic reviews of Customer activity and may, on a random basis, contact Customer to provide documentation of executed searches. Securint shall also investigate all legitimate reports of abuse or misuse of the services by Customer or others. Customer agrees to cooperate fully with any and all investigations. Violations discovered in any review by Securint will be subject to immediate action including, but not limited to, termination of the license to use the services, legal action, and/or referral to federal or state regulatory agencies.

**13. ATTORNEYS FEES:** The prevailing party in any action, claim or lawsuit brought pursuant to this Agreement is entitled to payment of all attorney fees and costs expended by such prevailing party in association with such action, claim or lawsuit.

**14. CUSTOMER CHANGE:** Customer shall notify Securint immediately of any changes to the information on Customer's Application for the Services. Securint reserves the right to terminate Customer's access to the services or terminate license to use the services without further notice upon receipt of any change in Customer's status which in Securint's sole discretion would cause Customer to be unable to conform to standards of good citizenship and good moral character or comply with its obligations under this Agreement.

**15. RELATIONSHIP OF PARTIES:** Customer shall at no time represent that it is the authorized agent or representative of Securint.

**16. CHANGE IN AGREEMENT:** By receipt of the services, Customer agrees to, and shall comply with, changes to the use limitations on the services (Part 5, Section B, Paragraph 2) and changes in pricing as Securint shall make from time to time by notice to Customer via e-mail, online click wrap amendments, facsimile, mail, or other written notification. All e-mail notifications shall be sent to the individual named in the Account Contact Information section (Part 1, Section C), unless stated otherwise in this Application. Any new, other, or different terms supplied by Customer, including those contained in purchase orders issued by Customer, are specifically and expressly rejected by Securint unless Securint agrees to them in a signed writing specifically including those new, other, or different terms.

**17. ENTIRE AGREEMENT:** This Agreement constitutes the final written expression of the agreement and understanding of the parties and is intended as a complete and exclusive statement of the terms of the agreement, which shall supersede all prior representations, agreements, and understandings, whether oral or written. In the event any one or more of the provisions of this Agreement or of any exhibit is held to be invalid or otherwise unenforceable, the enforceability of the remaining provisions shall be unimpaired.

## AUTHORIZATION AND ACCEPTANCE OF TERMS

**I HEREBY CERTIFY** that I am authorized to execute this Agreement on behalf of the Customer and that the statements provided in this Agreement are true and correct. Further, I hereby certify that the Customer agrees to be bound to the terms and conditions set forth in this Agreement. This Agreement is subject to verification and approval by Securint prior to taking effect and becoming binding.

**CUSTOMER**

Signature Mary Kay Price

Print Name Mary Price

Title HR Manager

Dated 8-31-04 (mm/dd/yyyy)

MKP [Initial]

# Appendix A

**PERMISSIBLE PURPOSE · EMPLOYMENT**

Customer hereby expressly acknowledges and agrees that, in addition to the terms and conditions of the Securint Application and Service Agreement, use of the Securint Services for employment purposes is also subject to the following provisions:

1) prior to procuring a consumer report, a clear and conspicuous disclosure, consisting solely of the disclosure, that a consumer report might be obtained for employment purposes must be made to the applicant; and

2) the applicant shall authorize in writing the right to procure the consumer report; and

3) prior to taking any adverse action, based in whole or in part upon the consumer report, Customer must provide to the applicant a copy of the consumer report and a summary of the consumer's rights as prescribed by the Federal Trade Commission; and

4) the consumer report will not be used in violation of any applicable federal or state law or regulation, including those specifically governing equal employment opportunity; and

5) precautions necessary to secure any system used to access consumer credit information through the Securint Services will be taken pursuant to the terms contained in the Securint License Agreement and the Access Security Requirements.

# Appendix B

**PERMISSIBLE PURPOSE · TENANT SCREENING**

Customer hereby expressly acknowledges and agrees that, in addition to the terms and conditions of the Securint Application and Service Agreement, use of the Securint Services for tenant screening purposes is also subject to the following provisions:

1) prior to taking any adverse action, based in whole or in part upon the consumer report, Customer will provide to the applicant a copy of the consumer report and a summary of the consumer's rights as prescribed by the Federal Trade Commission; and

2) the consumer report will not be used in violation of any applicable federal or state law or regulation including those specifically governing equal housing opportunities; and

3) precautions necessary to secure any system used to access consumer credit information through the Securint Services will be taken pursuant to the terms contained in the Securint License Agreement and the Access Security Requirements.

198

Case 2:08-cv-01730-GLL   Document 36-7   Filed 09/13/10   Page 87 of 173

# Appendix C

**USE OF MOTOR VEHICLE DRIVING RECORDS**

Customer hereby expressly acknowledges and agrees that, in addition to the terms and conditions of the Securint Application and Service Agreement, use of motor vehicle driving records ("MVRs") is subject to the following additional provisions:

1) Customer shall at all times comply with the DPPA; and

2) Prior to requesting MVRs, Customer shall obtain the applicant's express written consent for the release of such information.

3) That if requesting MVRs pertaining to drivers from Arkansas, Colorado, Michigan, or Ohio, Customer shall complete the applicable forms located in the Securint Form Directory and provide them to Securint prior to accessing such MVRs.

*Page 7 of 14*
*Revised 6-17-2004*

199

# s e c u r i n t ™

## CREDIT REPORT ADDENDUM

### TO SECURINT APPLICATION AND SERVICE AGREEMENT

We have partnered with Credit Data Services, Inc. to provide our customers with access to Experian® credit reports. In order to access Experian credit reports, you must first fully complete this Credit Report Addendum to the Securint Application and Service Agreement and return a fully executed copy by facsimile to Securint at 561.981.0799.

Before granting you access to Experian credit reports, we may ask you to submit to a physical inspection of your business premises. Experian requires these physical inspections to ensure that you have a legitimate purpose for accessing the confidential information contained in the credit reports. There is a non-refundable $100.00 fee for the inspection, and you will be billed for it in our next Securint invoice.

If you are already receiving credit reports from another source and have a copy of the results of a previous inspection please fax us a copy of those results along with this completed form. We will review the previous results and determine in our discretion if another inspection is required.

Company Name __Closet Maid__ (the "Customer")
Address __650 SW 27 Ave__ City __Ocala__ State __FL__ Zip __34474__
How will you be using credit reports? ☒ Employment Purposes ☐ Tenant Screening Purposes
Are you currently obtaining credit reports from another source? ☐ No ☒ Yes If so, name the source __ABC__

### TERMS AND CONDITIONS

Customer hereby requests access to Experian credit reports (the "Credit Reports") through Securint. Customer acknowledges and agrees that the decision to grant Customer access to the Credit Reports may be conditioned upon (i) the successful completion of a physical inspection of Customer's business premises; and (ii) receipt by Securint of all documentation necessary to support Customer's request for access to the Credit Reports. Securint utilizes a contracted agent network to perform the physical inspections. Customer understands and agrees that it is responsible for the payment of the $100.00 fee associated with the physical inspection of its business premises, regardless of whether such inspection is successful.

Upon successful completion of the physical inspection and receipt by Securint of all documentation necessary to support Customer's request for access to the Credit Reports, Customer will be granted access to the Credit Reports. Prior to ordering a Credit Report concerning an applicant, Customer will ensure that the applicant has consented in writing to the procurement of a Credit Report.

### AUTHORIZATION AND ACCEPTANCE

I HEREBY CERTIFY that I am authorized to execute this Credit Report Addendum to the Securint Service Application and Agreement on behalf of the Customer listed above.

**CUSTOMER**

Signature __Mary Kay Price__
Print Name __Mary Kay Price__
Title __HR Manager__
Phone __352 401-6137__
Dated __8-31-04__ (mm/dd/yyyy)

# s e c u r ⋔ n t™

**ACCESS SECURITY REQUIREMENTS**

Securint maintains strict controls over all information in its files in order to insure the privacy of all consumers. As such, it is a requirement that all end users take precautions to secure any system or device used to access consumer credit information. The following measures are designed to reduce unauthorized access of consumer credit reports.  In accessing Securint's services, you agree to following security protocols:

1. To protect your Securint account number and password so that only key personnel employed by your company know this sensitive information.  Unauthorized persons should never have knowledge of your password.  Do not post this information in any manner within your facility.  If a person who knows the password leaves your company or no longer has "a need to know," the password should be changed immediately.

2. That the system access software, whether developed by your company or purchased from a third party vendor, must have your Securint account number and password "hidden" or embedded and be known only by supervisory personnel.  Assign each user of your system access software a unique logon password. If such system access software is replaced by different access software and therefore no longer in use or, alternatively, the hardware upon which such system access software resides is no longer being used or is being disposed of, your password should be changed immediately.

3. To not discuss your Securint account number and password by telephone with any unknown caller, even if the caller claims to be an employee.

4. To restrict the ability to obtain credit information to a few key personnel.

5. To place all terminal devices used to obtain credit information in a secure location within your facility. You should secure these devices so that unauthorized persons cannot easily access them.

6. After normal business hours, to turn off and lock all devices or systems used to obtain credit information.

7. To secure hard copies and electronic files of consumer reports within your facility so that unauthorized persons cannot easily access them.

8. To shred or destroy all hard copy consumer reports when no longer needed.

9. To erase and overwrite or scramble electronic files containing consumer information when no longer needed and when applicable regulation(s) permit destruction.

10. To make all employees aware that your company can access credit information only for the permissible purposes listed in the Permissible Purpose section of your membership application. You or your employees may not access their own reports.  Nor should you or your employees access the report of a family member or friend unless it is in connection with a credit transaction or for some other permissible purpose.

# secur# n t™

## NOTICE TO USERS OF CONSUMER REPORTS: OBLIGATIONS OF USERS UNDER THE FCRA

The Fair Credit Reporting Act (FCRA) requires that this notice be sent to inform users of consumer reports of their legal obligations. The following is a summary of the responsibilities imposed by the FCRA. The FCRA, 15 U.S.C. 1681 et seq., is set forth in full at the Federal Trade Commission's Internet web site (http://www.ftc.gov).

## I. OBLIGATIONS OF ALL USERS OF CONSUMER REPORTS

### A. Users Must Have a Permissible Purpose

Congress has limited the use of consumer reports to protect consumers' privacy. All users must have a permissible purpose under the FCRA to obtain a consumer report. Section 604 of the FCRA contains a list of the permissible purposes under the law. These are:

As permitted by order of a court or a federal grand jury subpoena. *Section 604(a)(1)*

For any purpose if the consumer gives permission in writing. *Section 604(a)(2)*

For the extension of credit as a result of an application from a consumer, or the review or collection of a consumer's account. *Section 604(a)(3)(A)*

For employment purposes, including hiring and promotion decisions, where the consumer has given written permission. *Sections 604(a)(3)(B) and 604(b)*

For the underwriting of insurance as a result of an application from a consumer. *Section 604(a)(3)(C)*

When there is a legitimate business need, in connection with a business transaction that is initiated by the consumer. *Section 604(a)(3)(F)(i)*

To review a consumer's account to determine whether the consumer continues to meet the terms of the account. *Section 604(a)(3)(F)(ii)*

To determine a consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status. *Section 604(a)(3)(D)*

For use by a potential investor or servicer, or current insurer, in a valuation of, or an assessment of, the credit or repayment risks associated with an existing credit obligation. *Section 604(a)(3)(E)*

For use by state and local officials in connection with the determination of child support payments, or modifications and enforcement thereof. *Sections 604(a)(4) and 604(a)(5)*

In addition, creditors and insurers may obtain certain consumer report information for the purpose of making unsolicited offers of credit or insurance. The particular obligations of users of this "prescreened" information are described in Section V below.

### B. Users Must Provide Certifications

Section 604(f) of the FCRA prohibits any person from obtaining a consumer report from a consumer reporting agency (CRA) unless the person certifies the permissible purpose(s) for which the report is being obtained and certifies that the report will not be used for any other purpose.

### C. Users Must Notify Consumers When Adverse Actions Are Taken

The term "adverse action" is defined very broadly by Section 603 of the FCRA. "Adverse actions" include all business, credit, and employment actions affecting consumers that can be considered to have a negative impact – such as unfavorably changing credit or contract terms or conditions, denying or canceling credit or insurance, and denying employment or promotion.

#### 1. Adverse Actions Based on Consumer Reports

If a user takes any type of adverse action that is based at least in part on information contained in a consumer report, the user is required by Section 615 of the FCRA to notify the consumer. The notification may be done in writing, orally, or by electronic means. It must include the following:

*Page 10 of 14*
*Revised 6-17-2004*

201

The name, address, and telephone number (including any toll-free telephone number) of the CRA that provided the report.

A statement that the CRA did not make the adverse decision and cannot explain why the decision was made.

A statement setting forth the consumer's right to obtain a free copy of the consumer report from the CRA if the consumer requests the report within 60 days.

A statement setting forth the consumer's right to dispute directly with the CRA the accuracy or completeness of any information provided by the CRA.

### 2. Adverse Actions Based on Information Obtained From Third Parties Who Are Not Consumer Reporting Agencies

If a person takes an adverse action in connection with a credit transaction for personal, family, or household purposes that is based either wholly or partly upon information from a person other than a CRA, and the information is the type of consumer information covered by the FCRA, Section 615(b)(1) of the FCRA requires that the user clearly and accurately disclose to the consumer his or her right to obtain disclosure of the nature of the information that was relied upon by making a written request within 60 days of notification. The user must provide the disclosure within a reasonable period of time following the consumer's written request.

### 3. Adverse Actions Based on Information Obtained From Affiliates

If a person takes an adverse action involving credit, insurance, or employment based on information of the type covered by the FCRA, and this information was obtained from an entity affiliated with the user of the information by common ownership or control, Section 615(b)(2) requires the user to notify the consumer of the adverse action. The notification must inform the consumer that he or she may obtain a disclosure of the nature of the information relied upon by making a written request within 60 days of receiving the adverse action notice. If the consumer makes such a request, the user must disclose the nature of the information not later than 30 days after receiving the request. (Information that is obtained directly from an affiliated entity relating solely to its transactions or experiences with the consumer, and information obtained in a consumer report from an affiliate are not covered by Section 615(b)(2).)

## II. OBLIGATIONS OF USERS WHEN CONSUMER REPORTS ARE OBTAINED FOR EMPLOYMENT PURPOSES

If information from a CRA is used for employment purposes, the user has specific duties, which are set forth in Section 604(b) of the FCRA. The user must:

Make a clear and conspicuous written disclosure to the consumer before the report is obtained, in a document that consists solely of the disclosure, that a consumer report may be obtained.

Obtain prior written authorization from the consumer.

Certify to the CRA that the above steps have been followed, that the information being obtained will not be used in violation of any federal or state equal opportunity law or regulation, and that, if any adverse action is taken based on the consumer report, a copy of the report and a summary of the consumer's rights will be provided to the consumer.

Before taking an adverse action, provide a copy of the report to the consumer as well as the summary of the consumer's rights. (The user should receive this summary from the CRA, because Section 604(b)(1)(B) of the FCRA requires CRAs to provide a copy of the summary with each consumer report obtained for employment purposes.)

## III. OBLIGATIONS OF USERS OF INVESTIGATIVE CONSUMER REPORTS

Investigative consumer reports are a special type of consumer report in which information about a consumer's character, general reputation, personal characteristics, and mode of living is obtained through personal interviews. Consumers who are the subjects of such reports are given special rights under the FCRA. If a user intends to obtain an investigative consumer report, Section 606 of the FCRA requires the following:

The user must disclose to the consumer that an investigative consumer report may be obtained. This must be done in a written disclosure that is mailed, or otherwise delivered, to the consumer not later than three days after the date on which the report was first requested. The disclosure must include a statement informing the consumer of his or her right to request additional disclosures of the nature and scope of the investigation as described below, and must include the summary of consumer rights required by Section 609 of the FCRA. (The user should be able to obtain a copy of the notice of consumer rights from the CRA that provided the consumer report.)

The user must certify to the CRA that the disclosures set forth above have been made and that the user will make the disclosure described below.

*Page 11 of 14*
*Revised 6-17-2004*

Upon the written request of a consumer made within a reasonable period of time after the disclosures required above, the user must make a complete disclosure of the nature and scope of the investigation that was requested. This must be made in a written statement that is mailed, or otherwise delivered, to the consumer no later than five days after the date on which the request was received from the consumer or the report was first requested, whichever is later in time.

