## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

R. CATHY REARDON, on behalf of
herself and all similarly situated
individuals,

        Plaintiffs,

           v.

CLOSETMAID CORPORATION,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

2:08-cv-01730

Judge Mark R. Hornak

## OPINION

**Mark R. Hornak, United States District Judge**

This is a civil action brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681,

et seq. (the "FCRA"). Plaintiff Cathy Reardon, on behalf of herself and all similarly situated

individuals, alleges that the Defendant, ClosetMaid Corporation ("ClosetMaid"), disqualified

applicants for employment on the basis of consumer reports in a manner violative of the FCRA.

Specifically, Plaintiffs allege that ClosetMaid obtained and relied upon consumer reports without

obtaining the appropriate disclosures specifically required by 15 U.S.C. § 1681b(b)(2)(A) (the

"Disclosure Claim"). Plaintiffs further allege that ClosetMaid failed to provide applicants for

employment a reasonable amount of time to dispute the information contained in the consumer

reports, and requisite statutory notice of adverse action, prior to refusing to hire them based on

such reports, in violation of 15 U.S.C. § 1681b(b)(3) (the "Pre-Adverse Action Claim").

Plaintiffs seek statutory and punitive damages and attorneys' fees.

This case is currently set for trial beginning January 6, 2014.[1] The parties have filed cross-motions for summary judgment, ECF Nos. 90, 94. In addition, ClosetMaid has moved to decertify the Pre-Adverse Action Sub-Class, ECF No. 98, and Plaintiffs have moved to strike the declarations submitted by three ClosetMaid Human Resource Representatives (the "Declarations"), ECF No. 108. For the following reasons, both the Plaintiffs' Motions for Summary Judgment and ClosetMaid's Motions will be granted in part and denied in part. Specifically, with respect to the Disclosure Claim, Plaintiffs' Motion for Summary Judgment as to liability and willfulness as to certain members of the Disclosure Class is granted and is denied in all other respects. With respect to the Pre-Adverse Action Claim, ClosetMaid's Motion for Summary Judgment as to the 22 members of that Sub-Class who experienced no adverse employment action at all, and as to the 3 members who were provided with pre-adverse action notices sufficiently in advance of ClosetMaid's adverse action against them to fulfill the applicable statutory requirements is granted, and is denied in all other respects. ClosetMaid's Motion to Decertify and Plaintiffs' Motion to Strike are also both denied, but without prejudice.

## I.    BACKGROUND

### A.    Factual Background

On December 13, 2006, Ms. Reardon applied for a job as a Territory Supervisor for ClosetMaid. As part of the employment application, ClosetMaid provided Ms. Reardon with a document entitled, "Authorization to Obtain a Consumer Credit Report and Release of Information for Employment Purposes" (the "Authorization Form"), as well as a second document entitled, "Notice of Intent to Obtain a Consumer Credit Report" (the "Notice Form").

---

[1] In this regard, the parties have each filed a swarm of motions *in limine*, ECF Nos. 140-156 inclusive, a number of which touch on matters related to these Motions. The Court has examined those filings to see if they impact the dispositions set out in this Opinion. They do not. This Opinion, however, may impact the necessity for, or direction of, one or more of those motions *in limine*. That will be addressed at the pretrial conference set for later this month.

*See* ECF No. 97-6 at 3-9. The Authorization Form provides that "[p]ursuant to [the FCRA], I hereby authorize ClosetMaid . . . to conduct a comprehensive review of my background through a consumer report and/or investigative consumer report." *Id.* at 5. The Authorization Form also contains a waiver of rights provision, which states that "I hereby release ClosetMaid . . . from any and all liability for damages of whatever kind, which may at any time, result to me . . . because of compliance with this authorization and request to release." *Id.* The Notice Form provides that "as a condition of my consideration for employment with ClosetMaid, [. . .] ClosetMaid may obtain a consumer report." *Id.* at 3. The Notice Form further provides that "pursuant to the [FCRA], if any adverse action is to be taken based upon [a] consumer report, a copy of the report and summary of the consumer's rights will be provided to me if requested." *Id.* Ms. Reardon signed both documents and returned them to ClosetMaid along with her employment application.

During the time period between Ms. Reardon's application date and July 1, 2009, when ClosetMaid began using different notice and authorization forms altogether, ClosetMaid included an Authorization Form as part of every employment application provided to applicants whom ClosetMaid was interested in pursuing. ECF No. 95; ClosetMaid Concise Statement of Material Facts ("ClosetMaid SOF") ¶ 13. ClosetMaid did not, however, always include a Notice Form. ECF No. 93-3 at 16; Reardon Responsive Concise Statement of Material Facts ("Plaintiffs RSOF") ¶ 13 (citing ECF No. 93-3 (Fed. R. Civ. P. 30(b)(6) Deposition of ClosetMaid Corporation (Catherine Beal, designated) ("ClosetMaid Dep.")) at 59:10-18). In fact, the Notice Form was discontinued at some point for purposes of "simplification." *Id.*

According to Jennifer Boring, a Human Resources Representative at ClosetMaid, ClosetMaid's employment application and hiring procedures were position-specific and are "not necessarily a linear process." ECF No. 93-4 (Deposition of Jennifer Boring ("Boring Dep.")) at

51:17-18. Catherine Beal, ClosetMaid's Vice President of Human Resources, testified that ClosetMaid's procurement and review of an applicant's consumer report occurred towards the end of the recruiting process and only for applicants whom ClosetMaid has "selected to hire." ECF No. 93-3, ClosetMaid Dep. at 49:10-50:12. However, according to Ms. Beal the review of an applicant's consumer report was not necessarily the absolutely, positively final step in the application process. *Id.* at 66:19-67:08. For example, ClosetMaid also might have subjected applicants to some additional pre-hire processes, such as drug testing. *Id.*

After receiving Ms. Reardon's employment application, ClosetMaid obtained a consumer report about her from LexisNexis. That report contained negative information, which Ms. Reardon contends is incorrect. On December 18, 2006, ClosetMaid sent a letter to Ms. Reardon enclosing the consumer report and a summary of rights under the FCRA (the "Pre-Adverse Action Notice"). ECF. No. 97-10 at 2. In that letter, ClosetMaid stated that it would wait "five business days from the date of this letter before it makes a decision on your application." On December 22, 2006, four business days later, ClosetMaid sent Ms. Reardon a second letter (the "Adverse Action Notice") stating that "[t]he Company has now decided not to offer you the position you applied for based in whole or in part upon" the consumer report. ECF No. 97-11 at 2.

Plaintiffs contend that from December 1, 2006 to June 30, 2009, ClosetMaid obtained consumer reports as to 1,829 job applicants, 1,494 of whom were hired, and 299 who were not hired. Plaintiffs RSOF ¶ 45 (citing Beal Dep. Ex. 9). According to Plaintiffs, ClosetMaid has sent to only 3 individuals, not including Ms. Reardon, a copy of his or her consumer report and a summary of rights under the FCRA. Plaintiffs RSOF ¶ 44. In each of those 3 instances, ClosetMaid sent the pre-adverse action notice on May 1, 2008, and the adverse action notice on May 13, 2008, 8 business days later. *See* ECF. No. 93-11 at Exhibit A.

## B.    Procedural Background

This action was originally filed on December 19, 2008.[2]  In the First Amended Class Action Complaint ("FAC") filed on April 16, 2009, Ms. Reardon sought to represent individuals who executed forms permitting ClosetMaid to obtain a consumer report as part of an employment application (the "Disclosure Class") and, within that class, a sub-class of individuals whom ClosetMaid did not hire based in whole or in part upon information contained in the consumer report (the "Pre-Adverse Action Sub-Class"). FAC ¶ 44, ECF No. 16.  On April 27, 2011, the Court entered an order granting class certification noting that "[i]f it becomes clear that most [hiring] decisions were not made in a centralized fashion, ClosetMaid should move for decertification of, at a minimum, the subclass." ECF No. 51 at 17; 2011 WL 1628041 (W.D. Pa. Apr. 27, 2011).  The Disclosure Class purportedly consists of approximately 1,800 individuals and the Pre-Adverse Action Sub-Class consists of approximately 77 individuals.

On May 24, 2013, Plaintiffs filed a Motion for Partial Summary Judgment As to Liability seeking summary judgment as to (1) all individuals in the Disclosure Class who signed a disclosure/consent form containing a waiver of rights provision, and (2) all individuals in the Pre-Adverse Action Sub-Class.  Plaintiffs properly excluded from their motion all individuals who submitted Exclusion Requests pursuant to the September 28, 2012 Notice of Class Action.[3] ECF No. 90 Ex. 1.  On the same day, ClosetMaid filed its Motion for Summary Judgment against Plaintiffs as to all claims, ECF No. 94, and its Motion to Decertify the Pre-Adverse Action Sub-Class, ECF No. 98.  On June 25, 2013, Plaintiffs filed a Motion to Strike the

---

[2] This action was originally assigned to the late Chief Judge Gary L. Lancaster and, following his untimely death, was transferred to this member of our Court on May 16, 2013.  ECF No. 88.

