UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | | |
|---|---|---|
| R. CATHY REARDON<br>On behalf of herself and all<br>similarly situated individuals, | )<br>)<br>)<br>) | |
| Plaintiffs, | ) | NO. 2:08cv1730 MRH |
| v. | ) | |
| CLOSETMAID CORPORATION | ) | Hon. Judge Mark R. Hornak |
| Defendant. | )<br>) | **Class Action** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE
TO EXCLUDE EVIDENCE PERTAINING TO EMERSON'S WORTH (ECF 141)**

The Plaintiff is entitled to present evidence of Emerson's net worth in order to assist the jury with its determination of punitive damages. ClosetMaid Corporation (ClosetMaid) and Emerson Electric Co. (Emerson), are completely integrated in all relevant ways for which Emerson's worth will be offered. The undisputed evidence in this case is that background check and human resources functions of ClosetMaid and Emerson were the same. (Dep. Jennifer Boring Tr. 38:11-39:13)(Ex. A); (Dep. Catherine Beale at 4:20-6:25)(Ex. B). When ClosetMaid's employees and corporate designees testified under oath at their depositions, it was Emerson's in-house counsel Jeffrey R. Carius who attended the deposition with them. (Boring Dep. at 2.)

ClosetMaid's employee witnesses and corporate designee have Emerson business cards, have Emerson email, and receive their paychecks from Emerson. (Beale Dep. Tr. 5:5 – 6:4.) ClosetMaid's corporate designee testified that she was an Emerson employee. (Beale Dep. Tr.4:20-24.) All of ClosetMaid's documents were Emerson documents, including the Emerson background check form, which was revised and approved by

1

Emerson's counsel, Jeffrey R. Carius. (Boring Dep. Tr. 37:22-38:8; Beale Dep. Tr. 6:4). ClosetMaid's employee-witness considered Carius to be "[ClosetMaid's] counsel." (Boring Dep. Tr. 37:22-38:8).

ClosetMaid's corporate designee testified that ClosetMaid's president reported to Emerson executives. (Beale Dep. Tr. 13:20 – 14:25; 37:20-38:5.) ClosetMaid receives direction from the Emerson marketing department, brand department, and the legal department. (Beale Dep. Tr. 47-78). The Emerson legal department directs ClosetMaid on how to comply with the law. (Beale Dep. 37:20-38:5). ClosetMaid received consumer reports from LexisNexis pursuant to an agreement between Emerson and LexisNexis. (Beale Dep. Tr. 85:12 – 88:3)(Ex. C.) For branding purposes, ClosetMaid transformed all of its forms and references to ClosetMaid/Emerson. (Beale Dep. Tr. 117:9-118:20.) Regardless of the corporate structure of ClosetMaid as a wholly owned subsidiary of Emerson, the practical operation of the two entities is that Emerson is ClosetMaid.

In its Motion *in Limine*, ClosetMaid's statement that "there is no other record evidence linking Emerson to ClosetMaid that would be relevant to this case" is false. (Def.'s Motion in Limine at 2)(Doc. 141). ClosetMaid could have produced its net worth and corporate structure in discovery to refute the evidence of record that exists now. However, it refused to produce any of its corporate documents that show its net worth, how its company is organized, or its relationship with Emerson. In so doing, ClosetMaid cannot benefit from withholding information that now might help it. In moving *in limine* to exclude evidence about Emerson's net worth, ClosetMaid argues that the evidence

    (1)    would mislead a jury,

(2) that there is no evidence linking Emerson to ClosetMaid that would be relevant to the case,

(3) even if relevant, the evidence would not be probative,

(4) even if probative, unfair prejudice would outweigh probative value.

Defendant has not cited to a single, cognizable authority to demonstrate that evidence of Emerson's net worth should be excluded. In this case, the evidence on the record shows that ClosetMaid refused to provide any information at all about it own net worth or corporate relationship with Emerson. Meantime, ample evidence has been adduced that demonstrates unrebuttably that Emerson is deeply involved in, if not in total control, of ClosetMaid's background check policies, procedures, forms, human resources employees, corporate witness, and defense of this case. (Ex. A-C). A jury can be properly instructed on these issues in order to reach a proper verdict.

