# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION
----

R. CATHY REARDON,            )
On behalf of herself and     )
all similarly situated       )
individuals,                 )
                             )
        Plaintiffs,          )
                             )
   -vs-                      )  No. 2:08cv1730GLL
                             )
CLOSETMAID CORPORATION and   )
EMERSON ELECTRIC CO.,        )
                             )
        Defendants.          )

----

DEPOSITION OF: CATHERINE B. BEAL

----

DATE:  August 27, 2009
       Thursday, 9:00 a.m.

LOCATION:  OGLETREE DEAKINS NASH
           SMOAK & STEWART, P.C.
           Suite 400
           Four Gateway Center
           444 Liberty Avenue
           Pittsburgh, PA 15222

TAKEN BY:  Plaintiffs

REPORTED BY:  Nina Warren Biehler
              Notary Public
              Reference No. NB14437

Page 2

DEPOSITION OF CATHERINE B. BEAL, a witness, called by the Plaintiffs for examination, in accordance with the Federal Rules of Civil Procedure, taken by and before Nina Warren Biehler, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Ogletree Deakins Nash Smoak & Steward, P.C., Suite 400, Four Gateway Center, 444 Liberty Avenue, Pittsburgh, Pennsylvania, on Thursday, August 27, 2009, commencing at 9:09 a.m.

----

APPEARANCES

FOR THE PLAINTIFFS
James M. Pietz, Esq
PIETZ LAW OFFICE, LLC
Suite 700
Mitchell Building
304 Ross Street
Pittsburgh, PA  15219
P 412-288-4333
F 412-288-4334
jpietz@pietzlaw.com
   and
Christopher Colt North
THE CONSUMER & EMPLOYEE
RIGHTS LAW FIRM, P.C.
751-A Thimble Shoals Blvd.
Newport New, VA  23606

FOR THE DEFENDANTS
Maria Greco Danaher, Esq
Thomas A. Smock, Esq
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.
Suite 400
Four Gateway Center
444 Liberty Avenue
Pittsburgh, PA  15222
P 412-394-3333
F 412-232-1799
maria.danaher@ogletreedeakins.com
thomas.smock@ogletreedeakins.com

Page 3

1  APPEARANCES: (CONTINUED)
2    FOR THE DEFENDANTS: (CONTINUED)
     and
3    Jeffrey R. Carius
     EMERSON
4    Suite 220
     3300 Arapahoe Avenue
5    Boulder, CO  80303
     P 303-440-0297
6
7            * I N D E X *
8  Examination by Mr. Pietz ------------ 4
9  Certificate of Court Reporter -------- 133
   Errata Sheet ------------------ 134
10 Notice of Non-Waiver of Signature ------- 135

         * INDEX OF EXHIBITS *
16 Deposition Exhibit 1 -------------- 9
   Deposition Exhibit 2 -------------- 13
17 Deposition Exhibit 3 -------------- 17
   Deposition Exhibit 4 -------------- 20
18 Deposition Exhibit 5 -------------- 24
   Deposition Exhibit 6 -------------- 39
19 Deposition Exhibit 7 -------------- 51
   Deposition Exhibit 8 -------------- 84
20 Deposition Exhibit 9 -------------- 96
   Deposition Exhibit 10 ------------- 113
21 Deposition Exhibit 11 ------------- 116
   Deposition Exhibit 12 ------------- 118
22 Deposition Exhibit 13 ------------- 118
   Deposition Exhibit 14 ------------- 118
23 Deposition Exhibit 15 ------------- 122

Page 4

1           CATHERINE B. BEAL,
2           having been duly sworn,
3       was examined and testified as follows:
4                   ----
5              EXAMINATION
6                   ----
7  BY MR. PIETZ:
8  Q.  Ma'am, my name is Jim Pietz, I'm one of the
9      plaintiffs' counsel in this case, Reardon
10     versus ClosetMaid.
11 A.  [redacted]
12 Q.  [redacted]
13     [redacted]
14     [redacted]
15     [redacted]
16     [redacted]
17     [redacted]
18     [redacted]
19     [redacted]
20     [redacted]
21     [redacted]
22     [redacted]
23     [redacted]
24     [redacted]
25 Q.  And when you say you work for them, what duties

Page 5

1  and responsibilities do you have to Emerson
2  Electric?
3  A.  None, we are autonomous in nature; but it is
4  our parent company.

[redacted]

MR. NORTH:  Excuse me, one second, I'm sorry.
  When she keeps referring to Emerson, are we talking about Emerson Electric?  I think that we need to make that clear, as opposed to Storage Solutions or some other Emerson that might be out there.  I don't mind you -- we don't mind you referring to Emerson, as long as we understand it's Emerson Electric, the parent company.
  MS. DANAHER:  So let's wait for Jim to ask you the question.
BY MR. PIETZ:

[redacted]

Page 7

1    MS. DANAHER:  And if I could just add
2  for the record, I understand that there are a
3  lot of lawyers in the room, but if we could
4  focus on one lawyer to question one witness,
and if we have interruptions we can just do them as asides off the record and then have the questions come from one --
  MR. NORTH:  I wasn't asking her a question, I was just trying --
  MS. DANAHER:  I understand.
  MR. NORTH:  -- to be helpful.  I heard her say Emerson three times and, you know, I'm not sure the record would reflect what she's referring to.
  MS. DANAHER:  And I appreciate that, but I'm just putting on the record I'd prefer
17  to have the questions come from Jim.
  Thank you.
BY MR. PIETZ:
Q.  Are you familiar with the allegations that have been made in this lawsuit?
A.  Can you clarify, please?  Which allegations?
Q.  Well, the -- have you seen the complaint in this case?
25  A.  Yes.

