# EXHIBIT C



Page 85

```
 1                    - - - -
 2        (There was a recess in the proceedings.)
 3                    - - - -
 4   BY MR. PIETZ:
 5   Q.   Have you had a chance to look through Exhibit
 6        8?
 7                    - - - -
 8        (The witness reviewed the Exhibit.)
 9                    - - - -
10             MR. SMOCK:  Jim, can you tell us how
11        many pages that exhibit is?
```

Page 87

```
 1   the cost was more and it took longer to get the
 2   reporting than LexisNexis.
 3   Q.   Um-hum.
 4   A.   So we used LexisNexis more than Accurate.
 5   Q.   Okay.  I see.
 6             And then the last page of this
 7   exhibit is something that was just produced to
 8   me yesterday.  And can you tell me what this
 9   is?
10   A.   American Background service --
11
```

Page 86

```
 1
11   A.   Yes.
12   Q.   Okay, so I'm trying to understand, was there
13        just -- in order to do credit reports and
14        background checks did you just use one agency
15        or did you have a series of them at one time?
16   A.   We have had two until recently and we have now
17        signed a contract with American Background.
18   Q.   But the two you had until recently were -- you
19        had them simultaneous?
20   A.   Yes.
21   Q.   Okay, what's the reason for that, why did you
22        have to have two different ones?
23   A.   Accurate Background service is a local service
24        that's in Ocala.  And Securant is a database
25        service, now LexisNexis.  Accurate Background,
```

Page 88

```
 4
11   A.   Yes.
12   Q.   When these agreements were entered did you --
13        who was responsible for negotiating these
14        agreements?
15   A.   Securant and LexisNexis was done by Mary Price,
16        Securant, at the time.  And she was the HR
17        manager.
18   Q.   Okay.
19   A.   Since Mary left Jennifer Boring also is
20        involved in that.
21   Q.   Okay.  The Securant agreement that starts on
22        188, is that -- is that 188 to 191, is that the
23        agreement?
24   A.   This is the contract that I see.
25   Q.   And I'm just trying to understand, that was a
```

22 (Pages 85 to 88)

Page 89

1    contract that appears to be entered August 31st
2    of '04?
3  A.  Okay.
4  Q.  Is that right?  Okay.
5      And then the next document that
6    begins at 192, that is another -- that's a
7    contract with LexisNexis, as I understand?  Can
8    you tell me that entire agreement, you know,
9    the page range for that agreement.
10  A.  I can't tell you, no.
11  Q.  Okay, but then at Page 196, does that show
12    Jennifer Boring's signature?
13  A.  Yes.
14  Q.  Dated August 26, 2005?
15  A.  Yes.
16  Q.  So that's the agreement with LexisNexis?
17  A.  Yes.
18  Q.  Did you have occasion to review this agreement?
19  A.  No.
20  Q.  Jennifer Boring was responsible for negotiating
21    this?
22  A.  Yes.
23  Q.  And to your knowledge did she review this
24    thoroughly?
25  A.  I have no way of knowing.

Page 90

1  Q.  Do you see, going on to 197, there is an
2    Appendix A?
3  A.  Yes.
4  Q.  Do you remember ever reviewing this information
5    in connection with this agreement?
6  A.  No.
7  Q.  Do you know if Jennifer Boring reviewed it?
8  A.  I don't know.
9  Q.  Did this -- would the information that's here,
10    would this be information that you would
11    utilize in coming up with your policies and
12    practices for obtaining consumer reports?
13      MS. DANAHER:  That's what he's asking
14    you, just this page.
15      THE WITNESS:  I mean, it's not in
16    order.
17      MS. DANAHER:  Wait, you're asking
18    specifically about Page 197, right?
19      MR. PIETZ:  Yes.
20      MS. DANAHER:  Okay, so take your time
21    and read that.
22      MR. PIETZ:  I see what you mean, it
23    may be out of order, but I think that's the way
24    it was produced to me.
25      MS. DANAHER:  I apologize if that's