## IV. OBLIGATIONS OF USERS OF CONSUMER REPORTS CONTAINING MEDICAL INFORMATION

Section 604(g) of the FCRA prohibits consumer reporting agencies from providing consumer reports that contain medical information for employment purposes, or in connection with credit or insurance transactions, without the specific prior consent of the consumer who is the subject of the report. In the case of medical information being sought for employment purposes, the consumer must explicitly consent to the release of the medical information in addition to authorizing the obtaining of a consumer report generally.

## V. OBLIGATIONS OF USERS OF "PRESCREENED" LISTS

The FCRA permits creditors and insurers to obtain limited consumer report information for use in connection with unsolicited offers of credit or insurance under certain circumstances. Sections 603(l), 604(c), 604(e), and 615(d) This practice is known as "prescreening" and typically involves obtaining a list of consumers from a CRA who meet certain preestablished criteria. If any person intends to use prescreened lists, that person must (1) before the offer is made, establish the criteria that will be relied upon to make the offer and grant credit or insurance, and (2) maintain such criteria on file for a three-year period beginning on the date on which the offer is made to each consumer. In addition, any user must provide with each written solicitation a clear and conspicuous statement that:

Information contained in the consumer's file was used in connection with the transaction.
The consumer received the offer because he or she satisfied the criteria for credit worthiness or insurability used to screen for the offer.

Credit or insurance may not be extended if, after the consumer responds, it is determined that the consumer does not meet the criteria used for screening or any applicable criteria bearing on credit worthiness or insurability, or the consumer is not able to furnish required collateral.

The consumer may prohibit the use of information in his or her file in connection with future prescreened offers of credit or insurance by contacting the notification system established by the CRA that provided the report. This statement must include the address and toll-free telephone number of the appropriate notification system.

## VI. OBLIGATIONS OF RESELLERS

Section 607(e) of the FCRA requires any person who obtains a consumer report for resale to take the following steps:

Disclose the identity of the end-user to the source CRA.

Identify to the source CRA each permissible purpose for which the report will be furnished to the end-user.

Establish and follow reasonable procedures to ensure that reports are resold only for permissible purposes, including procedures to obtain: (1) the identity of all end-users;

(2) certifications from all users of each purpose for which reports will be used; and

(3) certifications that reports will not be used for any purpose other than the purpose(s) specified to the reseller. Resellers must make reasonable efforts to verify this information.

## VII. LIABILITY FOR VIOLATIONS OF THE FCRA

Failure to comply with the FCRA can result in state or federal enforcement actions, as well as private lawsuits. Sections 616, 617, and 621. In addition, any person who knowingly and willfully obtains a consumer report under false pretenses may face criminal prosecution. Section 619

By direction of the Commission.

**Donald S. Clark,**
Secretary.

---

1. The CRA must also provide the consumer summary to any party to whom it provides a consumer report for employment purposes (CCRRA Section 2403(b), FCRA Section 604(o)(1)(B)), and the employer must in turn provide the report and the summary to the consumer before taking adverse action against him or her (FCRA Section 604(o)(3)).

# s e c u r ⫟ n t™

## A SUMMARY OF YOUR RIGHTS UNDER THE FAIR CREDIT REPORTING ACT

The Fair Credit Reporting Act (FCRA) is designed to promote accuracy, fairness, and privacy of information in the files of every "consumer reporting agency" (CRA). Most CRAs are credit bureaus that gather and sell information about you – such as where you work and live, if you pay your bills on time, and whether you've been sued, arrested, or filed for bankruptcy – to creditors, employers, and other businesses. The FCRA gives you specific rights in dealing with CRAs, and requires them to provide you with a summary of these rights as listed below. You can find the complete text of the FCRA, 15 U.S.C. 1681 et seq., at the Federal Trade Commission's web site (http://www.ftc.gov).

- You must be told if information in your file has been used against you. Anyone who uses information from a CRA to take action against you – such as denying an application for credit, insurance, or employment – must give you the name, address, and phone number of the CRA that provided the report.

- You can find out what is in your file. A CRA must give you all the information in your file, and a list of everyone who has requested it recently. However, you are not entitled to a "risk score" or a "credit score" that is based on information in your file. There is no charge for the report if your application was denied because of information supplied by the CRA, and if you request the report within 60 days of receiving the denial notice. You are also entitled to one free report a year if you certify that (1) you are unemployed and plan to seek employment within 60 days, (2) you are on welfare, or (3) your report is inaccurate due to fraud. Otherwise, a CRA may charge you a fee of up to eight dollars.

- You can dispute inaccurate information with the CRA. If you tell a CRA that your file contains inaccurate information, the CRA must reinvestigate the items (usually within 30 days) unless your dispute is frivolous. The CRA must pass along to its source all relevant information you provided. The CRA also must supply you with written results of the investigation and a copy of your report, if it has changed. If an item is altered or deleted because you dispute it, the CRA cannot put it back in your file unless the source of the information verifies its accuracy and completeness, and the CRA provides you a written notice that includes the name, address and phone number of the source.

- Inaccurate information must be deleted. A CRA must remove inaccurate information from its files, usually within 30 days after you dispute its accuracy. The largest credit bureaus must notify other national CRAs if items are altered or deleted. However, the CRA is not required to remove data from your file that is accurate unless it is outdated or cannot be verified.

- You can dispute inaccurate items with the source of the information. If you tell anyone – such as a creditor who reports to a CRA – that you dispute an item, they may not then report the information to a CRA without including a notice of your dispute. In addition, once you've notified the source of the error in writing, they may not continue to report it if it is in fact an error.

- Outdated information may not be reported. In most cases, a CRA may not report negative information that is more than seven years old; ten years for bankruptcies.

- Access to your file is limited. A CRA may provide information about you only to those who have a need recognized by the FCRA -- usually to consider an application you have submitted to a creditor, insurer, employer, landlord, or other business.

- Your consent is required for reports that are provided to employers or that contain medical information. A CRA may not report to your employer, or prospective employer, about you without your written consent. A CRA may not divulge medical information about you without your permission.

- You can stop a CRA from including you on lists for unsolicited credit and insurance offers. Creditors and insurers may use file information as the basis for sending you unsolicited offers of credit or insurance. Such offers must include a toll-free number for you to call and tell the CRA if you want your name and address excluded from future lists or offers. If you notify the CRA through the toll-free number, it must keep you off the lists for two years. If you request and complete the CRA form provided for this purpose, you can have your name and address removed indefinitely.

- You may seek damages from violators. You may sue a CRA or other party in state or federal court for violations of the FCRA. If you win, the defendant may have to pay damages and reimburse you for attorney fees. If you lose and the court specifically finds you sued in bad faith, you or your attorney may have to pay the defendant's fees.

Page 13 of 14
Revised 6-17-2004

204

You may have additional rights under state law. You may wish to contact a state or local consumer protection agency or a state attorney general to learn those rights.

If you have questions or believe your file contains errors, call our toll-free number.

The FCRA gives several different federal agencies authority to enforce the FCRA:

| FOR QUESTIONS OR CONCERNS REGARDING: | PLEASE CONTACT: |
|---|---|
| CRAs, creditors and others not listed below | Federal Trade Commission<br>Bureau of Consumer Protection - FCRA<br>Washington, DC 20580 * 202-326-3761 |
| National banks, federal branches/agencies of foreign banks (word "National" or initials "N.A." appear in or after bank's name) | Office of the Comptroller of the Currency Compliance<br>anagement, Mail Stop 6-6<br>Washington, DC 20219 * 800-613-6743 |
| Federal Reserve System member banks (except national banks, and federal branches/agencies of foreign banks) | Federal Reserve Board<br>Division of Consumer & Community Affairs<br>Washington, DC 20551 * 202-452-3693 |
| Savings associations and federally chartered savings banks (word "Federal" or initials "F.S.B." appear in federal institution's name) | Office of Thrift Supervision<br>Consumer Programs<br>Washington, DC 20552 * 800-842-6929 |
| Federal credit unions (words "Federal Credit Union" appear in institution's name) | National Credit Union Administration<br>1775 Duke Street<br>Alexandria, VA 22314 * 703-518-6360 |
| Banks that are state-chartered, or are not Federal Reserve System members | Federal Deposit Insurance Corporation<br>Division of Compliance & Consumer Affairs<br>Washington, DC 20429 * 800-934-FDIC |
| Air, surface, or rail common carriers regulated by former Civil Aeronautics Board or Interstate Commerce Commission | Department of Transportation<br>Office of Financial Management<br>Washington, DC 20590 * 202-366-1306 |
| Activities subject to the Packers and Stockyards Act, 1921 | Department of Agriculture<br>Office of Deputy Administrator - GIPSA<br>Washington, DC 20250 * 202-720-7051 |

Page 14 of 14
Revised 6-17-2004

P.2

Aug 17 05 09:31a



Securint Account
# 6002

# LexisNexis®

## CONSUMER REPORT PRODUCTS APPLICATION & AGREEMENT

To activate your account:
1. Complete this Application. (You may complete the Application form online and print it.)
2. Make copies of documentation verifying your business and professional license. Examples of necessary documentation include:
   - Business License
   - Professional License
   - Corporate Charter or Similar Certificate of Organization for Partnership/LLC (Certified Copy)
3. Initial ALL pages of the Application, sign where indicated, and fax the Application and supporting documentation to 801-426-7155. If you have any questions, please contact your Account Representative.

LexisNexis Public Records Data Services, Inc. and LexisNexis Risk Management, Inc. are members of the LexisNexis Risk Management group of companies (hereinafter referenced either individually or collectively as the "LNRM Group"). The LNRM Group provides consumer report products, among other products and services (the "LNRM Services"), some of which you may contract for and receive pursuant to this Application and Agreement ("Agreement"). Rather than asking you to sign separate contracts for consumer report products with each of them individually, the LNRM Group has chosen to offer their consumer report products under this single contract for your convenience. The terms and conditions governing this Agreement are attached hereto. The information submitted on this Agreement will be used to determine eligibility for accessing consumer report products provided by the LNRM Group. The LNRM Group reserves the right to reject this Agreement without reason or for any reason whatsoever, without recourse against the LNRM Group, or any of their employees, officers, directors, agents, affiliates, or other designees. Additionally, the applicant hereby authorizes the LNRM Group to independently verify the information provided herein.

**PART 1:** (This section must be filled out entirely.)

**SECTION A: COMPANY INFORMATION ("Customer")**
Company Name _Closet Maid_
Physical Address _650 SW 27th Ave_
City _Ocala_                       State _FL_         Zip _34474_
Telephone ( _352_ ) _401-6000_       Company Web Address _www.closetmaid.com_

**SECTION B: ACCOUNT ADMINISTRATOR CONTACT INFORMATION**
Last Name _Boring_          First Name _Jennifer_           Title _ER Manager_
Telephone ( _352_ ) _401-6000_       Extension _6126_       Fax _352_ _401-6130_
Email Address _jennifer.boring@closetmaidmail.com_         SSN _N/A_
Computer IP Address _N/A_

**PART 2:** (If you choose to be billed on a credit card, fill out this portion and proceed to Part 4.)

**SECTION A: CREDIT CARD APPLICATION** (If you choose to be billed on a credit card, fill out this portion and proceed to Part 4. If you choose to be billed directly, skip this portion and proceed to Part 3.)

The LNRM Group accepts MasterCard, Visa, and American Express. For security and authentication purposes, the LNRM Group requires the account holder to provide the address to which the credit card company mails the monthly statement.

Cardholder Name _____
Card Number _____       Expiration (MM/YY) _____
Credit Card Statement Address _____
City_____       State _____       Zip_____
Card Type: ☐ MasterCard ☐ Visa ☐ American Express

By choosing to have a credit card billed directly by the LNRM Group, I hereby authorize the members of the LNRM Group that are providing services to the Customer under this Application and Agreement to bill this credit card for the charges incurred for use of the LNRM Services. Additionally, I hereby agree that if the credit card company refuses to pay charges incurred for my use of the LNRM Services I shall become personally responsible for the payment of such charges.

**PART 3:** (If you choose to be billed directly, fill out this portion and proceed to Part 4.)

**SECTION A: CREDIT INFORMATION** (If you choose to be billed directly, fill out this portion)

By submitting this direct billing application, Customer certifies that the individual whose name appears below is authorized to apply for credit on behalf of the Customer named in this Agreement. Customer certifies that the information provided relating to this credit application is true and complete. Customer hereby grants permission to the LNRM Group to verify the credit information provided herein.

**BILLING CONTACT**
Last Name _Price_          First Name _Mary_           Title _HR Manager_
Telephone ( _352_ ) _401-6000_       Extension _6137_       Fax ( _352_ ) _401-6130_
Email Address _mary.price@closetmaidmail.com_
Billing Address _PO Box 4400_
City _Ocala_                       State _FL_         Zip _34478_
Require P.O. number on Invoice? ☐ Yes ☒ No If so, P.O. Number _____

Page 1 of 5
LNRM Consumer Report v.4.21.05
_JB_ Customer Initial

SECTION B: COMPANY PRINCIPAL(S)

Principal(s) of Company (required for companies incorporated less than five years and also required for all sole proprietors and partnerships).

Last Name_____ First Name_____ Title_____ SSN_____
Last Name_____ First Name_____ Title_____ SSN_____
Last Name_____ First Name_____ Title_____ SSN_____
Dun & Bradstreet Number_____

BANKING INFORMATION
Financial Institution_____ Contact Name_____ Title_____
Address_____
City_____ State _____ Zip_____
Contact Telephone Number (_____)_____ Extension_____
Type of Account: ❑ Checking ❑ Savings Account Number_____

BUSINESS CREDIT REFERENCES
Name of Creditor_ _Securint - Account # 6002_____
Contact Telephone Number (_____)_____ Account Number_____
Name of Creditor_____
Contact Telephone Number (_____)_____ Account Number_____

(PART 4) (This section must be filled out entirely.)

SECTION A: TYPE OF BUSINESS - Please see attached (3 pages

❑ Publicly Traded Company   (Ticker Symbol: _____ Exchange: _____ Fortune 1000 Company: ❑ YES)
❑ Private Corporation   ❑ Sole Proprietor   ❑ Partnership/LLC   State of _____
Dun & Bradstreet Number_____ Federal Tax ID_____

BUSINESS / PROFESSIONAL LICENSE NUMBER _____
Date Issued/Expiration Date_____ Town/City Issued_____
County Issued_____ State_____

SECTION B: INDUSTRY CLASS: (Check the item that best describes the type of business in which you are engaged—**SELECT ONE.**)

❑ Attorney/Law Office            ❑ Landlord/Management Company
❑ Banking                        ❑ Media
❑ Child Support Enforcement      ❑ Process Server
❑ Collection                     ❑ University
❑ Human Resources                ❑ Utility Company
❑ Insurance                      ☒ Other (Specify) Manufacturing

## PART 5:  AVAILABLE CONSUMER REPORTING AGENCY SERVICES

SECTION A: SERVICES OFFERED BY LEXISNEXIS PUBLIC RECORDS DATA SERVICES

❑ Banko Collections Solutions    ❑ Deceased Notifier
❑ Batch Services                 ❑ Electronic Bankruptcy Notifier

SECTION B: SERVICES OFFERED BY LEXISNEXIS RISK MANAGEMENT

❑ MinDex                         ❑ Onescore
☒ PeopleWise Employment Screening   ❑ Securint Employment Screening*
❑ Securint Tenant Screening*
*$25.00 non-refundable application fee.

## PART 6:  PERMISSIBLE USE CERTIFICATION

FCRA PERMISSIBLE PURPOSE (At least one must be INITIALED to be permitted access to consumer reports.)

The information provided pursuant to this Agreement constitutes a consumer report ("Consumer Report") as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"). Customer certifies it has a permissible use under the FCRA to obtain Consumer Reports, and Customer further certifies that it will only use Consumer Reports obtained from the LNRM Group for the following permissible purposes:

____ 1.  In connection with the extension of credit to, or review or collection of an account of, the consumer (for personal, family or household purposes);
_JB_ 2.  For employment purposes;
____ 3.  In connection with the underwriting of insurance involving the consumer (for personal, family or household purposes);
____ 4.  In connection with a determination of a consumer's eligibility for a license or other benefit granted by a government agency;
____ 5.  As a potential investor or servicer, or current insurer, in connection with a valuation of, or assessment of credit or prepayment risks associated with, an existing credit obligation; or,

*Page 2 of 5*
*LNRM Consumer Report v.4.21.05*
_JB_ Customer Initial

___ 6.   For any other legitimate business need in connection with a business transaction initiated by a consumer or to review an account to determine whether the consumer continues to meet the terms of the account: provide details – approval required_____

## PART 7:  TERMS AND CONDITIONS

1.   SCOPE OF SERVICES.  The LNRM Group, each in their individual capacities as duly incorporated or registered legal entities, agrees to provide the LNRM Services to Customer. Rather than asking the Customer to sign separate documents with each of them individually, the LNRM Group has chosen to offer their respective products and services under a single document for the convenience of the Customer. Although the LNRM Group is only requiring Customer to sign one document, Customer agrees and acknowledges that this Agreement shall be interpreted as separate agreements between Customer and those LNRM Group members that are providing the LNRM Services. As such, the Customer agrees that the responsibilities and duties to provide services under this Agreement shall not be borne by the LNRM Group as a whole, but rather by the individual LNRM Group entity providing services hereunder. Moreover, this Agreement shall encompass all delivery methods for the LNRM Services, including online, batch, XML, assisted searching, machine-to-machine searches, and any other means which may become available.