[3] Once an individual submits an Exclusion Request and opts out of a class action, she is completely excluded from the suit, and has no standing to participate or object to any proposed settlement or appeal, but is not bound by the preclusive effect of the class suit and may pursue her own litigation as she sees fit.  *See Drelles v. Metropolitan Life Ins. Co.*, 357 F.3d 344 (3d Cir. 2003).

Declarations of ClosetMaid Human Resources Representatives Jennifer Boring, Patricia Dameron, and Merlyn Hernandez-Opio. ECF No. 108.

Oral argument was held on July 19, 2013. On August 2, 2013, the parties, at the Court's request, submitted supplemental briefing to address the factual issue of how and when in the hiring process ClosetMaid used an applicant's consumer report to assess the applicant's qualifications, and to identify the record evidence relating to this issue. ECF Nos. 125-126.

## II. STANDARD OF REVIEW

### A. Summary Judgment – Federal Rule of Civil Procedure 56

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp., v. Catrett*, 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party measured against the standard fixed by the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In reviewing the record evidence submitted, the court is to draw all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v.*

6

*Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48. An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *See id.* "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587; *Huston*, 568 F.3d at 104.

### B.    Motion to Strike – Federal Rule of Civil Procedure 12(f)

Federal Rule of Civil Procedure 12(f) permits a court to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *Craker v. State Farm Mut. Auto. Ins. Co.*, No. 11-0225, 2011 WL 1671634, at *5 (W.D. Pa. May 3, 2011) (citation omitted). Motions to strike under Rule 12(f) are committed to the discretion of the district court, but will usually be denied unless the allegations have no possible relation to the controversy, will cause unfair prejudice, or will confuse the issues in the case. *Adams v. Cnty. of Erie*, 2009 WL 4016636, at *1 (W.D. Pa. Nov. 19, 2009) (citations omitted).

### C.    Motion to Decertify – Federal Rule of Civil Procedure 23(c)(1)(C)

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Pursuant to this rule, district courts may decertify a class where appropriate after the case develops. *See Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998). In making the determination of whether to amend or reconsider a class certification, courts have routinely made such assessments under an analysis that focuses on whether changed circumstances have arisen in the case. *See, e.g., Eisenberg v. Gagnon*, 766

F.2d 770, 787 (3d Cir. 1985) (noting that "class actions depend on the continuing supervision of the district court, including reconsideration of the efficacy of class action treatment as the circumstances change"); *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 793 n. 14 (3d Cir. 1995) ("Under Rule 23(c)(1), the court retains the authority to re-define or decertify the class until the entry of final judgment on the merits.").

A district court "retains the discretion to decertify or modify the class so that the class action encompasses only the issues that are truly common to the class." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994). *See also* Fed. R. Civ. P. 23(c)(4); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 322 (3d Cir. 2011) ("[D]istrict court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable.") (citation omitted).

## III.  DISCUSSION

### A.  Disclosure Claims Under 15 U.S.C. § 1681b(b)(2)(A)

As noted above, Plaintiffs allege that ClosetMaid violated the FCRA by failing to provide the appropriate disclosures to applicants for employment prior to obtaining their consumer reports, in violation of section 1681b(b)(2)(A). Specifically, Plaintiffs contend that ClosetMaid's inclusion of a waiver of rights provision in the Authorization Form contravenes the FCRA's requirement that a "clear and conspicuous" disclosure appear "in a document that consists *solely of the disclosure.*" 15 U.S.C. § 1681b(b)(2)(A)(i) (emphasis added). Finally, Plaintiffs argue that ClosetMaid's violation of the FCRA's disclosure requirement was willful as a matter of law, thereby triggering an award of damages under section 1681n(a)(1)(A).

### 1.  Sufficiency of the Disclosure

Pursuant to the FCRA, consumer reports may be issued to employers for "employment purposes." 15 U.S.C. § 1681b(a)(3)(B). An employment purpose is defined as a purpose

relating to the evaluation of "a consumer for employment, promotion, reassignment or retention as an employee." 15 U.S.C. § 1681a(h). The FCRA requires, in pertinent part, that prior to procuring a consumer report on an applicant for employment, an employer must: (1) provide a clear and conspicuous disclosure to each applicant in writing "that a consumer report may be obtained for employment purposes"; and (2) obtain the applicant's authorization for the report in writing. 15 U.S.C. § 1681b(b)(2)(A). Section 1681b(b)(2)(A)(i) specifies that the disclosure must be made in writing "in a document that consists solely of the disclosure." Section 1681b(b)(2)(A)(ii) allows for the authorization to be made in the same document as the disclosure.

The FCRA does not define the term "clear and conspicuous," and there is little case law interpreting the term as used in section 1681b. According to the Court of Appeals for the Seventh Circuit, "it is appropriate to draw upon the wealth of [Uniform Commercial Code ("UCC")] and [Truth in Lending Act ("TILA")] case law in determining the meaning of 'clear and conspicuous' under the FCRA." *See Cole v. U.S. Capital*, 389 F.3d 719, 730 (7th Cir. 2004). *See also Stevenson v. TRW Inc.*, 987 F.2d 288, 295-96 (5th Cir. 1993) (interpreting "clear and conspicuous" language used in section 1681i(d) of the FCRA with reference to TILA and UCC cases). Our Court of Appeals has interpreted a "clear and conspicuous" disclosure to mean, in the context of the TILA, "in a reasonably understandable form and readily noticeable to the consumer." *See Rossman v. Fleet Bank (R.I.) Nat. Ass'n*, 280 F.3d 384, 390 (3d Cir. 2002) (citing 15 U.S.C. § 1632(a)). The UCC defines conspicuous as "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." U.C.C. § 1-201(b)(10). Other courts have regarded a FCRA disclosure as being non-conspicuous where it was printed in small type, on the back of a document, when it is the same size and typeface as the terms around it, or when it is not in boldface or capital lettering. *See,*

9

*e.g., Murray v. GMAC Mortg. Corp.*, 274 Fed. Appx. 489, 490-91 (7th Cir. 2008) (disclosure was not "conspicuous" within the meaning of FCRA requirements where it appeared on backside of solicitation flyer and occupied two of ten paragraphs all in the same size type); *Cole*, 389 F.3d at 731 (disclosure not "clear and conspicuous" where it was made in a paragraph at very bottom of flyer, printed in font size that was no larger than six-point, and that was not set off from remainder of text in any way); *Murray v. Sunrise Chevrolet, Inc.*, 441 F. Supp. 2d 940, 948 (N.D. Ill. 2006) (disclosure was not "clear and conspicuous" where notice appeared in a single paragraph at the bottom of a flyer and was printed in the smallest typeface on the page).

Here, there is no dispute that Ms. Reardon received and signed both the Notice Form and Authorization Form. Plaintiffs concede that "[b]oth forms include FCRA disclosures [describing] the nature and scope of consumer reports to be obtained." ECF No. 100 at 16. Therefore, to the extent that at least one of the two forms provided applicants with a proper disclosure under section 1681b(b)(2)(A)(i), Ms. Reardon's disclosure claim, as well as that of any other Disclosure Class member who received both forms, must fail.

The first sentence of ClosetMaid's Notice Form, a document which contains only two paragraphs in medium-size typeface, states as follows:

> "I understand that as a condition of my consideration for employment with ClosetMaid, or as a condition of my continued employment with ClosetMaid may obtain [sic] a consumer report . . . ."

ECF No. 97-6 at 3. Although the language of the Notice Form may have been inartfully worded, the disclosure is in a reasonably understandable form, the amount of text on the page is minimal, and the disclosure appears in the opening sentence of the document such that it is readily noticeable to the consumer. Accordingly, the disclosure contained in the Notice Form provided is, for FCRA purposes, a legally sufficiently clear and conspicuous disclosure of ClosetMaid's intent to procure a consumer report for employment purposes. In addition, the disclosure in the

Notice Form otherwise complies with the requirements of section 1681b(b)(2)(A) because it appears in a document that consists only of the disclosure and authorization, a combination that is expressly authorized by section 1681b(b)(2)(A)(ii).