This court has previously explained that net worth is relevant to the inquiry of whether and how much a jury may award as punitive damages. *Smith v. Life Investors Ins. Co. of Am.*, 2:07-CV-681, 2009 WL 3364933 (W.D. Pa. Oct. 16, 2009). In *Smith*, the court explained:

> Defendant argues, with citation to numerous cases, that information about its net worth is affirmatively inconsistent with the award of punitive damages. However, Defendant's interpretation of the law is not quite accurate-what the Supreme Court actually stated in *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 427-28, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (emphasis added) was:
> The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award. *Gore,* 517 U.S., at 585, 116 S.Ct. 1589, 134 L.Ed.2d 809 ("The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business"); *see also id.,* at 591, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (BREYER, J., concurring) ("[Wealth] provides an open-ended basis

3

> for inflating awards when the defendant is wealthy.... **That does not make its use unlawful or inappropriate;** it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct"). The principles set forth in *Gore* must be implemented with care, to ensure both reasonableness and proportionality.
>    In *Bombar v. West American Ins. Co.,* 932 A.2d 78, 94 & n. 14 (Pa.Super.2007), the Court held that a trial court could consider the net worth of an insurance company's parent corporation in assessing punitive damages against the insurer for bad faith. Indeed, Pennsylvania continues to cite the following as the relevant criteria in assessing punitive damages: (1) the character of the defendant's act, (2) the nature and extent of the plaintiff's harm, and (3) the wealth of the defendant. *See Hollock v. Erie Insurance Exchange,* 842 A.2d 409, 419 (Pa.Super.2004).

*Id*. ClosetMaid's objection boils down to one issue: if a jury knew how much Emerson was worth, it might be inclined to award a higher punitive damage figure against ClosetMaid.

Evidence of "financial resources" is relevant to the assessment of punitive damages. *Id.*; *DiPrinzio v. MBNA Am*., 2005 WL 2039175 (E.D.Pa. 2005). Because ClosetMaid refused to produce its net worth, Plaintiff is entitled to rely on the completely accurate Emerson10-K because Emerson is ClosetMaid in all relevant ways. There is no evidence that ClosetMaid retains its revenues, but there is unrebutted evidence that financial transactions such as payment of employee payroll is made by Emerson to ClosetMaid employees. (Beale Dep. 6:11-15). The Third Circuit has held that a trial court did not abuse its discretion by admitting a net worth exhibit for that purpose in *U.S. v. Municipal Authority of Union Twp.*,150 F.3d 259, 268 (3d Cir. 1998): "If the subsidiary does not retain its revenues, as the evidence showed in this case, then its parent's financial resources are highly relevant." Plaintiff can estimate from other sources that ClosetMaid's annual revenue is around $91 million. ClosetMaid chose to sit on its

objection instead of responding to Plaintiff's request for documents of ClosetMaid's worth. (Ex. D). ClosetMaid objected to producing that information, refused to produce that information and did not seek a protective order. When a party has a document in its possession and refuses to produce such a document, the Plaintiff is entitled to the inference that such documents would be adverse to the party that withheld it. *U.S. v. Hines*, 470 F.2d 225, 230 (3d Cir. 1972)(applying the long-standing rule that "[i]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.")(citations omitted). In this case, ClosetMaid hides its worth to avoid providing information to the jury in order to assess whether and how much it should assess in punitive damages, if punitive damages are part of the verdict.

Based on Emerson's integral involvement in the most relevant aspects of ClosetMaid's human resources function, and in particular the background check function central to this case, the Plaintiff is justified in obtaining, producing, identifying and moving into evidence the parent company's publicly available 10-K. The information that is publicly available about Emerson's net worth is entirely accurate, relevant, and admissible since the evidence is that Emerson derives income from ClosetMaid and that it has an integrated human resources, background check, document, payroll and legal function.

ClosetMaid cannot seriously contest that the Emerson Form 10-K is an authentic document publicly filed with the SEC. A publicly filed SEC document is proper evidence that should be admitted by the trial court. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999)(holding that Fed. R. Civ. P. 201 allowed for the

admission of "relevant documents legally required by and publicly filed with the SEC" at any stage of the proceeding, including at the motion to dismiss stage.) The question then becomes whether the probative value of the evidence is outweighed by unfair prejudice.

Although Defendant objected to the admission of a publicly-filed document that was clearly admissible under Fed. R. Evid. 201. The Plaintiff is not attempting to pierce the corporate veil in order to hold ClosetMaid's parent company liable for its wrongdoing. The identity of the proper party defendant is firmly established. Not only is the Form10-K admissible, it is relevant material for the jury to consider. The Form 10-K describes Emerson's consolidated accounting policies as:

> Effective October 1, 2012, the Company adopted updates to ASC 220, *Comprehensive Income*, and now presents comprehensive income in a separate financial statement immediately following the statement of earnings. This update does not change the items reported in other comprehensive income or when those items should be reclassified into earnings. Effective first quarter 2014, additional disclosures will be required for comprehensive income, including presenting reclassifications out of accumulated other comprehensive income by income statement line item.
>
> **Principles of Consolidation**
> The consolidated financial statements include the accounts of the Company and its controlled affiliates. Intercompany transactions, profits and balances are eliminated in consolidation.

(Emerson Form 10-K at 19).