Page 8

Q.  Okay.  And what's your understanding of the claims that have been made in there?
A.  On Cathy Reardon?
4  Q.  Just what's your understanding of, in a
5  nutshell, of what the claims being made in the
6  case are?
7  A.  That Cathy Reardon was not hired based on her
8  background.
9  Q.  Do you have an understanding as to the -- is
10  there any claim made about the procedures being
11  used by ClosetMaid?
12  A.  There's a question about the procedures that's
13  being used.
14  Q.  And what's your understanding of those claims?
15  A.  That we used inappropriate form or something of
16  that nature.
17  Q.  You understand that today you're testifying here as a corporate representative for ClosetMaid; is that right?
A.  Yes.
Q.  And you understand that since you are testifying as the corporate representative you're not -- you're not testifying in your individual capacity, but any testimony you give
25  will bind ClosetMaid; do you understand that?

Page 9

1  A. Yes.
2  Q. Have you had occasion to give a deposition
3     before?
4  A. Yes.
5  Q. Okay. In what connection was that?
6  A. A criminal case. And workers' comp cases.
7  Q. Okay. So you have some understanding of some
8     of the general rules here, you know, when I ask
9     a question if you don't understand what I'm
10    asking, please let me know and I'll be happy to
11    rephrase it.
12 A. Okay.
13 Q. Also, you understand that the court reporter
14    here is taking down my question and your
15    answer, so let me finish my question before you
16    start your answer, you understand that?
17 A. Okay.
18        MR. PIETZ: Okay, let's mark this as
19    Exhibit No. 1, which is the notice.
20        - - - -
21    (Exhibit No. 1 marked for identification.)
22        - - - -
23 BY MR. PIETZ:
24 Q. Showing you what we've marked as Exhibit No. 1,
25    you recognize -- do you recognize this

Page 10

1     document?
2  A. Yes.
3  Q. Have you had occasion to review it prior to
4     your deposition here today?
5  A. Yes.
6  Q. And do you see it lists a number of topics
7     here?
8  A. Yes.
9  Q. Are you papered today to testify with respect
10    to each of these subjects?
11 A. To the best of my ability, yes.
12 Q. Did you do anything in preparation for coming
13    here today to testify on these topics?
14 A. Some, yes.
15 Q. What did you -- can you just tell me generally
16    what you did?
17 A. We reviewed some documents that were submitted
18    to you.
19 Q. Okay. And those are documents that were
20    submitted that we requested as part of the
21    discovery in this case?
22 A. That is correct, they were submitted to our
23    attorney.
24 Q. Can you tell me what the nature of the business
25    is at ClosetMaid?

Page 11

1  A. We make storage products, closets, shelving,
2     pantry shelving, some wood products, shower
3     caddies, miscellaneous storage.
4  Q. And where is ClosetMaid located?
5  A. ClosetMaid's headquarters?
6  Q. Yes.
7  A. Ocala, Florida.
8  Q. And are there other areas where they do
9     business or have offices?
10 A. They do have offices in Grantsville, Maryland.
11 Q. Okay.
12 A. Chino, California. We have distribution
13    centers in Tacoma, Washington and Belle Vernon,
14    Pennsylvania.
15 Q. Anywhere else?
16 A. That's all, as far as the U.S. is concerned.
17 Q. How many employees does ClosetMaid have?
18 A. A little over a thousand, I don't have the
19    exact number.
20 Q. And that's in all these locations you just
21    described?
22 A. Yes.
23 Q. Okay. And what type of employees, generally?
24 A. More general labor, some professional, a few
25    sales.

Page 12

1  Q. Any other types of employees?
2  A. Warehouse workers.
3  Q. Now, with respect to these employees, can you
4     explain to me how the human resources function
5     operates with respect to -- with respect to
6     them?
7  A. Can you be more specific? I mean, that's
8     pretty broad.
9  Q. Okay. Is there a human resources department
10    that handles the employment of these employees?
11 A. Yes.
12 Q. And what, generally, do they do, that
13    department?
14 A. The employment?
15 Q. Right.
16 A. They receive requisitions, employment
17    requisitions, which is an internal document
18    approving the hire of that position. Once they
19    have the approval of hiring the position they
20    sit down with the hiring manager and determine
21    what they're looking for in a particular
22    position.
23        Then we develop a recruiting plan on
24    how we're going to recruit, is it going to be
25    internal, is it going to be external. And then

Page 13

1  we determine, you know, what needs to be done
2  at that point in time. Then we accept the
3  resumes, applications, it depends, you know, of
4  the position.
5       MR. PIETZ: Okay. Well, we'll get to
6  that in a second. Let's get back to the issue
7  of -- some charts were produced in connection
8  with this litigation, let's take a look at
9  those.
10            - - - -
11      (Exhibit No. 2 marked for identification.)
12            - - - -
13      MR. PIETZ: This would be Exhibit 2.
14  BY MR. PIETZ:
15  Q.  Okay, looking at Exhibit 2, there's a series of
16      documents here, but can you generally describe
17      what these are?
18  A.  They're internal ClosetMaid organizational
19      charts.