Page 91

1    confusing.
2      MR. PIETZ:  Okay, I see it.
3      MR. NORTH:  Yes, I put this back
4    together the right way, I think, if that will
5    help you.
6      MS. DANAHER:  Can we go off the
7    record for a minute?
8
9  (There was a discussion off the record.)
10        - - - -
11      MR. PIETZ:  The documents between 192
12    and 206 appear to me to be part of the same
13    contract, based upon the page numbers where it
14    says Page -- well, now it gets more confusing.
15      MS. DANAHER:  Off one more minute.
16        - - - -
17  (There was a discussion off the record.)
18        - - - -
19  (There was a recess in the proceedings.)
20        - - - -
21  BY MR. PIETZ:
22  Q.  We left off with this exhibit that you
23    rearranged --
24  A.  Yes, that's correct.
25  Q.  -- I guess, would be fair to say.

Page 92

1      So can you just maybe, on the record,
2    describe what you did?
3  A.  I used the page numbers at the bottom, Page 1
4    of 14, 2 of 14, 3 of 14, put them in
5    simultaneous order.
6  Q.  Okay.
7  A.  14 of 14.
8  Q.  Okay.  And the first agreement is which one?
9  A.  Securant.
10  Q.  And that -- okay, how many pages is that?
11  A.  Fourteen.
12  Q.  Okay.  All right.  And that's the one that was
13    signed by?
14  A.  Mary Price.
15  Q.  Mary Price?  Okay.
16      And then what's the second agreement
17    in that exhibit?
18  A.  LexisNexis.
19  Q.  Okay.  And how many pages is that?
20  A.  Five.
21  Q.  Okay.  And that was the agreement signed by
22    Jennifer Boring?
23  A.  Yes.
24  Q.  And that's dated?
25  A.  8-26-2005.

Page 93

1  Q.  Okay.  And then the next document is --
2  A.  It's Accurate Background check.
3  Q.  Okay.  And is that -- that's another company
4     that --
5  A.  It's an addendum, yes.
6  Q.  And what's it an addendum to?
7  A.  Pricing.  And it was to Mary Price from Lola
8     Gonzalez.
9  Q.  Okay.  And then the final page of that is the
10    document with respect to American Background
11    that we talked about already.
12 A.  That is correct.
13 Q.  That was just produced.
14 A.  And that was signed in April of '09.
15 Q.  Okay.  All right.
16        MS. DANAHER:  This will be one
17    collective Exhibit 8 then, as we described it.
18        MR. PIETZ:  Yes, one Exhibit 8.
19 BY MR. PIETZ:
20 Q.  Were these -- going back to this series of
21    documents that are represented in Exhibit 8,
22    were these documents that were used as a basis
23    to comply with the FCRA?
24 A.  These are contracts that allowed us to access
25    an individual's background.

Page 94

1  Q.  All right.  But isn't it also true that there
2     were certain appendix that were attached that
3     described requirements under the Fair Credit
4     Reporting Act?
5  A.  There are appendix attached.
6  Q.  Were these appendices used as a basis for
7     ClosetMaid's endeavor to comply with the Fair
8     Credit Reporting Act?
9  A.  We have a standard operating procedure that was
10    in place, I believe, at the time that these
11    were signed.
12 Q.  Okay.  At any point in time did you compare
13    those procedures with the requirements that are
14    outlined in these appendices?
15 A.  I did not.
16 Q.  Did anyone at the company?
17 A.  I don't know.
18 Q.  Did you ask anyone to do it?
19 A.  No.
20 Q.  Did anyone in -- did you provide these
21    agreements to any of the lawyers to review?
22 A.  Not that I'm aware of.
23 Q.  Let's look at, it would be Page 5 of 14.  Do
24    you see that Appendix A?
25 A.  I do.