2.   RESTRICTED LICENSE.  The LNRM Group hereby grants to Customer a license to use the LNRM Services, subject to the restrictions and limitations set forth below:

(i)   Generally.  The LNRM Group hereby grants to Customer a restricted license to use the LNRM Services solely for Customer's own internal business purposes. Customer represents and warrants that all of Customer's use of the LNRM Services shall be for only legitimate purposes relating to its business as specified by Customer in Part 6 of the Agreement and as otherwise governed by this Agreement. Customer shall not use the LNRM Services for marketing purposes, nor shall Customer use any information contained in the LNRM Services for a purpose not specified by Customer in Part 6 hereof or as  otherwise authorized in this Agreement, or disclose any such information contained in the LNRM Services, unless required to do so by applicable law, or resell or broker the LNRM Services to any third party. Customer agrees that if LNRM Group determines or reasonably suspects that Customer is using the information in a manner other than that certified by Customer in Part 6 or as otherwise authorized herein, reselling or brokering the LNRM Services' information, programs, computer applications, or data, or is otherwise violating any provision of this Agreement, or any applicable law, regulation or rule, the LNRM Group may take immediate action, including terminating the delivery of, and the license to use, the LNRM Services. Customer shall not access the LNRM Services from Internet Protocol addresses located outside of the United States and its territories without the LNRM Group's prior written approval. Customer shall comply with all laws, regulations and rules which may, in the LNRM Group's opinion, govern the use of the LNRM Services and information provided therein.

(ii)   Consumer Reports.  The LNRM Services provided under this Agreement constitute Consumer Reports. The Customer hereby certifies that it will only obtain and use the LNRM Services for the permissible purposes identified in Part 6 of this Agreement. Customer certifies that when using the LNRM Services, it will comply with all applicable provisions of the FCRA and all other applicable federal, state and local legislation, regulations and rules. Without limiting the generality of the foregoing, Customer certifies that (a) it will comply with all applicable provisions of the California Credit Reporting Agencies Act and any related regulations; and (b) it will comply with all Vermont statutes and regulations on fair credit reporting, including but not limited to, obtaining the consent of Vermont residents prior to obtaining any information on Vermont residents through LNRM Group. Customer agrees it will recertify, in writing, to the LNRM Group its permissible purposes for use of the LNRM Services upon the request of the LNRM Group.

(iii)   GLBA Information.  Some information contained in the LNRM Services is "nonpublic personal information," as defined in the privacy provisions of the Gramm-Leach-Bliley Act, 15 U.S.C. 6801, et seq. ("GLBA"), and is regulated by the GLBA. Customer shall not use and/or obtain nonpublic personal information through the LNRM Services in any manner that would violate the GLBA, and the regulations issued thereunder, or any similar state or local laws, regulations and rules. Customer certifies that with regard to the nonpublic personal information, it complies with the Interagency Standards for Safeguarding Customer Information.

(iv)   DPPA Information.  Some information contained in the LNRM Services may be "personal information," as that term is used in the Drivers Privacy Protection Act, 18 U.S.C. 2721, et seq., and related state laws (collectively, "DPPA"). Customer certifies that prior to requesting from the LNRM Services personal information contained in a "motor vehicle record," as defined in the DPPA ('MVR'), it will obtain the consumer's written consent to obtain such information (to the extent applicable law allows use of personal information based on such consent) or otherwise provide LNRM Group the necessary certification of permissible use of such information as required under the DPPA.

(v)   Copyrighted Materials.  Customer shall not remove or obscure the copyright notice or other notices contained on materials accessed through the LNRM Services..

3.   SECURITY.  Customer acknowledges that the information available through the LNRM Services includes personally identifiable information, including without limitation, the information described in Sections 2. (i), (iii), (iv) and (viii) hereof and it is Customer's obligation to keep all such accessed information secure. Accordingly, Customer shall (a); restrict access to LNRM Services to those employees who have a need to know as part of their official duties; (b) ensure that none of its employees shall (i) obtain and/or use any information from the LNRM Services for personal reasons, or (ii) not transfer any information received through the LNRM Services to any party except as permitted hereunder; (c) immediately notify the LNRM Group to deactivate the user identification number of any employee who no longer has a need to know, or for terminated employees on or prior to the date of termination; (d) unless otherwise agreed, keep all user identification numbers confidential and prohibit the sharing of user identification numbers; (e) in addition to any obligations under Section 2. (ii), take all commercially reasonable measures to prevent unauthorized access to, or use of, the LNRM Services or data received therefrom, whether the same is in electronic form or hard copy, by any person or entity; (f) maintain and enforce data destruction procedures to protect the security and confidentiality of all information obtained through LNRM Services as it is being disposed; (g) unless otherwise required by law, purge all information received through the LNRM Services and stored electronically or on hard copy by Customer within 90 days of initial receipt; (h) be capable of receiving the LNRM Services where the same are provided utilizing "secure socket layer," or such other means of secure transmission as is deemed reasonable by the LNRM Group; and (i) not access and/or use the LNRM Services via mechanical, programmatic, robotic, scripted or other automated search means, other than through batch or machine-to-machine applications approved by the LNRM Group. In the event that Customer discloses to the LNRM Group "nonpublic personal information" (as such term is defined in the GLBA Section 6809 (4)) about its customers and consumers ("Customer NPI") pursuant to the terms of this Agreement, the LNRM Group agrees: (i) to maintain the confidentiality of all Customer NPI; and (ii) not to disclose or use Customer NPI except in the performance of its obligations pursuant to this Agreement or in connection with judicial or government proceedings pursuant to applicable law.  In addition, the LNRM Group has implemented appropriate measures designed to meet the objectives of the Interagency Guidelines Establishing Standards for Safeguarding Customer Information.  Notwithstanding the foregoing, Customer acknowledges that Customer may provide information to the LNRM Group that constitutes Customer NPI but which is duplicative of information that the LNRM Group has lawfully received from other sources free of any obligation of confidence.  In such event, Customer acknowledges that this will not prohibit the LNRM Group from using and disclosing such information from such other sources so long as the LNRM Group does not state or imply that Customer was the source of such information.

4.   PERFORMANCE.  The LNRM Group will use reasonable efforts to deliver the LNRM Services requested by Customer and to compile information gathered from selected public records and other sources used in the provision of the LNRM Services; provided, however, that the Customer accepts all information "AS IS." Customer acknowledges and agrees that the LNRM Group obtains its data from third-party sources, which may or may not be completely thorough and accurate, and that Customer shall not rely on the LNRM Group for the accuracy or completeness of information supplied through the LNRM Services.  Customer understands that Customer may be restricted from accessing certain LNRM Services

Page 3 of 5
LNRM Consumer Report v.4.21.05
_____ Customer Initial

Closet Maid # 20 MA 920

which may be otherwise available. The LNRM Group reserves the right to add materials and features to, and to discontinue offering any of the materials and features that are currently a part of, the LNRM Services. In the event that any entity within the LNRM Group discontinues a material portion of the materials and features that Customer regularly uses in the ordinary course of its business, and such materials and features are part of a flat fee subscription plan to which Customer has subscribed, such LNRM Group entity will, at Customer's option, terminate this Agreement.

5.    PRICING SCHEDULE. The LNRM Group agrees to provide the products identified and selected by Customer in Part 5 of this Agreement (for the purposes of this Section 5, the "Products") at the applicable charge then prevailing for the information requested. Notwithstanding the foregoing, if a Schedule A is attached to this Agreement, the fees as listed on Schedule A shall supersede any other listed prices. Customer agrees to pay to the LNRM Group entity providing services under this Agreement fees in accordance with the prices as may be posted on each LNRM Group entity's website, as updated from time to time through online announcements, customer bulletins, and published price schedules. The LNRM Group is not responsible for ensuring delivery of such updates, changes, additions, or deletions to any of its pricing policies that may occur from time to time, and it is Customer's responsibility to check the websites of the LNRM Group for updates. All current and future pricing documents are deemed incorporated herein by reference. Secured products require payment of a twenty-five dollar ($25.00) non-refundable application fee.

6.    INTELLECTUAL PROPERTY. Customer agrees that Customer shall not reproduce, retransmit, republish, or otherwise transfer for any commercial purposes the LNRM Services' information, programs or computer applications. Customer acknowledges that the LNRM Group (and/or their third-party data providers) shall retain all right, title, and interest under applicable contractual, copyright, and related laws in and to the data and information that they provide. Customer shall use such materials in a manner consistent with the LNRM Group's interests and notify the LNRM Group of any threatened or actual infringement of the LNRM Group's rights.

7.    PAYMENT OF FEES. Customer shall be responsible for payment for all services obtained through Customer's user identification names and or numbers ("User ID") after the expiration of a free trial if applicable, whether or not such User ID is used by Customer or a third party, provided access to the User ID is not the result of use by a person formerly or presently employed by any members of the LNRM Group or who obtains the User ID by or through a break-in or unauthorized access of the LNRM Group's offices, premises, records or documents, or computer system. Customer shall pay on a monthly basis to each LNRM Group entity the fees incurred for the use of such LNRM Group entity's service, and Customer agrees that it may be electronically invoiced for those fees. Payments shall be received within twenty (20) days of the invoice date.

8.    TERM OF AGREEMENT. This Agreement is for services rendered and shall be in full force and effect during such periods of time during which any LNRM Group entity is providing services for Customer (the "Term"); provided, however, that if a Schedule A is attached to this Agreement, any term provided on such Schedule A (the "Schedule A Term") shall be considered the Term of this Agreement until the expiration of that Schedule A Term. Upon expiration of any Schedule A Term, this Agreement shall continue in effect for so long as any LNRM Group entity is providing services for Customer.

9.    TERMINATION.  Except where an attached Schedule A provides for a Schedule A Term or otherwise sets forth Customer's minimum financial commitment, either party may terminate this agreement at any time for any reason.

10.    GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without effect to conflict of law principles. Additionally, any action brought pursuant to Customer's use of the LNRM Services or pursuant to the terms and conditions of this Agreement shall be brought within the jurisdiction of the courts of Palm Beach County, Florida.

11.    ASSIGNMENT. The license granted pursuant to this Agreement to Customer to use the LNRM Services may not be assigned by Customer, in whole or in part, without the prior written consent of the LNRM Group. For purposes of this Agreement a change in control of Customer of twenty percent (20%) or more shall constitute an assignment.

12.    WARRANTIES/LIMITATION OF LIABILITY. Neither any entity of the LNRM Group, nor their subsidiaries and affiliates, nor any third-party data provider (for purposes of indemnification, warranties, and limitations on liability, the LNRM Group, their subsidiaries and affiliates, and their data providers are hereby collectively referred to as the "LNRM Group") shall be liable to Customer (or to any person claiming through Customer to whom Customer may have provided data from the LNRM Services) for any loss or injury arising out of or caused in whole or in part by LNRM Group's acts or omissions in procuring, compiling, collecting, interpreting, reporting, communicating, or delivering the LNRM Services. If, notwithstanding the foregoing, liability can be imposed on the LNRM Group, then Customer agrees that the LNRM Group's aggregate liability for any and all losses or injuries arising out of any act or omission of the LNRM Group in connection with anything to be done or furnished under this Agreement, regardless of the cause of the loss or injury, and regardless of the nature of the legal or equitable right claimed to have been violated, shall never exceed $100.00; provided, however, that such limitation of liability shall not apply to LNRM Group's indemnification obligation detailed in Section 13 hereof, and Customer covenants and promises that it will not sue the LNRM Group for an amount greater than such sum even if Customer and/or third parties were advised of the possibility of such damages and that it will not seek punitive damages in any suit against the LNRM Group. Customer expressly agrees and acknowledges that (i) there is no partnership or joint venture between any of the LNRM Group entities; (ii) there shall not be any joint nor several obligations or liabilities undertaken amongst, between, or on behalf of any of the LNRM Group entities; (iii) the LNRM Group entities do not expressly or impliedly agree to be responsible or liable for the acts and omissions of one another; and (iv) the LNRM Group entities do not warrant the services provided by one another. The LNRM Group does not make and hereby disclaims any warranty, express or implied, with respect to the LNRM Services provided hereunder; provided, however, that the LNRM Group does hereby warrant that the LNRM Group has complied with the law and applicable third-party data provider contracts in providing the LNRM Services. The LNRM Group does not guarantee or warrant the correctness, completeness, merchantability, or fitness for a particular purpose of the LNRM Services or information provided therein. In no event shall the LNRM Group be liable for any indirect, incidental, or consequential damages, however arising, incurred by Customer from receipt or use of information delivered hereunder or the unavailability thereof.

13.    INDEMNIFICATION. Customer hereby agrees to protect, indemnify, defend, and hold harmless the LNRM Group from and against any and all costs, claims, demands, damages, losses, and liabilities (including attorneys' fees and costs) arising from or in any way related to use of information received by Customer (or any third party receiving such information from or through Customer) furnished by or through the LNRM Group. Each entity of the LNRM Group hereby agrees to protect, indemnify, defend, and hold harmless Customer from and against any and all costs, claims, demands, damages, losses, and liabilities (including attorneys' fees and costs) arising from or in any way related to their respective breaches of the warranty made in Section 12 hereof regarding authorized provision of the data.

14.    SURVIVAL OF AGREEMENT. Provisions hereof related to release of claims, indemnification, use and protection of information and data, payment for the LNRM Services, Audit, and disclaimer of warranties shall survive any termination of the license to use the LNRM Services.

15.    AUDIT. Customer understands and agrees that in order to ensure compliance with the FCRA and other applicable federal, state and local laws, regulations and rules, regulatory agency requirements, the terms and conditions of this Agreement and the LNRM Group's obligations under its contracts with its data providers, the LNRM Group may conduct periodic reviews of Customer's use of the LNRM Services and may, upon reasonable notice, audit Customer's records, processes and procedures related to Customer's use, storage and disposal of LNRM Services and information received therefrom. Customer agrees to cooperate fully with any and all audits. Violations discovered in any review and/or audit by the LNRM Group will be subject to immediate action including, but not limited to, suspension or termination of the license to use the LNRM Services, reactivation fees, legal action, and/or referral to federal or state regulatory agencies.

Page 4 of 5
LNRM Consumer Report v.4.21.05
_____ Customer Initial

195

*Closet Maid #20MA920*

16. **EMPLOYEE TRAINING.** Customer shall train new employees prior to allowing access to LNRM Services on Customer's obligations under this Agreement, including but not limited to, the licensing requirements and restrictions under Section 2 and the security requirements of Section 3. Customer shall conduct a similar review of its obligations under this Agreement with existing employees who have access to LNRM Services no less than annually. Customer shall keep records of such training.

17. **ATTORNEYS FEES.** The prevailing party in any action, claim or law suit brought pursuant to this Agreement is entitled to payment of all attorney fees and costs expended by such prevailing party in association with such action, claim or lawsuit.

18. **TAXES.** The charges for all LNRM Services are exclusive of any state, local, or otherwise applicable sales, use, or similar taxes. If any such taxes are applicable, they shall be charged to Customer's account.

19. **CUSTOMER CHANGE.** Customer shall notify the LNRM Group immediately of any changes to the information on Customer's Application for the LNRM Services. The LNRM Group reserve the right to terminate Customer's access to the LNRM Services or terminate the license to use the LNRM Services without further notice upon receipt of any change in Customer's status which in the LNRM Group's sole discretion would cause Customer to be unable to comply with its obligations under this Agreement.

20. **RELATIONSHIP OF PARTIES.** None of the parties shall at any time represent that they are the authorized agents or representatives of the others.

21. **CHANGE IN AGREEMENT.** By receipt of the LNRM Services, Customer agrees to, and shall comply with, changes to the Restricted License granted Customer in Section 2 herein, and changes in pricing as the LNRM Group shall make from time to time by notice to Customer via e-mail, online "click wrap" amendments, facsimile, mail, or other written notification. All e-mail notifications shall be sent to the individual named in the Contact Information section, unless stated otherwise in this Agreement.