Plaintiffs' argument that the Notice Form did not operate as a legally sufficient disclosure because "it failed to disclose [ClosetMaid's] intention to also obtain an 'investigative consumer report'" misses the mark. ECF No. 100 at 17. Section 1681d(a)(1) of the FCRA provides that prior to procuring an investigative consumer report, a disclosure must be provided to the consumer "that an investigative consumer report including information as to [the consumer's] character, general reputation, personal characteristics, and mode of living, whichever are applicable, may be made." 15 U.S.C. § 1681d(a)(1). Here, there is simply no evidence to suggest that ClosetMaid procured an "investigative consumer report" for any member of the Disclosure Class, nor any evidence that ClosetMaid intended to procure such a report. Therefore, ClosetMaid's mention of "investigative report" in the Authorization Form is merely superfluous and not reflective of a statutory obligation or a violation of such an obligation. Therefore, any member of the Disclosure Class, including Ms. Reardon, who received a Notice Form in addition to an Authorization Form was necessarily provided a legally sufficient form of disclosure via the Notice Form in accordance with section 1681b(b)(2)(A), and summary judgment is granted in favor of ClosetMaid as to such persons relative to their disclosure claims.[4]

---

[4] The resulting failure of Ms. Reardon's "disclosure" claim has no effect on the viability of the entire action. It is well settled that once a class has been certified, mooting a class representative's claim does not moot the entire action because the class "acquire[s] a legal status separate from the interest asserted by [the named plaintiff]." *See Weiss v. Regal Collections*, 385 F.3d 337, 342 (3d Cir. 2004) (citing *Sosna v. Iowa*, 419 U.S. 393, 399 (1975)). "Litigation may continue because the stake of other class members is attributed to the class representative." *Brown v. Phila. Hous. Auth.*, 350 F.3d 338, 343 (3d Cir. 2003). To the extent the inadequacy of Ms. Reardon's disclosure claim is a defect, it is one that Plaintiffs can readily cure with substitution of a new class representative as to that claim. *See, e.g., Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 617-18 (5th Cir. 1983) ("[I]f after the class has been certified and its claims heard and the representatives are found to be inadequate for some reason during the course of the class claims . . ., the appropriate step is appointment of new representatives from the existing class, not decertification.").

Turning to the remaining Disclosure Class members who received *only* the Authorization Form it is necessary to determine whether, as it contends, ClosetMaid complied with its disclosure obligations under section 1681b(b)(2)(A). The title of the Authorization Form states in capital letters, "AUTHORIZATION TO OBTAIN A CONSUMER CREDIT REPORT AND RELEASE OF INFORMATION FOR EMPLOYMENT PURPOSES." The first paragraph of the Authorization Form begins as follows:

> Pursuant to the Fair Credit Reporting Act, I hereby authorize ClosetMaid and its designated agents and representatives to conduct a comprehensive review of my background through a consumer report and/or investigative consumer report to be generated for employment, promotion, reassignment or retention as an employment.

ECF No. 97-6 at 5. The subsequent paragraph of the Authorization Form explains the type of information that may be included in the consumer report. *Id.* The third paragraph begins, "I []" authorize the complete release of these records or data pertaining to me which an individual, company, firm, corporation, or public agency may have." *Id.* The waiver of rights provision appears in the fourth paragraph of the Authorization Form and states as follows: "I hereby release ClosetMaid . . . from any and all liability for damages of whatever kind, which may at any time, result to me . . . because of compliance with this authorization and request to release." *Id.* Finally, the last paragraph of the Authorization Form states that, "pursuant to the [FCRA], if any adverse action is to be taken based upon the consumer report, a copy of the report and a summary of the consumer's rights will be provided to me if requested." *Id.*

According to Plaintiffs, ClosetMaid's Authorization Form fails to provide a clear and conspicuous disclosure, in violation of section 1681b(b)(2)(A)(i). In addition, Plaintiffs contend that ClosetMaid's inclusion of a waiver of rights provision facially contravenes section 1681b(b)(2)(A)(ii)'s requirement that the disclosure appear "in a document that consists solely of the disclosure." In support of this assertion, Plaintiffs cite to a Federal Trade Commission

12

("FTC") opinion letter from 1998, which addresses the sufficiency of a combined disclosure and authorization form containing a waiver of FCRA rights.[5] The Letter states as follows:

> While we believe that you may combine the disclosure and authorization . . ., we note that your draft disclosure includes a waiver by the consumer of his or her rights under the FCRA. The inclusion of such a waiver in a disclosure form will violate Section 604(b)(2)(A) of the FCRA, which requires that a disclosure consist "solely" of the disclosure that a consumer report may be obtained for employment purposes. Moreover, it is a general principle of law that benefits provided to citizens by federal statute generally may not be waived by private agreement unless Congress intended such a result.

Letter from William Haynes, Attorney, Div. of Credit Practices, Fed. Trade Comm'n, to Richard W. Hauxwell, CEO, Accufax Div. (June 12, 1998), 1998 WL 34323756 (F.T.C.), 1 ("Hauxwell FTC Letter"). Plaintiffs also cite to an FTC opinion letter from 1997, which provides that even where an employer includes a disclosure in an employment application, "an employer that follows this procedure must also clearly and conspicuously disclose in a completely separate document that a consumer report may be obtained for employment purposes, as required by [section 1681b(b)(2)(A)]." Letter from William Haynes, Attorney, Div. of Credit Practices, Fed. Trade Comm'n, to Harold Hawkey, Employers Assoc. of N.J. (Dec. 18, 1997), 1997 WL 33791224 (F.T.C.), 1 ("Hawkey FTC Letter"). The Hawkey FTC Letter further clarifies that "[n]othing else may appear on the document that detracts from the disclosure required by [section 1681b(b)(2)(A)]. An employer may elect to obtain the consumer's authorization on that document, because that would focus the consumer's attention on the disclosure and thus further the purpose intended by the 'separate document' provision of this section." *Id.* An additional FTC opinion letter from 1997 provides as follows:

> The reason for specifying a stand-alone disclosure was so that consumers will not be distracted by additional information at the time the disclosure is given. We

---

[5] Although an opinion letter by an agency charged with administering a statute, such as the FTC, is not entitled to "*Chevron* deference," *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 863 (1984), it is well established that it is entitled to "respect" and is persuasive. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

13

> believe that including an authorization in the same document with the disclosure .
> . . will not distract from the disclosure itself; to the contrary, a consumer who is
> required to authorize procurement of the report on the same document will be
> more likely to focus on the disclosure. *However, such a document should include*
> *nothing more than the disclosure and the authorization for obtaining a consumer*
> *report.*

Letter from Cynthia Lamb, Investigator, Div. of Credit Practices, Fed. Trade Comm'n, to

Richard Steer, Jones Hirsch Connors & Bull, P.C. (Oct. 21, 1997),1997 WL 33791227 (F.T.C.),

1 (emphasis added) ("Steer FTC Letter").

In response, ClosetMaid, relying on a case from the Western District of North Carolina,

contends that the proper test for whether inclusion of release language in a disclosure complies

with section 1681b(b)(2)(A) is whether the release language is "not so great a distraction"[6] as to

discount the effect of the disclosure. *Smith v. Waverly Partners*, LLC, 3:10-CV-00028-RLV,

2012 WL 3645324, at *6 (W.D.N.C. Aug. 23, 2012). ClosetMaid contends that its waiver of

rights provision is narrow in scope and pertains directly to its procurement of the applicant's

authorization, a provision that is allowed to coexist in the same form as a disclosure pursuant to

section 1681b(b)(2)(A)(ii). In *Smith*, the court dismissed the plaintiff's FCRA claim on

summary judgment, finding that the waiver of rights language included in the employer's

combined disclosure and authorization form was kept sufficiently distinct from the disclosure

language so as not to render it ineffective. *Smith*, 2012 WL 3645324 at *6. The court in

*Singleton v. Domino's Pizza*, No. 11-1823, 2012 WL 245965 (D. Md. Jan. 25, 2012), however,

came to a different, and the Court believes correct, conclusion with regard to an employer's

inclusion of a waiver of rights provision in a disclosure form. There, the court denied the

employer's motion to dismiss the plaintiff's section 1681b(b)(2)(A) claim, finding that "both the

---

[6] A construct not found in the FCRA, the applicable regulations, or in any agency guidance.

statutory text and FTC advisory opinions indicate that an employer violates the FCRA by including a liability release in a disclosure document." *Singleton*, 2012 WL 245965 at \*9.

Neither of these cases is binding on this Court; however, the Court agrees with the analysis in *Singleton*, given the rather direct statutory language at issue. Specifically, ClosetMaid's inclusion of a release provision in the Authorization Form, which served as a combined disclosure and authorization form for those Disclosure Class members who did *not* receive a Notice Form as part of their employment application, facially violates section 1681b(b)(2)(A)(i). Although the disclosure itself is arguably "clear and conspicuous" given that the title of the Authorization Form appears in bold capital letters and explains that the consumer report is for employment purposes, the Authorization Form simply does not comply with the FCRA's express requirement that the disclosure appear in a document that consists solely of the disclosure (or, at most, a disclosure and authorization only). Even if the Court were to accept ClosetMaid's characterization of the waiver of rights provision as being narrowly tailored to ClosetMaid's procurement of the applicant's authorization for the consumer report, and not a "great distraction", the release verbiage still is not an "authorization," which is the only other provision the FCRA allows in a valid disclosure form. To hold otherwise would have the Court rewrite the applicable provision of the FCRA to include a "not a great distraction" safe harbor for impermissible language, which, of course, it may not do. If that is to be done, it is a job for Congress. Therefore, we grant Plaintiffs' Motion for Summary Judgment on the question of liability as to the members of the Disclosure Class who received only the Authorization Form.[7]

---

[7] The Court also rejects, for lack of a statutory or regulatory basis, ClosetMaid's argument that the Authorization Form is valid because nothing prohibits an "authorization" from including a release, and a "disclosure" may include an "authorization," and therefore, a "disclosure" which includes an "authorization" which includes a "release" passes statutory muster. Such a multi-level bootstrapping approach to validating an otherwise invalid "disclosure" runs counter to the actual statutory language at hand.