The Defendant confuses the issue of relevance of a parent company's financial condition to establish liability as opposed to the parent company's ability to pay. The Plaintiff does not attempt to pierce the corporate veil in order to hold Emerson liable for ClosetMaid's wrongdoing. The identity of the proper party defendant has been firmly established. Not only is the Form10-K admissible, it is relevant material for the jury to

6

consider. We know from the 10-K that intercompany transactions, profits and balances have been eliminated by consolidation, therefore it is apparent on the face of the 10-K that ClosetMaid does not retain its own revenues.

In this case, it is clear from the record that piercing the corporate veil is unnecessary. Information regarding Emerson, as parent company, is probative to allow the jury to consider it among all the evidence it reviews in reaching a verdict and whether and how much that verdict may include punitive damages; not to assign liability to a corporate parent. *Cont'l Trend Res. Inc.*, 810 F.Supp at 1527, 1533. While some cases have held that the financial condition of a parent is irrelevant in assessing punitive damages, it is far from settled law and decisions vary greatly on the facts of each case. In that case, the jury could have properly considered the assets of the holding company parent as one of many factors in arriving at an appropriate damages award.

When a jury assesses punitive damages against a "violator, who was penalized . . . the reference to [the parent company's] financial statement merely assured that the penalty would not be set at a level above [the violator's] ability to pay. If the subsidiary does not retain its revenues, as the evidence showed in this case, then its parent's financial resources are highly relevant." *U.S. v. Mun. Auth. of Union Twp.*, 150 F.3d 259, 268 (3d Cir. 1998). In the instant case, Midland does the collection business for the holding company. Like the Defendant in *Union Township*, the Midland Defendant here refused to produce its net worth in discovery. The Third Circuit found not only that there was no prejudice in admitting such evidence of a parent's financial condition, but that it was relevant evidence for the jury to consider.

The fact that a jury was permitted to consider a "parent's financial condition in

7

assessing a penalty on a subsidiary is a far cry from piercing the corporate veil and holding the parent liable for the actions of its subsidiary; [w]here the penalty was assessed against the subsidiary alone." *U.S. v. Mun. Auth. of Union Twp.*, 150 F.3d at 268.  If the jury considers the wealth of Emerson in assessing punitive damages, it may be but one of the factors it could consider pursuant to the proper jury instructions. *Id*. This reasoning is consistent with distinguishing between liability and ability to pay. *U.S. v. Magnesium Corp. of Am.*, No. 2:01cv40-DB, 2006 WL 1699608, at *3 (D. Utah June 14, 2006).

Courts that have ruled the value of the parent company was a relevant factor in assessing punitive damages have bristled when it appeared that such damages were a percentage of the net worth of the parent. *In re Tezla*, Bankr. No. 08-12700, 2009 WL 212542, at *4 (Bankr. E.D.Pa. Jan 29, 2009)(considering relevant the value of the parent company, not assessing punitive damages solely on that value but instead on several factors).  However, when the net worth of the parent is considered as a factor and the award of punitive damages is proportionally reasonably related to the award of damages, the net worth of the parent is admissible.  *Brim v. Midland Credit Management, Inc.*, Civ. No. 5:10CV369-IPJ (N.D. Ala. May 4, 2011)(denying the Defendant's motion for a new trial based in part on the presentation of the parent company's net worth)(Doc. 99.)

## CONCLUSION

For these reasons, the Defendant's Motion in Limine should be denied.

Respectfully submitted,

By:   *s/ James M. Pietz*
      James M. Pietz
      Pa I.D. No. 55406

9

        Pietz Law Office LLC
        429 Forbes Ave., Suite 1710
        Pittsburgh, PA 15219
        412-288-4333
        E-mail:  jpietz@jpietzlaw.com

        Leonard A. Bennett, Esq.
        Consumer Litigation Associates
        763 J. Clyde Morris Boulevard
        Suite 1-A
        Newport News, VA 23601
        (757) 930-3660
        E-mail:  lenbennett@clalegal.com

        Christopher North. Esq.
        751-A Thimble Shoals Blvd.
        Newport News, VA  23606
        (757) 873-1010
        E-mail:  cnorthlaw@aol.com

        *Counsel for the Representative And*
        *Class Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 13th day of December, 2013, I caused a true and correct copy of Plaintiff's Opposition to Defendant's Motion *In Limine* to Exclude Evidence of Emerson's Worth to be served by way of ECF Notification upon the following counsel of record for the Defendant:

W. Scott Hardy
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One PPG Place, Suite 1900
Pittsburgh, PA 15222
E-mail: scott.hardy@ogletreedeakins.com

Philip K. Kontul
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One PPG Place, Suite 1900
Pittsburgh, PA 15222
E-mail: Philip.kontul@ODNSS.com

*s/ James M. Pietz*
James M. Pietz
Pa I.D. No. 55406
Pietz Law Office LLC
429 Forbes Ave., Suite 1616
Pittsburgh, PA 15219
412-288-4333
E-mail: jpietz@jpietzlaw.com