Page 14

13  Q.

Page 15

1       don't know specifically.
2   Q.  Does he have responsibilities for this entity
3       known as Emerson Storage Solutions?
4   A.  I'm not positive.
5   Q.  What is Emerson Storage Solutions?
6   A.  It's a branding.
7   Q.  What does that mean, branding?
8   A.  Just like Emerson is a name, ClosetMaid is a
9       name, it was a group of our division that
10      actually was going to be known as Emerson
11      Storage Solutions.
12  Q.  The way you're answering it sounds like it's
13      the past tense.
14  A.  There was a lawsuit where we had to dismantle
15      using that term, because there's another
16      company out there that used something, and the
17      agreement was we no longer use Emerson Storage
18      Solutions.
19  Q.  I see. And Emerson Storage Solutions, though,
20      it connoted a group of companies underneath or
21      subsidiaries of Emerson Electric; is that
22      right?
23  A.  I'm not really familiar with who it included,
24      but I know that ClosetMaid was using Emerson
25      Storage Solutions for a short period of time.

Page 16

Q.  Actually using that name, instead of
    ClosetMaid?
A.  No, we never dismantled ClosetMaid.
    ClosetMaid's the brand.
Q.  Okay.
A.  But in trying to describe more about what we
    do, I believe marketing, I'm not positive, came
    up with Emerson Storage Solutions --
Q.  I see.
A.  -- but it did not fly.
Q.  How long have you been with ClosetMaid?
12  A.  Thirteen years.
Q.  So tell me about how you -- what was your first
    position at ClosetMaid?
A.  An HR manager.
Q.  HR manager. And then when was that that you
    began, what year?
A.  September of '96.
Q.  And at that time was ClosetMaid part of Emerson
    Electric or a subsidiary?
A.  Yes.
Q.  When was, to your knowledge, ClosetMaid
    acquired by Emerson Electric?
A.  I don't remember the specific dates. We were
25      part of a joint venture at one point with

Page 17

1  Vermont American when I first started, that was
2  owned by ClosetMaid -- or owned by Emerson.
3  Q. All right, well, tell me, then, more about your
4     positions within ClosetMaid.
5  A. I was the HR manager. At a later date, and I
6     don't remember exactly when, I was promoted to
7     director of human resources. And, eventually,
8     vice-president of human resources.
9           MR. PIETZ: Let's mark this as
10 Exhibit 3.
11          - - - -
12     (Exhibit No. 3 marked for identification.)
13          - - - -
14          MR. PIETZ: I show you what we marked
15 as Exhibit 3.
16          MR. SMOCK: Could we go off the
17 record for a minute, Jim?
18          - - - -
19     (There was a discussion off the record.)
20          - - - -
21 BY MR. PIETZ:
22 Q. I'm showing you what we've marked as Exhibit 3,
23    and this is a -- just to let you know,
24    something we found on the Internet from a
25    website called Jigsaw.com. Are you familiar

Page 18

1  with that website?
2  A. No.
3  Q. Have you seen this before?
4  A. No.
5  Q. Do you see that it lists your name there?
6  A. Yes.
7  Q. And it lists you as vice-president of human
8     resources?
9  A. Yes.
10 Q. For -- and your business card indicates Emerson
11    Electric Company on that website.
12 A. Okay.
13 Q. Is that your email address?
14 A. Yes.
15 Q. And that's Emerson -- that address there, what
16    is that address that's listed?
17 A. That's where my office is.
18 Q. And that phone number there, is that your phone
19    number?
20 A. Yes. That is the main telephone number.
21 Q. For whom?
22 A. ClosetMaid.
23 Q. 352 that's an area code --
24 A. Yes.
25 Q. -- for Ocala?

Page 19

1  Okay, let's look at the next page
2  here, which is Bates stamped No. 238. This
3  indicates it's the Human Resources
4  Organizational Chart. Can you tell me what
5  this document is?
6  A. It was -- as of May '09 this was the human
7     resources department.
8  Q. For?
9  A. ClosetMaid.
10 Q. And you're the head of the human resources
11    department of ClosetMaid?
12 A. That is correct.
13 Q. How long have you been here?
14 A. I think -- I don't know exactly, I think 2001.
15 Q. Now, it lists another person here, Pat Dameron,
16    and it lists her as Director of Human Resources
17    Corporate. What is her duties and
18    responsibilities?
19 A. She reports directly to me.
20 Q. Okay.
21 A. And assists me in working with these other
22    facilities that ClosetMaid is responsible for.
23 Q. And those are the facilities around the country
24    that you described in the United States?
25 A. Yes.