Page 95

1  Q.  Okay.  Do you see No. 1?  Can you read that?
2     Let me read it to you.
3         It says, prior to procuring a
4     consumer report, a clear and conspicuous
5     disclosure, consisting solely of the
6     disclosure, that a consumer report might be
7     obtained for employment purposes must be made
8     to the applicant.
9         What did that language -- what does
10    that language, consisting solely of the
11    disclosure, mean to you?
12 A.  That they need to be notified of their rights.
13 Q.  I understand that.
14 A.  And that they would sign off on us getting
15    their background.
16 Q.  But the language that says, consisting solely
17    of the disclosure, what does that mean?
18 A.  I don't understand what it reads, I'm just
19    thinking.
20 Q.  Well, if a disclosure included a release of all
21    claims against ClosetMaid and its affiliates
22    and its representatives would that be a
23    disclosure consisting only of the disclosure?
24        MS. DANAHER:  Object to the extent
25    that it calls for a legal conclusion.

Page 96

1         MR. PIETZ:  No, I'm not asking for a
2     legal conclusion.
3         MS. DANAHER:  I understand, I just
4     need to put that on the record.
5         THE WITNESS:  Again, it's my opinion,
6     so I don't know.  I mean, you could -- it's
7     interpretation of what this document states.
8         MR. PIETZ:  This is 9.
9              - - - -
10    (Exhibit No. 9 marked for identification.)
11             - - - -
12        MR. NORTH:  Marie, did she have a
13    hand in preparing this?  I assume she did or
14    we're wasting our time.
15 BY MR. PIETZ:
16 Q.  Okay, this is -- this is Exhibit 9, but this
17    was a document that was produced with the
18    supplemental disclosures that we recently got
19    that was identified as Exhibit G.
20        Can you tell me what this document
21    is?
22 A.  It is a document that was submitted to our
23    attorney giving you information of how many
24    applications that we took from 12-1-06 until
25    June 30th of '09.

Page 97

1      And under, Candidates, that is the
2   number of resumes or applications that were
3   selected --
4   Q.   Okay, we'll go through it.
5        Let me just -- let's back up a second
6   and me ask you, first of all, what was the
7   reason that this was developed, to your
8   understanding?
9   A.   It was asked for on the number of applications.
10  Q.   Okay, but -- okay, explain to me, then, why you
11  created this form.
12  A.   We created the form to try to give our attorney
13  the information that was requested on how many
14  applications that we took during this period of
15  time.
16       MS. DANAHER: And if you'll allow me
17  to clarify, it wasn't a confidential
18  communication, it was in response to your
19  discovery requests that you and I discussed.
20       MR. PIETZ: Right.
21       MR. NORTH: Please drop in any time.
22       MS. DANAHER: I just wanted to let
23  you know.
24       MR. NORTH: Yes, I appreciate that.
25  BY MR. PIETZ:

Page 98

1   Q.   All right, you referenced a time frame of
2   12-1-06 to some time in '09. How did that time
3   frame -- why was that time frame created?
4   A.   Because the Cathy Reardon case was from
5   12-1-06, so we froze all files at that point in
6   time.
7   Q.   Okay. I see. And are you saying that
8   documentation with respect to the years prior
9   doesn't exist?
10  A.   No, it does not.
11  Q.   Is there any kind of documents that can be used
12  to identify that, any kind of electronic or
13  other type of information --
14  A.   Applicants?
15  Q.   Yes.
16  A.   No.
17  Q.   Okay. And what is your document retention
18  policy?
19  A.   Two years.
20  Q.   Two years. Can you be more descriptive?
21  A.   We keep applications two years.
22  Q.   Okay.
23  A.   So on 12-1-08 or 12 of '08, the following month
24  we would destroy all of December. So it's a
25  running --

Page 99

1   Q.   Right. At any point in the process is
2   applicant information input into a computer?
3   A.   We have applicant flow logs.
4   Q.   What is that?
5   A.   It is a list of candidates.
6   Q.   Okay. And when you say, list, what's on the
7   list?
8   A.   Basic information on the job that they're
9   applying for.
10  Q.   Okay.
11  A.   Their name.
12  Q.   Okay. Address?
13  A.   The date they applied. I don't think the
14  address is on there. The date they applied and
15  the disposition.
16  Q.   Okay. And that -- how is that stored
17  electronically?
18  A.   I don't know if it purges after two years or
19  not, I honestly don't know.
20  Q.   Okay. But there is some mechanism where
21  applicant information is put in through some
22  form of a database?
23  A.   In some locations, yes. Others were just
24  handwritten on a log.
25  Q.   Okay. And what happens to the logs?