22. **ENTIRE AGREEMENT.** Except as otherwise provided herein, this Agreement constitutes the final written agreement and understanding of the parties and is intended as a complete and exclusive statement of the terms of the agreement, which shall supersede all prior representations, agreements, and understandings, whether oral or written, which relate solely and exclusively to the use of the LNRM Services. Any new, other, or different terms supplied by the Customer beyond the terms contained herein, including those contained in purchase orders or confirmations issued by the Customer, are specifically and expressly rejected by the LNRM Group unless the LNRM Group agrees to them in a signed writing specifically including those new, other, or different terms. The terms contained herein shall supersede and govern in the event of a conflict between these terms and any new, other, or different terms in any contract in which this Agreement is referenced or made a part of. In the event any one or more provisions of this Agreement or any exhibit is held to be invalid or otherwise unenforceable, the enforceability of the remaining provisions shall be unimpaired. All capitalized terms used in these Terms and Conditions that are not defined shall have the meaning given to them in the Application.

## AUTHORIZATION AND ACCEPTANCE OF TERMS

I HEREBY CERTIFY that I am authorized to execute this Agreement on behalf of the Customer listed above and that the statements I have provided in this Agreement are true and correct. Further, I hereby certify that the Customer agrees to the Terms and Conditions for use of Consumer Report Products.

CUSTOMER
Signature
Print Name Jennifer Boring
Title Employee Relations Mgr.
Dated 8/26/2005 (mm/dd/yyyy)

Salesperson Name: Michael Jackson
Territory Code: 106612
Primary Market:
Industry Code 1:
Additional Email:
Roll Up: ☐ Yes ☐ No

**Internal Use Only**
Phone: 561-999-8645
FT Days: Clicks:
Secondary Market:
Industry Code 2:
Bill Group Master:

Page 5 of 5
LNRM Consumer Report v.4.21.05
Customer Initial

196

# Accurate Background Check

PO Box 1864
Ocala, Florida 34470

Phone 352.291.1155
Fax 352.854.8917
Email Lolagonzalez@earthlink.net
www.accuratebackgroundcheck.com

January 21, 2002

Closet Maid Corporation
Att: Mary Price
PO Box 4400
Ocala, Florida  34478

Dear Mary Price,

We have found it necessary to increase our prices starting February 1st. 2002.  We have been providing Closet Maid with background information since 1999, within this time we have increased our price by $2.00 and included Workers Compensation which was not in the original agreement and also separated the profiles by providing criminal and Workers Compensation on separate reports.  We are also providing you with unlimited County Searches in the State of Florida for the same price.

There is a  new Law (Graham-Leach) which has made it costly to provide our companies with accurate information.  Due to this Law, identifiers are being omitted and reboved from records making it more time consuming for the researchers to positively identify the applicants.  We are finding it necessary to contact Probation Officers, State Attorneys, Prosecutors, Process Servers and other important sources of information more often.

27.00

 We have found it necessary to increase our price from $22.00 to $32.00 for the labor requests and from $45.00 to $50.00 for the salary requests.  We made a commitment to Cathy Beal that we would save your company money and provide the best service possible, we want to continue this commitment without jeopardizing accuracy.

We truly have enjoyed being your business partner's and are committed to continue this relationship.

Respectfully,

*Lola M. Gonzalez*

Lola M. Gonzalez
Private Investigator & Business Development
License Number: C2000544

MVR - Free



## Background Package & Ala Carte Pricing for ClosetMaid - Emerson (4/09)

### Package Option 1 - 7 Year Ntl Criminal Database Package

Crime Guard National Criminal Database Search w/ County follow up – 7 Years*
Social Locator Service

**Base Package Price - $14.00**
*County follow up searches included if criminal information is discovered from the national database. American Background will filter the database results. County court access fees additional, only if applicable.

### Package Option 2 - 7 Year Ntl Criminal Database w/ Current County Criminal Search

Current County or State Criminal Search
Crime Guard National Criminal Database Search w/ County follow up – 7 Years*
Social Locator Service

**Base Package Price – $18.00**
*American Background will search the local county or state the applicant currently resides. County follow up searches included if criminal information is discovered. American Background will filter the database Results. County court access fees additional, only if applicable.

### Ala Carte Options

Credit Report                                                    $5.95

Motor Vehicle Report (state access fee is in addition)           $2.00

***Additional services/packages available. Please call for additional quotation***

INITIALS

# *Exhibit G*



8/14/2009

| CM Location | # EE's hired (from Bi-Annual)[1] | FCRA Forms Completed & background checks run (not hired) | # filling out FCRA form no background check run | # Credit Checks Run | # Candidates[4] | # Applicants[5] |
|---|---|---|---|---|---|---|
| Grantsville, MD | 189 | 57 | 128 | 1 | 1811 | 1191 |
| Belle Vernon, PA | 66 | 27 | 247 | 0 | 507 | 151 |
| Chino, CA[3] | 783 | 51 | 1375 | 4 | 2359 | 1407 |
| Ocala, FL[2] | 456 | 164 | 598 | 31 | 2092 | 1930 |
| Totals | 1494 | 299 | 2348 | 36 | 6769 | 4679 |

(1)FCRA Form Completed and Background Report Run
(2)Includes CMNA and Tacoma, WA
(3)Used California FCRA Form with Correct Verbiage and Requirements
(4)EEO Guidelines for Candidate: Express interest in an open position; includes Applicant Numbers
(5)EEO Guidelines for Applicant: Express interest in an open position, applied properly, possess qualifications, and considered for opening

12/1/2006 - June 30,2009

**FCRA Forms completed and run but not hired**     (Reasons)
      Non-third party references
      Declined position (no longer interested)
      Did not show
      Did not return phone calls
      Did not pass drug screen /post offer physical



**CLOSETMAID** together

# APPLICATION FOR EMPLOYMENT

## WITH

# ≡CLOSETMAID®

### (APPLICATION LIMITED TO OPENING APPLIED FOR)

NAME ███████████████████

DATE ███████████████████

POSITION *GPW / MAINTENANCE TECH - ELECTRICAL*

ClosetMaid is an Equal Opportunity Employer. Applicants will be considered for job openings without any regard to race, sex, religion, sexual orientation, national origin, creed, age, disability and military service/veteran status.)



Exhibit 10
Witness Closetmaid
Date 9/27/09 Rptr. NB
AKF



EMERSON.
Storage Solutions

280




**APPLICATION FOR EMPLOYMENT**

Date _Jan. 2 2007_ ___ Position Applied For: ~~****~~ *GPW /MAINTENANCE TECH. ELEC.*

How did you hear about this opening: _____ Date Available for Work: _Any Time._

INSTRUCTIONS: Please read carefully. Every item on this form must be answered to the best of your ability and knowledge. Please print and use a pen. Your qualifications will be carefully reviewed, and you will be given thorough consideration for the vacancy/position applied for. Upon employment, this application will become part of your permanent record with us. Keep this in mind as you complete it. *Special Note: You are not required to supply any information that is prohibited by Federal, State or Local law. We are an Equal Opportunity Employer.*

PERSON
Name __

Street 8

Previous

Are you 1
(You will

Have you
☐ Yes
(The fact
If "yes" please describe in detail and attach to application.

**EDUCATION:**

High School (Name and Address) _SALISBURY ELK-LICK_

Did you graduate? _YES._. If no, last grade completed _____ G.E.D Obtained? _____ Grade Average _____

Colleges (Name and Address) _NONE_

Colleges (Name and Address) _NONE_

Did you graduate? _____ If no, number of hours completed _____ Grade Point Average _____ Degree _____

Major _____ Minor _____ If attending, date of graduation _____

Other Education _____

Certifications _____

Awards, Honors, Leadership Roles _____

Foreign Languages: _____

**MILITARY:** ☐ not applicable

List service in U.S. Military: From _____ to _____ Branch _____

Rank at Discharge _____ Military experience that may be applicable: _____

281

# ■CLOSETMAID®

**EMERSON.**
Storage Solutions

**GENERAL EMPLOYMENT INFORMATION:**

1. List here all of the equipment with which you have experience and training. (Examples: computer, lathe, milling machine, etc.): <u>Wood Work Machine, Shipping and Forklift Training,</u> <u>Elec, Home Building</u>

2. Were you previously employed by us? <u>No</u>   if yes, when? _____ to _____

3. Present Salary: <u>$12.00</u>   (hr)week/year.

   Salary Expected: _____ hr/week/year.  Number of hours available per week? <u>40+</u>   ☐ No preference.

4. Type of Employment sought:   ☑ regular full time   ☐ regular part time   ☐ temporary   ☐ seasonal

5. Which of these times are you available:  Days:   ☑ yes   ☐ no   OR   Nights:   ☑ yes   ☐ no

Address _____   Last Salary _____ per hour or week
Kind of Business _____   Supervisor _____
Job Title _____   Reason for Leaving ☐ Quit ☐ Discharge ☐ Retired
Dates Employed _____ to _____   ☐ Layoff   ☐ Other _____
Telephone Number _____

**CLOSET**MAID


EMERSON.
*Storage Solutions*

**ACTIVITIES:**

Please list any information which you feel may be helpful in considering your application. For example: significant work accomplishments, special training, specific interests, etc.

*Cutting Wood Pattern Out 3/4 ply Stock, Building*
*Fixture and Assemble projects.*

Affiliations with professional, civic organizations which you consider relevant to your ability to perform the job for which you are applying:

**CURRENT/PRIOR CONTRACTUAL OBLIGATIONS:**

Do you have any current contractual obligations relating to a prior employer or client, such as a Confidentiality and/or Non-Compete Agreement?  ☐ Yes   ☐ No   If so, please list the agreements, dates and employers/clients involved.

**EMPLOYMENT REFERENCE:**

Please list below two business references who can attest to your skills, knowledge and experience, that will contribute to your success in the position for which you are applying.

NAME *Fibred Group.*     NAME *Hilt's Elec.*
ADDRESS *P.O. Box 3349*     ADDRESS *Salisbury Pa*
*Lavale, MD. 21504*
TELEPHONE (301) *724-2800 /724-6050*   TELEPHONE (814) *662-4191*
OCCUPATION *Prod./Labor*     OCCUPATION *Elec./Labor*

*Black.*

283

# ■CLOSETMAID®



EMERSON.
Storage Solutions

APPLICATION LIMITED TO OPENING APPLIED FOR

PLEASE READ CAREFULLY BEFORE SIGNING

I hereby affirm that my answers to the foregoing questions are true and correct. I authorize this Company to conduct whatever investigation it deems necessary to confirm the answers submitted on this application. If the investigation concludes that I provided any untrue information, this will serve as sufficient grounds to immediately terminate the application process, or immediately terminate my employment regardless of when the discovery occurs.

I understand and agree that my employment is "at will" for no definite period and may, regardless of the period of payment and wages or salary, be terminated at any time for any reason without any previous notice. I further understand that no Company official has made any promises to the contrary or guaranteed me employment for any specified period of time, or has the authority to make such promise/guarantee, and that no employee handbook or policy may be construed to the contrary or interpreted as a contract or guarantee of employment.

I also authorize any of my former employers to furnish this company with their record of my services; my reason for leaving their employ, and any other information they may have concerning me. I hereby release any of my former employers from all liability for any damages in furnishing said record.

I agree that if I am employed by this Company, a full transcript of my records as an employee, including reason for termination, may be given to a prospective future employer on its request, and do hereby release this Company from any and all liability or damages whatsoever in furnishing such information.

I agree to abide by the rules and policies of this Company. I further understand that all applicants are subject to post-offer medical examination, and drug screening, as a condition of employment. Examinations are to be made by a representative designated by the Company.

Upon separation of employment, I authorize the Company to withhold from my final paycheck, vacation and expense checks any and all monies owed to the Company by me at the time of my termination.

The use of this application form does not indicate that there are any positions available, and in no way obligates the Company.

**I agree that any claim or lawsuit relating to this application, my service or employment with ClosetMaid or its affiliates, whether relating to contracts or federal or state statutory claims, must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit unless filed under a federal or state statute with a shorter** tions to the

## AUTHORIZATION FOR RELEASE
## OF INFORMATION FOR EMPLOYMENT PURPOSES

I hereby authorize ClosetMaid/Emerson Electric Co., and its designated agents and representatives to conduct a comprehensive review of my background causing a consumer report and/or an investigative consumer report to be generated for employment purposes.

I understand that the scope of the consumer report/investigative consumer report may include, but is not limited to, the following areas:

Verification of social security number, current and previous residences, employment history including all personnel files, education, character references, credit history and reports, criminal history records from any criminal justice agency in any or all federal, state county jurisdictions, birth records, motor vehicle records to include traffic citations and registration and any other public records.

I authorize the complete release of these records or data pertaining to me which an individual, company, firm, corporation, or public agency may have. I understand that I must provide my date of birth to adequately complete said screening, and acknowledge that my date of birth will not affect any hiring decisions.

I hereby release ClosetMaid/Emerson Electric Co., and its agents, officials, representatives, or assigned agencies, including officers, employees, or related personnel both individually and collectively, from any and all liability for damages of whatever kind, which may at any time, result to me, my heirs, family or associates because of compliance with this authorization and request to release. You may contact me as indicated below.

I understand this authorization will not expire if I am hired, but also understand I have the right to revoke the authorization at any time, provided I do so in writing.

together

# APPLICATION FOR EMPLOYMENT

## WITH



# CLOSETMAID®

(APPLICATION LIMITED TO OPENING APPLIED FOR)

ClosetMaid is an Equal Opportunity Employer. Applicants will be considered for job openings without any regard to race, sex, religion, sexual orientation, national origin, creed, age, disability and military service/veteran status.)



Exhibit __11__
Witness _Closetmaid_
Date _8/27/09_ Rptr. _NB_

_AKF_

EMERSON.

**CLOSETMAID**

EMERSON.
Storage Solutions

## APPLICATION FOR EMPLOYMENT

Date _Feb, 12th, 2007_          Position Applied For: _Forklift Operation / Maintenance / Machine Operation_

How did you hear about this opening: _Reference_          Date Available for Work: _ASAP_

INSTRUCTIONS: Please read carefully. Every item on this form must be answered to the best of your ability and knowledge. Please print and use a pen. Your qualifications will be carefully reviewed, and you will be given thorough consideration for the vacancy/position applied for. Upon employment, this application will become part of your permanent record with us. Keep this in mind as you complete it. Special Note: You are not required to supply any information that is prohibited by Federal, State or

Foreign Languages: _None_

MILITARY:      ☑ not applicable

List service in U.S. Military: From _____ to _____ Branch _____

Rank at Discharge _____ Military experience that may be applicable: _____

287

# CLOSETMAID

EMERSON.
*Storage Solutions*

## GENERAL EMPLOYMENT INFORMATION:

1. List here all of the equipment with which you have experience and training. (Examples: computer, lathe, milling machine, etc.): *All Heavy Equipment / Mig Welding / Overhead Cranes / Various Machines*

2. Were you previously employed by us? *No* _____ If yes, when? _____ to _____

3. Present Salary: *$9.50 hr* hr/week/year.
   Salary Expected: *$9.50 hr* hr/week/year.   Number of hours available per week? *40+*   ☐ No preference.

4. Type of Employment sought:   ☑ regular full time   ☐ regular part time   ☐ temporary   ☐ seasonal

5. Which of these times are you available:   Days: ☑ yes ☐ no   Nights: ☑ yes ☐ no

   Weekends: ☐ yes ☑ no   Holidays: ☐ yes ☑ no

6. List here names of relatives currently in our employ: *N/A*

7. In case of emergency, notify *Patricia Coberly*   Telephone Number *1-301-895-5131*

## EXPERIENCE:

List below all present and past employment beginning with your most recent employer.  Please attach a separate sheet of paper if you have additional prior employers.