## 2.    **Willful Noncompliance**

The FCRA permits a plaintiff to recover damages when a defendant acted either negligently or willfully in violating the statute's requirements. *See* 15 U.S.C. § 1681o(a)(1) (providing that a plaintiff may recover actual damages in cases of negligent noncompliance); *id.* § 1681n(a)(1)-(3) (providing for actual, statutory, and/or punitive damages, along with attorney's fees in cases of willful noncompliance). In the absence of negligent or willful misconduct, however, a plaintiff may not recover at all. *See Safeco Ins. Co. v. Burr*, 551 U.S. 47 (2007).

A defendant acts willfully under the FCRA by either knowingly or recklessly disregarding its statutory duty. *Safeco*, 551 U.S. at 57–60. A defendant's conduct is reckless only if it was "objectively unreasonable" in light of "legal rules that were 'clearly established' at the time." *Fuges v. Sw. Fin. Servs., Ltd.*, 707 F.3d 241, 249 (3d Cir. 2012) (citing *Safeco*, 551 U.S. at 69-70). However, where "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco*, 551 U.S. at 70 n. 20. Thus, "even when a court disagrees with a party's reading of FCRA, it may not impose liability for a reckless, and therefore willful, violation of the statute unless that party's reading is 'objectively unreasonable.'" *Fuges*, 707 F.3d at 249 (citing *Safeco*, 551 U.S. at 69). In other words, an employer "cannot be said to have willfully violated FCRA if the company acted on a reasonable interpretation" of the FCRA. *Id.* at 248.

In *Safeco*, the Supreme Court concluded that the defendant's violation of a different provision of the FCRA "was not objectively unreasonable." *Id.* at 70. According to the Court, the defendant's reading of the statute had "a foundation in the statutory text," there were prior appellate-level interpretations of the statutory provision, and there was a "dearth of [regulatory] guidance" regarding "the less-than-pellucid statutory text." *Id.*

In *Fuges*, the Third Circuit applied these same three factors to determine whether a defendant may benefit from the "safe harbor" of a "reasonable interpretation of FCRA's coverage." 707 F.3d at 248. Specifically, the court looked to (1) the plain meaning of the FCRA; (2) whether the defendant's application of the FCRA "had a 'foundation in the statutory text,'" *id.* at 252 (quoting Safeco, 551 U.S. at 69-70); and (3) the existence, or lack thereof, of judicial or agency guidance that could support the defendant's interpretation. *Id.* (quoting *Safeco*, 551 U.S. at 70). Even in the absence of such guidance, however, a defendant does "not receive a pass because the issue has never been decided." *Id.* at 253 n. 21 (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 722 (3d Cir. 2010)).

Here, the first and second factors weigh conclusively against ClosetMaid as the language of section 1681b(b)(2)(A) is plain and clearly ascertainable. According to section 1681b(b)(2)(A), the disclosure must be "clear and conspicuous" and set forth "in a document that consists solely of the disclosure," with the exception that the required written "authorization may be made on the [same] document." 15 U.S.C. § 1681b(b)(2)(A)(i)-(ii). ClosetMaid had no obligation to obtain a waiver of rights from the consumer; in fact, doing so in a disclosure form directly conflicted with the FCRA's clear prohibition on an employer's inclusion of any additional provision, excluding the authorization itself, in the disclosure form. Unlike the FCRA provision at issue in *Safeco*, which the Court regarded as "less-than-pellucid," 551 U.S. at 70, the statutory text here is unambiguous and not susceptible of differing interpretations.

As for the second prong, ClosetMaid argues that its Authorization Form derives its content from the pertinent statutory text. We disagree. There is simply nothing in the statutory text that would validate ClosetMaid's interpretation that it is proper to include a waiver of rights provision, even one narrowly tailored to ClosetMaid's procurement of the applicant's

17

authorization for the consumer report, in a disclosure form. The statute itself cuts exactly the other way.

Finally, we turn to a review of the relevant guidance from judicial and agency sources that was available at the time the Authorization Form was in use. As discussed previously, the Hauxwell FTC Letter explicitly advised against including any additional language, specifically, a waiver of rights provision, in a disclosure form. The Steer FTC Letter also advised that a disclosure form "should include nothing more than the disclosure and the authorization for obtaining a consumer report." 1997 WL 33791227. Additionally, the Hawkey FTC Letter provides that "[n]othing else may appear on the document that detracts from the disclosure." 1997 WL 33791224. Considering this agency guidance, all of which was available at the time the Authorization Form was in use, ClosetMaid's position with regard to its inclusion of a waiver of rights provision in the Authorization Form is legally insupportable. The Authorization Form is facially contrary to the statute at hand, and all of the administrative guidance on the questions. ClosetMaid's only support for its position is having its own position.[8]

There is no issue of material fact at issue as to this question.[9] ClosetMaid's Authorization Form was contrary to the law as Congress enacted it, and it proceeded ahead

---

[8] ClosetMaid has also cited to the *Smith* case to support its position as being a reasonable application of the relevant statutory language. Of course, *Smith* was decided several years after the events at issue here, and as previously noted, inserting an implied "not a great distraction" safe harbor into the statutory analysis is contrary to the statutory language. Here the release language was part and parcel of the operative language of the Authorization Form. ECF No. 97-6. Having it in its own consecutive paragraph of the same string of text on that Form does not make it "not a great distraction." The Court would observe that the *Smith* court's invocation of the "not so great a distraction" rubric is unaccompanied by the citation to any authority for its existence or application, or of any support for a court's application of such a doctrine in the context of plain text statutory language that goes in the other direction. *See Smith,* 2012 WL 3645324, at *6.

[9] In similar cases, where a defendant's actions are so plainly contrary to the provisions of the FCRA, courts have granted summary judgment for a plaintiff on the issue of willful noncompliance. *See Kudlicki v. Farragut Fin. Corp.,* 2006 WL 927281 (N.D. Ill. Jan. 20, 2006) (summary judgment for the plaintiff on willful failure to comply was appropriate when it was "clear from the most cursory glance" at defendant's mailer that it did not comply with 15 U.S.C. § 1681b(f)(1), allowing the use of a consumer report obtained from a consumer reporting agency, without the consumer's authorization, only for limited purposes including the extension of a firm offer of credit); *Adams v.*

anyway. Under the *Safeco* definitions of "willful," its conduct was objectively unreasonable as a matter of law. Accordingly, we grant Plaintiffs' Motion for Summary Judgment as to this issue, with respect to the members of the Disclosure Class who received only the defective Authorization Form. The parties shall promptly meet and confer and be prepared to advise the Court as to their respective positions as to the appropriate mechanism for the calculation and assessment of the statutorily available damages related to this issue.[10]

## B.     Pre-Adverse Action Claims Under 15 U.S.C. § 1681b(b)(3)(A)

The FCRA requires that an employer provide an applicant with advance notice of the employer's intention to take any adverse action on the basis of information contained in the applicant's consumer report. 15 U.S.C.A. § 1681b(b)(3)(A)(i)-(ii). The employer must also provide the applicant with a copy of the report and summary of rights under the FCRA. *Id.*

As to the Pre-Adverse Action Sub-Class, Plaintiffs contend that ClosetMaid violated section 1681b(b)(3)(A) by failing to provide pre-adverse action notices to 77 individuals whose consumer reports contained what they describe as derogatory information that disqualified them from employment with ClosetMaid.[11] According to Plaintiffs, ClosetMaid decided not to hire Plaintiffs based at least in part on their consumer reports without sending them pre-adverse action notices, which deprived Plaintiffs of an opportunity to review and address any issues in

*Berger Chevrolet, Inc.*, 2001 WL 533811 (W.D. Mich. May 7, 2001) (granting summary judgment for the plaintiff on willful noncompliance where defendant's employee, in violation of federal criminal law and the FCRA, obtained credit reports for Plaintiffs and used their credit to secure financing for car sales or leases for applicants with bad credit histories without Plaintiffs' consent).

[10] The Court reaches no conclusion as to whether the Plaintiffs would be able to adduce proof that would support the award of punitive damages on this record, but only a conclusion that as a statutory matter, they would be available because ClosetMaid's actions were objectively unreasonable.