Page 20

1  Q. And there's a Jennifer Boring listed as human
2     resources manager for Ocala.
3  A. That's correct.
4  Q. And what's her responsibility?
5  A. She is responsible for Ocala, slash, CMNA.
6  Q. What's CMNA?
7  A. ClosetMaid North America.
8  Q. Now, do all these -- the persons we just
9     identified, do they also have Emerson email
10    addresses?
11 A. Yes.
12          MR. PIETZ: Let's mark this as
13 Exhibit 4.
14          - - - -
15    (Exhibit No. 4 marked for identification.)
16          - - - -
17 BY MR. PIETZ:
18 Q. Exhibit 4, just to let you know, is something,
19    again, we downloaded from a website,
20    Monster.com. It appears to be a listing for a
21    human resources manager.
22         Are you familiar with that
23    advertisement?
24 A. I know we recruited for that position. It is
25    not my job to post an ad.

Page 21

1  Q.  Okay. Would that have been Pat Dameron's
2      responsibility?
3  A.  Yes.
4  Q.  And that is Pat Dameron's email address that is
5      listed there?
6  A.  That is correct.
7  Q.  And that's an Emerson email address; is that
8      correct?
9  A.  That is correct.
10 Q.  And the next chart at 239, Bates No. 239,
11     again, that's another organizational chart,
12     apparently for -- it says, Ocala/CMNA?
13 A.  That's correct.
14 Q.  Can you tell me what that is?
15 A.  That is the same chart that we discussed
16     earlier, Jennifer Boring is the human resource
17     manager for ClosetMaid Ocala and ClosetMaid
18     North America.
19 Q.  Okay. In connection with the documents that
20     were put together and produced in this
21     litigation, did Jennifer Boring have some
22     responsibility?
23 A.  Yes.
24 Q.  And what was that?
25 A.  She put most of the documents together.

Page 22

1  Q.  Did there come a point in time in that process
2      where you learned that additional documents had
3      to be produced? Or supplemental documents had
4      to be produced?
5  A.  During the transition or the time period Maria
6      would occasionally --
7          MS. DANAHER: Hold on just a second.
8      I would prefer that you don't mention anything
9      that we specifically talked about. But if you
10     can answer this question by giving him general
11     information, which was the yes or no question,
12     then you can do that.
13         THE WITNESS: Yes.
14 BY MR. PIETZ:
15 Q.  Okay, I'm not asking for anything, you know,
16     your attorney told you, I just want to know
17     what did you understand has happened with
18     respect to this production of documents. Why
19     was there a need to produce more documents, to
20     your understanding?
21 A.  You had requested them.
22 Q.  Okay. Did Jennifer Boring, when she was doing
23     -- producing the documents here, did she only
24     produce documents that were limited to the
25     Ocala location and --

Page 23

1  A.  That is all that she is responsible for.
2  Q.  I see. And so when that initial production was
3      made it was limited only to Ocala?
4  A.  Yes. And ClosetMaid North America.
5  Q.  What's the difference between -- or what's
6      ClosetMaid North America?
7  A.  ClosetMaid North America is our sales positions
8      throughout the country.
9  Q.  Okay.
10 A.  And the drivers.
11 Q.  I see. But it doesn't include those other
12     locations that you had described earlier,
13     Chino, Grantsville --
14 A.  No.
15 Q.  -- Belle Vernon?
16 A.  No.
17 Q.  Okay, let's go now to 240. And can you tell me
18     what that document is?
19 A.  It's an organizational chart for Chino,
20     California.
21 Q.  And then 241?
22 A.  It is an organizational chart for our Canada
23     facility, which is no longer in existence.
24 Q.  Okay. And then, finally, 242, that would be
25     the chart for Grantsville --

Page 24

1  A.  That's correct.
2  Q.  -- Maryland. Okay.
3          MR. PIETZ: Let's mark this as
4      Exhibit 5.
5          - - - -
6      (Exhibit No. 5 marked for identification.)
7          - - - -
8  BY MR. PIETZ:
9  Q.  I'm showing you what we've marked as Exhibit 5,
10     and I'll represent to you that these are some
11     screen shots that we printed from the Emerson
12     website, Emerson.com.
13         Are you familiar with the Emerson
14     website?
15 A.  I know it's in existence.
16 Q.  Have you had occasion to go on it and review
17     it?
18 A.  I don't go on it.
19 Q.  You don't go on it at all?
20 A.  No.
21 Q.  Okay. Okay, do you see that first page on
22     Exhibit 5? In there it uses the term, Emerson
23     Storage Solutions. Is that what your
24     understanding -- does this describe -- and I'm
25     sorry, strike that question.