Page 100

1   A.   After two years they're destroyed.
2   Q.   The document retention policy, is that a
3   uniform policy throughout all the locations?
4   A.   Yes. Yes. And the applicant flow log is part
5   of our affirmative action plan and it is
6   destroyed after two years.
7   Q.   Okay, but it's put into a computer somehow?
8   A.   Like I stated, it could be handwritten or it's
9   put in a computer.
10  Q.   Okay, but you -- yeah, you indicated there was
11  some form of computer entry where it goes to a
12  database.
13  A.   In some locations.
14  Q.   Okay, in some locations.
15  A.   Right.
16  Q.   Do you know which locations those are?
17  A.   I'm not positive.
18  Q.   Okay. Let's look at this -- this form. Who
19  created this?
20  A.   It was a combination between Jennifer Boring
21  and Pat Dameron because of their responsibility
22  of locations.
23  Q.   Okay. And what did they do to create this?
24  A.   They used data, the applicant flow logs, data
25  from Oracle and our affirmative action plan.

25 (Pages 97 to 100)

Page 101

1  Q.  What do you mean Oracle?
2  A.  Oracle is the system I discussed earlier that
3      was the payroll software system.
4  Q.  How would that contain information -- would
5      that contain information about applicants?
6  A.  It may.
7  Q.  Okay.  Now, tell me what -- let's go through
8      this, and there's different columns here.  Can
9      you tell me why you came up with these
10     different columns?
11 A.  In the far right you have two columns that say,
12     Candidates and Applicants.  A candidate is --
13 Q.  Okay, we're going to go from the right to left?
14 A.  Yes, we are.
15 Q.  Okay.
16 A.  I don't know why.  I'm sorry, I don't know why.
17         The right, a candidate is anyone that
18     applied for a position that was open.  And an
19     applicant is anyone that expressed interest in
20     that position and possesses the qualifications
21     for that job.
22 Q.  Okay, let me see if I understand.  A candidate
23     would be someone that may not be qualified,
24     but, nevertheless, applied?
25 A.  Yes.

Page 102

1  Q.  Whereas an applicant is someone that's
2      qualified and applied?
3  A.  That's correct.
4  Q.  So they both would be considered -- they both
5      applied for this?
6  A.  It's one minus the other --
7         MS. DANAHER:  To the extent that
8      applied hasn't been defined, do you mean
9      writing out an application?  Maybe that needs
10     to be clarified.
11        MR. PIETZ:  Yeah, let's approach it
12     that way.
13 BY MR. PIETZ:
14 Q.  Let's start with the applicants, did they
15     complete the forms that we've been talking
16     about, the consent form and go through that
17     procedure?
18 A.  Not necessarily.
19 Q.  And why not necessarily?
20 A.  I can give you an example to where you can
21     understand.
22 Q.  Okay.
23 A.  Someone applies for an accounting manager
24     position.  And they've never been in accounting
25     in their life.  So they're not going to be

Page 103

1      considered an applicant, because they need
2      experience to be in that position.
3  Q.  I understand.
4  A.  But they applied through a resume.  But their
5      basic resume shows that they are, maybe,
6      qualified, based on their resume.
7  Q.  Okay.
8  A.  So that's why I said not necessarily.  At this
9      point it could be a resume, but they are a
10     potential applicant for the position that's
11     available.
12 Q.  Okay.  But you would have a copy of a form that
13     they signed and filled out; isn't that right?
14 A.  I would have a resume at that point in time.
15 Q.  Okay.
16 A.  Or an application, depending on how they
17     applied.
18 Q.  I understand.  But whether or not they signed
19     the FCRA forms -- can I call them the FCRA
20     forms now?  That could be determined simply by
21     going to their file and looking to see if they
22     signed a form.
23 A.  That's correct.
24 Q.  Okay.  Okay, so they may or may not have gotten
25     to the point where an FCRA form was filled out?