1. Employer *Benson International*
   Address *8535 Mason Dixon Hwy Thoxextate PA*   Last Salary *$9.50 hr* per hour or week
   Kind of Business *Trailer Fabrication*   Supervisor *Lenny Loftin*
   Job Title *Detailer*   Reason for Leaving ☐ Quit ☐ Discharge ☐ Retired
   Dates Employed *Nov 13th 05* to *Nov 13th 06*   ☑ Layoff ☐ Other
   Telephone Number *1-814-634-0080*

2. Employer *Weimer Brothers*
   Address *8467 Avilton Lon. Rd. Lou. Md 21529*   Last Salary *$7.10 hr* per hour or week
   Kind of Business *Dairy Farm / Logging Operation*   Supervisor *John Weimer*
   Job Title *Laborer*   Reason for Leaving ☐ Quit ☐ Discharge ☐ Retired
   Dates Employed *June 01* to *July 04*   ☐ Layoff ☑ Other *Attended College*
   Telephone Number *1-301-689-8245*

3. Employer _____
   Address _____   Last Salary _____ per hour or week
   Kind of Business _____   Supervisor _____
   Job Title _____   Reason for Leaving ☐ Quit ☐ Discharge ☐ Retired
   Dates Employed _____ to _____   ☐ Layoff ☐ Other
   Telephone Number _____

4. Employer _____
   Address _____   Last Salary _____ per hour or week
   Kind of Business _____   Supervisor _____
   Job Title _____   Reason for Leaving ☐ Quit ☐ Discharge ☐ Retired
   Dates Employed _____ to _____   ☐ Layoff ☐ Other
   Telephone Number _____

**CLOSETMAID**                                                                EMERSON
                                                                              Storage Solutions

ACTIVITIES:

Please list any information which you feel may be helpful in considering your application. For example: significant work accomplishments, special training, specific interests, etc.

Woodworking Skills / Good working with hands / Like operation of equipment and machines

Affiliations with professional, civic organizations which you consider relevant to your ability to perform the job for which you are applying:

N/A

CURRENT/PRIOR CONTRACTUAL OBLIGATIONS:

Do you have any current contractual obligations relating to a prior employer or client, such as a Confidentiality and/or Non-Compete Agreement? ☐ Yes ☑ No   If so, please list the agreements, dates and employers/clients involved.

EMPLOYMENT REFERENCE:

Please list below two business references who can attest to your skills, knowledge and experience, that will contribute to your success in the position for which you are applying.

NAME _Benson International_           NAME _Paul Wheeler / Wheeler Bros. inc._
ADDRESS _8535 Mason Dixon Hwy_       ADDRESS _Somerset Industrial Park_
_Meyersdale PA_
TELEPHONE ( 814 ) _634-0080_          TELEPHONE ( 814 ) _443-2361_
OCCUPATION _Trailer Fabrication_      OCCUPATION _Gov. Parts Dealer_

**CLOSETMAID**

EMERSON.
*Storage Solutions*

APPLICATION LIMITED TO OPENING APPLIED FOR

PLEASE READ CAREFULLY BEFORE SIGNING

I hereby affirm that my answers to the foregoing questions are true and correct. I authorize this Company to conduct whatever investigation it deems necessary to confirm the answers submitted on this application. If the investigation concludes that I provided any untrue information, this will serve as sufficient grounds to immediately terminate the application process, or immediately terminate my employment regardless of when the discovery occurs.

I understand and agree that my employment is "at will" for no definite period and may, regardless of the period of payment and wages or salary, be terminated at any time for any reason without any previous notice. I further understand that no Company official has made any promises to the contrary or guaranteed me employment for any specified period of time, or has the authority to make such promise/guarantee, and that no employee handbook or policy may be construed to the contrary or interpreted as a contract or guarantee of employment.

I also authorize any of my former employers to furnish this company with their record of my services, my reason for leaving their employ, and any other information they may have concerning me. I hereby release any of my former employers from all liability for any damages in furnishing said record.

I agree that if I am employed by this Company, a full transcript of my records as an employee, including reason for termination, may be given to a prospective future employer on its request, and do hereby release this Company from any and all liability or damages whatsoever in furnishing such information.

I agree to abide by the rules and policies of this Company. I further understand that all applicants are subject to post-offer medical examination, and drug screening, as a condition of employment. Examinations are to be made by a representative designated by the Company.

Upon separation of employment, I authorize the Company to withhold from my final paycheck, vacation and expense checks any and all monies owed to the Company by me at the time of my termination.

The use of this application form does not indicate that there are any positions available, and in no way obligates the Company.

I agree that any claim or lawsuit relating to this application, my service or employment with ClosetMaid or its affiliates, whether relating to contracts or federal or state statutory claims, must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit unless filed under a federal or state statute with a shorter statute of limitations. I specifically waive any federal and state statutes of limitations to the contrary.

# ■CLOSETMAID™

## AUTHORIZATION FOR RELEASE
## OF INFORMATION FOR EMPLOYMENT PURPOSES

I hereby authorize ClosetMaid/Emerson Electric Co., and its designated agents and representatives to conduct a comprehensive review of my background causing a consumer report and/or an investigative consumer report to be generated for employment purposes.

I understand that the scope of the consumer report/investigative consumer report may include, but is not limited to, the following areas:

> Verification of social security number, current and previous residences, employment history including all personnel files, education, character references, credit history and reports, criminal history records from any criminal justice agency in any or all federal, state county jurisdictions, birth records, motor vehicle records to include traffic citations and registration and any other public records.

I authorize the complete release of these records or data pertaining to me which an individual, company, firm, corporation, or public agency may have. I understand that I must provide my date of birth to adequately complete said screening, and acknowledge that my date of birth will not affect any hiring decisions.

I hereby release ClosetMaid/Emerson Electric Co., and its agents, officials, representatives, or assigned agencies, including officers, employees, or related personnel both individually and collectively, from any and all liability for damages of whatever kind, which may at any time, result to me, my heirs, family or associates because of compliance with this authorization and request to release. You may contact me as indicated below.

I understand this authorization will not expire if I am hired, but also understand I have the right to revoke the authorization at any time, provided I do so in writing.



_Signature_                                                                          _Date_

lmeyers grantsville Nov 06

# ■CLOSETMAID®

# APPLICATION FOR EMPLOYMENT





Application limited to opening applied for. ClosetMaid® is an Equal Opportunity Employer. Applicants will be considered for job openings without any regard to race, sex, religion, sexual orientation, national origin, creed, age, disability and military service/veteran status.



EMERSON.

Exhibit   12
Witness Closetmaid
Date 8/27/09 Rptr. NB
**AKF**

302

 

## APPLICATION FOR EMPLOYMENT

Did you graduate? yes  If no, last grade completed _____ G.E.D obtained? _____ Grade Average C ___
College (Name and address) _____
College (Name and address) _____
Did you graduate? _____ If no, number of hours completed _____ Grade Point Average _____
Degree_____ Major _____ Minor _____
If attending, date of graduation _____
Other education _____
Certifications _____

Page 2

303

# CLOSETMAID®

EMERSON.

Awards, Honors, Leadership Roles _____

_____

_____

Foreign Languages: _____   _____   _____

**MILITARY:** ☒ Not applicable

List service in U.S. Military: From _____ to _____ Branch _____

Rank at discharge _____ Military experience that may be applicable: _____

## GENERAL EMPLOYMENT INFORMATION:

1. List here all of the equipment with which you have experience and training. (Examples: computer, lathe, milling machine, etc.) _____   _____

    _____   _____

2. Were you previously employed by us? _No_____ If yes, when? _____ to _____

3. Type of employment sought:   ☒ Regular full-time   ☐ Regular part-time

    ☐ Temporary   ☐ Seasonal

4. Which of these times are you available:   Days: ☒ Yes ☐ No   Nights: ☐ Yes ☐ No

    Weekends: ☒ Yes ☐ No   Seasonal: ☐ Yes ☐ No

    Number of hours available per week? _40 hrs_   ☐ No preference

5. Present salary: _____ ☐ Hour ☐ Week ☐ Year

    Salary expected: _____ ☐ Hour ☐ Week ☐ Year

6. List here names of relatives currently in our employ: _____

    _____

## ACTIVITIES:

Please list any information which you feel may be helpful in considering your application. (Examples: significant work accomplishments, special training, specific interests, etc.) _drive forktruck___

_____

Affiliations with professional, civic organizations which you consider relevant to your ability to perform the job for which you are applying: _____

_____

Page 3

304

 

**EMPLOYMENT HISTORY:**

List below all present and past employment beginning with your most recent employer. Please attach a separate sheet of paper if you have additional prior employers.







**EMPLOYMENT HISTORY:**

List below all present and past employment beginning with your most recent employer. Please attach a separate sheet of paper if you have additional prior employers.



 

**EMPLOYMENT HISTORY:**

List below all present and past employment beginning with your most recent employer. Please attach a separate sheet of paper if you have additional prior employers.



# ■CLOSETMAID®


EMERSON

## CURRENT / PRIOR / CONTRACTUAL OBLIGATIONS:

Do you have any current contractual obligations relating to a prior employer or client, such as a confidentially and/or non-complete agreement? ☒ Yes ☒ No If so, please list the agreements, dates and employers/clients involved: _____

_____

_____

▓▓▓  ▓▓▓  ▓▓▓  ▓▓▓  ▓▓▓  ▓▓▓  ▓▓▓  ▓▓▓  ▓▓▓  ▓▓▓  ▓▓▓

## REFERENCES:

Please list below three business references who can attest to your skills, knowledge and experience, that will contribute to your success in the position for which you are applying.

Name _George Hutcheson_____   Job Title _City Worker_
Address _165 Happy Hill Lane Frostburg_
Phone # _301 768 2765_   Alternate phone _____
Email address _____

Name _Lawrence Kaseeamp_____   Job Title _Railroad_
Address _150 S Caboose Frostburg_
Phone # _301 689 1965_   Alternate phone _____
Email address _____

Name _Lisa Dixon_____   Job Title _____
Address _1026 Blackburn Livonia MT_
Phone # _304 523 9051_   Alternate phone _____
Email address _____

Page 5

306

 

EMERSON.

## APPLICATION LIMITED TO OPENING APPLIED FOR PLEASE READ
## CAREFULLY BEFORE SIGNING

I hereby affirm that my answers to the foregoing questions are true and correct. I authorize this Company to conduct whatever investigation it deems necessary to confirm the answers submitted on this application. If the investigation concludes that I provided any untrue information, this will serve as sufficient grounds to immediately terminate the application process, or immediately terminate my employment regardless of when the discovery occurs.

I understand and agree that my employment is "at will" for no definite period and may, regardless of the period of payment and wages or salary, be terminated at any time for any reason without any previous notice. I further understand that no Company official has made any promises to the contrary or guaranteed me employment for any specified period of time, or has the authority to make such promise/guarantee, and that no employee handbook or policy may be construed to the contrary or interpreted as a contract or guarantee of employment.

I also authorize any of my former employers to furnish this company with their record of my services, my reason for leaving their employ, and any other information they may have concerning me. I hereby release any of my former employers from all liability for any damages in furnishing said record.

I agree that if I am employed by this Company, a full transcript of my records as an employee, including reason for termination, may be given to a prospective future employer on its request, and do hereby release this Company from any and all liability or damages whatsoever in furnishing such information.

I agree to abide by the rules and policies of this Company. I further understand that all applicants are subject to post-offer medical examination, and drug screening, as a condition of employment. Examinations are to be made by a representative designated by the Company.

Upon separation of employment, I authorize the Company to withhold from my final paycheck, vacation and expense checks any and all monies owed to the Company by me at the time of my termination.

The use of this application form does not indicate that there are any positions available, and in no way obligates the Company.

I agree that any claim or lawsuit relating to this application, my service or employment with ClosetMaid® or its affiliates, whether relating to contracts or federal or state statutory claims, must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit unless filed under a federal or state statute with a shorter statute of limitations. I specifically waive any federal and state statutes of limitations to the contrary.

**CLOSETMAID**


EMERSON

# APPLICANT NOTICE:

In accordance with our drug free workforce policy, ClosetMaid® will require a drug test of all applicants prior to the first day of employment.

*Any offer of employment is considered conditional based upon the successful completion of the drug screen process.*

---

*Our hiring policy is simple:*

**This company hires lawful workers only – U.S. citizens or nationals and non-citizens with valid work authorization – without discrimination.**

Federal immigration law requires all employers to verify both the identity and employment eligibility of all persons hired to work in the United States.

In its efforts to meet the law's requirements, this company is participating in the Basic Pilot program established by the Department of Homeland Security and the Social Security Administration (SSA) to aid employers in verifying the employment eligibility of all newly hired employees. Our participation in the pilot program does not exempt us from the obligation to complete a Form I-9 for everyone we hire.

**For additional information on the verification program, contact:**
Department of Homeland Security
USCIS/SAVE Program
111 Massachusetts Avenue, 2nd Floor
Washington, DC 20001
Phone (888) 464-4218

---

*Nuestra póliza de empleo es simple:*

**Sin discriminación, esta compañia emplea solamente trabajadores legales – ciudadanos o nacionales de los Estados Unidos y extranjeros con autorización de trabajo.**

La Ley Federal de Inmigración y Nacionalidad requiere que todas las empresas verifiquen la identidad y elegibilidad de las personas que buscan empleo en los Estados Unidos.

En su esfuerzo de cumplir los requisitos de la Ley, esta compañia participa en un programa Piloto Básico de verificación de empleo, establecido por El Departmento de Seguirdad Nacional (DHS) en conjunto con la Administración de Seguro Social en esta forma los empleadores, verificaran la elegibilidad de todos los nuevos aplicantes. Nuestra participación en este programa piloto, hace que no exista ningun tipo de excepción en la Ley, tenemos la obligación de completar el formulario I-9 para toda persona que nostros empleamos.

**Para mayor información de este programa de verificaión, puede usted comunicarse:**
Department of Homeland Security
U.S. Citizenship and Immigration Services
Systematic Alien Verification for Entitlements
(SAVE )Program
Washington, DC 20529
Phone (888) 464-4218

Page 7

308

# CLOSETMAID

**AUTHORIZATION FOR RELEASE**
**OF INFORMATION FOR EMPLOYMENT PURPOSES**

I hereby authorize ClosetMaid/Emerson Electric Co., and its designated agents and representatives to conduct a comprehensive review of my background causing a consumer report and/or an investigative consumer report to be generated for employment purposes.

I understand that the scope of the consumer report/investigative consumer report may include, but is not limited to, the following areas:

Verification of social security number, current and previous residences, employment history including all personnel files, education, character references, credit history and reports, criminal history records from any criminal justice agency in any or all federal, state county jurisdictions, birth records, motor vehicle records to include traffic citations and registration and any other public records.

I authorize the complete release of these records or data pertaining to me which an individual, company, firm, corporation, or public agency may have. I understand that I must provide my date of birth to adequately complete said screening, and acknowledge that my date of birth will not affect any hiring decisions.

I hereby release ClosetMaid/Emerson Electric Co., and its agents, officials, representatives, or assigned agencies, including officers, employees, or related personnel both individually and collectively, from any and all liability for damages of whatever kind, which may at any time, result to me, my heirs, family or associates because of compliance with this authorization and request to release. You may contact me as indicated below.

I understand this authorization will not expire if I am hired, but also understand I have the right to revoke the authorization at any time, provided I do so in writing.



# ∎CLOSETMAID®

## APPLICATION FOR EMPLOYMENT





EMERSON.

Exhibit 13
Witness Closetmaid
Date 9/27/09 rptr. NB
AKF

417



**EMERSON**

# APPLICATION FOR EMPLOYMENT

Date _5/14/07_  Position applied for: _Any_ _____

How did you hear about this opening: _Sign_ _____

Referred by: _____  Date available for work: _5/15/07_ _____

**INSTRUCTIONS:** Please read carefully. Every item on this form must be answered to the best of your ability and knowledge. Please print and use a pen. Your qualifications will be carefully reviewed, and you will be given thorough consideration for the vacancy/position applied for. Upon employment, this application will become part of your permanent record with us. Keep this in mind as you complete it.
*Special Note: You are not required to supply any information that is prohibited by Federal, State or Local law. We are an Equal Opportunity Employer.*

HB?
H01
H04

College (Name and address) _____
College (Name and address) _____
Did you graduate? _____ If no, number of hours completed _____ Grade Point Average _____
Degree_____ Major _____ Minor _____
If attending, date of graduation _____
Other education _____
Certifications _____

Page 2

418

**CLOSETMAID**

EMERSON

Salary expected: ___ncu___    ☑ Hour ☐ Week ☐ Year

6. List here names of relatives currently in our employ: _____

_____

## ACTIVITIES:

Please list any information which you feel may be helpful in considering your application. (Examples: significant work accomplishments, special training, specific interests, etc.) fork lift teaining

Affiliations with professional, civic organizations which you consider relevant to your ability to perform the job for which you are applying: Church help them build things for those

people who need help (Habitat for Humanity)

Page 3

419

 

## EMPLOYMENT HISTORY:

List below all present and past employment beginning with your most recent employer. Please attach a separate sheet of paper if you have additional prior employers.