[11] This assessment is based on a review of those files by one of Plaintiffs' counsel and his judgment as to whether they contain information which is arguably derogatory. ClosetMaid contests those assessments, and seeks to conclusively resolve that dispute in its favor now. However, the issue is not whether the assessment of Plaintiff's counsel is correct (or even admissible). If as a matter of fact the report contains negative information, and that report was obtained on an applicant "selected for hire" and then no hire followed, then there is at least a factual issue as to whether the report played any role in the decision.

their reports. Plaintiffs argue that once a consumer report is "part of the mix" of information being used to determine the prospective employee's eligibility for employment, the pre-adverse action notices required under section 1681b(b)(3) must be made. Plaintiffs rely on the testimony of Ms. Beal, ClosetMaid's Rule 30(b)(6) corporate designee, to demonstrate that it was ClosetMaid's policy and practice to procure a consumer report only after an applicant was deemed qualified and "selected for hire" and, therefore, as a matter of ClosetMaid's own practice, the consumer report was necessarily part of the information being used to assess the applicant's qualifications and make the final hiring decision. Specifically, Ms. Beal testified that an applicant's consumer report is obtained "pretty far down in the process of getting ready to potentially hire someone." ECF No. 93-3, ClosetMaid Dep. at 66:3-23, 67:3-8. Plaintiffs thus contend that ClosetMaid violated section 1681b(b)(3)(A) by not providing notice to each of the sub-class members and that such violation was willful.

In response, ClosetMaid contends that Plaintiffs have failed to adduce evidence sufficient to demonstrate that all but a handful of Sub-Class members were even entitled to pre-adverse action notices or that they did not receive such notices as required. In support of this contention, ClosetMaid divides the sub-class members into three groups: (1) those who did not experience an adverse employment action at all and, thus, were not entitled to a pre-adverse action notice (22 individuals); (2) those who actually received pre-adverse action notices (approximately 5 individuals); and (3) those whose consumer reports were not factually relied upon, in whole or in part, as a basis for ClosetMaid's adverse action and, thus, who were not entitled to a pre-adverse action notice (50 individuals).[12]

---

[12] There appear to be some discrepancies regarding how many of the Sub-Class members fall into each of these three categories. For example, ClosetMaid contends that there are 6 individuals, including Ms. Reardon, who received pre-adverse action notices, whereas Plaintiffs state that the total number is 4, including Ms. Reardon. Because the

The Court will address each of these arguments separately, keeping in mind that to the extent that any of the claims raised by Plaintiffs require engaging in overarching and fundamentally individualized determinations, "the [C]ourt retains the discretion to decertify or modify the class so that the class action encompasses only the issues that are truly common to the class." *Casey*, 43 F.3d at 63.

### 1.    A Group of 22 Individuals Who Did Not Experience Any Adverse Action

ClosetMaid contends that, of the 77 individuals comprising the Pre-Adverse Action Sub-Class, 22 of them have not actually experienced an adverse employment action. For example, Courtney M. declined an offer of employment, Steven M. failed to appear for his interview, and Richard G. told ClosetMaid that he was not interested in a position. ClosetMaid SOF ¶ 29.

In the employment context, an adverse action is "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee." *Id.* § 1681a(k)(1)(B)(ii). The FCRA definition of adverse action also includes a catch-all clause: any action taken or determination that is (i) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, . . .; and (ii) adverse to the interests of the consumer. *Id.* § 1681a(k)(1)(B)(iv). In the circumstances here, Plaintiffs contention, made at oral argument, that ClosetMaid's procurement of the consumer report in and of itself constitutes an "adverse action," misses the mark since the Court can discern no basis to conclude that an applicant was treated "adversely" by the simple act of ClosetMaid obtaining a consumer report about them. Those individuals who, one way or the other, removed themselves from ClosetMaid's hiring process simply did not experience an adverse employment action as

---

parties are in the best position to resolve this question, we leave it to them to provide the Court, at the appropriate time, with the exact number of sub-class members that fall into each of these three categories.

contemplated by the FCRA.[13]  Accordingly, ClosetMaid's contention that they were not statutorily entitled to receive a FCRA pre-adverse action notice from ClosetMaid is correct. Summary judgment is granted in favor of ClosetMaid as to these individuals, thereby eliminating them from the Sub-Class.

### 2.    A Group of Individuals Who Actually Received Pre-Adverse Action Notices

Of the remaining 55 individuals in the Sub-Class, ClosetMaid contends that it used consumer reports as a basis to reject only 5 applicants other than Ms. Reardon, and provided each of those individuals with a pre-adverse action notice at least 5 days in advance prior to taking any adverse action. ClosetMaid SOF ¶ 26. According to both Plaintiffs and the record evidence, ClosetMaid has provided pre-adverse action notices to only 3 individuals since 2006, other than Ms. Reardon. *See* ECF No. 93-11 at Exhibit A.

ClosetMaid correctly notes that the FCRA is silent as to the precise amount of time an employer is required to provide an applicant prior to refusing to hire her on the basis of derogatory information in a consumer report. However, Congress has made clear the "employer must [] provide the consumer with *a reasonable period* to respond to any information in the report that the consumer disputes[,] and with written notice and the opportunity and time period to respond." H.R. REP. 103-486 at 40 (1994). *See also Kelchner v. Sycamore Manor Health*

---

[13] Several district courts have analyzed the meaning of "adverse action" in the employment context of the FCRA. In *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532, 535 (E.D. Pa. 2012), our sister court addressed whether the defendant, a credit reporting agency, violated section 1681b(b)(3) of the FCRA by adjudicating prospective employees as "non-competitive" based on their consumer reports, prior to providing the employees with a pre-adverse action letter.  There, the court held that the adjudication of employees as "non-competitive" constituted an "adverse action" that triggering the pre-adverse action notice requirement. *Id.* at 538-42. In *Obabueki v. Int'l Bus. Machines Corp.*, 145 F. Supp. 2d 371, 376 (S.D.N.Y. 2001), plaintiff applied for a job with defendant and was hired contingent on the outcome of a background check.  After the background check revealed a prior criminal conviction, members of defendant's human resources department met and decided to withdraw plaintiff's conditional offer. *Id.* at 377.  The defendant subsequently sent plaintiff a pre-adverse action letter. *Id.*  The court ultimately rejected the plaintiff's argument that defendant was obligated to send the pre-adverse action letter prior to when the human resources department met to review the background check, finding that an internal decision to rescind an offer is not an adverse action. *Id.* at 391.

*Ctr.*, 305 F. Supp. 2d 429, 436 (M.D. Pa. 2004) aff'd, 135 F. App'x 499 (3d Cir. 2005). Further, a "reasonable period for the employee to respond to disputed information is not required to exceed 5 business days following the consumer's receipt of the consumer report from the employer." H.R. REP. 103-486 at 40.

Here, there is no dispute that ClosetMaid mailed to Ms. Reardon a letter dated December 18, 2006, notifying her that there was derogatory information in her credit report and that it was considering refusing to hire her on that basis. There is no dispute that ClosetMaid then sent to Ms. Reardon a letter informing her that it had not selected her for employment on December 22, 2006, exactly 4 business days later. Within the facts presented here, the Court concludes that a jury could find that Ms. Reardon was not given a "reasonable" time to dispute the derogatory information in her credit report, especially where the pre-adverse action notice itself explicitly provides that ClosetMaid would "wait five business days from the date of this letter before it makes a final decision on [her] application," and then did not do so. ECF No. 97-10 at 2. As a result, we deny ClosetMaid's Motion for Summary Judgment as to Ms. Reardon.

With respect to the remaining individuals who actually received pre-adverse action notices, the record evidence establishes that ClosetMaid complied with its obligations under section 1681b(b)(3)(A). According to the record evidence, ClosetMaid mailed the pre-adverse action notice for all three such individuals on May 1, 2008. *See* ECF No. 93-11 at Exhibit A. Subsequently, ClosetMaid mailed the adverse action notice on May 13, 2008, 8 business days later. *Id.* Thus, as a matter of law, these individuals were afforded a "reasonable" amount of time to address or respond to negative information in their consumer reports, in compliance with section 1681b(b)(3)(A). Accordingly, summary judgment as to these individuals is granted in favor of ClosetMaid and they are eliminated from the Sub-Class.

### 3. The Remaining Group of 50 Sub-Class Members

As to the remaining 50 Sub-Class members[14] who experienced an adverse employment action, based on its affidavits, ClosetMaid contends that all but a handful of them were not hired for reasons totally unrelated to their consumer reports. ClosetMaid SOF ¶¶ 27-30. These reasons include failing a drug test (2 applicants), falsifying information on their application (10 applicants), the applicant's work history (2 applicants), the candidate was not the "best qualified" (26 applicants), the applicant's references (5 applicants), and the fact that there were no open positions at the time of the application (5 applicants). ECF No. 97 at Exs. 13-15.[15] According to ClosetMaid, the procurement of an applicant's consumer report is not necessarily *the* final step in the review process such that an adverse decision made at that point is necessarily related to a degree to the consumer report. Ms. Beal testified that there are "other things that take place" after the procurement of an applicant's consumer report, such as drug testing. ClosetMaid Dep. at 66:21-23.