## Page 25

1         Does this explain what Emerson
2   Storage Solutions was?
3         MS. DANAHER: I'm going to object
4   just to the extent that she said that she
5   doesn't go on this website, and because this is
6   multiple pages I'm concerned that she may be
7   answering a question that she's not fully
8   informed about. So to that extent I object.
9         You can answer if you can.
10 BY MR. PIETZ:
11 Q. I'm just asking about the first page. Looking
12   at the first page, does this describe what was
13   your understanding of what Emerson Storage
14   Solutions is?
15         MS. DANAHER: Let me just add one
16   more objection. Because we've already defined
17   Emerson as Emerson Electric, and I understand
18   what you're doing here, but I'm just concerned
19   that we're stretching beyond the scope of this
20   30(B)(6). She's here with respect to
21   ClosetMaid and ClosetMaid's relationship to
22   Emerson Electric, as Mr. North has pointed out,
23   and so I'm concerned that we're stretching
24   beyond the scope of the 30(B)(6). I'm not
25   telling her not to answer, but I am putting an

## Page 26

1   objection on the record, because I think it
2   goes a little afield of what we're here to do.
3         MR. PIETZ: Well, this does mention
4   ClosetMaid.
5         MS. DANAHER: I'm fine, Jim, I didn't
6   tell her not to answer. I just want to make
7   sure that my objection is on the record.
8         THE WITNESS: I'm not familiar with
9   all the detail.
10 BY MR. PIETZ:
11 Q. Okay, going on to the second page. And this is
12   a document that appears to list the executive
13   leadership for Emerson.
14         Are you familiar with these persons
15   and their role at Emerson?
16 A. Some of them.
17 Q. And this lists Patrick Sly. Second to the last
18   person there.
19 A. That is correct.
20 Q. And he's listed as the executive
21   vice-president, Emerson Storage Solutions &
22   Professional Tools.
23 A. Okay.
24 Q. Is that -- we talked about him earlier. Is
25   that, to your understanding, what his title is?

## Page 27

1         MS. DANAHER: Asked and answered,
2   objection.
3         MR. PIETZ: I thought she had
4   answered that she wasn't sure what his title
5   was?
6         MS. DANAHER: That's right, she said
7   she didn't know, and I'm --
8 BY MR. PIETZ:
9 Q. Well, does this refresh your recollection as to
10   what his title is?
11 A. I can't guarantee it. As I stated earlier, I
12   thought it was executive vice-president, so
13   that's similar.
14 Q. Okay, let's go back to what you started talking
15   about earlier.
16         Can you -- in your role as the head
17   of human resources, you're familiar with the
18   policies and procedures for interviewing and
19   recruiting clients?
20 A. Yes.
21 Q. Okay. Can you just tell me, generally, how
22   that process works with respect to ClosetMaid?
23 A. As far as recruiting?
24 Q. Recruiting and interviewing, finding and
25   recruiting employees. Just generally, I'm not

## Page 28

1   asking for --
2 A. For all the details?
3 Q. Right.
4 A. We receive a requisition that it's approved to
5   hire. And then we meet with the hiring
6   manager. We determine what they're looking
7   for, versus the job description. And then once
8   that has been decided we develop a recruiting
9   plan as to if we're going to run an ad, if it's
10   internal, and we post it accordingly.
11 Q. Okay. And then the next step is what, in that
12   process, once it's posted and you have a
13   potential recruit?
14 A. They would interview the individuals, usually
15   by phone, initially, if they are external. If
16   not, if it's internal, we would interview them
17   locally, determine if they are what we call
18   good standing, which means they have a good
19   record, in general. If it's internal at that
20   point, if they are eligible, the hiring manager
21   may interview the individual. We -- if they
22   are selected for the job we give them an offer
23   letter.
24 Q. Okay, you've used the term external and
25   internal, what does that mean?

Page 29

1  A.  Internal would be someone that may be promoted
2      or transferred into this job that's already
3      working within ClosetMaid.
4  Q.  Okay. Would that -- what about with respect to
5      Emerson Electric or any of its subsidiaries?
6  A.  No.
7  Q.  Is that considered internal?
8  A.  No.
9  Q.  And external is someone?
10 A.  That does not work for ClosetMaid.
11 Q.  And you used the phrase, determine that they
12     are in good standing?
13 A.  That's an internal terminology.
14 Q.  And what does that mean?
15 A.  Basically they don't have a lot of write-ups,
16     disciplinaries.
17 Q.  So that term applies to a person from inside
18     ClosetMaid --
19 A.  That is correct.
20 Q.  Okay, based upon their employment file?
21 A.  Correct.
22 Q.  Okay. Now, is there a point in this process
23     where, as a matter of practice and procedure,
24     that ClosetMaid seeks to obtain a consumer
25     report or background check on an employee or a

Page 30

1      prospective employee?
2  A.  Yes.
3  Q.  Okay. Can you tell me what that process is or
4      how that works?
5  A.  Once the individual has been interviewed on the
6      phone or locally and they're determined to be a
7      potential candidate, they're qualified,
8      first-line basis, they're qualified for the
9      position, then at that point in time we would
10     give them documents to perform a background
11     check.
12 Q.  Okay. And with respect to the documents, what
13     are you -- what documents are you referring to?
14 A.  The release for the background.
15 Q.  And what else?
16 A.  The FCRA information.
17 Q.  Okay. And are these form documents?
18 A.  Yes.
19 Q.  Okay. And when did you first become aware that
20     these form documents were used for purposes of
21     consumer reports and FCRA?
22 A.  Early -- I don't remember. I mean, several
23     years ago.
24 Q.  Well, you started in '97 in human resources.
25     Did you have -- become aware of them at that