Page 104

1  A.  That is correct.
2         MR. NORTH:  Candidate or applicant?
3         MR. PIETZ:  Applicant.  We're talking
4      about applicants, on the left.
5         MR. NORTH:  Which is smaller than
6      candidates.
7         THE WITNESS:  Right.
8         MS. DANAHER:  Can we agree that no
9      candidates filled out an application form, so
10     we can cross that off?
11        MR. PIETZ:  Okay, that was going to
12     be my next question.
13        MS. DANAHER:  I'm sorry.
14        MR. PIETZ:  Okay.
15 BY MR. PIETZ:
16 Q.  So moving right to left, the candidates,
17     though, okay, as counsel indicated, they were
18     people who may have sent in a resume, but never
19     got to the point of filling out any form?
20 A.  No, that's not correct.  I'm sorry.
21        MS. DANAHER:  It's not your fault.
22        THE WITNESS:  A candidate is anyone
23     that applies for a position.  If they were in
24     Ocala they may have came in and completed an
25     application, they didn't have a resume.

1  BY MR. PIETZ:
2  Q.  Okay.
3  A.  So it could be either resume or application.
4  Q.  Okay. But what about the FCRA forms?
5  A.  They aren't completed yet.
6  Q.  So none of the people in the candidate column
7      would have filled out an FCRA form?
8          MR. NORTH: Well, later they might
9      have, right?
10         THE WITNESS: Later. Later.
11         MR. NORTH: Okay.
12         THE WITNESS: But at the time of
13     submitting their resume or application that is
14     not the process.
15         MR. NORTH: You explained that
16     earlier, that once you make the cut there's a
17     subuniverse of people who sign the forms,
18     right?
19         THE WITNESS: Right.
20  BY MR. PIETZ:
21  Q.  The bottom line, I guess, is, though, with
22      respect to the candidates, we could determine,
23      from going to their file and seeing what forms
24      are there, to determine whether or not they --
25      there's a form?

1  A.  Correct.
2  Q.  Isn't that right?
3  A.  That's correct.
4  Q.  All right.
5      Okay, now, going to the next column,
6      it says, Number of Credit Checks Run.
7  A.  Okay, now we're going to go to the beginning.
8  Q.  Okay.
9  A.  So we have our applicant. I'm trying to
10     confuse you, okay?
11         MS. DANAHER: You're doing a good
12     job.
13         THE WITNESS: Okay, the first column
14     is the people that were actually hired.
15         MR. PIETZ: Okay.
16         THE WITNESS: Okay?
17         MR. NORTH: You're over in the left
18     now?
19         THE WITNESS: In the left.
20         The next column, that is headed, FCRA
21     Forms Completed and Background Checks Run, But
22     was Not Hired. So that is the group of people
23     where they actually completed the form, but for
24     some reason or another they were not hired.
25         MR. PIETZ: Okay.

1          THE WITNESS: That could be their
2      references came out really, really bad. It
3      doesn't have to be something that was on that
4      third-party report. It could be that when I
5      called them back they didn't return my call.
6      It could be they didn't show up. It could be
7      drug testing. So I don't have the specifics as
8      to why, but that's the number where we ran the
9      background.
10  BY MR. PIETZ:
11  Q.  Okay, so -- just so I understand, though, the
12      column, Employees Hired, and then the next
13      column --
14  A.  Um-hum.
15  Q.  -- those are exclusive groups; isn't that
16      right?
17  A.  Those are all together.
18  Q.  No, no, what I'm saying is no one in the second
19      column is a member of the first column?
20  A.  That is correct. That is correct.
21  Q.  If we went to the group in the second column --
22  A.  Um-hum.
23  Q.  -- FCRA forms completed --
24  A.  Um-hum.
25  Q.  -- would we be able to determine, by looking at