1. Employer _Express_                                      Job Title _Temp Service_
   Address _Ocala Fl_
   Supervisor _Bill_          Last salary _9.00_    ☑ Per hour ☐ Per week ☐ Year
   Phone # ( 352 ) _867-8055_ Dates employed _April 20-07_ to _present June 07_
   Reason for leaving ☐ Quit ☐ Discharge ☐ Retired ☐ Layoff ☐ Other

2. Employer _Canteen and vending_                    Job Title _Vender / forklift_
   Address _Gainesville Fl_
   Supervisor _Hunter Manfredi_ Last salary _450.00_ ☐ Per hour ☑ Per week ☐ Year
   Phone # ( 352 ) _377-6510_ Dates employed _11-20-06_ to _April 20-07_
   Reason for leaving ☐ Quit ☐ Discharge ☐ Retired ☐ Layoff ☑ Other _Minor league baseball also_

3. Employer _Silver Springs Water_          Job Title _forklift operator and conveyor operator_
   Address
   Supervisor _Joe Smith_     Last salary _1050_    ☑ Per hour ☐ Per week ☐ Year
   Phone # ( 352 ) _368-6800_ Dates employed _July 17 2007_ to _present_
   Reason for leaving ☐ Quit ☐ Discharge ☐ Retired ☐ Layoff ☑ Other _2nd job_

4. Employer                                               Job Title
   Address
   Supervisor                 Last salary           ☐ Per hour ☐ Per week ☐ Year
   Phone # (   )              Dates employed              to
   Reason for leaving ☐ Quit ☐ Discharge ☐ Retired ☐ Layoff ☐ Other

420

# CLOSETMAID®


EMERSON

## CURRENT / PRIOR / CONTRACTUAL OBLIGATIONS:

Do you have any current contractual obligations relating to a prior employer or client, such as a confidentially and/or non-complete agreement?  ☐ Yes  ☒ No  If so, please list the agreements, dates and employers/clients involved: _____

_____

_____

## REFERENCES:

Please list below three business references who can attest to your skills, knowledge and experience, that will contribute to your success in the position for which you are applying.

1. Name  _Lucas Lucero_                     Job Title  _Farm Work_
   Address
   Phone #  ( 352 ) _528-9431_          Alternate phone #  (     )
   E-mail address

2. Name  _Hunter Manfredi_               Job Title  _Supervisor_
   Address
   Phone #  ( 352 ) _377-0510_          Alternate phone #  (     )
   E-mail address

3. Name  _Mike Smith / Joe Smith_        Job Title  _Silver Springs Water_
              _Co worker      Supervisor_              _Supervisor_
   Address
   Phone #  (     )                          Alternate phone #  (     )
   E-mail address

Page 5

421




EMERSON

## APPLICATION LIMITED TO OPENING APPLIED FOR PLEASE READ
## CAREFULLY BEFORE SIGNING

I hereby affirm that my answers to the foregoing questions are true and correct. I authorize this Company to conduct whatever investigation it deems necessary to confirm the answers submitted on this application. If the investigation concludes that I provided any untrue information, this will serve as sufficient grounds to immediately terminate the application process, or immediately terminate my employment regardless of when the discovery occurs.

I understand and agree that my employment is "at will" for no definite period and may, regardless of the period of payment and wages or salary, be terminated at any time for any reason without any previous notice. I further understand that no Company official has made any promises to the contrary or guaranteed me employment for any specified period of time, or has the authority to make such promise/guarantee, and that no employee handbook or policy may be construed to the contrary or interpreted as a contract or guarantee of employment.

I also authorize any of my former employers to furnish this company with their record of my services, my reason for leaving their employ, and any other information they may have concerning me. I hereby release any of my former employers from all liability for any damages in furnishing said record.

I agree that if I am employed by this Company, a full transcript of my records as an employee, including reason for termination, may be given to a prospective future employer on its request, and do hereby release this Company from any and all liability or damages whatsoever in furnishing such information.

I agree to abide by the rules and policies of this Company. I further understand that all applicants are subject to post-offer medical examination, and drug screening, as a condition of employment. Examinations are to be made by a representative designated by the Company.

Upon separation of employment, I authorize the Company to withhold from my final paycheck, vacation and expense checks any and all monies owed to the Company by me at the time of my termination.

The use of this application form does not indicate that there are any positions available, and in no way obligates the Company.

I agree that any claim or lawsuit relating to this application, my service or employment with ClosetMaid® or its affiliates, whether relating to contracts or federal or state statutory claims, must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit unless filed under a federal or state statute with a shorter statute of limitations. I specifically waive any federal and state statutes of limitations to the contrary.

Signature _____   Date _____

Page 6

422

**CLOSET**MAID®

≋
**EMERSON**

# APPLICANT NOTICE:

In accordance with our drug free workforce policy, ClosetMaid® will require a drug test of all applicants prior to the first day of employment.

*Any offer of employment is considered conditional based upon the successful completion of the drug screen process.*

---

*Our hiring policy is simple:*

**This company hires lawful workers only – U.S. citizens or nationals and non-citizens with valid work authorization – without discrimination.**

Federal immigration law requires all employers to verify both the identity and employment eligibility of all persons hired to work in the United States.

In its efforts to meet the law's requirements, this company is participating in the Basic Pilot program established by the Department of Homeland Security and the Social Security Administration (SSA) to aid employers in verifying the employment eligibility of all newly hired employees. Our participation in the pilot program does not exempt us from the obligation to complete a Form I-9 for everyone we hire.

**For additional information on the verification program, contact:**
Department of Homeland Security
USCIS/SAVE Program
111 Massachusetts Avenue, 2nd Floor
Washington, DC 20001
Phone (888) 464-4218

---

*Nuestra póliza de empleo es simple:*

**Sin discriminación, esta compañia emplea solamente trabajadores legales – ciudadanos o nacionales de los Estados Unidos y extranjeros con autorización de trabajo.**

La Ley Federal de Inmigración y Nacionalidad require que todas las empresas verifiquen la identidad y elegibilidad de las personas que buscan  empleo en los Estados Unidos.

En su esfuerzo de cumplir los requisitos de la Ley, esta compañia participa en un programa Piloto Básico de verificación de empleo, establecido por El Departamento de Seguridad Nacional (DHS) en conjunto con la Administración de Seguro Social en esta forma los empleadores, verificaran la elegibilidad de todos los nuevos aplicantes. Nuestra participación en este programa piloto, hace que no exista ningun tipo de excepción en la Ley, tenemos la obligación de completar el formulario I-9 para toda persona que nostros empleamos.

**Para mayor información de este programa de verificación, puede usted comunicarse:**
Department of Homeland Security
U.S. Citizenship and Immigration Services
Systematic Alien Verification for Entitlements
(SAVE )Program
Washington, DC 20529
Phone (888) 464-4218

Page 7

423

# CLOSETMAID®

### AUTHORIZATION TO OBTAIN A CONSUMER CREDIT REPORT AND RELEASE OF INFORMATION FOR EMPLOYMENT PURPOSES

Pursuant to the Fair Credit Reporting Act, I hereby authorize ClosetMaid and its designated agents and representatives to conduct a comprehensive review of my background through a consumer report and/or investigative consumer report to be generated for employment, promotion, reassignment or retention as an employee. I understand the scope of the consumer report/investigative consumer report and may include, but is not limited to the following areas:

Verification of Social Security Number, current and previous residences, employment history including all personnel files, education, character references, credit history and reports, criminal history records from any criminal justice agency in any or all federal, state, or county jurisdictions, birth records, motor vehicle records to include traffic citations and registration and any other public records.

I, _____, authorize the complete release of these records or data pertaining to me which an individual, company, firm, corporation, or public agency may have. I understand that I must provide my date of birth to adequately complete said screening, and acknowledge that my date of birth with not affect any hiring decisions. I hereby authorize and request any present or former employer, school, police department, financial institution or other personal knowledge about me, to furnish bearer with any and all information in their possession regarding me in connection with an application or employment. I am authorizing that a photocopy of this authorization be accepted with the same authority as the original.

I hereby release ClosetMaid ,and its agents, officials, representative, or assigned agencies, including officers, employees, or related personnel both individually and collectively, from any and all liability for damages of whatever kind, which may at any time, result to me, my heirs, family, or associates because of compliance with this authorization and request to release. You may contact me as indicated below. I understand that a copy of this authorization may be given at anytime, provided I do so in writing.

I understand that, in pursuant to the Fair Credit Reporting Act, if any adverse action is to be taken based upon the consumer report, a copy of the report and a summary of the consumer's rights will be provided to me if requested.

## PLEASE PRINT CLEARLY!

➤ **Print Previous Three Addresses (City and State):**

*(1) City:* Williston *State:* Fl *From:* 2000 *To:* Present

*(2) City:* _____ *State:* _____ *From:* _____ *To:* _____

*(3) City:* _____ *State:* _____ *From:* _____ *To:* _____

*By signing below, you are certifying that the above information is true and correct:*

Rev. 2/2006

123

# ■CLOSETMAID

## APPLICATION FOR EMPLOYMENT

*3:30 pm.

DL?

*Intereste
in lst



Application limited to opening applied for. ClosetMaid is an Equal Opportunity Employer. Applicants will be considered for job openings without any regard to race, sex, religion, sexual orientation, national origin, creed, age, disability and military service/veteran status.

EMERSON



Exhibit 14
Witness ClosetMaid
Date 8/27/09 Rptr. NB
AKF

# ■CLOSETMAID.


EMERSON.

## APPLICATION FOR EMPLOYMENT

Date _10-2-08_ Position applied for: _General Labor  Shipping and Receiving_
How did you hear about this opening: _Current Employee_
Referred by: _Mary Evans_ Date available for work: _As soon as possible_

**INSTRUCTIONS:** Please read carefully. Every item on this form must be answered to the best of your ability and knowledge. Please print and use a pen. Your qualifications will be carefully reviewed, and you will be given thorough consideration for the vacancy/position applied for. Upon employment, this application will become part of your permanent record with us. Keep this in mind as you complete it. *Special Note: You are not required to supply any information that is prohibited by Federal, State or Local law. We are an Equal Opportunity Employer.*

College (Name and address) _____
College (Name and address) _____
Did you graduate? _____ If no, number of hours completed _____ Grade Point Average _____
Degree _____ Major _____ Minor _____
If attending, date of graduation _____
Other education _____
Certifications _____

Page 2

# ■CLOSETMAID®

EMERSON

Awards, Honors, Leadership Roles _ASB, Graphic Arts Design_

Foreign Languages: _____   _____   _____

**MILITARY:** ☑ Not applicable

List service in U.S. Military: From _____ to _____ Branch _____

Rank at discharge _____ Military experience that may be applicable: _____

## GENERAL EMPLOYMENT INFORMATION:

1. List here all of the equipment with which you have experience and training. (Examples: computer, lathe, milling machine, etc.) _Comp. Word / Excel_      _lathe_

Affiliations with professional, civic organizations which you consider relevant to your ability to perform the job for which you are applying: _____

**CLOSETMAID®**

EMERSON

## EMPLOYMENT HISTORY:

List below all present and past employment beginning with your most recent employer. Please attach a separate sheet of paper if you have additional prior employers.



**CLOSET**MAID®



## CURRENT / PRIOR / CONTRACTUAL OBLIGATIONS:

Do you have any current contractual obligations relating to a prior employer or client, such as a confidentially and/or non-complete agreement? ☐ Yes ☐ No  If so, please list the agreements, dates and employers/clients involved: _____

_____

_____

## REFERENCES:

Please list below three business references who can attest to your skills, knowledge and experience, that will contribute to your success in the position for which you are applying.





Page 5

 

## APPLICATION LIMITED TO OPENING APPLIED FOR PLEASE READ
## CAREFULLY BEFORE SIGNING

I hereby affirm that my answers to the foregoing questions are true and correct. I authorize this Company to conduct whatever investigation it deems necessary to confirm the answers submitted on this application. If the investigation concludes that I provided any untrue information, this will serve as sufficient grounds to immediately terminate the application process, or immediately terminate my employment regardless of when the discovery occurs.

I understand and agree that my employment is "at will" for no definite period and may, regardless of the period of payment and wages or salary, be terminated at any time for any reason without any previous notice. I further understand that no Company official has made any promises to the contrary or guaranteed me employment for any specified period of time, or has the authority to make such promise/guarantee, and that no employee handbook or policy may be construed to the contrary or interpreted as a contract or guarantee of employment.

I also authorize any of my former employers to furnish this company with their record of my services, my reason for leaving their employ, and any other information they may have concerning me. I hereby release any of my former employers from all liability for any damages in furnishing said record.

I agree that if I am employed by this Company, a full transcript of my records as an employee, including reason for termination, may be given to a prospective future employer on its request, and do hereby release this Company from any and all liability or damages whatsoever in furnishing such information.

I agree to abide by the rules and policies of this Company. I further understand that all applicants are subject to post-offer medical examination, and drug screening, as a condition of employment. Examinations are to be made by a representative designated by the Company.

Upon separation of employment, I authorize the Company to withhold from my final paycheck, vacation and expense checks any and all monies owed to the Company by me at the time of my termination.

The use of this application form does not indicate that there are any positions available, and in no way obligates the Company.

I agree that any claim or lawsuit relating to this application, my service or employment with ClosetMaid® or its affiliates, whether relating to contracts or federal or state statutory claims, must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit unless filed under a federal or state statute with a shorter statute of limitations. I specifically waive any federal and state statutes of limitations to the contrary.

Signature _____   Date  _10-2-08_

# ∎CLOSETMAID



EMERSON

# APPLICANT NOTICE:

In accordance with our drug free workforce policy, ClosetMaid® will require a drug test of all applicants prior to the first day of employment.

*Any offer of employment is considered conditional based upon the successful completion of the drug screen process.*

---

## Our hiring policy is simple:

**This company hires lawful workers only – U.S. citizens or nationals and non-citizens with valid work authorization – without discrimination.**

Federal immigration law requires all employers to verify both the identity and employment eligibility of all persons hired to work in the United States.

In its efforts to meet the law's requirements, this company is participating in the Basic Pilot program established by the Department of Homeland Security and the Social Security Administration (SSA) to aid employers in verifying the employment eligibility of all newly hired employees. Our participation in the pilot program does not exempt us from the obligation to complete a Form I-9 for everyone we hire.

**For additional information on the verification program, contact:**
Department of Homeland Security
USCIS/SAVE Program
111 Massachusetts Avenue, 2nd Floor
Washington, DC 20001
Phone (888) 464-4218

## Nuestra póliza de empleo es simple:

**Sin disriminación, esta compañía emplea solamente trabajadores legales – ciudadanos o nacionales de los Estados Unidos y extranjeros con autorización de trabajo.**

La Ley Federal de Inmigración y Nacionalidad require que todas las empresas verifiquen la identidad y elegibilidad de las personas que buscan empleo en los Estados Unidos.

En su esfuerzo de cumplir los requisitos de la Ley, esta compañía participa en un programa Piloto Básico de verificación de empleo, establecido por El Departamento de Seguirdad Nacional (DHS) en conjunto con la Administración de Seguro Social en esta forma los empleadores, verificaran la elegibilidad de todos los nuevos aplicantes. Nuestra participación en este programa piloto, hace que no exista ningun tipo de excepción en la Ley, tenemos la obligación de completar el formulario I-9 para toda persona que nostros empleamos.

**Para mayor información de este programa de verificación, puede usted comunicarse:**
Department of Homeland Security
U.S. Citizenship and Immigration Services
Systematic Alien Verification for Entitlements
(SAVE )Program
Washington, DC 20529
Phone (888) 464-4218



## DO+ABLE PRODUCTS®

### CALIFORNIA AUTHORIZATION FOR RELEASE OF INFORMATION FOR EMPLOYMENT PURPOSES

By my signature below, I consent to have a comprehensive review of my background causing a consumer report and/or an investigative consumer report to be generated for employment purposes. I hereby authorize Do+Able Products Division/Emerson Electric Co. to obtain a background report from:

<div align="center">

LexisNexis® Express Screening
Post Office Box 812289
Boca Raton, FL 33481

</div>

I understand that the scope of the consumer report/investigative consumer report will include: (An "X" in the box denotes this report is being requested and generated.)

☒ Verification of social security number               ☒ Current and previous residences
☒ Employment history including all personnel files      ☒ Education
☒ Character references                                  ☒ Credit history and reports
☒ Motor vehicle records to include traffic citations and registration      ☒ Birth records
☒ Criminal history records from any criminal justice agency in any or all federal, state county jurisdictions

I authorize the complete release of these records or data pertaining to me which an individual, company, firm, corporation, or public agency may have. I understand that I must provide my date of birth to adequately complete said screening, and acknowledge that my date of birth will not affect any hiring decisions.

I hereby release Do+Able Products/Emerson Electric Co., and its agents, officials, representatives, or assigned agencies, including officers, employees, or related personnel both individually and collectively, from any and all liability for damages of whatever kind, which may at any time, result to me, my heirs, family or associates because of compliance with this authorization and request to release. You may contact me as indicated below.