The question is whether a factfinder could conclude that ClosetMaid's decision not to hire these 50 Sub-Class members violated ClosetMaid's obligations under section 1681b(b)(3). Section 1681b(b)(3)(A) provides that "before taking any adverse action *based in whole or in part on the report*, the person intending to take such adverse action shall provide to the consumer to whom the report relates" the consumer report and summary of rights. 15 U.S.C. § 1681b(b)(3)(A) (emphasis added).

Plaintiffs' reading of the statute as requiring pre-adverse action notices to be provided to an applicant for employment anytime an employer "might" use information from a consumer

---

[14] A sufficiently large enough group to fulfill Rule 23(a)'s numerosity requirement. *Stewart v. Abraham,* 275 F.3d 220, 226-7 (3d Cir. 2001), *cert. denied,* 536 U.S. 458 (2002).

[15] It would appear that of this group a total of only 7, those that failed a drug test and those as to whom there was no open position, would involve reasons that were essentially objective, rather than engaging rationales that necessarily involved the subjective judgment of ClosetMaid's hiring managers.

report to disqualify the applicant, e.g. upon the employer's acquisition of the consumer report is without statutory support. Such an interpretation is contrary to the language of the FCRA itself. As the Supreme Court stated in *Safeco*, "[i]f the statute has any claim to lucidity, not all 'adverse actions' require notice, only those 'based . . . on' information in a credit report. 551 U.S. at 63. Nonetheless, under the peculiar facts here, Plaintiffs have presented sufficient evidence to demonstrate that ClosetMaid's policy and practice during the relevant time period was to procure consumer reports only after a prospective employee was deemed qualified and "selected to hire." ECF No. 93-3, ClosetMaid Dep. 49:22-50:4. This evidence therefore raises an inference that any decision on the part of ClosetMaid not to hire an applicant once his or her consumer report has been procured was based, at least in part, on the contents of the report.[16]

To refute Plaintiffs' allegations, ClosetMaid relies on sworn Declarations from three (3) members of its Human Resources department, Patricia Dameron, Merlyn Hernandez-Opio, and Jennifer Boring (the "Declarants").[17] Each Declaration attaches an Exhibit A, which purports to list in summary fashion the reasons a given applicant was not hired, and states that "each of the individuals identified on Exhibit A [attached to the Declaration] were not subject to an adverse employment action that was based on, whether in whole or in part, the results of any financial or criminal background check (i.e., any consumer report)." ECF No. 97 Exs. 13-15 ¶ 3. According to ClosetMaid's *argument,* the Declarants personally participated in the hiring process for the

---

[16] This inference is not unlike that which results from a plaintiff's fulfillment of the "prima facie" case phase in an employment discrimination case litigated using the "shifting burdens" analysis of *McDonnell-Douglas v. Green*, 411 U.S. 792, 802 (1973). Under that analytical construct, that inference alone, unless rebutted, would support but not require a finder of fact's verdict that the consumer report was at least in part the basis of the declination of hire by ClosetMaid.

[17] The fact that ClosetMaid contends that three (3) managers have sufficient personal knowledge among themselves as to the hiring decisions involving fifty (50) applicants would seem to belie any argument that such decisions were not to a very substantial degree "centralized." Presumably, at trial, ClosetMaid would need to rely on no more than these three (3) affiants as fact witnesses to explain the hiring rationale as to all of those fifty (50) applicants.

individuals listed in their respective Exhibits A. ECF No. 112 at 4. To prepare the involved Exhibits A, the Declarants apparently reviewed each individual's application file to determine what the file reflected as to the reason that particular applicant was not hired. *Id.*; *see also* ECF No. 112-2, at 13-17.[18]

Plaintiffs assert that the Declarations submitted by ClosetMaid in support of its Motion for Summary Judgment should be stricken because they are based on "retrospective guess work" rather than personal knowledge and, therefore, fail to comply with Federal Rule of Civil Procedure 56(c). Rule 56(c) allows the use of affidavits in connection with a summary judgment motion when the affidavit is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). *See also Petruzzi's IGA Supermarkets, Inc., v. Darling-Delaware Co.*, 998 F.2d 1224, 1234 n. 9 (3d Cir. 1993) (observing that evidence introduced at summary judgment stage must be "capable of being admissible at trial"). A party opposing a summary judgment motion must set forth specific facts that reveal a genuine issue of material fact, and "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Gonzalez v. Sec'y of the Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (citing *Kirleis v. Dickie, McCamey & Chilcote*, 560 F.3d 156, 161 (3d Cir. 2009). Hearsay declarations in affidavits may be considered in the summary judgment context if the declarant

---

[18] As noted, ClosetMaid *argues* that each declarant has personal knowledge of the basis for declination of hire of certain specific applicants, but an examination of the involved declarations, which mirror each other in phrasing, reveals that they do not make that specific recitation of only personal knowledge, but also speak of "information provided" and "information in records." The Court simply cannot be certain whether on this point ClosetMaid's position is simply unintentional fuzziness in drafting, or is intentionally cagey. ClosetMaid argues at one point that each of the three declarants has first hand knowledge based on their "particular involvement in the hiring decisions related to each of the applicants at issue," ECF No. 112 at 2. Then, on the same page of its Memorandum, it says that its "Human Resources Staff" personally reviewed the application files of each Sub-Class member to "determine the reason why each and every one of those individuals was not hired by ClosetMaid." *Id.* On the next page of that Memorandum, ClosetMaid cuts the issue very close to the corner by advising the Court that each declarant also considered such file content, and then applied their "knowledge and experience." First-hand knowledge? General knowledge? The Court cannot at this point divine that answer.

would be available for trial and the declaration as set forth in the affidavit would be admissible if it were made by the declarant in open court. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990).

Here, for purposes of summary judgment, ClosetMaid has set forth sufficient evidence to establish that Declarants Boring, Dameron, and Hernandez-Opio possessed the requisite personal knowledge regarding the matters set forth in their Declarations, but barely. Specifically, Ms. Boring, ClosetMaid's current Human Resources Director, testified that even though each declaration does not say so specifically, in preparing[19] the Declarations, each of the Declarants reviewed the applicant files for the members of the Pre-Adverse Action Sub-Class as to which that particular Declarant actually participated in the hiring process. ECF No. 112-2 at 67:23-71:01. Each Declarant then confirmed the file content as to the hiring decisions identified in their respective Declarations, as set forth in Exhibit A to the involved Declaration. At trial, each Declarant will have the opportunity (and obligation) to present admissible testimony consistent with their Declaration. Nonetheless, to the extent that each respective Exhibit A was created by Ms. Boring in preparation for this phase of the litigation, rather than contemporaneously with ClosetMaid's hiring decisions for each of the individuals listed, we would observe that the evidence is substantially self-serving and does not in and of itself obviate the permissible inference that the consumer report procured at the latest stages of the hiring process played some role in the hiring decisions. That inference is generated by the combination of the timing of the reports' procurement within that process, the "selected for hire" standard, and the adverse action taken soon thereafter.

---

[19] It is pretty clear that no Declarant actually prepared or even drafted their own Declaration. ClosetMaid counsel and Ms. Boring did that. Nonetheless, each Declarant has put their own credibility on the line by executing their Declarations subject to the penalties for perjury. For these purposes, that is good enough.

Thus, for each of these 50 Sub-Class members, the Declarations are sufficient to support the existence of a genuine issue of material fact with respect to whether ClosetMaid's hiring decisions were driven, in whole or in part, by those individuals' consumer reports, or whether ClosetMaid relied, as it claims (and as it must), *solely* on other disqualifying information, much of which is highly subjective.

Plaintiffs present a compelling argument based on the testimony of ClosetMaid officials that no consumer report is even obtained until the involved applicant has been "selected for hire," and that the fifty (50) remaining Sub-Class members were then not hired after the reports were obtained. On the other hand, ClosetMaid contends that as to each such Sub-Class member, it can demonstrate that the content of the consumer report had literally nothing to do with the decision not to hire. While the timing involved in ClosetMaid's processes and its use of the term "selected for hire" may make prevailing with that argument tough sledding, ClosetMaid can make it at trial.[20] It is for the factfinder to decide whether ClosetMaid violated section 1681b(b)(3) with respect to these 50 members of the Pre-Adverse Action Sub-Class and, if so, whether such a violation was willful. Accordingly, summary judgment as to liability (at the behest of either party) is not warranted as to these Plaintiffs.

---

[20] In this regard, ClosetMaid is in a position akin to that of a defendant in a "pattern and practice" case brought under Title VII of the Civil Rights Act. *See Teamsters v. United States,* 431 U.S. 324 (1977). In those cases, where the plaintiff demonstrates the existence and general application of an unlawful employment practice, the burden shifts to the defendant to prove that the improper practice did not, at all, animate the employment decision as to a particular applicant. Here, if ClosetMaid were to not offer any proof, a fact finder would be permitted to find from the facts that no credit reports were obtained until an applicant had been "selected for hire," and that the declination of hire decision was made only after the reports were obtained, that they played at least some role in that declination decision. Given that it is uncontroverted that no timely "adverse action" notices were given to such applicants, the statutory violation would be made out. Then, it would fall to ClosetMaid to prove that as to a particular applicant, the report played no role at all. At least two courts of appeals have held that such pattern and practice actions are not distinct substantive claims, but instead relate solely to the method of proof available (at least when the plaintiff is not the Government), and that the "pattern and practice" phraseology in the context of private plaintiffs is simply a variation on the *McDonnell-Douglas* theme. *Parisi v. Goldman, Sachs,* 710 F.3d 483 (2d Cir. 2013); *Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343 (5th Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002). As this case proceeds to trial, the Court expects that the parties will more precisely define the method of proof they propose to use as to liability issues relative to this Sub-Class.