Page 31

1      point, when you began working?
2  A.  I believe it was after that.
3  Q.  Okay.
4  A.  2000, 2001, I don't know. And maybe 2000.
5      Yeah, I don't know. I can't remember
6      specifically.
7  Q.  Okay. Do you remember the occasion you had to
8      become aware of that?
9  A.  I don't remember.
10 Q.  Well, as head of the human resources at
11     ClosetMaid do you have any duties and
12     responsibilities with respect to these forms?
13 A.  Yes.
14 Q.  And what's that?
15 A.  I mean, we have to abide by the law and we go
16     to seminars. We use services.
17 Q.  When you say, services, what do you mean?
18 A.  Bureau of Labor Reporting, BLR; Aer Employer
19     associations. Various things that keep us
20     abreast of what's going on in laws and
21     regulations.
22 Q.  And whose responsibility is it to do that, with
23     respect to these forms?
24 A.  Basically, me.
25 Q.  And in that connection did you do anything in

Page 32

1      your tenure at ClosetMaid to go back and
2      examine the forms to determine whether or not
3      they were in compliance with the law?
4  A.  Yes.
5  Q.  And tell me what you did.
6  A.  We researched various forms on the websites,
7      the legal websites.
8  Q.  The forms that you -- that were -- that were
9      used, that you described, these documents, can
10     you tell me where they came from?
11 A.  No, it was too long ago.
12 Q.  Were you involved in their creation?
13 A.  I worked with my management to create them,
14     yes.
15 Q.  And who did you work with to create them?
16 A.  I don't remember.
17 Q.  When was that?
18 A.  Again, I don't remember the time frame. So
19     whoever the HR manager was at the time.
20 Q.  Was that someone that you reported to or --
21 A.  No, they reported to me.
22 Q.  Okay. To your knowledge, the documents that
23     we're referring to, how long have they been in
24     use at ClosetMaid?
25 A.  The specific, I'm not sure. For several years.

Page 33

1  Q.  And the documents that you're referring to, are
2      they standard documents that are used in all
3      the areas of the company that you described,
4      you know, Grantsville, Chino, Belle Vernon, et
5      cetera?
6          MS. DANAHER: I'm just going to
7      object because the question is awfully broad in
8      terms of time frame. She's been there for a
9      number of years.
10         But if you can answer that, go ahead.
11         THE WITNESS: In general, yes.
12 BY MR. PIETZ:
13 Q.  Have they changed over time with respect to
14     form?
15 A.  There are certain forms in California that are
16     different than Ocala.
17 Q.  Okay.
18 A.  They may have changed a little over time, I
19     cannot confirm. We are constantly looking at
20     updating various documents.
21 Q.  With respect to the forms, did you -- did you
22     obtain legal advice with respect to the
23     legality of these forms?
24 A.  I don't recall at the time.
25 Q.  Is there in-house counsel at ClosetMaid?

Page 34

1  A.  No.
2  Q.  Who handles the -- that function of whether or
3      not forms that are being used by ClosetMaid
4      comply with the law?
5  A.  Basically, me.
6  Q.  Okay. Is there an in-house counsel function
7      that would govern ClosetMaid?
8  A.  No.
9  Q.  Does -- is there an in-house counsel function
10     at Emerson that oversees ClosetMaid?
11 A.  Oversees?
12 Q.  Yes.
13 A.  No.
14 Q.  Do you -- is there an outside counsel that you
15     have access to --
16 A.  No.
17 Q.  -- to determine?
18     So with respect to the forms that are
19     being used, who has -- what is the approval
20     process for use of those forms? Can you
21     describe that for me?
22 A.  As I stated earlier, we research through
23     various avenues to determine what forms we need
24     to use. We go to government websites, we go to
25     legal websites and I confer with the HR manager

Page 35

1      and we come up with a form.
2  Q.  Have you ever submitted those forms to anyone
3      at Emerson for their review?
4  A.  I don't remember.
5  Q.  Did you contact anyone at Emerson for
6      consultation with respect to the appropriate
7      type of form?
8  A.  I can't remember specifically.
9  Q.  Did you contact anyone at Emerson or any of its
10     other subsidiaries about the forms that they
11     use?
12 A.  I don't deal with the other subsidiaries.
13 Q.  My question was, did you ever contact them in
14     that regard?
15 A.  I don't know. I don't contact the other
16     subsidiaries.
17 Q.  But my question is specifically with respect to
18     these forms.
19 A.  No.
20 Q.  So you were never curious as to what these
21     other companies do?
22 A.  No.
23 Q.  In connection with this notice of deposition,
24     did you go and examine the forms that they use,
25     with respect to this deposition?

Page 36

1  A.  Who is, they?
2  Q.  These other -- Emerson and their other
3      subsidiaries.
4  A.  No. I have no responsibility to them, nor do
5      they have responsibility to me.
6  Q.  Do you have -- can you look at our Exhibit 1?
7      Can you look at No. 8 on Exhibit 1?
8  A.  Okay.
9  Q.  In preparing for your deposition today what did
10     you do in connection with No. 8?
11 A.  Nothing.
12 Q.  You did nothing?
13 A.  I did nothing. They are not -- as I stated
14     earlier, we do not -- I don't contact other
15     subsidiaries. I am responsible for ClosetMaid.
16 Q.  But this asks that you know and do that.
17         MS. DANAHER: I object, because I
18     think that's an interpretation. It just says
19     -- she's testifying with respect to her
20     knowledge as to the extent to which the
21     applications for employment used by ClosetMaid
22     are used by other subsidiaries. She's coming
23     with her own knowledge and she's letting you
24     know that.
25         And, Jim, I'm sorry, if you don't