1      their files, as to why they were not hired?
2  A.  I think so.
3  Q.  And why do you think so?
4  A.  Because that's the process, that we would keep
5      their applications intact with what forms were
6      used at that time.
7  Q.  Okay. But how -- what would, in the file,
8      indicate the reason for not being hired? Is
9      there some form that would explain that?
10  A.  There would be an internal code that would tell
11     us it's for references or whatever.
12  Q.  Okay. And it would -- there's a code for --
13     that would apply to a background check or a
14     consumer report?
15  A.  Or credit.
16  Q.  Okay. Now, let's go to the next column,
17     Filling out the FCRA, No Background Check.
18     What is this column?
19  A.  Basically that means that an applicant was more
20     or less qualified for the position. And so if
21     you recall the procedure, we may have
22     interviewed them on the phone or whatever, we
23     decided to proceed to determine if we were
24     going forward. So we had them complete the
25     FCRA form, but somewhere before we actually

1    sent it in to get the background they were
2    eliminated from the potential hire.
3  Q.  Okay.
4  A.  So there were that many people that completed
5    the form --
6  Q.  Okay.
7  A.  -- but we did not complete the process and do
8    the background.
9  Q.  Okay. So then my next question, like the
10    previous one, this column, it is exclusive of
11    the first two, meaning no one would be a member
12    -- who is a member of this third column,
13    Filling out FCRA Form, would be a member of
14    either of the first two?
15  A.  That is correct. That is correct.
16        MR. NORTH: Could I say one thing on
17    the record?
18        I bet this was hard and we really
19    appreciate you doing it.
20        THE WITNESS: It was.
21        MR. NORTH: Because I've done a lot
22    of these cases and sometimes it takes two years
23    just to get an employer to do this. So I
24    really appreciate it. It's really going to
25    help us if we ever can resolve the case. And I

1    know you had help, because you couldn't
2    possibly do it without help, but thank you. We
3    appreciate it. It's required, but that doesn't
4    mean it doesn't take years to get it sometimes.
5        MR. PIETZ: And the short amount of
6    time it was done.
7        THE WITNESS: Very short.
8  BY MR. PIETZ:
9  Q.  Okay, then, the next column is, Credit Checks
10    Run.
11  A.  Um-hum.
12  Q.  Can you --
13  A.  Specifically, they're -- as I indicated
14    earlier, there are only certain positions that
15    we run a credit on, such as somebody that needs
16    a credit card, somebody that is of high
17    management and they have a fiduciary
18    responsibility to ClosetMaid. And so we ran 36
19    credit checks.
20  Q.  Now, this credit checks column, though, would
21    -- they would be a member of the first two?
22  A.  Could be.
23  Q.  Or one of the two?
24  A.  Yes.
25  Q.  Okay. So what you're saying, I guess, then, if

1    we went and looked at Cathy Reardon's file --
2  A.  Um-hum.
3  Q.  -- we would be able to determine from that file
4    why she was not hired?
5  A.  Yes.
6  Q.  Do you know why she was not hired?
7  A.  Credit.
8  Q.  Credit. And that's reflected in her file --
9  A.  Yes.
10  Q.  -- by a code?
11  A.  I have the background. I have the credit
12    report. And it was charged off by American
13    Express, and we could go on and on.
14        MR. PIETZ: Now, what I wanted to do,
15    I don't know if there's a way to short circuit
16    it, but I have these exemplars and I wanted to
17    sort of identify and figure out what part of
18    ClosetMaid they represented.
19        MS. DANAHER: Cathy can probably tell
20    you, if you want to stay off the record for a
21    second, she can flip through and tell you which
22    one came from which location.
23        To make it simple, everything I sent
24    to you yesterday came from Chino.
25        MR. PIETZ: I understand.