I understand this authorization will not expire if I am hired, but also understand I have the right to revoke the authorization at any time, provided I do so in writing. This means that Do+Able Products/Emerson Electric Co. may request other consumer reports/investigative consumer reports, of any nature, in the future while I am an employee unless I revoke my authorization in writing.



Under section 1786.22 of the California Civil Code, you may obtain a copy of this file. (**Please check the box if you wish to receive a free copy of ordered report.**)

☐ Under rights granted to me by California Law, I wish to receive a copy of my Investigative Consumer Report

Attached, please find your rights under the California Consumer Reporting Agencies Act



## Summary of Your Rights Under the Fair Credit Reporting Act

The federal Fair Credit Reporting Act (FCRA) is designed to promote accuracy, fairness, and privacy of information in the files of every "consumer reporting agency" (CRA). Most CRAs are credit bureaus that gather and sell information about you-such as if you pay your bills on time or have filed bankruptcy-to creditors, employers, landlords, and other businesses. You can find the complete text of the FCRA, 15 U.S.C. §§1681-1681, at the Federal Trade Commission's Web site (http://www.ftc.gov). The FCRA gives you specific rights, as outlined below. You may have additional rights under state law. You may contact a state or local consumer protection agency or a state attorney general to learn those rights.

**Access to your file is limited.** A CRA may provide information about you only to people with a need recognized by the FCRA-usually to consider an application with a creditor, insurer, employer, landlord, or other business.

**Your consent is required for reports that are provided to employers, or reports that contain medical information.** A CRA may not give out information about you to your employer, or prospective employer, without your written consent. A CRA may not report medical information about you to creditors, insurers, or employers without your permission.

**You can find out what is in your file.** At your request, a CRA must give you the information in your file, and a list of everyone who has requested it recently. There is no charge for the report if a person has taken action against you because of information supplied by the CRA, if you request the report within 60 days of receiving notice of the action. You also are entitled to one free report every twelve months upon request if you certify that (1) you are unemployed and plan to seek employment within 60 days, (2) you are on welfare, or (3) your report is inaccurate due to fraud. Otherwise, a CRA may charge you a fee of up to nine dollars ($9). If you feel you are entitled to a free credit report, you can phone 1 888 524-3666 to confirm your eligibility and to request your free copy delivered by U.S. mail.

**You must be told if information in your report has been used against you.** Anyone who uses information from a CRA to take action against you-such as denying an application for credit, insurance, or employment-must tell you, and give you the name, address, and phone number of the CRA that provided the consumer report.

**You can dispute inaccurate information with the CRA.** If you tell a CRA that your file contains inaccurate information, the CRA must reinvestigate the items (usually within 30 days) by presenting to its information source all relevant evidence you submit, unless your dispute is frivolous. The source must review your evidence and report its findings to the CRA. (The source also must advise national CRAs-to which it has provided the data-of any error.) The CRA must give you a written report of the investigation and a copy of the revisions made to your information if the investigation results in any change. If the CRA's investigation does not resolve the dispute, you may add a brief statement to your file. The CRA must normally include a summary of your dispute statement in future reports. If an item is deleted or a dispute statement is filed, you may ask that anyone who has recently received your report be notified of the change.

**Inaccurate information must be corrected or deleted.** A CRA must remove or correct inaccurate or unverified information from its files, usually within 30 days after you dispute it. However, the CRA is not required to remove accurate data from your file unless it is outdated (as described later) or cannot be verified. If your dispute results in any change to your report, the CRA cannot reinsert into your file a disputed item unless the information source verifies its accuracy and completeness. In addition, the CRA must give you a written notice telling you it has reinserted the item. The notice must include the name, address and phone number of the information source.

**You can dispute inaccurate items with the source of the information.** If you tell anyone-such as a creditor who reports to a CRA-that you dispute an item, they may not then report the information to a CRA without including a notice of your dispute. In addition, once you've notified the source of the error in writing, it may not continue to report the information if it is, in fact, an error.

**Outdated information may not be reported.** In most cases, a CRA may not report negative information that is more than seven years old; ten years for bankruptcies.

**You may choose to exclude your name from CRA lists for unsolicited credit and insurance offers.** Creditors and insurers may use file information as the basis for sending you unsolicited offers of credit or insurance. Such offers must include a toll-free phone number for you to call if you want your name and address removed from future lists. If you call, you shall be kept off the lists for two years. The toll-free number for all of the national CRAs is 1 888 5OPTOUT (1 888 567 8688.) If you request, complete, and return the CRA form provided for this purpose, you shall be taken off the lists indefinitely.

**You may seek damages from violators.** If a CRA, a user or (in some cases) a provider of CRA data, violates the FCRA, you may sue them in state or federal court.

The FCRA gives several different federal agencies authority to enforce the FCRA:

For questions or concerns regarding:
Please contact:

CRAs, creditors and others not listed below
Federal Trade Commission - CRC
600 Pennsylvania Avenue, NW
Washington, DC 20580
1 877 FTC HELP

Identity Theft
Identity Theft Data Clearinghouse
600 Pennsylvania Avenue, NW
Washington, DC 20580
1 877 ID THEFT

National banks, federal branches/agencies of foreign banks (word "National" or initials "N.A." appear in or after bank's name)
Office of the Comptroller of the Currency
Compliance Management,
Mail Stop 6-6
Washington, DC 20219
1 800 613 6743

Federal Reserve System member banks (except national banks, and federal branches/agencies of foreign banks)
Federal Reserve Board
Division of Consumer & Community Affairs
Washington, DC 20551
1 202 452 3693

Savings associations and federally chartered savings banks (word "Federal" or initials "F.S.B." appear in federal institution's name)
Office of Thrift Supervision
Consumer Programs
Washington, DC 20552
1 800 842 6929

Federal credit unions (words "Fed..l Credit Union" appear in institution's nan. . National Credit Union
Administration
1775 Duke Street
Alexandria, VA 22314
1 703 518 6360

State-chartered banks that are not members of the Federal Reserve System
Federal Deposit Insurance Corporation
Division of Compliance & Consumer Affairs
Washington, DC 20429
1 800 934 FDIC

Air, surface, or rail common carriers regulated by former Civil Aeronautics Board or Interstate Commerce
Commission
Department of Transportation
Office of Financial Management
Washington, DC 20590
1 202 366 1306

Activities subject to the Packers and Stockyards Act, 1921
Department of Agriculture
Office of Deputy Administrator - GIPSA
Washington, DC 20250
1 202 720 7051



**CLOSETMAID**
together

$6/8$

# APPLICATION FOR EMPLOYMENT

## WITH

# **CLOSETMAID**®

**(APPLICATION LIMITED TO OPENING APPLIED FOR)**

NAME _Regina (Cathy) Reardon_

DATE _12/13/06_

POSITION _Territory Mgr / Supervisor_

ClosetMaid is an Equal Opportunity Employer. Applicants will be considered for job openings without any regard to race, sex, religion, sexual orientation, national origin, creed, age, disability and military service/veteran status.)



CMEXHIBIT

D

Exhibit _15_
Witness _Closetmaid_
Date _8/27/09_ pr. _NB_

AKF

# ■CLOSETMAID

### AUTHORIZATION TO OBTAIN A CONSUMER CREDIT REPORT AND RELEASE OF INFORMATION FOR EMPLOYMENT PURPOSES

Pursuant to the Fair Credit Reporting Act, I hereby authorize ClosetMaid and its designated agents and representatives to conduct a comprehensive review of my background through a consumer report and/or investigative consumer report to be generated for employment, promotion, reassignment or retention as an employee. I understand the scope of the consumer report/investigative consumer report may include, but is not limited to the following areas:

Verification of Social Security Number, current and previous residences, employment history including all personnel files, education, character references, credit history and reports, criminal history records from any criminal justice agency in any or all federal, state, or county jurisdictions, birth records, motor vehicle records to include traffic citations and registration and any other public records.

I, _Regina C Reardon_ , authorize the complete release of these records or data pertaining to me which an individual, company, firm, corporation, or public agency may have. I understand that I must provide my date of birth to adequately complete said screening, and acknowledge that my date of birth with not affect any hiring decisions. I hereby authorize and request any present or former employer, school, police department, financial institution or other personal knowledge about me, to furnish bearer with any and all information in their possession regarding me in connection with an application or employment. I am authorizing that a photocopy of this authorization be accepted with the same authority as the original.

I hereby release ClosetMaid ,and its agents, officials, representative, or assigned agencies, including officers, employees, or related personnel both individually and collectively, from any and all liability for damages of whatever kind, which may at any time, result to me, my heirs, family, or associates because of compliance with this authorization and request to release. You may contact me as indicated below. I understand that a copy of this authorization may be given at anytime, provided I do so in writing.

I understand that, in pursuant to the Fair Credit Reporting Act, if any adverse action is to be taken based upon the consumer report, a copy of the report and a summary of the consumer's rights will be provided to me if requested.

## PLEASE PRINT CLEARLY!

Name (print): _Regina_ _C._ _Reardon_ _Genter_
First       Middle          Last           (Maiden)

Print all Former Names Used: (1) _Regina C. Genter_ (2) _____

Social Security Number: _161 . 52 . 5231_  Sex: M /(F)  Race: _White_

Date of Birth: _7/5/58_  Phone Number: _412 628·7788_ HS Graduation Year: _1976_

May We Contact Your Employers? _yes_  May We Contact Your Supervisors? _yes_

Comments: _____

_____

➤ Print Previous Three Addresses (City and State):

(1) City: _____

(2) City: _____

(3) City: _____ State: _____ From: _____ To: _____

*By signing below, you are certifying that the above information is true and correct:*

Signature: _Regina C Reardon_   Date: _12/13/06_

Rev. 2/2006

209

# ■CLOSETMAID



### APPLICATION FOR EMPLOYMENT

Date __12 / 13 /06__  Position Applied For: __Territory Manager /Supervisor__

How did you hear about this opening: __Claire Murphy__   Date Available for Work: __Immedietely__

**INSTRUCTIONS: Please read carefully. Every item on this form must be answered to the best of your ability and knowledge. Please print and use a pen. Your qualifications will be carefully reviewed, and you will be given thorough consideration for the vacancy/position applied for. Upon employment, this application will become part of your permanent record with us. Keep this in mind as you complete it. *Special Note: You are not required to supply any information that is prohibited by Federal, State or Local law.* We are an Equal Opportunity Employer.**

**PERSONAL:**
Name __Regina__  __C.__  __Reardon__  Telephone No. (412) 628-7788
         First       M.I.       Last

Have you ever been convicted of or pleaded guilty or Nolo Contendre (no contest or an Alford plea) to any felony?
☐ Yes  ☒ No
(The fact you have been convicted of a crime will not automatically disqualify you from further consideration for employment.)
If "yes" please describe in detail and attach to application.

**EDUCATION:**

Awards, Honors, Leadership Roles _____

Foreign Languages: _____

**MILITARY:**   ☒ not applicable

List service in U.S. Military: From _____ to _____ Branch _____

Rank at Discharge _____. Military experience that may be applicable: _____

210

# CLOSETMAID

EMERSON

## GENERAL EMPLOYMENT INFORMATION:

1. List here all of the equipment with which you have experience and training. (Examples: computer, lathe, milling machine, etc.): __Computer , IMA CART (Home Depot), drill -handheld and basic Tools__

2. Were you previously employed by us? __No__ If yes, when? _____ to _____

3. Present Salary: __600.00__ hr/week/year. __Unemployed currently WAS__

   Salary Expected: __700.00__ hr/week/year. Number of hours available per week? __40__ ☐ No preference.

4. Type of Employment sought: ☒ regular full time ☐ regular part time ☐ temporary ☐ seasonal

5. Which of these times are you available: Days: ☒ yes ☐ no   Nights: ☒ yes ☐ no

   Weekends: ☒ yes ☐ no   Holidays: ☐ yes ☐ no

6. List here names of relatives currently in our employ: __NONE__

7. In case of emergency, notify __Tom Reardon__ Telephone Number __412 848-8500__

## EXPERIENCE:

List below all present and past employment beginning with your most recent employer. Please attach a separate sheet of paper if you have additional prior employers.

1. Employer __Stinehcomb Associates, Inc.__
   Address __III E Adams Street Sandusky, PA__ Last Salary __$600.00__ per hour or week
   Kind of business __NURSERY SERVICE__ Supervisor __Hank Okuma__
   Job Title __Vendor Rep/Merchandiser__ Reason for Leaving ☐ Quit ☐ Discharge ☐ Retired
   Dates Employed __May 2003__ to __July 2006__ ☒ Layoff ☐ Other __due to loss of contract in Pgh Market__

2. Employer __Chas Levy Circulating Co, LLC__
   Address __1260 N. Branch St Chicago IL__ Last Salary __8.60__ per hour/per week
   Kind of business __Magazine Circulation Co__ Supervisor __Cheryl Coppokarne__
   Job Title __Part time Merchandiser__ Reason for Leaving ☒ Quit ☐ Discharge ☐ Retired
   Dates Employed __March 2000__ to __Aug 2003__ ☐ Layoff ☐ Other

3. Employer __RCR MAILING SPECIALISTS__ (Self Employed)
   Address __Butler St Pgh PA__ Last Salary Appry __950.00__ per hour or week
   Kind of business __Direct MAIL Advertising__ Supervisor __Myself__
   Job Title __Owner__ Reason for Leaving ☐ Quit ☐ Discharge ☐ Retired
   Dates Employed __Jan 1993__ to __April 2003__ ☐ Layoff ☒ Other __phased out business__

4. Employer __Penny Saver Publications__
   Address __1 Podi Rd Pgh PA__ Last Salary __$720.00__ per hour or week
   Kind of business __Direct MAIL ADVERTISING__ Supervisor __Sam Debonna__
   Job Title __Manager Direct MAIL DIVISION__ Reason for Leaving ☐ Quit ☐ Discharge ☐ Retired
   Dates Employed __1986__ to __Jan 1993__ ☐ Layoff ☒ Other __Meet ownership) dissolved my division I started my own business with my customers from Pennysaver__

211

**CLOSETMAID**

EMERSON.

**ACTIVITIES:**

Please list any information which you feel may be helpful in considering your application. For example: significant work accomplishments, special training, specific interests, etc.

I have always worked independently and have been successful + self motivated. Operating my own business for 10 years afforded me great experience with customer service, management and setting goals. The first 6 years in business I was able to increase sales by at least 12%. I Am a crafter by Hobbie and a creative Thinker.

Affiliations with professional, civic organizations which you consider relevant to your ability to perform the job for which you are applying:

I am not currently affiliated with any organizations, but I HAVE always been a great networker.

**CURRENT/PRIOR CONTRACTUAL OBLIGATIONS:**

Do you have any current contractual obligations relating to a prior employer or client, such as a Confidentiality and/or Non-Compete Agreement? ☐ Yes ☒ No    If so, please list the agreements, dates and employers/clients involved.

**EMPLOYMENT REFERENCE:**

Please list below two business references who can attest to your skills, knowledge and experience, that will contribute to your success in the position for which you are applying.

☆ When checking references please refer to me as: Cathy Reardon not many people remember that my formal name is Regina. Thanks! I've gone by Cathy majority of my life.

4124866787   P.01

12/13/2006

To: Flamela Edwards     CLOSETMAID

Fr: R. Cathy Reardon

Re: Professional References / Application for Employment



**Please note: When checking references please refer to me as Cathy Reardon
Not everyone remembers my formal name is Regina.   Thankyou!

# R. Cathy Reardon

███████████████████

## Personal Summary:
Dependable... Multi-Tasking...Excellent Communication Skills...Self Motivated...Team
Player...Detail and Customer Service Oriented...Flexible...Quick Learner...

## Computer:
Microsoft Office 2003, Windows XP

## Employment:

**Merchandiser/Vendor Representative,  Stinchcomb Associates,Inc.**
April 2003 – July 2006
Responsibilities include:  Stocking , merchandising and rotating product.  Product knowledge,
pricing ,sales promotions and markdowns.  Maintaining department.  Team resets when required
and team support when needed.  Fostered client/business relations with oral/written
communication. Develope  rapport with store management,personnel and other store vendors
along with translating client concerns to appropriate management personnel. Execute purchase
orders and monthly sales reports from stores own computer; completed written reports within
timely manner.  Independently serviced 10  Pittsburgh Home Depot Locations.