28

## C.    Motion to Strike

With respect to Plaintiffs' Motion to Strike the Declarations, it is denied for the same reasons as stated above, *i.e.*, ClosetMaid has established, but not by much, that for summary judgment purposes, the Declarants possessed the requisite baseline personal knowledge and were competent to testify regarding the matters addressed in their respective Declarations.[21] Although ClosetMaid has yet to lay the predicate foundation for introduction of each Declaration's Exhibit A as a business record, *see* Fed. R. Evid. 803(6), this is a curable defect at trial if there are business records supporting the summary which is Exhibit A. *See* Fed. R. Evid. 1006. Accordingly, Plaintiffs' Motion to Strike is denied without prejudice to their ability to challenge the testimony and evidence that may be offered on these points at trial.

## D.    Motion to Decertify

As detailed above, the Pre-Adverse Action Sub-Class is narrowed to a group consisting of 50 members. Accordingly, the focus is on the arguments ClosetMaid advances in its Motion to Decertify as to these 50 Sub-Class members only. With respect to these remaining Sub-Class members, ClosetMaid contends that the requirements of typicality under Rule 23(a) and predominance and superiority under Rule 23(b)(3) are not satisfied and, thus, the Sub-Class should be decertified. ECF No. 99 at 5. As to typicality, ClosetMaid asserts that because Ms. Reardon received a pre-adverse action letter and experienced an adverse employment action based on her consumer report, her claims are not typical of those of the Sub-Class she currently represents. Because the core of Ms. Reardon's pre-adverse action claim – that ClosetMaid took adverse action against her based on her consumer report before timely providing her with the required disclosures under FCRA – is the same as that for all of the remaining members of the

---

[21] This evidence, to be admissible at trial, will require ClosetMaid to produce for testimony persons who have actual personal knowledge as to the basis of decision as to each "selected for hire" applicant who was not hired, or proof of its decisional process and conclusion otherwise admissible under Fed. R. Evid. 803.

Sub-Class, that requirement is met. As to predominance and superiority, ClosetMaid contends that the individual factual issues affecting the Sub-Class predominate over common issues because ClosetMaid made its hiring decisions on an individual basis and, thus, a class action poses an inferior method for resolving this action.

Because Plaintiffs request monetary damages, they properly sought to certify the Pre-Adverse Action Sub-Class pursuant to Rule 23(b)(3). ECF No. 34 at 1. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2558-59 (2011) (holding that a class requesting individualized monetary relief must be certified under Rule 23(b)(3)). Certification of any class or sub-class has four threshold requirements under Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy]. Fed. R. Civ. P. 23(a).

For certification under Rule 23(b)(3), a class or sub-class must meet two additional requirements: (1) the questions of law or fact common to class members must predominate over any questions affecting only individual members, and (2) a class action must be superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). The party requesting certification must affirmatively demonstrate its compliance with all of these requirements. *Dukes*, 131 S.Ct. at 2551-52. A court must conduct a "rigorous analysis" in determining whether the prerequisites of Rule 23 have been satisfied. *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013) (quoting *Dukes* and applying the "rigorous analysis" standard to Rule 23(b)). This analysis often requires "overlap with the merits of the plaintiff's underlying claim." *Dukes*, 131 S.Ct. at 2551.

The Third Circuit has held that courts should "consider the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem it appropriate to 'analyze the two factors together, with particular focus on the predominance requirement.'" *Sullivan*, 667 F.3d at 297 (citing *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009). This predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Marcus v. BMW of N. Am.*, 687 F.3d 583, 600 (3d Cir. 2012) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). It is "a standard 'far more demanding' than the commonality requirement of Rule 23(a)...'requiring more than a common claim.'" *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) (quoting *Amchem*, 521 U.S. at 623-24, and *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001)). Rather, the plaintiff must "demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 311-12. This calls for the district court to rigorously assess "the available evidence and method or methods by which plaintiffs propose to use the evidence" at trial. *Id.* at 312.

The requirements of predominance and commonality appear to be satisfied in this case. To the extent ClosetMaid asserts that predominance or commonality requirements cannot be met because there were individual decisions "finally" made to the remaining Sub-Class members, such argument has been rejected by the Third Circuit. *See Sullivan*, 667 F.3d at 298-99 (stating that predominance requirement is satisfied where proof of liability for defendant's conduct depends on the conduct of defendant, not on the conduct of the individual class members) (citation omitted); *Baby Neal*, 43 F.3d at 57 ("Even where individual facts and circumstances do become important to the resolution, class treatment is not precluded.").

The fact that ClosetMaid may raise distinct factual defenses as to some members of this Sub-Class – based on the different reasons for which ClosetMaid allegedly declined to hire different Sub-Class members – is not fatal to the predominance requirement's fulfillment. Rule 23(b)(3) does not require that all issues be common to the class, but only that common issues predominate.[22] *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 315 (3d Cir. 1993). "Where there are sufficient material common questions, '[c]ourts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members.'" *Demmick v. Cellco P'Ship*, 2010 WL 3636216, at *12 (D.N.J. Sept. 8, 2010) (quoting *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003), citing *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 924 (3d Cir. 1992)). Courts are even more reticent to disallow class action treatment on the basis of individualized liability issues "where the plaintiff points to a specific company-wide policy or practice that allegedly gives rise to consistent liability." *Kurihara v. Best Buy Co., Inc.*, 2007 WL 2501698, at *10 (N.D. Cal. Aug. 30, 2007).

Plaintiffs' allegations that ClosetMaid failed to timely provide Ms. Reardon and other applicants with the required section 1681b(b)(3) disclosures suggest proof will be adduced of a broad-based, systemic deficiency within ClosetMaid's hiring system, namely the generalized procurement of consumer reports at a point in time at which the hiring decisions had advanced to the point where applicants had been "selected for hire" and then were not hired, at least raising the inference that the contents of the consumer report played at least some role in the ultimate

---

[22] The commonality requirement is met if there is at least one common issue which centered to the validity of the claims asserted. *Dukes*, 131 S. Ct. at 2556.

decision.[23] This provides "sufficient evidence of a class-wide practice that gives rise to liability" that gets the Plaintiffs through the class action door. *Cornn v. United Parcel Serv.*, No. C03-2001, 2005 WL 2072091, at *2 (N.D. Cal. Aug. 26, 2005). This is also the type of issue where the claims related to a class's challenge to a company-wide policy or practice predominate over potential individualized liability issues such as fact-based defenses, and therefore lend themselves to resolution by class action suit.

The Sub-Class also satisfies the superiority requirement of Rule 23(b)(3), under which "a class action must represent the best 'available method [] for the fair and efficient adjudication of the controversy." *Newton*, 259 F.3d at 191 (quoting Fed. R. Civ. P. 23(b)(3)). Rule 23(b) provides four factors to help guide courts in determining whether a class action is superior to other methods of resolution: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P 23(b)(3).

We find no problems presented by the first three factors in this case, and ClosetMaid does not direct us to any. Instead, it argues that a class action here would present serious manageability problems due to the individualized inquiries a court and a factfinder would need to make as to the reasons ClosetMaid declined to hire each class member and as to any awardable monetary damages. While this issue is a closer call, on the record now before the Court, we disagree for the following reasons.

---

[23] Thus, this case presents a situation different from that in *Rodriguez v. Nat'l City Bank*, 726 F.3d 372 (3d Cir. 2013) in that here, there is a specific, discrete challenged employment practice applicable on a subclass-wide basis that would have affected all subclass members in a common way. *Id.* at 383. The process for procuring, and using the involved consumer reports on those "selected for hire" (and the resulting inference that the contents affected the hiring decision in at least some fashion) is conduct common to all Sub-Class members. *Id.* at 384-85.

This is not a situation like that in *Newton*, where "the need for individualized inquiry into actual injury" caused by hundreds of millions of stock trades presented "a mind-boggling undertaking." 259 F.3d at 191. Nor is it a case like *Georgine v. Amchem Products, Inc.*, where our Circuit determined that there were "simply too many uncommon issues, and the number of class members [was] surely too large." 83 F.3d 610, 632-33 (3d Cir. 1996). There are 50 plaintiffs in the remaining Sub-Class, and ClosetMaid's entire basis for decertification is one potential uncommon issue – that it will assert different non-report related reasons for not hiring different members of the Sub-Class as its defense. Since we have already held that the common issues in this case predominate over concerns related to ClosetMaid's individual hiring decisions, this is not a proper basis for decertification on the superiority requirement. *See In re Plastics Additives Antitrust Litig.*, 2006 WL 6172035, at *13 (E.D. Pa. Aug. 31, 2006) ("[D]enying certification on the sole ground of the unmanageability of the action, at least in the class certification stage, is 'disfavored.') (quoting *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)).