9 (Pages 33 to 36)

Page 37

1  like the answer, I'm sorry, but we can't put
2  knowledge into her head.
3       MR. PIETZ: Well, it's her duty to
4  determine what ClosetMaid's knowledge is, not
5  her own. And to that extent this is asking for
6  ClosetMaid's knowledge.
7       MS. DANAHER: Exactly right. And she
8  has ClosetMaid's knowledge and she just told
9  you, as VP of HR, if she doesn't coordinate and
10 make sure that they all use the same form,
11 that's just a fact.
12 BY MR. PIETZ:
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

Page 38

1 [redacted]
2 [redacted]
3 [redacted]
4 [redacted]
5 [redacted]
6  Q.  And what was that in connection with?
7       MS. DANAHER: And, again, the same
8  objection, you don't need to go into detail,
9  but you can answer his question generally.
10      THE WITNESS: I use them for guidance
11 or advice. I can't --
12 BY MR. PIETZ:
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 [redacted]
18 Q.  Now, the policies and practices used for --
19     that we're talking about for obtaining consumer
20     reports about prospective or current employees,
21     is that the same for any type of employee, you
22     know, whether they're professional or truck
23     driver, hourly, salaried, is it the same?
24 A.  No.
25 Q.  And what -- how is it different?

Page 39

1  A.  We -- as an example, we do not request specific
2      information on credit for anyone that it
3      doesn't apply. If they're not going to have
4      company credit cards or be in a significant
5      managerial role we don't get into their credit.
6  Q.  Okay.
7  A.  So it depends on the job.
8  Q.  Any other differences?
9  A.  Truck drivers, there's more specific
10     information we have to get.
11 Q.  But is it fair to say that on all types of
12     prospective employees there's some form of
13     consumer report that's typically ordered?
14 A.  Yes.
15 Q.  And what about with respect to a current
16     employee, is that different in any way?
17 A.  We do not do another report if they're already
18     current, they've already been hired.
19 Q.  And that -- you just rely on their employee
20     file.
21 A.  That is correct.
22              - - - -
23 (Exhibit No. 6 marked for identification.)
24              - - - -
25 BY MR. PIETZ:

Page 40

1  Q.  Showing you what we've marked as Exhibit 6, can
2      you identify this document?
3  A.  This is a standard operating procedure that we
4      used in 2006.
5  Q.  For what?
6  A.  For recruiting.
7  Q.  And in only 2006?
8  A.  It may have been tweaked since then. I know
9      that it was created as dated, in 2006, this
10     particular document.
11 Q.  Okay, so this is dated, am I correct, April
12     25th, 2006?
13 A.  That is correct.
14 Q.  And it supersedes a prior procedure that was
15     dated May of 2004?
16 A.  That is correct.
17 Q.  And is this -- this indicates it's for salaried
18     recruiting procedure. What does that mean?
19 A.  That means that it would be salaried positions.
20     It would not be a warehouse worker.
21 Q.  Okay, so this only applies to salaried?
22 A.  That's correct.
23 Q.  It doesn't apply to hourly?
24 A.  That's correct.
25 Q.  Is there a procedure that applies to hourly?

Page 41

1  A. I'm not positive if it's documented like this.
2     I can't answer that.
3  Q. Are consumer reports or background checks done
4     with respect to hourly employees?
5  A. Not credit.
6  Q. But otherwise?
7  A. Yes.
8  Q. And the forms that you were talking about
9     earlier, are those same forms used for --
10 A. Yes.
11 Q. -- those employees?  Okay.
12    All right, let's look at this.  Now,
13    in Section 3.0 there's some definitions there.
14    Can you help me with the TBNT, do you see that?
15 A. Yes.
16 Q. Can you explain what that is?
17 A. It's a letter to the applicant that basically
18    states, thank you for applying, but no thank
19    you, you're not selected for the position;
20    thanks but no thanks.  This is just an internal
21    document, SOP, that we use for recruiting.
22 Q. But is that a document that's sent --
23 A. Yes.
24 Q. -- to a potential recruit?
25 A. That is correct.

Page 42

1  Q. Informing them that the company is not
2     interested.
3  A. That is correct.
4  Q. Okay.  And there's a -- it says, JobLine, can
5     you tell me what that is?
6  A. That was an internal job line where you could
7     call and find out about the positions that we
8     had available.
9  Q. Okay.  And that's for internal?
10 A. For ClosetMaid, in general.
11 Q. But that applies to employees of ClosetMaid?
12 A. That is correct.
13 Q. And, Intranet, what is that?
14 A. That is where we post jobs on ClosetMaid's
15    website.
16 Q. Well, the term, Intranet, what does that mean?
17 A. That's internal, intra.  It's the ClosetMaid
18    website.
19 Q. And is that just to ClosetMaid or does that
20    include Emerson --
21 A. No.
22 Q. -- and its subsidiaries?
23 A. It's strictly ClosetMaid.
24 Q. Okay, let's go over to 5.3.  This is entitled,
25    Creating a Position Folder/File.  Can you