1        MR. NORTH: Can we agree, though,
2    that everything you sent us is authentic, so we
3    don't have to go through and authenticate a
4    bunch of stuff? I mean, we got it from you,
5    but if you don't agree --
6        MS. DANAHER: Can you stipulate to
7    their authenticity?
8        THE WITNESS: Okay.
9        MS. DANAHER: To say that they're a
10    part of the business records, that someone --
11        THE WITNESS: Okay.
12        MS. DANAHER: -- either you or
13    someone in your control went through --
14        THE WITNESS: Okay.
15        MS. DANAHER: -- and pulled that out
16    and gave it to you and you gave it to me?
17        THE WITNESS: Okay.
18        MR. PIETZ: I think we're going to
19    say it, it's just --
20        MR. NORTH: It was our concern. His
21    concern I think, is where, I don't think --
22        MR. PIETZ: Well, one of the things
23    I, you know, wanted to -- again, also, is that,
24    you know, these are from different parts of
25    ClosetMaid, okay? So I wanted her to identify

Page 113

```
1      --
2              MS. DANAHER: Yes, from the different
3      locations, you mean.
4              MR. PIETZ: Maybe we can just go
5      through each one.
6              MS. DANAHER: Yeah, and we may be
7      able to do them in groups.
8              Jim, if you want to give us a second
9      and hand us what you're looking at she can flip
10     through, then you can just ask one question,
11     you know, where do these --
12             MR. NORTH: Off the record.
13                 - - - -
14     (There was a discussion off the record.)
15                 - - - -
16     (Exhibit No. 10 marked for identification.)
17                 - - - -
18     BY MR. PIETZ:
19     Q.  Okay, looking at Exhibit 10 -- let me ask you
20         first, just generally, as part of the discovery
21         in this case we had an agreement with counsel
22         that ClosetMaid would produce some exemplar
23         files from its different locations. Tell me
24         what you did in response to that agreement.
25     A.  It was my understanding that you wanted
```

Page 114

```
1      applications. So we went back and tried to
2      give you examples of applications from each
3      location.
4      Q.  Okay.
5      A.  And that's why they are what they are.
6      Q.  And to do that, though, you went to sort of --
7          how did you select an exemplar file?
8      A.  We asked the individual locations to send us
9          applications -- again, this was a very big task
10         -- an application as an example from periodic
11         times throughout the process, so that you could
12         get a representative sample of what took place.
13         Because as I indicated earlier, we have changed
14         things along the way.
15     Q.  So that in each respective location whoever was
16         responsible for getting the documents would
17         have to go to a particular file, and what were
18         they instructed to pull out of the file?
19     A.  The applications during that period of time.
20     Q.  Okay. And anything else, apart from the
21         applications?
22     A.  I don't think so.
23     Q.  And what about the FCRA forms?
24     A.  I don't think so.
25     Q.  They didn't get all the FCRA forms?
```

Page 115

```
1      A.  I don't know. I don't know. I didn't do it.
2      Q.  Who was responsible for this task?
3      A.  Pat and Jennifer.
4      Q.  Pat Dameron and Jennifer Boring?
5      A.  That is correct.
6      Q.  Okay, let's look at what we've marked as
7          Exhibit 10.
8              Okay, Exhibit 10 is one of these
9          exemplar files from which location?
10     A.  It's one or the other, and I think it's
11         Grantsville. It could be Belle Vernon, because
12         of the Pennsylvania address.
13     Q.  Okay.
14             MS. DANAHER: If you're going to use
15     these as exhibits, Jim, I would simply ask that
16     before we make them part of the deposition
17     transcript that we be permitted to black out
18     the personal information, because you and I
19     have that confidentiality agreement, and there
20     are Social Security numbers and things --
21             MR. PIETZ: Oh, yeah, I -- I would
22     say -- I thought the confidentiality agreement
23     would cover these. We can stipulate on the
24     record that if they're ever filed in court
25     that, you know, we would redact any personal
```