**Retail Service Merchandiser,  Chas Levy Circulating Co, LLC**
March 2000 – August 2003
Responsibilities include:  stocking and refreshing Department fixtures and displays
through out the store.  Rotating product, review inventories and prepare for shipping
out for store credits, resets per planagram and setting up and tearing down  promo-
tional  displays.
Communication on a weekly basis through company merchandising hotline for updates
and reporting time worked.
Responsible for communicating with Department Managers and Store Managers for
6  Pittsburgh  Mass Merchandise/Grocery Store locations.

**Owner/ Sole Proprietor, RCR Mailing Specialists**
January 1993 - April 2003
 Responsibilities included:  Prospect  new business, following up on leads, Developing
sales plans  and meeting daily, weekly and monthly goals.  Scheduling and meeting
deadlines.  Customer Service.
Responsible for coordinating all phases of a turnkey process  for Direct Mail Adver-
tising Services, including brokering vendors for Printing, Mailing lists and Machine Mail
Processing.
Hiring,training and motivating employees.
Accounting, billing and collections.

## Screening Resume Candidates by Phone

**Name:** R. Cathy Reardon
**Phone:** ███████████████████████
**Position** ███████████████████████

**Why are you interested in this position?**

- I've been self-employed for a long time
- Merchandising experience, familiar with Closet Maid
- I know a lot of management personnel in Home Depot
  Pittsburgh area
- Job security; rather w/ manufacturer

**What is your experience with retail merchandising?**

- been in management before a long time
- she's independently service 10 Home Depot stores
- stocking, merchandising, rotating products

**Why do you want to leave _____ (current position/job)?**

Not currently employed at the moment

**Are you willing to travel?** Yes

**Do you have reliable transportation?** Yes

**How much money do you make at your previous job?** 32,000 / year + mileage
+ benefits

**How much do you expect to make for this position?**

- a little bit more than that

**My Comment(s):**

- outstanding balan
- salary is perfect for her

215

December 18, 2006

Regina C. Reardon
██████████████████████████

Dear Regina:

Enclosed you will find a copy of a report we have obtained from LexisNexis at PO Box
812289, Boca Ratón, Fl 33481.

The Company may decide not to offer you the position you applied for based on whole
or in part upon the information in this report.  Enclosed is a summary of your rights
under the Fair Credit Reporting Act.

The Company will wait five business days from the date of this letter before it makes a
decision on your application.

Sincerely,

Melissa Martell
Human Resources Representative

216

December 22, 2006

Regina C. Reardon

██████████████

Dear Regina:

As part of the application process, you were notified that this Company may obtain a consumer report on your background, references and in some situations your credit history.  Subsequently, the Company provided you with a copy of this report and notified you that it may deny your application based in whole or in part upon the results of this report.

The Company has now decided not to offer you the position you applied for based in whole or in part upon this consumer report.  The Fair Credit Reporting Act requires us to provide you with the following information:

This Company, not the reporting agency listed below, made this decision.  The reporting agency will not be able to explain the specific reason(s) why our Company chose not to offer you employment.

Although you may already have received this information, the reporting agency used was Lexis Nexis Express Screening.  The address and telephone number of this agency is PO Box 812289 Boca Ratón, FL 33481, (877)913-6245.

You have already received a copy of the reference report which the agency identified above provided our Company.  Under the Fair Credit Reporting Act, you have the right to another free copy of this report within 60 days.  You also have the right to dispute, pursuant to 15 United States Code Section 1681i, with the reporting agency identified above, the accuracy and completeness of any information in the report furnished by this agency to our Company.

Sincerely,

Melissa Martell, MBA, PHR
Human Resources Representative

217

Applicant Verification Report

**Important:** The information contained in this Applicant Verification Report is provided for identity verification and fraud prevention purposes only. It does not constitute a consumer report as defined by **Fair Credit Reporting Act (FCRA).** This report is not intended to recommend, or not recommend, any individual and it should not be used as a factor in evaluating the named individual for employment, promotion, reassignment or retention as an employee. The records may or may not have sufficient information to conclusively establish the exact identity of an individual. The information is provided merely as an indication of information that should be verified prior to making a decision. Final verification of the named individual's identity is solely your responsibility.

**Request #:** 1023-2301-2100-0065
**Date:** 12/15/06
**Report Requested by:**
ClosetMaid
650 SW 27 Ave.
Ocala, FL 34474-2034
(352) 401-6137 Main Phone

LexisNexis *Express Screening*
**employment**

Express Screening
P.O. Box 812289
Boca Raton, Florida 33481
(877) 913-6245
support@expscreening.lexisnexis.com

# Applicant Verification Report

 **We have verified all information that you entered.**

Applicant Verification Report

National Criminal Report

**Important:** This report is provided pursuant to your Service Application and Agreement and must only be used in strict compliance with the terms thereof. As such, this report and the information contained herein must be held in strict confidence and must be used solely for employment purposes. If you intend to take an adverse action based either in whole or in part on the contents of this report, you must comply with the requirements of the **Fair Credit Reporting Act (FCRA)** governing the use of consumer reports and the taking of adverse actions, including but not limited to providing the applicant with a copy of this report and the Federal Trade Commission's publication, **A Summary of Your Rights Under the Fair Credit Reporting Act.** Express Screening has previously provided your company with copies of this publication, and you can obtain additional copies by clicking the hyperlink above.

**Important Note:** When screening a candidate for a criminal background we recommend that you use our On–Site Courthouse Search in those locales where the candidate has lived for the preceding 7 years. The National Criminal Report is a valuable resource but it only utilizes records that are available electronically. Criminal records are available electronically in many but not all U.S. states and counties, and even when available they may be incomplete.

**Request #:** 1023–2302–4100–0058

LexisNexis *Express Screening*

**employment**

Express Screening
P.O. Box 812289
Boca Raton, Florida 33481
(877) 913–6245
@expscreening.lexisnexis.com



Natio





( T
KY

Co
Fre
FL
Mia
OH
Co
TX

Co
AZ
Bro
GA
La

Se
CT
OH

Im
cor
Co
pro

Credit Report

**Important:** This report is provided pursuant to your Service Application and Agreement and must only be used in strict compliance with the terms thereof. As such, this report and the information contained herein must be held in strict confidence and must be used solely for employment purposes. If you intend to take an adverse action based either in whole or in part on the contents of this report, you must comply with the requirements of the **Fair Credit Reporting Act (FCRA)** governing the use of consumer reports and the taking of adverse actions, including but not limited to providing the applicant with a copy of this report and the Federal Trade Commission's publication, **A Summary of Your Rights Under the Fair Credit Reporting Act.** Express Screening has previously provided your company with copies of this publication, and you can obtain additional copies by clicking the hyperlink above.

**Request #:** 1023-2299-7100-0029
**Date:** 12/15/06
**Report Requested by:**
ClosetMaid
650 SW 27 Ave.
Ocala, FL 34474-2034
(352) 401-6137 Main Phone

*LexisNexis Express Screening*
**employment**
Express Screening
P.O. Box 812289
Boca Raton, Florida 33481
(877) 913-6245
support@expscreening.lexisnexis.com

# Credit Report



Credit Report

Credit Report



**Important:** Before taking adverse action in an employment decision based in whole or in part on the confidential information contained in this report, the FCRA requires that you provide the applicant with a copy of this report and the Federal Trade Commission's publication, **A Summary of Your Rights Under the Fair Credit Reporting Act.** Express Screening has previously provided your company with copies of this publication, and you can obtain additional copies by clicking the hyperlink above.

# ■CLOSETMAID

## FAIR CREDIT REPORTING ACT
## AUTHORIZATION FORM

### NOTICE OF INTENT TO OBTAIN A CONSUMER CREDIT REPORT

I understand that, as a condition of my consideration for employment with ClosetMaid, or as a condition of my continued employment with ClosetMaid may obtain a consumer report that includes, but is not limited to, my credit history or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information bearing on my credit standing or credit capacity.

I understand that, pursuant to the federal Fair Credit Reporting Act, if any adverse action is to be taken based upon this consumer report, a copy of the report and a summary of the consumer's rights will be provided to me if requested.

_Regina C. Reardon_
Signature of Applicant

_12/13/06_
Date

_Regina C. Reardon_
Printed Name of Applicant

Rev. 2/2006

227




**APPLICATION LIMITED TO OPENING APPLIED FOR**

PLEASE READ CAREFULLY BEFORE SIGNING

I hereby affirm that my answers to the foregoing questions are true and correct. I authorize this Company to conduct whatever investigation it deems necessary to confirm the answers submitted on this application. If the investigation concludes that I provided any untrue information, this will serve as sufficient grounds to immediately terminate the application process, or immediately terminate my employment regardless of when the discovery occurs.

I understand and agree that my employment is "at will" for no definite period and may, regardless of the period of payment and wages or salary, be terminated at any time for any reason without any previous notice. I further understand that no Company official has made any promises to the contrary or guaranteed me employment for any specified period of time, or has the authority to make such promise/guarantee, and that no employee handbook or policy may be construed to the contrary or interpreted as a contract or guarantee of employment.

I also authorize any of my former employers to furnish this company with their record of my services, my reason for leaving their employ, and any other information they may have concerning me. I hereby release any of my former employers from all liability for any damages in furnishing said record.

I agree that if I am employed by this Company, a full transcript of my records as an employee, including reason for termination, may be given to a prospective future employer on its request, and do hereby release this Company from any and all liability or damages whatsoever in furnishing such information.

I agree to abide by the rules and policies of this Company. I further understand that all applicants are subject to post-offer medical examination, and drug screening, as a condition of employment. Examinations are to be made by a representative designated by the Company.

Upon separation of employment, I authorize the Company to withhold from my final paycheck, vacation and expense checks any and all monies owed to the Company by me at the time of my termination.

The use of this application form does not indicate that there are any positions available, and in no way obligates the Company.

**I agree that any claim or lawsuit relating to this application, my service or employment with ClosetMaid or its affiliates, whether relating to contracts or federal or state statutory claims, must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit unless filed under a federal or state statute with a shorter statute of limitations. I specifically waive any federal and state statutes of limitations to the contrary.**

Date ___12/13/06___  Signature ___Regina C. Reardon___

## Edwards, Flamela [CL/OCA]

**From:**   R.Cathy Reardon [reardon2@verizon.net]
**Sent:**   Friday, December 22, 2006 11:36 PM
**To:**   Edwards, Flamela [CL/OCA]
**Subject:** Regina C. Reardon/LexisNexis Report response

Dear Flamela,
I sent Mellissa Martell the correspondence below, I'm not sure if it went through.  Since the timing of this explanation is crucial I am sending to you also, if you would kindly see that she receive a copy. I also faxed over to her the proof of  records.
Thankyou
Regina C. Reardon

— Original Message —-
**From:** R.Cathy Reardon
**To:** mellissamartell@closetmaidmail.com
**Sent:** Friday, December 22, 2006 7:30 PM
**Subject:** Regina Reardon/LexisNexis Report

Dear Mellissa,
I just received your copy of report obtained from LexisNexis.  In regards to the National Criminal Report,  I was falsely accused and the charges were withdrawn. For the record I was never arrested, the charges were mailed to me via a citation.  I will fax to you a copy of the letter from County of Allegheny Clerk of Courts dated May 11, 2006  stating that all records and documents pertaining to this case be expunged and destroyed. My attorney explained that it takes time for the process. The incident involved my teenage daughter having friends over to our home and the friends concealed and brought in alcohol.  I would be happy to explain further anymore details that you may need.  The reason I did not mention this at time of application is because the charges were withdrawn over 1 year ago and the papers were ordered to be destroyed 8 months ago.  Had I known the records were still showing I would have explained in advance.  I can assure you that I have an excellent reputation in my community, business and among my peers.
Two of my references are aware of the above situation and can attest to my credibility and integrity.  They are Patty Mochtyak one of my business employment references and Gayle Aguglia one of my professional references.  I implore you to examine the courts paperwork and please consider me for the position.

Thankyou
Regina C. Reardon

12/27/2006

December 23, 2006

To: LexisNexis Screening
P. O. Box 812289
Boca Raton, Fl. 3348
Attn: Consumer Inquiry Department

Fr: Regina Cathy Reardon
100 lammert Dr.
Glenshaw, Pa. 15116

Re: Dispute involving inaccurate information on Public Records
Report provided to ClosetMaid

To Whom It May Concern:

After receiving a copy of your report in which I gave ClosetMaid consent for, I
realized there was a significant inaccuracy in the Public Records /National Criminal
Report appearing under my name.
For the record, I was falsely accused and all charges in that report were withdrawn.
The records were withdrawn over 1 year ago and on May 9,2006 the charges were
ordered to be expunged and destroyed from my records.
I am faxing over proof (3 pages) of the expungement for you to examine and please look
into correcting my records. As I am seeking employment having this on my records is
an enormous detriment to my character.
Your immediate attention would be greatly appreciated.

Thank you,

Regina Cathy Reardon

Cc: Melissa Martell / Human Resources Representative
Flamela Edwards / Human Resources Representative
ClosetMaid
630 SW 27th Street
Ocala, Fl 33474

OFFICE OF THE CLERK OF COURTS



GEORGE F. MATTA, II
CLERK OF COURTS

County of Allegheny

116 COURTHOUSE • 436 GRANT STREET
PITTSBURGH, PENNSYLVANIA 15219-2489
PHONE (412) 350-5322 • FAX (412) 350-7111

PHILIP MARTELL
CHIEF OF STAFF
RAYMOND DEEP
DEPUTY
DARLENE SKOSNIK
DEPUTY
JACK CAMBEST
SOLICITOR

5-11-06

Dear Sir/Madam:

Enclosed is a copy of the court order directing that all records and documents pertaining to this case be expunged and destroyed. The Clerk of Courts has sent a copy of this to the proper agencies.

We cannot, however, predict when total compliance will occur. This letter is only meant to inform you that the Judge has approved your request for an Expungement and that the process has been initiated.

Sincerely,

George F. Matta, II
Allegheny County Clerk of Courts

JoAnn Lyden

Expungement Specialist
JoAnn Lyden

Regina C. Reardon        page 2

231

December 21, 2006

To: Melissa Martell / Human Resources Representative

Fr: Regina C. Reardon

Re: Correspondence / LexisNexis Report

3 pages including Cover

1 of 3

OFFICE OF THE CLERK OF COURTS

 

**GEORGE F. MATTA, II**
CLERK OF COURTS

116 COURTHOUSE • 436 GRANT STREET
PITTSBURGH, PENNSYLVANIA 15219-2465
PHONE (412) 350-5320 • FAX (412) 350-7111

PHILIP MARTELL
CHIEF OF STAFF
RAYMOND DEEP
DEPUTY
CARLENE SKOSNIK
DEPUTY
JACK CAMBEST
SOLICITOR

5-11-06

Dear Sir/Madam:

Enclosed is a copy of the court order directing that all records and documents pertaining to this case be expunged and destroyed. The Clerk of Courts has sent a copy of this to the proper agencies.

We cannot, however, predict when total compliance will occur. This letter is only meant to inform you that the Judge has approved your request for an Expungement and that the process has been initiated.

Sincerely,

George F. Matta, II
Allegheny County Clerk of Courts

Expungement Specialist
JoAnn Lyden

Regina C. Reardon     page 2

233

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA



IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the afore-mentioned keepers of criminal records shall expunge and destroy the official and unofficial arrest, expungement and other documents pertaining to the arrest or prosecution or both of the above named defendant in the above-captioned criminal proceedings, and that each shall request the return of such records which its agency made available to State or Federal agencies and immediately upon receipt thereof shall destroy such records, with the exception of the District Attorney's records concerning ARD or PWV, which shall be used solely for the purpose of determining subsequent eligibility for ARD or PWV, and that said keepers of such criminal records shall file with this court an Affidavit stating that the mandates of this Order have been fulfilled. IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Clerk of Courts shall expunge the indices of the official and unofficial arrest and other documents pertaining to the arrest or prosecution or both of the above named defendant in the above-captioned criminal proceedings.

BY THE COURT,

_____ J.

REVIEWED BY

**AFFIDAVIT OF EXPUNGEMENT**

This is to certify that the official arrest and criminal records and other documents filed pertaining to the particular arrest or prosecution or both of the above named defendant in the above-captioned criminal proceedings, which are in the custody or and in control of this Office, have been expunged and destroyed.

Date: _____     Certifying Officer: _____

*Page 3*

December 21, 2006

To: Melissa Martell / Human Resources Representative

Fr: Regina C. Reardon

Re: Correspondence / LexisNexis Report

4 3 pages including Cover

1 of 4 4

Note:
There is an additional page that was missed in the original fax of 3

page 4

REGINA REARDON                    K 246389-3

<u>**CHARGE**</u>                                    <u>**DISPOSITION**</u>

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

Withdrawn

236