The 50 remaining Sub-Class Plaintiffs allege that ClosetMaid engaged in activities violative of section 1681b(b)(3) by failing to provide prospective employees who had been "selected for hire" with the required pre-adverse action notice (either timely or at all) before taking adverse action against them based, in whole or in part, on information contained in their consumer reports. Evidence for the resolution of this legal question would entail generalized common proof as to ClosetMaid's hiring processes, the timing of its procurement of consumer reports within the hiring process, what "selected for hire" means, the finalized identification of those applicants who are within this Sub-Class, and ClosetMaid's ultimate use of the involved consumer reports.

The Court has some concern as to how the jury will methodically deal with the parsing of the reasons for ClosetMaid's non-hire decisions, and whether the involved reports played any role at all in each discrete decision. That concern would appear to be counterbalanced by ClosetMaid's method of advancing the evidence that it asserts will carry the day for it. That is, it contends that the three (3) Human Resources Declarants, and admissible business records, will be able to address, together, these issues for the remaining Sub-Class members. If this is in fact so, then the development of the record in these regards will present some trial management issues, but not insurmountable ones, given the rather limited number of necessary witnesses on this point. Having three (3) witnesses testify from their personal knowledge about such matters relative to fifty (50) people is not by any measure a "mind-boggling undertaking," and with the Court's use of proper jury instructions and special verdict form, and the parties' use of evidentiary summaries as permitted by Fed. R. Evid. 1006, a jury can surely handle the task at hand.[24]

Plaintiff's damage claims as pled also complicate this point. The principal thrust of the Plaintiffs' claims in these regards is that ClosetMaid's conduct as to this Sub-Class was willful, which would support the award of actual, statutory and punitive damages, along with equitable relief. ECF No. 16 at ¶ 65. Apparently as a back-up position, Plaintiffs then claimed at

---

[24] The Court will require the parties to advise the Court as to the methodology of proof of liability and the defense against it that they will use at trial, as the briefing to date does not squarely address that topic. For instance, if the Plaintiffs use the *McDonnell-Douglas* formulation, the record appears to demonstrate that they will rather easily carry the light burden of making out a prima facie case by showing that each Sub-Class member was "selected for hire," a consumer report was then procured as to each of them, and then shortly thereafter they were not hired. ClosetMaid can then seemingly carry its relatively light burden of production of a legitimate reason for non-hire wholly unrelated to the consumer report. Then, Plaintiffs will have to show that the reasons advanced are pretextual. Alternatively, if the *Teamsters* mode of proof applies, Plaintiffs would show the uniform application of a single employment practice in which the applicants are first "selected for hire," and then a consumer report is procured resulting in certain non-hires. Then, the defendant must come forward with proof sufficient to rebut the presumption created that the consumer report played some role in the hiring decision. If the former methodology would apply, continuing certification of this Sub-Class may become substantially more problematic, as the specter of fifty "mini-trials" becomes more real. If the latter, that is much less of a risk, as there is a presumption in existence that may streamline the proof. Or, perhaps, the parties have in mind one or more other methods.

paragraph 66 of the First Amended Complaint that ClosetMaid's approach was at least negligent, which would support *only* actual damages. Now, in their Pretrial Statements, both parties concede that only statutory and punitive, but not actual, damages are being sought. ECF No. 138 at 15-17, ECF No. 139 at 9. If the remedial component of the case is limited to the former methodology only, and then only as to statutory and/or punitive damages, then the predominance and superiority concerns attendant to Rule 23(b)(3) actions regarding the individualized determination of the entitlement to, and amount of, money damages are minimal, since both statutory and punitive damages can, on the facts alleged, be calculated and assessed principally on a class-wide basis and would not overtake the advantages of class action treatment.[25] If on the other hand, the Plaintiffs were trying their case on a theory that requires as to each Sub-Class member a discrete individualized assessment of actual damages, or if they seek actual damages flowing from claims of willful misconduct on ClosetMaid's part, then the case takes on an overriding individualized cast, both as to the defense against liability by ClosetMaid, and the assessment of actual damages on behalf of each Sub-Class member. The Court would then be compelled to revisit its assessment of predominance and superiority and continued class certification.[26]

---

[25] The Court does not read the Plaintiffs' papers as contending that they will demonstrate at trial any degree of uniqueness to the statutory or punitive damages claim of any particular member of this Sub-Class. Instead, the thrust of their position is that the amounts of such damages, if any at all, would be the same based on ClosetMaid's actions, and not any special characteristics of the situation of one or more particular Sub-Class members. Of course, this will be an issue to be resolved with precision prior to trial. *See Kurihara v. Best Buy Co., Inc.*, 2007 WL 2501698, at *9-11 (N.D. Ca. Aug. 30, 2007) (Individualized inquiries as to damages, as opposed to liability, do not defeat predominance).

[26] The Court cannot readily discern from the multitude of filings when and how the Plaintiffs first stated their abandonment of all claims for actual damages. This may matter. If Plaintiffs, as a class, end up foregoing any effort to recover actual damages, this could compromise the interests of individual class members who believe that they were actually harmed by non-compliance by ClosetMaid with the adverse action notice obligations. This reality could necessitate the Court's revisiting certification, or requiring, upon revised class notice, an opportunity for such Sub-Class members to opt out of the Sub-Class to pursue their actual damages claims on their own. The Court believes at this juncture the better course is to allow the parties to consider that question in the context of the Court's Opinion, and advise the Court of their position as to such matters. From where the Court sits, the issues surrounding

Because a jury could reasonably find that Plaintiffs' contentions, if true, reflect a systemic deficiency within ClosetMaid's hiring process that advances applicants to the "selected for hire" stage when a consumer report is procured, and a "final" decision is made thereafter, we conclude that this common issue predominates over individualized inquiries as to the 50 Sub-Class members (at least as to the quest for statutory and punitive damages), and therefore class action certification as a method of resolution of these claims is sufficiently superior to the alternative.[27] Accordingly, the requirements of Rule 23(b) continue to be met, and we deny ClosetMaid's Motion to Decertify on the record now before the Court. The Court will revisit that inquiry as is appropriate, based on its consideration of the positions of the parties as to the methodology that will be used to prove and defend against a liability finding, and whether actual damages will be an issue at trial.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 90) is granted in part and denied in part, and Defendant's Motion for Summary Judgment (ECF No. 94) is granted in part and denied in part. Specifically, with respect to the Disclosure Claim, we grant Plaintiffs' Motion for Summary Judgment as to liability and willfulness as to the members of the Disclosure Class who received only the defective Disclosure Form, and deny it in all other

---

the calculation of individual actual damages generate ClosetMaid's best argument relative to the continued efficacy of class action treatment, but it is not one that is at all fully developed in the record. ECF No. 99 at 14-15. It also appears that the Plaintiffs have not directly addressed it. ECF No. 103. Before this case can proceed to trial, they will have to do so. *See Williams v. Telespectrum, Inc.,* 2007 WL 6787411 (E.D. Va. June 1, 2007) (denying class treatment due to the need to calculate actual damages in order to test the constitutionality ratio of any award of punitive damages).

[27] The one that comes to the Court's mind is fifty (50) separate trials, all of which would have identical predicate proof as to the ClosetMaid hiring process, acquisition of reports, declaration of "selected for hire" status, and then a single unique issue, namely whether that previously procured report had any role at all in the ultimate non-hire decision. In the Court's judgment, a single trial with one pathway of proof on all of the predicate and foundational facts, followed by the testimony from only three (3) Human Resources witnesses as to the basis of each non-hire decision, is "superior" to that. *Neale v. Volvo Cars of N. Am. LLC,* 2:10-cv-4407, 2013 WL 1223354, *12 (D.N.J. Mar. 26, 2013); *Kurihara v. Best Buy, Inc.,* No. C-01884 MHP, 2007 WL 2501698, at *9-11 (N.D. Cal. Aug. 30, 2007).

respects. With respect to the Pre-Adverse Action Claim, we grant ClosetMaid's Motion for Summary Judgment as to the 22 members of the Sub-Class who experienced no adverse employment action, and as to the 3 members who were provided with pre-adverse action notices sufficiently in advance of ClosetMaid's adverse action against them, and deny it in all other respects. ClosetMaid's Motion to Decertify (ECF No. 98) and Plaintiffs' Motion to Strike Declarations (ECF No. 108) are both denied without prejudice to their being revisited in conformity with the matters set forth in this Opinion. An appropriate Order follows.

Mark R. Hornak
United States District Judge

Dated: December 2, 2013

cc: All counsel of record