Page 43

1     explain what this is referring to?
2  A. Again, these are processes that I set up for my
3     recruiters.
4  Q. Okay.
5  A. And they're just to create a file with a
6     potential job.
7  Q. Okay.
8  A. That's exactly what it is, it's a folder.
9  Q. And that would include all the information
10    related to the recruiting of that -- for that
11    position?
12 A. That is correct.
13 Q. All applicants and other information gained
14    with respect to those applicants?
15    MS. DANAHER:  Object to form.  I
16    think it doesn't accurately reflect what she
17    just answered.  It misstates her testimony.
18    But go ahead.
19    And I'll tell you specifically, I
20    think she said, position, and then you said,
21    applicants.  So I'm concerned that you've
22    broadened out the definition.
23    But Cathy can handle that.
24 BY MR. PIETZ:
25 Q. Do you understand the question?

Page 44

1  A. Can you be more clear?
2  Q. Can you repeat the question?
3        - - - -
4  (The record was read back by the Reporter.)
5        - - - -
6     THE WITNESS:  It is a folder that
7     includes resumes and applications for the
8     position.
9  BY MR. PIETZ:
10 Q. Okay.  And it would include the
11    thanks-but-no-thanks letter, as well?
12 A. I don't know.
13 Q. Okay.  Well, it says here, However, they are
14    required to maintain a thanks but no thanks
15    file of resumes in the front filing area for
16    each position.
17    Why is that done?
18 A. Once they have been eliminated from being a
19    potential candidate --
20 Q. Yeah.
21 A. -- then we send them a thanks-but-no-thanks
22    letter and we file it away for record
23    retention.
24 Q. Okay.  Going back to this -- talking about this
25    document in general, you indicated it was

Page 45

1  created in 2006?
2  A. Apparently it was updated in 2006.
3  Q. Okay. Can you tell me what you -- and in 2006,
4     were you head of human resources?
5  A. Yes.
6  Q. Okay. Can you tell me what you -- the steps
7     you went through to update this document?
8  A. As I stated before, I work very closely with my
9     HR managers and we have very specific processes
10    in place in trying to continue to abide by the
11    law, just like we do.
12         And so at the time Mary Price was my
13    manager and we documented the steps that we go
14    through in recruiting. And once she -- since
15    she was closer to it, once she created this
16    document on the steps then she would work with
17    me, submit it to me, we would review it and
18    then we would train the recruiters at the time.
19 Q. And you said her name was Mary Brice?
20 A. Price.
21 Q. Price, okay. Is she still with the company?
22 A. No.
23 Q. Do you know where she is now?
24 A. Yes.
25 Q. And where is that?

Page 46

1  A. Ocala Recycling.
2  Q. So she was generally responsible for coming up
3     with this subject with your review and approval
4     [REDACTED]
5     [REDACTED]
6     [REDACTED]
7     [REDACTED]
8     [REDACTED]
9     [REDACTED]
10    [REDACTED]
11 Q. This document.
12    [REDACTED]
13    [REDACTED]
14    [REDACTED]
15    [REDACTED]
16    [REDACTED]
17 Q. No one at Emerson?
18 A. No.
19 Q. What did Mary Price do to come up with some of
20    the forms that were being used in connection
21    with this procedure for consumer -- for
22    obtaining consumer reports?
23 A. I would only be guessing, so I don't think
24    that's a fair answer.
25 Q. Did you contact her at all in connection with

Page 47

1  preparation for today's deposition?
2  A. No.
3  Q. Going on to Section 5.2. I note that there's,
4     in 5.2, what it refers to as some attachments,
5     5.2.2, 5.2.3, but they're not attached to this
6     document. Is there a reason for that?
7  A. 5.2.1 are job descriptions, and that would be
8     for every job that we have.
9  Q. I guess what I'm asking is, in italics it says,
10    See Attachment 5.2.2, but they're not attached.
11 A. Okay.
12 Q. Was that -- is there a reason for that?
13 A. Well, as I indicated, when we sit down with the
14    hiring manager I may have a piece of paper that
15    actually says, this is what I'm looking for for
16    this position.
17 Q. Um-hum.
18 A. So that is a recruitment plan. They then have
19    to determine where I need to post the job.
20 Q. I understand?
21 A. Such as Monster.com.
22 Q. I see. Okay. I'm just trying to understand
23    why --
24 A. Because they're individual documents.
25 Q. It's an individual document.

Page 48

1  A. It's an individual document or recruitment
2     plan.
3  Q. [REDACTED]
4     [REDACTED]
5     [REDACTED]
6     [REDACTED]
7     [REDACTED]
8     [REDACTED]
9     [REDACTED]
10    [REDACTED]
11    [REDACTED]
12    [REDACTED]
13    [REDACTED]
14    [REDACTED]
15    [REDACTED]
16    [REDACTED]
17 Q. And that is the marketing department for whom?
18 A. Our marketing department working with Emerson's
19    marketing department.
20 Q. And do you know the reason for that?
21 A. Branding.
22 Q. I don't understand what that means, branding.
23    Why -- what is that -- I don't work in
24    advertising, maybe you could help me.
25 A. Brand recognition.