Page 116

```
1      identifying information. In fact, I think it's
2      a local rule here.
3              MS. DANAHER: Yes.
4              MR. PIETZ: So I really do agree to
5      that, there's no reason we have to have that on
6      here.
7              MS. DANAHER: Okay.
8              MR. PIETZ: I don't know that for
9      purposes of making it a part of the deposition
10     right now we have to go through and redact
11     everything.
12             MS. DANAHER: Because the depositions
13     aren't filed there would be at least that
14     protection. And if you and I can agree that if
15     the deposition is ever going to be disseminated
16     or attached to anything we'll redact the
17     information.
18             MR. PIETZ: Yes. That's correct.
19             THE WITNESS: I think that's
20     Grantsville, Maryland.
21                 - - - -
22     (Exhibit No. 11 marked for identification.)
23                 - - - -
24             THE WITNESS: This is Grantsville,
25     Maryland.
```

Page 117

```
1   BY MR. PIETZ:
2   Q.   And this is Exhibit 11.
3   A.   Yes.
4   Q.   Let me ask you, though, specifically about
5        Exhibit 11, on the last page, is that one of
6        the FCRA forms that we've been discussing
7        earlier that was used?
8   A.   Yes.
9
10
11
12
13
14
15
16
17
18
19
20
21   Q.   Okay.  Was -- was this -- were these forms
22        given to the marketing department for review?
23   A.   No.  These are employment documents, so they
24        don't review those.
25             - - - -
```

Page 118

```
1        (Exhibit No. 12 marked for identification.)
2             - - - -
3   BY MR. PIETZ:
4   Q.   Okay, this is the next one.
5   A.   This is Grantsville, Maryland.
6   Q.   That's the exemplar forms from Grantsville?
7   A.   Yes.  Correct.
8             - - - -
9        (Exhibit No. 13 marked for identification.)
10            - - - -
11            THE WITNESS:  This is Ocala, Florida.
12   BY MR. PIETZ:
13   Q.   And that's exhibit?
14   A.   13.
15   Q.   13 is from Ocala.
16            - - - -
17       (Exhibit No. 14 marked for identification.)
18            - - - -
19   BY MR. PIETZ:
20   Q.   Exhibit 14.
21   A.   This is from Chino, California.
22   Q.   That's Exhibit 14?
23   A.   Yes.
24   Q.   Now, is it -- was it determined in this --
25            MR. SMOCK:  Are you jumping around
```

Page 119

```
1        some from the order that we provided them?
2             MR. PIETZ:  Yes, I'm not going to go
3        through them all.
4             MR. SMOCK:  Yes, I'm just asking.
5             MR. PIETZ:  We don't want to be here
6        till tomorrow.
7   BY MR. PIETZ:
8   Q.   Exhibit 14 was from Chino, you said?
9
10
11
12
13
14
15
16
17
18
19
20   A.   Pat Dameron oversees that.
21   Q.   Um-hum.
22   A.   And we did have -- we've had two applications
23        -- I mean two managers at that location that
24        took applications.  One of them is no longer
25        there, the other one is.  So it is their
```

Page 120

```
1        responsibility to make sure that they're in
2        compliance with what has been set up by
3        ClosetMaid.
4   Q.   Okay.  And looking at this California
5        authorization or release --
6   A.   Um-hum.
7   Q.   -- the form that's used here, do you see it
8        also there at the last paragraph, before the
9        handwriting, it again references Emerson
10       Electric; do you see that?
11   A.   Yes.
12   Q.   And is that the same -- is Emerson Electric
13       there for the same reason?
14   A.   The same reason.
15   Q.   Okay.  What's Do+Able Products?
16   A.   Do+Able is the name of the company that we
17       purchased, I think it was around early '05,
18       late '04, I think it's early '05.  And that was
19       their name when we purchased them.
20   Q.   Yes, it's located in Chino?
21   A.   Chino, California.
22   Q.   Under this release form, do you see at the
23       bottom it says, Attached, please find your
24       rights under the California Consumer Reporting
25       Agencies Act?
```